1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF TENNESSEE
2               NASHVILLE DIVISION

3


4   UNITED STATES OF AMERICA        )
                                    )
5   VS                             )   No. 3:22-cr-327
                                    )
6   CHESTER GALLAGHER [1]           )
    HEATHER IDONI [2]               )
7   CALVIN ZASTROW [3]              )
    COLEMAN BOYD [4]                )
8   PAUL VAUGHN [6]                 )
    DENNIS GREEN [7]                )
9   _____

10

11

12    BEFORE THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

13               TRANSCRIPT OF PROCEEDINGS

14                  January 24, 2024

15                   (Volume 2-B)

16  _____

17

18

19

20

21  _____

22  **Roxann Harkins, RPR, CRR**
    Official Court Reporter
23  719 Church Street, Ste 2300
    Nashville, TN 37203
24  615.403.8314
    roxann_harkins@tnmd.uscourts.gov
25

1    **APPEARANCES:**

2    For the Government:        AMANDA J. KLOPF
                                US Attorney's Office
3                               719 Church Street, Suite 3300
                                Nashville, TN 37203
4

5                               KYLE RANDOLPH BOYNTON
                                WILFRED T. BEAYE , JR.
6                               U.S. Department of Justice
                                150 M St. NE
7                               Washington, DC 20530

8

9    For the Defendant Gallagher:

10                              JODIE A. BELL
                                Law Office of Jodie Bell
11                              214 Second Avenue North
                                Suite 208
12                              Nashville, TN 37201

13

14   For the Defendant Idoni:

15                              WILLIAM J. CONWAY
                                214 Second Avenue North
16                              Suite 208
                                Nashville, TN 37201

17

18   For the Defendant Zastrow:

19                              ROBERT LYNN PARRIS
                                200 Jefferson Avenue
20                              Suite 1500
                                Memphis, TN 38103
21
                                DAVID I. KOMISAR
22                              800 Broadway
                                Third Floor
23                              Nashville, TN 37203

24

25

1   For the Defendant Boyd:

2                           G. KERRY HAYMAKER
                            Haymaker & Heroux
3                           300 James Robertson Parkway
                            Suite 306
4                           Nashville, TN 37201

5                           STEVEN C. THORNTON
                            PO Box 16465
6                           Jackson, MS 39236

7

8   For the Defendant Vaughn:

9                           STEPHEN CRAMPTON
                            Thomas More Society
10                          PO Box 4506
                            Tupelo, MS 38803
11

12  For the Defendant Green:

13                          MANUEL B. RUSS
                            340 21st Avenue North
14                          Nashville, TN 37203

15

16

17

18

19

20

21

22

23

24

25

1

2                         **I N D E X**

3

4   Opening statement by Government.....................16

5   Opening statement by Defendant Gallagher...........22

6   Opening statement by Defendant Zastrow.............32

7   Opening statement by Defendant Boyd................35

8   Opening statement by Defendant Vaughn..............37

9   Opening statement by Defendant Green...............41

10  Opening statement by Defendant Idoni...............43

11

12  <u>Government witness</u>

13  **LANCE SCHNEIDER**

14  Direct Examination By Mr. Boynton ..................50
    Cross-Examination By Mr. Conway ....................74
15  Cross-Examination By Mr. Russ ......................85
    Cross-Examination By Mr. Crampton ..................89
16  Cross-Examination By Mr. Thornton ..................95
    Cross-Examination By Ms. Bell .....................100
17  Redirect Examination By Mr. Boynton ...............102

18

19                      **E X H I B I T S**

20    Government No. 3I....Video Clip #9 ...............68
      Government No. 16....Video Clip- Google Drive .....68
21          video

22

23

24

25

1

2          The above-styled cause came to be heard on

3    January 24, 2024, before the Hon. Aleta A. Trauger,

4    District Judge, when the following proceedings were had

5    at 2:45 p.m., to-wit:

6

7          (A jury of 12 people and 4 alternates was

8    previously selected and sworn.)

9

10          THE COURT:  Okay.  I'm going to give my

11    preliminary jury instructions while those people are

12    taking the elevators down.  And by the time I finish

13    that -- it only takes about ten minutes -- then we will

14    allow the people from the other courtroom and whatever

15    other spectators we had to shoo out of the courtroom,

16    we'll allow them to come in as well.  So I'm going to do

17    instructions and then we'll allow other people to come

18    in.

19          Members of the jury, I shall now give you

20    some initial instructions about this case and about your

21    duties as jurors.  At the end of the trial I shall give

22    you further instructions.  I may also give you

23    instructions during the trial.  Unless I specifically

24    tell you otherwise, all of these instructions are equally

25    binding on you and must be followed.

1    It will be your duty to decide from the

2  evidence whether each defendant is guilty or not guilty

3  of the crimes charged.  From the evidence you will decide

4  what the facts are.  You are entitled to consider that

5  evidence in the light of your own observations and

6  experiences in the affairs of life.

7    You may use reason and common sense to draw

8  deductions or conclusions from facts which have been

9  established by the evidence.  You will then apply those

10  facts to the law, which I give you in my instructions so

11  that you may reach a verdict.  You are the sole judges of

12  the facts, but you must follow the law as stated in my

13  instructions whether you agree with it or not.

14    Do not let sympathy or prejudice influence

15  you.  The law demands of you a just verdict unaffected by

16  anything except the evidence, your common sense and the

17  law as I give it to you.  You should not take anything I

18  may say or do during the trial as indicating what I think

19  of the evidence or what I think your verdict should be.

20    The evidence from which you will find the

21  facts includes the testimony of witnesses, documents and

22  other things received as exhibits, any facts that are

23  stipulated to, that is, agreed to by the parties, and any

24  fact I say you may accept as true even without evidence.

25    Certain things are not evidence and must not

be considered by you.  Statements, arguments, questions
and comments by lawyers representing the parties in the
case are not evidence.  Objections are not evidence.
Lawyers have a right to object when they believe
something is improper.  You should not be influenced by
the objection.  If I sustain an objection to a question,
you must ignore the question and must not try to guess
what the answer might have been.

Testimony that I strike from the record and
tell you to disregard is not evidence and must not be
considered.  Anything you see or hear about this case
outside the courtroom is not evidence.  You are to decide
the case based solely on the evidence received and
presented to you here in the courtroom.

Sometimes evidence is received for a limited
purpose only.  That is, it can be used for one particular
purpose but not for any other purpose.  I will tell you
when that occurs and instruct you on the purposes for
which an item can and cannot be used.

There are two kinds of evidence:  Direct and
circumstantial evidence.  Direct evidence is direct proof
of a fact, such as testimony of an eyewitness.
Circumstantial evidence is proof of facts from which you
may conclude that other facts exist.  I'm going to give
you further instructions on this at the end, but let me

1  just say, direct evidence would be if somebody came in
2  and said it's raining outside and you believed them, that
3  would be direct evidence.  If someone came in with a wet
4  raincoat and a wet umbrella, you could presume from that
5  evidence, circumstantial evidence, that it was raining
6  outside.  The law doesn't make any distinction between
7  direct and circumstantial evidence.  They're both as good
8  as each other.
9          It will be up to you to decide which
10  witnesses to believe, which witnesses not to believe and
11  how much of any witness's testimony to accept or reject.
12  I will give you further instructions on determining the
13  credibility of witnesses at the end of the case.
14          As you know, this is a criminal case.  There
15  are some basic rules about a criminal case that you must
16  keep in mind.  First, the defendants are presumed
17  innocent until proven guilty.  The indictment against
18  them brought by the government is only an accusation,
19  nothing more.  It is not proof of guilt or anything else.
20  The defendants, therefore, start out with a clean slate.
21          Second, the burden of proof is on the
22  government until the very end of the case.  The
23  defendants have no burden to prove their innocence or to
24  present any evidence or to testify.  Since a defendant
25  has the right to remain silent, the law prohibits you

1 from arriving at your verdict by considering that a

2 defendant may not have testified.

3 　　　　Third, the government must prove the

4 defendant's guilt beyond a reasonable doubt.  I will give

5 you further instructions on this point later, but bear in

6 mind that in this respect a criminal case is different

7 from a civil case where I mentioned the proof is by a

8 preponderance of the evidence, which is a lesser

9 standard.

10 　　　　Fourth, the defendants have been charged

11 with the same two crimes.  The number of charges is no

12 evidence of guilt and this should not influence your

13 decision in any way.  In our system of justice, guilt or

14 innocence is personal and individual.  It is your duty to

15 separately consider the evidence against each of the

16 defendants on each of the two charges and to return a

17 separate verdict as to each one of them.

18 　　　　For each one you must decide whether the

19 government has presented proof beyond a reasonable doubt

20 that that particular defendant is guilty of a particular

21 charge.  Your decision on any one defendant or on any one

22 charge, whether it is guilty or not guilty, should not

23 influence your decision on another defendant or on any

24 other charge.

25 　　　　Now a few words about your conduct as

jurors.  First, do not discuss the case either among
yourselves or with anyone else during the course of the
trial and do not permit anyone to discuss it with you.
Until you retire to the jury room at the end of the case
to deliberate on your verdict, you simply are not to talk
about the case at all.  In fairness to both sides, you
should keep an open mind throughout the trial, reaching
your conclusions only during your final deliberations
after all the evidence is in and you have heard the
closing arguments and my instructions to you on the law.

So you can talk about anything, your
families, what you did last night, what series you're
watching on television, but don't talk about the case
amongst yourselves or with anyone else.

Many of you use cell phones, BlackBerrys --
BlackBerrys, we don't use BlackBerrys anymore, I need to
cross that out -- the internet and other tools of
technology.  You must not use these tools to communicate
electronically with anyone about the case.  This includes
your family and friends.

Until the verdict is in, you may not
communicate with anyone about the case on your cell phone
through email, iPhone, text messaging, Twitter, blogs,
websites, Internet chat rooms, social networking
websites, anything, LinkedIn, YouTube, all of those

1  things.

2          Second, do not read or listen to anything

3  related to this case in any way.  Ignore any news

4  coverage that you may see on your phone or on the radio

5  or on the television set.  Turn it off the minute it

6  comes on if anything with this case is reported.  You

7  must decide this case solely on the evidence presented

8  here in court and the law as I instruct you at the end of

9  the case.

10          Third, wear your juror badge at all times.

11  You don't need to wear those numbers anymore, but wear

12  your round juror badge at all times visibly and do not

13  permit any person to discuss this case in your presence.

14  If anyone should try to talk to you about it, bring that

15  to the Court's attention promptly in writing through the

16  court security officer without discussing it with your

17  fellow jurors.

18          Fourth, though it is a normal human tendency

19  to converse with people with whom one is thrown in

20  contact, please do not, during the time you serve on this

21  jury, talk in or out of the courtroom with any of the

22  defendants or their lawyers, the prosecutors, any witness

23  or the news media.  By this, not only do not talk about

24  the case, but do not talk with them at all about

25  anything, even to pass the time of day.  In no other way

can everyone be assured of the absolute impartiality
they're entitled to expect from you as jurors.

Fifth, while you sit as a juror in this
case, you are not to conduct any research or make any
investigations on your own about the case. That's not
your job. Your job is to decide the case based solely
upon the evidence presented to all of you here in the
courtroom.

You should not review or seek out
information about the issues, the parties, the lawyers,
the witnesses, either in traditional formats such as
newspapers, books, televisions, radio, newspapers, or
through the Internet or any other computer research. You
should not go on the Internet or participate in or review
any websites, Internet chat rooms or blogs, nor should
you seek out information of any kind that in any way
relates to this case.

Why do we impose this restriction? Because
you are here to decide this case based solely on the
evidence or lack of evidence presented in the courtroom.
Many of you regularly use the Internet to do research or
to examine matters of interest to you. The information
you're accessing is not evidence in this case. What you
are examining may be wrong, incomplete, inaccurate or
outdated.

1        As a juror you must not be influenced by any
2   information outside the courtroom.  The Rules of Evidence
3   and Criminal Procedure determine what is and is not
4   evidence to be properly considered by you.  What you are
5   witnessing on the Internet has not been through the
6   filters of the Rules of Evidence and Criminal Procedure.
7   To base your verdict on anything else would unfairly and
8   adversely impact the judicial process.
9        Sixth, do not make up your mind about what
10  the verdict should be until after you've gone to the jury
11  room to decide the case and you and your fellow jurors
12  have discussed the evidence.  Keep an open mind until
13  then.
14        During the trial I will permit you to take
15  notes, and we will be passing out notebooks and pens to
16  you.  Many courts do not permit note taking by jurors and
17  a word of caution is in order.  There's always a tendency
18  to attach undue importance to matters that one has
19  written down.  Some testimony, which is considered
20  unimportant at the time presented and, thus, not written
21  down, may take on greater important later in the trial in
22  light of other evidence presented.
23        Therefore, I'm instructing you that your
24  notes are only a tool to aid your own individual memory
25  and you should not compare your notes with other jurors

1    in determining the content of testimony or in evaluating
2    the importance of any evidence.  Your notes are not
3    evidence and are by no means a complete outline of the
4    proceedings or a list of the highlights of the trial.
5              Above all, your memory should be your
6    greatest asset when it comes time to deliberate and
7    render a decision in this case.  Your notes are to be
8    left at your seats during recesses and overnight and are
9    not to leave the courthouse at any time.
10             The trial will proceed in the following
11   manner.  First, the government lawyers will make an
12   opening statement, which is simply an outline to help you
13   understand the evidence as it comes in.  Then the defense
14   attorneys may but don't have to make opening statements.
15   Opening statements are neither evidence nor arguments.
16             The government will then present its
17   witnesses and counsel for the defendants may
18   cross-examine them.  Following the government's case, the
19   defendants may, if they wish, present witnesses whom the
20   government may cross-examine.  After all the evidence is
21   in, the lawyers will present their closing arguments to
22   summarize and interpret the evidence for you.  Then I
23   will instruct you on the law.  After that you will retire
24   to deliberate on your verdict.
25             So we are ready for opening statements.  At

this point we will allow any spectators who wish to come
into the courtroom for opening statement and any other
observers.

(Pause in proceedings.)

THE COURT:  Thank you.  I'm going to read
this notice too, which I don't think has yet been
published.  You are welcome in this courtroom for the
trial of this case.  When you are in the courtroom, you
cannot express in any way approval or disapproval of the
testimony.  Behavior that you cannot engage in includes
but is not limited to nodding or shaking your head,
making facial expressions or hand gestures or speaking
out.  If you do so, you will be removed from the
courtroom.

You may not use cell phones in any way while
in the courtroom.  You cannot record the proceedings on
your cell phone or any other recording device.  If court
security officers see your cell phone out, you will be
asked to leave for the day.

Also, electronic devices may not be used for
photography, video or audio broadcasting or video or
audio recording on the floors of the courthouse occupied
by the court.  Please conform your behavior to these
expectations.  And I will just warn you that I suspect
the government will be monitoring things.  So if anybody

1  starts transmitting videos from the courthouse, we'll

2  probably know about it.  Okay?  We want to have an

3  orderly procedure.

4          We're now going to have opening statements.

5  The government begins.  Ms. Klopf.

6          MS. KLOPF:  Thank you, Your Honor.

7          UNIDENTIFIED SPEAKER:  May I please just for

8  a moment raise the human flag because lives are at stake

9  here.  I have firsthand --

10         THE COURT:  Sir, you may leave the courtroom

11  if you cannot be quiet.  Sit down and be quiet or you

12  must leave the courtroom.

13         UNIDENTIFIED SPEAKER:  The Lord led me to

14  pray --

15         THE COURT:  Take him out of the courtroom,

16  please.

17         UNIDENTIFIED SPEAKER:  The Lord led me to

18  pray for COVID.  I have already given to the Court on the

19  file the record.  You need to consider what God's word

20  says.

21             (Person removed from the courtroom.)

22             THE COURT:  Ms. Klopf, go ahead.

23          GOVERNMENT OPENING STATEMENT

24             MS. KLOPF:  On March 15, 2021, these six

25  defendants and many others acted together to block the

1    doors of the healthcare clinic in Mt. Juliet, Tennessee.
2    They did it because this clinic provided reproductive
3    health care, and they wanted to stop as many patients as
4    possible from accessing the clinic that day.
5            The blockade ended the only way it was going
6    to, with arrests.  And in their own words, you'll hear
7    one of the defendants explain what this was not.  It was
8    not a protest, it was not a demonstration.
9            Protests are a part of the fabric of our
10   nation.  You may have seen one coming into the building
11   yesterday or today.  But our society has drawn lines on
12   what constitutes a protest and what constitutes a crime.
13           We as a country have enacted these laws to
14   hold people who commit crimes accountable, and that's why
15   we're here today.  The law prohibits people from using
16   physical obstruction to intimidate or interfere with a
17   person who is either getting or giving reproductive
18   health services.
19           Whether violent or not, doing that is a
20   crime.  It's also a crime to conspire, meaning to agree,
21   to do that.  The term reproductive healthcare covers a
22   lot of services, birth control, ultrasounds, prenatal
23   care, miscarriage care, pregnancy counseling, not just
24   abortion.
25           The law protects health clinics regardless

1   of whether or not they provide abortions or counsel

2   against them.  But this case, it's not about abortion.

3   It's about following the law; about our agreement as a

4   society to follow the laws as written and to hold those

5   who break the law accountable.

6           Over the next few days you'll learn how this

7   blockade in Mt. Juliet came to be.  The clinic called

8   carafem was on the second floor of a medical building in

9   Mt. Juliet that housed multiple businesses.  This

10  blockade of the clinic doors was planned because the

11  blockaders believed that the local lawful protests, where

12  the protesters stood outside the building's entrance who

13  never needed to be arrested, were not successfully

14  accessing the patients that were going to this clinic.

15  So these defendants, many of whom are not from

16  Mt. Juliet, decided to travel here, join together, go

17  inside and block the doors.

18          This blockade of the clinic was planned at

19  least a month in advance.  Over the month of February,

20  these defendants and others planned travel to

21  Mt. Juliet, Tennessee.  They invited others.  One

22  defendant traveled to Tennessee from Michigan to lock

23  down his plans.  They sent Facebook messages to plan

24  various events leading up to the blockade.  They set up

25  sleeping arrangements and they paid for others' housing.

1          They took actions to ensure that this

2     blockade would be as well-attended as possible and last

3     as long as possible.  They vetted the participants,

4     discussing who was willing to be arrested.  One defendant

5     went on the Internet and looked up the very law that he

6     violated and is charged with here today that says that

7     blocking access to a clinic entrance is a crime.  He also

8     looked up the Mt. Juliet Police Department and the

9     Mt. Juliet jail.  The blockaders were planning on being

10    arrested.

11         One of the participants in the blockade,

12    Caroline Davis, will testify.  Davis was charged in this

13    case and she has pleaded guilty.  She'll describe the

14    careful planning that went into this blockade.  She'll

15    also describe her role.  She'll explain why these

16    defendants chose to block these doors because the legal

17    protest outside the building weren't getting the job

18    done, so they needed to come inside and block the doors

19    of the clinic.

20         She'll describe a final planning meeting

21    once everyone got to Tennessee at which they divvied out

22    roles:  Blocking doors, lookouts to warn others that

23    patients were coming or leaving, engaging police to stall

24    them to make the blockade last as long as possible,

25    blowfish.

1          A blowfish, you'll learn, is a person that

2     remained in the hallway during the course of the blockade

3     to try to appear to police that they were willing to be

4     arrested but, in fact, intended to leave before final

5     arrests were actually made.  Their job?  To delay arrests

6     and make the blockade last longer.  The defendants even

7     had a videographer creating a how-to for future

8     blockades.

9          The morning of the blockade the clinic was

10    set to open at 8:00 a.m.  The blockaders came prepared

11    with a preprinted flyer that already said that people had

12    been arrested.  This was no accident.  They were planning

13    on being arrested.

14         The blockaders entered the building and took

15    positions up and down the hallway.  The clinic had two

16    entrance points, the main entrance for patients and a

17    second entrance for employees.  Some of the defendants

18    and the other blockaders took up position in front of the

19    main entrance.  Some of them took up positions in front

20    of the employee entrance.  Others filled the hallway.

21         Some of these blockaders were some of these

22    defendants' children.  During the course of the morning,

23    three of those defendants filmed the blockade.  In their

24    recordings, the morning wears on.  Patients turn away

25    from the clinic because of the blockaders.

An employee exits the clinic but can't get back in because one of the defendants refuses to move from in front of a door. You'll see the coordinated effort of these defendants and the blockaders to turn away as many patients as possible. One defendant leaves because the police start talking about arrests but leaves his children behind to continue the blockade.

When police arrived, the blockaders were told to leave and none complied. Over the course of the multiple hours, some of the defendants drew out negotiations with police. In the defendant's own words, this was a tactic that they were using to buy more time.

A patient who was turned away by the defendants and the other blockaders will testify. You'll hear from an employee of the clinic who was trapped inside the clinic for hours because the defendants would not move away from their positions in front of the doors. A police officer will testify who tried to escort a patient down the hallway and had to physically move some of the blockaders but still couldn't get the patient through the clinic door.

The blockade went on for almost three hours before police finally arrested some of the blockaders and allowed the clinic and the other businesses to go back to normal. The blockaders could not have blocked that

1    hallway for so long without the help of the participants

2    and all the different roles that they played; stalling

3    the police, blocking the main door, blocking the employee

4    entrance, being on the lookout for patients and filling

5    the hallway.

6              So the defendant was right, this was not a

7    protest.  People are entitled to hold whatever beliefs

8    they like.  It's a fundamental part of America, but that

9    does not mean that they get to break the law.  Another

10   fundamental part of America is the rule of law, which

11   means that when a person violates the law, there are

12   consequences and they are held accountable.

13             And that is why you are here today, because

14   these defendants broke the law.  And I am confident that

15   at the end of this trial, when you apply the law to this

16   evidence, that you will find the defendants guilty on all

17   counts.  Thank you.

18             THE COURT:  Thank you, Ms. Klopf.

19             Ms. Bell, do you wish to argue?

20             MS. BELL:  Yes.

21             THE COURT:  All right.

22        DEFENDANT GALLAGHER OPENING STATEMENT

23             MS. BELL:  Thank you.

24             Make sure you guys can hear me.  On March 5,

25   2021, my client, Chester Gallagher, engaged in a

peaceful, nonviolent rescue in the hallways outside the
carafem clinic in Mt. Juliet, Tennessee.  You'll hear
this word rescue throughout the trial.  It will be given
different meanings probably.  But one meaning I think
that everyone will agree to is that a rescue is where you
try to persuade a pregnant woman or a couple who's
expecting a child not to go forward with an abortion or
to terminate their pregnancy.  A rescue is rescuing the
unborn.

        Now, my name is Jodie Bell.  I represent
Mr. Chester Gallagher, defendant No. 1.  Mr. Gallagher's
a husband to his wife Joann.  He's a former law
enforcement officer --

        MS. KLOPF:  Objection, Your Honor.

        THE COURT:  Ms. Bell, that's inappropriate
opening.  You're testifying.

        MS. BELL:  He's a former law enforcement
officer?

        THE COURT:  You are testifying and giving
evidence.  Opening argument is inappropriate for that.

        MS. BELL:  The proof will show that my
client is a minister.

        MS. KLOPF:  Objection, Your Honor, that
violates the pretrial ruling.

        THE COURT:  Bench conference.

1                  (Whereupon, the following proceedings were

2     had at the bench outside the hearing of the jury:)

3                  THE COURT:  Government say the objection.

4                  MS. KLOPF:  Your Honor, we are objecting on

5     the evidence of this, which this Court has ruled on in

6     our pretrial motions.

7                  THE COURT:  Well, if Mr. Gallagher

8     testifies, he certainly can testify that he is a minister

9     and was a prior law enforcement officer, but we don't

10    know that he's going to testify.

11                 I can't hear you, Ms. Bell.

12                 MS. BELL:  And other witnesses who are going

13    to testify I think can testify to those facts as well and

14    are aware of his ministry and those sorts of things.  So

15    I think it is fair and that is what happened on this

16    particular occasion.  I think the proof will show that

17    these people were engaged in ministry leading up to what

18    happened on March 5 there.

19                 THE COURT:  That's not what we're talking

20    about.  We're not talking about what they were engaged

21    in.  You are giving background facts about your client,

22    and we don't know if your client is going to be

23    testifying in order to give those background facts, so.

24                 MS. BELL:  I think a number of other

25    witnesses may be testifying to that as well.  I believe

1  Ms. --

2          MS. KLOPF:  Also some of that testimony

3  sounds inappropriate and like it would violate the

4  Court's pretrial order on evidence it sounds like on

5  ministry and things like that.

6          MS. BELL:  I respectfully disagree with her.

7          THE COURT:  Well, you may not give

8  background facts about your defendant.  I'm not sure what

9  evidence is coming in.  I'm sure the government is not

10  going to bring out, in its witnesses, any background

11  facts about your defendant that you're proffering to the

12  jury at this time.  So stay away from that subject.

13          MR. CRAMPTON:  Your Honor.

14          THE COURT:  Yes.

15          MR. CRAMPTON:  In the same vein, if I may

16  address my opening, I do intend to mention for Mr. Vaughn

17  that he conducts a sidewalk counseling ministry in the

18  context of his bringing some of those sidewalk counselors

19  to this event and that being the reason that he was

20  there.  Not by way of character evidence, but by way of

21  setting up exactly what he was doing there, why he was

22  there.

23          THE COURT:  Well, if he's going to testify,

24  but you're not going to tell me right now he's going to

25  testify and you can't commit to his testifying at this

1  point.  So if the only way this evidence is coming in is

2  if he testifies, you cannot cover it in opening

3  statement.

4          MR. CRAMPTON:  We have other witnesss that

5  we anticipate will address it.

6          THE COURT:  Well, I'm not sure that it's

7  relevant.

8          MR. CRAMPTON:  It goes to motive here,

9  Your Honor.  The government has already raised they came

10 to be arrested.  We will show that Mr. Vaughn did not

11 come to be arrested.  He came to minister, the same way

12 he ministers elsewhere.

13         THE COURT:  We'll deal with it when you make

14 your opening statement.

15         (End of bench conference.  Whereupon, the

16 following proceedings were had in the hearing and

17 presence of the jury:)

18         MS. BELL:  May I proceed?

19         THE COURT:  Yeah.

20         MS. BELL:  As I was saying, my client, he's

21 a minister.  He's a pro-life advocate.  His ministry and

22 his pro-life advocacy overlap.  As part of his ministry,

23 he rescues, we just talked about, engages in rescues that

24 involve what's called interposition.  You'll hear about

25 that.

He also knows that through these activities he risks arrest. Those are things you'll hear through the course of the trial: Rescue, attempting to save the unborn. Interposition is this idea of getting between the expecting woman and the clinic and engaging that person, offering help, offering counseling, giving that woman a moment to pause, confront this empathetic offer of help before making a decision that cannot be taken back.

To do that, a rescuer needs to get close to that person during this time of need and knows that sometimes that means you're getting close to the door of a clinic and you're risking arrest for doing so.

Now, in February and March 2021, my client, Mr. Gallagher, who has lots of friends that he's very close with who share similar beliefs, organized a ministry, rally and rescue in Middle Tennessee. As part of that, he invited people who share his beliefs to come and participate. He helped, with his friend Heather Idoni, arrange for lodging for people who might have had a financial hardship but wanted to come.

He arranged for a church for services. He arranged for meals. He sent all that out. He did that ahead of time, and people came. They came to Middle Tennessee. They stayed in lodging arranged for them by

Mr. Gallagher and Ms. Idoni.  They prayed together and
they worshiped, and on March 5 of 2021 they went to the
carafem clinic to do a rescue.

Before going into what happened there, you
need to understand that, as Ms. Klopf said, the carafem
clinic is located on the second floor of a medical office
building.  It's at the end of a long hallway.  There are
other businesses in the building, so in order to identify
who might be coming for a procedure at the carafem
clinic, you need to get closer to the clinic to do that
interposition.

So at 7:45 in the morning on March 5, my
client, along with others, headed over to the carafem
clinic and went up to that second floor for the purpose
of offering this help as part of this rescue.

And you'll see that there were people with
my client who were taking video of what was going on
because a rescue needs to be peaceful and nonviolent.  It
needs to be orderly.  It is an emotional thing.  People
are confronting a lot of feelings.  You don't need people
talking all over, you don't need people rushing towards a
woman who's in crisis.  People sort of need to know when
they need to stand back and move forward.

People filmed the rescue, and that's where
most of the government's video clip is going to come

from, from Mr. Green, Mr. Gallagher, from Mr. Boyd. They filmed the rescue. Yes, to show other people how to safely do it, peacefully and nonviolently, but also so they couldn't be accused of intimidating, threatening others, so there would be a record of exactly what happened.

Mr. Gallagher, based on his former employment, he would talk to the police. He was one of the people. You don't want everyone talking to the police. They do anticipate with a lot of people in a hallway outside a reproductive health services clinic that the police will come. And they want to engage the police, let them know why they're there, what they're doing. So you'll see that.

What you'll also see on these videos is an interposition. And I'd ask you to pay close attention to that. You'll hear from the Ashbys, the couple that comes up at about 7:45, a little before 8:00 out of that elevator. They make a left turn out of the elevator, then they turn left again and start down that long hall. Mr. Ashby goes into the restroom. Ms. Ashby remains in the hallway.

It's really important to watch this. She's approached by two young women about her size, about her age. They're not yelling at her, they're not screaming

at her. They're trying to engage her. They assume she's there for a procedure, and they want to offer that lifeline, that opportunity, that help. That's why we're there. The other rescuers stand by and let these two young women engage somebody else, somebody who's in crisis.

While that happens, Ms. Flowers, a clinic worker does approach. She comes up, she's frustrated. She's aggravated, and that's fair. Let me just say that. It's totally fair to be frustrated and aggravated when you come to work in the morning and the hallway outside your job is crowded with people singing, praying. It's not what you expected. So I don't fault her.

But she comes up and she tells the Ashbys, go downstairs, go to your car, I'll call you later. And then she turns around with her cell phone pulled out now and says, super pro-life, no masks. It's very aggravated, very angry. No one's engaging her, no one's elevating this tense situation out of that group.

Ms. Flowers turns to go back into the building through the employee entrance, and Mr. Zastrow is there sitting on the ground. She tells him to move. He said, respectfully, ma'am, no. He's sitting on the floor. You're trespassing. Okay, ma'am, very humble, very quiet. I'm calling the police, they're coming,

okay, ma'am.  He's de-escalating a tense situation.

And the police come.  The police show up.
The police do arrive.  They engage these rescuers, they
speak with Mr. Gallagher.  They speak with Mr. Vaughn.
They start talking about why they're there and explaining
what's going on.

During this time another patient comes to
the clinic or suspected patient.  This patient is with a
police escort.  And the officer does come down the hall
with her and say, clear the seas, clear the seas.  He
does have to push people, but the rescuers comply.  They
get out of the way.  They do what he's asking them to do.
Now, the woman says, I've got enough of this.  That's
fair enough for her.  She walks away.

The rescuers are there from about 7:45 to
10:15.  Prior to the end of all of this, Officer
Bancroft, who you'll hear from, comes down the line of
rescuers and asks all the people that are there for their
name, the date of birth and the state they're from.  No
one refuses that information.  They give it to her.

After she's done, five-minute warning is
given.  Anyone who doesn't want to be arrested, leave.
Bunch of people leave, some stay.  The end of the five
minutes, those that stay stand up and peacefully,
nonviolently are placed in handcuffs and walked down the

1  stairs.

2          They don't go limp.  They don't fall to the

3  ground.  They don't prolong things.  They don't resist

4  arrest.  They don't chain themselves to the railing in

5  the stairwell as they're walking down.  They peacefully,

6  nonviolently, compliantly --

7          MS. KLOPF:  Your Honor, I'm going to object

8  to this as --

9          THE COURT:  This is argument, not opening

10  statement as to what the proof will show.

11          MS. BELL:  The proof will show that on that

12  day there were no threats.  There's no oppression, no

13  injury, nobody was placed in reasonable fear of injury.

14  On that day what happened at the carafem clinic in

15  Mt. Juliet was a peaceful, nonviolent rescue.  No

16  violation of federal law, no FACE Act violation, no

17  conspiracy to violate the law.  Thank you.

18          THE COURT:  Thank you, Ms. Bell.

19          Mr. Parris, do you wish to make an opening?

20       DEFENDANT ZASTROW OPENING STATEMENT

21          MR. PARRIS:  Well, I did --

22          THE COURT:  Change your mind?

23          MR. PARRIS:  -- until Ms. Bell covered

24  everything, so I'm not going to go back through it.  Four

25  words, I want you to remember four words.  If you're a

1    note taker, do this for me, because in three, four, five

2    days I'm going to come back to it.  Injure, oppress,

3    threaten, intimidate.

4              My name's Robert Parris.  I represent Calvin

5    Zastrow, that gentleman nodding his head.  And something

6    happened on March 5, 2021, that's going to be called a

7    protest, going to be called a rescue, it's going to be

8    called a blockade, it's going to be called a prayer

9    meeting, whatever.  It doesn't matter legally.

10             Because Count One of the indictment alleges

11   that there was an agreement made between these

12   defendants.  And as you've heard, I assume it's been said

13   to you-all that the government has to prove each and

14   every element of the charge beyond a reasonable doubt.

15   And the second -- the first element is there had to be an

16   agreement.  It's called a conspiracy.  And I don't think

17   there's any question there was an agreement.  Now, to do

18   what, that's different, but they did come to an

19   agreement.

20             But the second element is that the aim of

21   the agreement was to act together to injure, oppress,

22   threaten or intimidate a person in the free exercise or

23   enjoyment of any right or privilege secured to a person

24   by the laws of the United States, which would be access

25   to the reproductive health.  But if you don't get past

1    that element in Count One, the rest of it doesn't matter.

2                   And I'm submitting to you that the evidence

3    will show the exact opposite of injury, oppression,

4    threats or intimidation.

5                   Now, the only -- and the only possible

6    argument that could be made in this case would be that

7    many people in a small area, regardless of what their

8    acts were --

9                   MS. KLOPF:  Objection, Your Honor.

10   Argumentative.

11                  MR. PARRIS:  I'll withdraw it, Your Honor.

12   I've made my point.

13                  But the evidence will show just exactly what

14   Ms. Bell said.  That's how that went down.  It's going to

15   be on video.  It's not a question about what happened.

16   But I submit to you, three or four days from now when I

17   stand up here again, I'm going to look at you and say,

18   what you saw, the testimony you heard, the evidence

19   certainly does not support it, that any of those four

20   elements the government is able to prove beyond a

21   reasonable doubt.

22                  Moreover, even if somehow or another the

23   evidence were to show one of those, the government must

24   also prove that there was a prior agreement to do that

25   and there is no evidence to show that.  The evidence will

show, as Ms. Bell stated so well, that it's peaceful,
nonviolent, orderly. The exact opposite of those four
words that I just read to you that are in the statute,
that are in your instruction, that are in the indictment.
Annoying, maybe. Little distasteful to some, maybe.
Aggravating to those at work, probably. But the crime
charged, no.

In three or four days after all the proof is
in, I'm confident that you will not find any of those
four words have been proven beyond a reasonable doubt and
your verdict to Count One will be not guilty. Thank you.

THE COURT: Thank you, Mr. Parris.

Mr. Haymaker, do you wish to argue?

DEFENDANT BOYD OPENING STATEMENT

MR. HAYMAKER: Good afternoon. My name is
Kerry Haymaker. The gentleman here, Steven Thornton, and
we represent Coleman Biden -- Coleman Boyd the gentleman
in the gray jacket and green tie. I'm going to keep this
fairly short because the other two lawyers have done a
very good job of weighing out what happened that day.

But the evidence will show that Mr. Boyd's
presence that day was a little bit different. You're
going to hear that this entire episode lasted about two
and a half hours from start to finish. You're going to
hear evidence that Coleman Boyd arrived on the second

1  floor of that building at 7:47 a.m. prior to the

2  scheduled time where that clinic was supposed to even

3  open.  He got off the elevator.  He walked a few steps to

4  the corner of a hallway and he stood at the end of the

5  hallway.  He was about 60 feet, all the way at the end of

6  the hallway about 60 feet from the entrance to carafem.

7          The entire time he was there he remained in

8  the same spot.  He never got closer than about 60 feet to

9  the carafem door.  He arrived at 7:47 a.m. and at 12

10  minutes after 8:00, 12 minutes after the carafem clinic

11  was scheduled to open, he left.

12          You will know exactly what he said while he

13  was on the floor.  You will know exactly what he did

14  while he was on the floor.  And the reason you will know

15  is because you are going to see the video that was taken

16  by him.  Not only was a video taken by him, it was video

17  that he broadcast on Facebook livestream.

18          So I say all that to say this.  As you

19  listen to the evidence in this case, I want one question

20  to linger in the back of your mind.  And that question is

21  what did he do?  What did Coleman Boyd do?  Thank you.

22          THE COURT:  Thank you, Mr. Haymaker.

23          Mr. Crampton, do you wish to make an

24  argument -- I mean, an opening statement?  I know you

25  wish to make an argument.

DEFENDANT VAUGHN OPENING STATEMENT

1  
2          MR. CRAMPTON:  Yes, I do.  Thank you.

3          Good afternoon.  Thank you all for your
4  patience and for your close attention here.  My name is
5  Steve Crampton.  I represent the defendant Paul Vaughn
6  seated pretty much immediately behind me.

7          As some of my co-counsel have already
8  explained and laid out and I hope you've gathered, each
9  defendant comes before you with a whole separate
10 perspective, whole separate story, separate facts.  And I
11 would ask and urge you to pay particularly close
12 attention to the facts as the government presents them --
13 the burden of proof, of course, being the government's --
14 to ensure that they don't just present evidence of, as
15 they said in opening statement, the blockaders or the
16 group.  But that the evidence shows individually what
17 each defendant did.

18         And somewhat like what Mr. Haymaker said
19 with respect to Coleman Boyd, so I expect the evidence
20 will show you with regard to Mr. Vaughn.  Mr. Vaughn, I
21 would submit to you, at the end of the evidence, you will
22 conclude is an innocent man.

23         He is accused, like all the others, of
24 conspiring to injure, intimidate, oppress or threaten
25 someone in violation of a federal right.  And, again, I

1  will challenge you, you find in all the evidence

2  presented here where Mr. Vaughn ever engaged in an act of

3  oppression, ever injured anyone, ever threatened anyone,

4  ever intimidated anyone.  What you will find instead is

5  Mr. Vaughn played a very key role here, but a role

6  disengaged from any actions near the clinic entrance.  He

7  wasn't blocking or interfering with anyone.

8           Mr. Vaughn was the messenger.  Mr. Vaughn

9  ended up communicating between the other defendants and

10 the police.  He was the messenger.  I would submit to you

11 that this case may become, for Mr. Vaughn, a

12 don't-shoot-the-messenger sort of case.  What Mr. Vaughn

13 did was not hinder, was not attempt to obstruct the

14 police in the exercise of their duties either, but

15 instead to assist and to help the police who had, I think

16 the evidence will show, never encountered a mass

17 demonstration of this sort.

18           And let me say a word with regard to the

19 government's position with the terminology here.  You've

20 heard interposition, you've heard rescue, you've heard

21 demonstration, so forth.  That one defendant himself will

22 tell you that this is not an act of civil disobedience or

23 a demonstration.

24           I would submit to you that for those who

25 view it that way, it is indeed an interposition, but that

1    doesn't mean it can't also be what you may have seen in

2    the historic past, simple sit-ins.  To watch the video,

3    which you will see, it will be indistinguishable to you

4    between the actions of the Civil Rights marches --

5                    MS. KLOPF:  Objection, Your Honor, this is

6    argumentative.

7                    MR. CRAMPTON:  I'll move along, Your Honor.

8                    It was a simple, as has been said, a

9    peaceful, nonviolent exercise.  In the meantime with

10   respect to Mr. Vaughn, the evidence will show and you

11   will hear from police officers, he was respectful, he

12   obeyed what they asked him to do.  He was a key component

13   to their resolving successfully this whole situation

14   that, as I said, they had never encountered before.

15                   So at the end of the day Mr. Vaughn did not

16   come to risk arrest.  He came to assist or ended up

17   acting in this capacity, both the folks that were near

18   the door and were engaged in this rescue kind of activity

19   and the police officers who had their own job to do.  And

20   yet he stands accused of conspiring and of violating the

21   FACE Act.

22                   And the accusation stands that he delayed

23   and he intentionally delayed the police in undertaking

24   their actions and effectuating either removal of the

25   folks or conducting arrests.  And I will submit to you

that the evidence will, in fact, show that he did not
delay any police action.  Again, instead he assisted the
police.  For that action, he stands here accused of these
very serious crimes.

The government has also mentioned to you
this plotting and planning before the events of March 5;
right?  We anticipate the government will present a good
deal of evidence to you showing text messages, Facebook
messages, Facebook searches, communications of all kinds
between various defendants and others.  And I will ask
you again, please pay very careful attention.  Look and
see if you see Paul Vaughn's name mentioned anywhere in
those communications.  I submit you will not.

The government also makes much of this
planning meeting the night before or maybe two nights
before, maybe there were two different meetings, where
they discussed and divvied out, as the government says,
the roles of these various individuals to play.  Again,
listen carefully.  See if you hear Paul Vaughn's name
mentioned as attending any of these sessions.  I submit
you will not.

And the evidence will show he neither
participated in any planning, nor acted in response to
anyone's request from the other defendants to do what he
did on that day.  Consequently, we will ask and we will

1  submit to you that at the end of the evidence, the only
2  logical, reasonable and just verdict is not guilty for
3  Paul Vaughn.  Don't shoot the messenger.  Thank you.
4           THE COURT:  Thank you, Mr. Crampton.
5           Mr. Russ, do you wish to make an opening?
6           MR. RUSS:  Yes, Your Honor.
7           DEFENDANT GREEN OPENING STATEMENT
8           MR. RUSS:  Good afternoon, everyone.  Again,
9  my name is Ben Russ.  I represent Mr. Dennis Green who is
10 sitting behind me with the longer beard and glasses.  One
11 of the benefits of going fifth in the order is that a lot
12 has been said, so I won't belabor a lot of points that
13 you've already heard, but I did want to reiterate a few.
14           First of all, we talked about the fact that
15 you're not really in one trial, you're trying six
16 different people here.  So I would remind you, as several
17 people who have come up here already have said, look at
18 what Mr. Green did and you can hold Mr. Green accountable
19 for what he did, but you can't hold him accountable for
20 everybody else's actions.  I would ask that you do that.
21           I would also ask you to focus on the
22 statutes that they're charged with and the exact wording
23 of these statutes.  Mr. Parris talked about the
24 conspiracy statute, which is Count One.  And he's
25 correct.  In order for you to find Mr. Green or anyone

else guilty of that count, you have to find that they

conspired to oppress, to threaten, to injure or to

intimidate someone in the exercise of their right of

access to the clinic.

Also, in Count Two, which is the act of

violating the FACE Act itself, which you've heard a lot

already at this point, you have to find that they either

intimidated or interfered with somebody in accessing the

clinic.

Now, you've heard, again, that there's going

to be a lot of video that you're going to look at.

Mr. Green is one of the people that was filming one of

those videos. And you're going to see what he had to say

and what everyone else had to say and Mr. Gallagher's

video and Mr. Boyd's video and the case -- the clinic

worker's video. You're going to see all aspects of this.

It's a little unusual in a criminal case where the

evidence is essentially livestreamed. But that's what

happened here.

So we're not necessarily here about the

facts. We're here about the interpretation of the facts

through the lens of the law the Judge will give you at

the end of the case. Just like Mr. Parris said and just

like I've said two minutes ago, in order for you to find

Mr. Green or any of the other defendants guilty on either

of those counts, you have to show in Count One where they
oppressed, threatened, intimidated, injured; or in Count
Two, where they interfered with or intimidated someone
going into the clinic.

Be careful, as I'm sure you will, when you
analyze that evidence.  Listen to all the evidence and I
think it will take a few days, but I think it will move
pretty quickly.  At the end of that, I think you're going
to find that neither of these statutes have been violated
by Mr. Green.

THE COURT:  Thank you, Mr. Russ.

Mr. Conway, do you wish to make an opening?

MR. CONWAY:  Yes, Your Honor.  Thank you.

DEFENDANT IDONI OPENING STATEMENT

MR. CONWAY:   Ladies and gentlemen, I
represent Heather Idoni.  She's the only female charged
that's sitting at the table.  I want to first start out
by telling you she's not guilty.  I want to tell you why.

Quickly I just want to go over three things.
One, Ms. Idoni didn't talk to, didn't have any
interaction with any patients on March 5, 2021.  She
didn't talk to, have any action -- any interaction with
any of the providers, any of the healthcare workers, any
of the nurses, any of the employees.

She didn't talk to or have any interaction

1    other than giving some demographics to the police.  This

2    criminal trial as it relates to Ms. Idoni is going to

3    kind of come at you as a story, I'm going to try and

4    speed it up.  Three chapters.  The first chapter is going

5    to be how did we get here?  What happened prior to

6    March 5 that led all these people to get together.  Then

7    a second chapter will be, well, what happened in the

8    hallway.  And then the third chapter will be, you know,

9    what happened and everything after.

10              Obviously, as every story, there's kind of a

11   cast of characters.  There's a lot in this case so I'm

12   not going to go over all of them, but basically we've got

13   one group, devote, pro-life, those kind of people.

14   Ms. Idoni is one of those people.  We have abortion

15   clinic workers, reproductive healthcare workers, the

16   patients seeking healthcare.  We've got the police that

17   have come to the scene.

18              So Chapter 1, how did we get here?  Well,

19   Ms. Idoni is friends with Chet Gallagher as you heard.

20   They share very similar beliefs and you're going to hear

21   about that.  She was told about this particular clinic

22   and they asked her to come down and it was in need of a,

23   quote/unquote, rescue.

24              You're going to see the messages between

25   Ms. Idoni and Mr. Gallagher that are going to be kind of

setting up the lodging.  Ms. Idoni has all these Wyndham
hotel points from her and her husband, so she could help
this group out by using her Wyndham points and providing
a free place to stay.  And you'll see messages that
that's exactly what she did.

And for helping the group find housing, she
wasn't going to accept any kind of payment or anything.
That's just not how she is.  The plan was to get there on
Wednesday, March the 3rd in the evening.  Then they were
going to hold rallies, prayer sessions.  She was going to
attend -- she doesn't really lead them -- about March 5.
The prayer sessions, they kind of pray for everybody.
They pray for the police, they pray for the mothers, they
pray for the babies, themselves and anything you can
talk -- think about.  It's going to be a lot like what
you're going to see in the multiple videos that happened
in the hallway of March 5.

Now, Caroline Davis is going to talk about
kind of these before-session prayers and rallies and
stuff.  And a lot of the times what they do is they pray
collectively and then they pray individually and they ask
for guidance from the Holy Spirit on what they're going
to do when they get to this clinic, this clinic on Friday
morning.

For them it's very spiritual.  It's very

1    personal.  Ms. Idoni was led not to interact with

2    anybody, not to make things dangerous.  She was possibly

3    going to provide some guidance, some persuasion or some

4    dissuasion to any mothers, but as you'll see from the

5    videos, she didn't do any of that.  She never acted --

6    interacted with any patients or any providers or

7    anything.

8               So that kind of leads us to Chapter 2, what

9    happened in the hallway.  Well, I'm going to keep it a

10   little bit short because literally everything is on

11   video.  Body cams, multiple other defendants were filming

12   it, other people that are not here were filming it.  She

13   arrived, she stood next to the door, her hands up, just

14   like my hands are now and prayed and sang the entire time

15   that she was there.

16              The whole thing lasted between two and a

17   half, three hours.  You know, there's been some

18   discrepancy, but this was in the morning.  They got there

19   before it opened and they were gone before lunchtime,

20   before 11:30 because the police arrived fairly quickly.

21   They realized that it was a nonviolent, peaceful what

22   they would call protest.  And it was in front of the

23   doors, as Ms. Bell said.

24              Because this is not like a stand-alone

25   Planned Parenthood like off Charlotte, I don't know if

it's still there, but it's inside of a medical facility.
So some people might be coming in and they go talk to
them and they say, I'm here to get my teeth cleaned.
That's why they went up to the second floor.

You're going to hear from a Detective
Watkins who was the lead investigator on the scene.  At
10:05 a.m. he makes his final order.  He said, y'all
don't leave in five minutes, people are going to start
getting arrested.  Some people left, some people didn't.
Ms. Idoni didn't.

Her, these other defendants, that were on
the wall, and there's others, were arrested by MJPD,
Mt. Juliet PD for criminal trespass.  They thought at
that point in time that was the end of it.  Come about a
year later in March of 2022, officers from MJPD began
being interviewed by the federal authorities for the
investigation of the FACE Act, which is why we're all
here today.

They poured over Facebook posts, Google
searches, phone records, personal Facebook
correspondence.  They got it all.  And you're going to
see it all.  You're going to see it all throughout this
week.  That's what the trial's about.

After you see it all, when the evidence is
over, you're going to see exactly what I'm talking about.

Ms. Idoni didn't interact with any patients, didn't
interact with any providers, didn't hardly interact with
any police.  She's here because she had Wyndham points
and she wanted to help out her friends with similar
beliefs with the lodging.  At the end of the trial, the
Judge is going to instruct you on the law.  And when you
apply it to Ms. Idoni, I'm confident that you'll find her
not guilty.  Thank you.

        THE COURT:  Okay.  Thank you very much.

        All right.  Is the government ready with its
witnesses?

        MR. BOYNTON:  The government calls Sergeant
Lance Schneider.

        THE COURT:  Sergeant Lance Schneider.

        MR. BOYNTON:  Your Honor, we do have a
procedural step here with transcript binders.  Would
Your Honor like to take the afternoon break now or charge
ahead?

        THE COURT:  I'd sort of like to charge ahead
unless any of the jurors need a break?  Does anybody need
a break desperately?  We've just got another hour to go.

        MR. CRAMPTON:  Not that we count, but we
would second the motion.

        THE COURT:  To get the binders ready?

        MR. BOYNTON:  Yes, Your Honor.

1          THE COURT:  Okay.  Well, I don't think we

2    probably need the break to get the binders ready.  You

3    can just pass them out, can't you?  You've got several

4    people there at your table who might be able to help.

5          Okay, members of the jury, don't open these

6    yet.  I believe they are transcripts of videos and audios

7    you will hear; is that right, Ms. Klopf, Mr. Boynton?

8    These are transcripts of various videos and audios you

9    intend to play?

10          MR. BOYNTON:  That's correct, Your Honor.

11          THE COURT:  Okay.  Don't open these yet.  We

12    will -- has everybody got one?  The transcripts are --

13    everyone got one?  No.  Two people back here don't have

14    them.  Okay.

15          The transcripts are listening aids, okay.

16    They've been prepared for your assistance in hearing and

17    figuring out what's being said.  However, if you hear

18    something different from what you see on the printed

19    page, what you hear is the evidence.  And these

20    transcripts are not evidence.  They will not go back to

21    the jury room with you.  They're just listening aids.

22          Okay.  So the first witness is Lance

23    Schneider.

24

25

1                        **LANCE SCHNEIDER**

2    called as a witness, after having been first duly sworn,

3    testified as follows:

4                        **DIRECT EXAMINATION**

5    BY MR. BOYNTON:

6        Q.    Good afternoon, Sergeant Schneider.  Will

7    you please state your full name and spell it for the

8    court reporter.

9        A.    My name is Lance Schneider.  Spelling of the

10   last name is S-c-h-n-e-i-d-e-r.  First name Lance,

11   L-a-n-c-e.

12       Q.    And where is your hometown, sir?

13       A.    My hometown is Murfreesboro.  Or Nashville,

14   Tennessee, currently living in Murfreesboro.

15       Q.    Where are you employed right now?

16       A.    The City of Mt. Juliet Police Department.

17       Q.    And it's probably obvious, but what's your

18   job with the City of Mt. Juliet?

19       A.    Currently I am a municipal investigator with

20   the rank of corporal.  I believe at the date and time of

21   occurrence of this event I was the sergeant on the A

22   detail patrol back in 2021.

23       Q.    And how long have you been employed with

24   Mt. Juliet Police Department?

25       A.    15 years and a few months.

1      Q.    Were you employed anywhere else before that,

2  sir?

3      A.    Yes, sir, the La Vergne Police Department.

4      Q.    How long were you with La Vergne?

5      A.    Nine years.

6      Q.    How big is the Mt. Juliet Police Department?

7      A.    Roughly about 85 to 90 officers.  The

8  department, you said?

9      Q.    Yeah.  And around March of 2021, you said

10  that you were a patrol sergeant at that time; is that

11  right?

12      A.    Yes.

13      Q.    And what were your duties as a patrol

14  sergeant with the Mt. Juliet Police Department?

15      A.    As a patrol sergeant it's my responsibility

16  to manage the duties of the officers assigned under me,

17  which at the time was about eight or nine.  So I have to

18  make sure that they are performing their jobs correctly

19  and entertaining any kind of complaints that come up

20  against them, as well as doing the standard job of a

21  patrol officer.

22      Q.    At the time you said there were about 80 or

23  90 sworn with the Mt. Juliet Police Department.  Was that

24  true back in 2021?

25      A.    No, it was probably about 65 to 70 back

1  then.

2       Q.    And back then how big was one of your patrol

3  shifts?

4       A.    About eight or nine on a good day.

5       Q.    When you say on a good day, what do you mean

6  by that?

7       A.    If nobody was sick, no vacations, no

8  training, things of that nature.

9       Q.    So if you're full staffed, you're at eight

10 or nine?

11      A.    Yes.

12      Q.    When we're talking about a patrol shift, the

13 size of your patrol shift, what does that mean?

14      A.    Could you restate that question?

15      Q.    Sure.  I just want to help the jury

16 understand what a patrol shift is.  So you've got patrol

17 duties, responsibilities in the city of Mt. Juliet?

18      A.    Yes.

19      Q.    You've got eight or nine officers on your

20 shift.  Are there other officers available to assist with

21 calls that come in or is the shift the group of folks who

22 are responsible for those calls?

23      A.    During the daytime there is the patrol

24 shift.  Like I said, on a good day is eight or nine

25 officers at the time.  There are investigators, there are

administrative personnel that are sworn that can come out
and assist if need be.

    Q.    But generally it's the eight or nine
officers who are covering the shift?

    A.    That is correct.

    Q.    Okay.  And those are the calls for service
coming in?

    A.    Yes.

    Q.    All right.  I want to take you back to
March 5, 2021.  Were you on duty that day, Sergeant?

    A.    Yes, but not at a patrol fashion.  We had a
training evolution going on at the time.

    Q.    And can you explain to the jury what that
is?

    A.    We had an in-house training that we were
doing that my shift was a part of because that was not a
typical duty day for us.

    Q.    So, in other words, you were supposed to be
off duty that day, but instead of being off duty you were
in training?

    A.    Correct.

    Q.    And were you dressed in uniform that day?

    A.    No, I was not.  I had on what we call our
training uniform, which consists of khaki-style pants and
a black City of Mt. Juliet Police Department polo shirt.

1    Of course, with that we have to wear our vest and gun

2    belt because we drive a patrol car.

3         Q.    So if you were to leave training, you'd be

4    wearing -- at least your ballistic vest; is that right?

5         A.    Correct.

6         Q.    Does your ballistic vest bear your badge of

7    authority?

8         A.    Yes.

9         Q.    At some point on March 5, 2021, did you

10   become of aware for a need of officers at the Providence

11   pavilion in Mt. Juliet?

12        A.    Yes, I did.

13        Q.    Can you tell the jury what you heard?

14        A.    We were in -- as I said, my shift was in

15   a -- was in the training room, and I think we were on

16   break at the time and we got notified that the patrol

17   sergeant on duty was requesting as much help as he could

18   get to that area.  On the way there I found out more

19   about what it was, just needed help with a lot of people,

20   more than he had to manage.

21        Q.    And you said on the way there.  Can you

22   describe to the jury exactly where you headed to?

23        A.    I don't know how familiar they are with that

24   area, but the Mt. Juliet Police Department is on the

25   north end of town or north end of the city up close to

1    Lebanon Road.  And the Providence pavilion in question is
2    about four miles south on the south side of the
3    interstate.
4        Q.    And the Providence pavilion is the location
5    you were called to; is that right?
6        A.    Yes.
7        Q.    And the Providence pavilion is in
8    Mt. Juliet?
9        A.    Yes.
10       Q.    And is Mt. Juliet in the Middle District of
11   Tennessee?
12       A.    Yes, it is.
13       Q.    Was it just you who responded there or did
14   other officers go as well?
15       A.    Oh, no.  We had -- I want to say every
16   officer assigned to the south side of town for the patrol
17   shift that was working that day was present.  Everybody
18   that was in training was present.  And then shortly
19   thereafter, all the detectives and administrative staff
20   showed up.
21       Q.    What did you see when you arrived, sir?
22       A.    Inside or outside?
23       Q.    Let's start with outside.
24       A.    When I arrived outside, there was a lot of
25   police vehicles in the parking lot.  So I found a place

1   to park and there was a -- if I remember correctly, there

2   was a group of people at the five -- I think it's the

3   5000 building, which is right next door, it's an office

4   building next door up on the hill, not -- not down in the

5   pavilion parking lot.

6           I proceeded inside up to where I knew the

7   clinic was, the specific location of this event.  I went

8   up the elevator and encountered a large group of police

9   officers and a large group of people.

10      Q.   Based on your training and experience as an

11  officer, why was this a police issue?

12      A.   The police issue existed when the group of

13  protesters refused -- or disrupted business for the other

14  businesses that were around and refused to leave when

15  they were asked to leave by the property owner.

16      Q.   And so you said the other businesses, and I

17  want to talk about that a little bit more.  So the

18  building that you were in, was there just one business

19  there or were there multiple businesses there?

20      A.   No, it's multiple businesses on multiple

21  floors.

22      Q.   And are all of them associated with the

23  carafem Health Clinic or are there a variety of

24  businesses there, different types?

25      A.   It's a variety.  I believe one of the

businesses on that same floor was a Vanderbilt
affiliated, like physical rehabilitation clinic for
sports injuries and such.

Q.   Okay.  And you testified a moment ago that
this was a police issue because of the disruption that
this was causing, not just to carafem, but to the other
businesses in the building; is that right?

A.   Correct.  The only reason we were there is
because of the disruption and the fact that the people,
the protestors had refused to leave.

Q.   When you arrived, did you understand what
you were supposed to be doing on scene?

A.   Not at the moment.  We had to collectively
get together and decide what was the actual problem and
how were we going to address it.

Q.   At some point during the day did you become
involved in making arrests?

A.   Yes.

Q.   Approximately how long after you arrived did
you become involved in that process?

A.   I'd say about two and a half, three hours.

Q.   Do you recall, sitting here today, who you
were responsible for arresting?

A.   I took responsibility for arresting four
juveniles.  I do not remember their names.

1     Q.   And when you say arrested and you're talking
2  about juveniles, can you describe the process that you
3  mean by that term arrested?

4     A.   Yes.  In Wilson County an arrest for a
5  juvenile is essentially a ticket.  It is a piece of paper
6  that I fill out with a charge on it.  I give it to the
7  Youth Services Division of the Wilson County Sheriff's
8  Office who contacts the parents and says -- let's the
9  parents know that their juvenile has a court date.

10     Q.   So they were issued summons essentially that
11  required them to come to court?

12     A.   Yes.

13     Q.   But they weren't placed in handcuffs or put
14  in patrol cars or anything like that?

15     A.   No.

16     Q.   And that's just the juveniles we're talking
17  about; right?

18     A.   Correct.

19     Q.   I want to take you back to the second floor
20  hallway.  At some point during the day did you learn that
21  someone needed to get into the carafem clinic?

22     A.   Yes.

23     Q.   What was your reaction to that?

24     A.   I was -- I just happened to be standing
25  closest to the hallway, so I was -- I was told to take

the female down to the clinic.  And she got behind me and
we started walking down the hall.

Q.    Okay.  So the person who needed to get in
there, you recall that she was a female?

A.    Yes.

Q.    Do you know why she needed to get in there?

A.    Not a clue.

Q.    Okay.  Had you ever seen her before?

A.    No.

Q.    All right.  And you testified a second ago
that you just started walking her down the hallway; is
that right?

A.    Yes.

Q.    All right.  Based on your training and
experience, why was it necessary for you to go with her
down to the clinic?

A.    Based -- based on my training and
experience, the average person would not walk down that
hall for being intimidated, overwhelmed, possibly in
fear, but the group that we had been --

MR. CONWAY:  Objection, speculation as far
as what they might be thinking, judge.

MR. BOYNTON:  Your Honor, I think it goes to
the foundation for why he chose to do what he did.  It's
what was going through his mind at the time.

1           THE COURT:  You're just saying that you
2  presumed that someone confronted with that situation
3  might be --
4           THE WITNESS:  Yes, ma'am.
5           THE COURT:  -- intimidated.
6           THE WITNESS:  Not her specifically, just
7  somebody generally.
8           THE COURT:  That's why you accompanied her;
9  right?
10          THE WITNESS:  Yes, ma'am.
11          THE COURT:  She didn't say I'm intimidated
12  and afraid?
13          THE WITNESS:  No.
14          THE COURT:  Okay.
15          MR. CONWAY:  Withdraw my objection.
16          THE COURT:  Okay.  Go ahead.
17  BY MR. BOYNTON:
18     Q.   When you started down the hallway heading
19  towards the clinic, what did you see in front of you,
20  sir?
21     A.   Just -- I'd say, I don't know, 20, 25 people
22  lined on each side of the hallway, not being violent but
23  refusing to move.
24     Q.   Now, when you say lined on each side of the
25  hallway -- and you're looking towards the door, was there

1    a clear route for you down to the door?

2        A.    No.

3        Q.    So can you describe a little bit more why

4    that route wasn't clear for you?

5        A.    Well, like I said, it wasn't a --

6    necessarily a wide hallway.  I have to use -- I can only

7    use myself as an example, but for me to walk down that

8    hallway, approaching myself, I would have to turn

9    sideways just a little bit.

10       Q.    Okay.  As you turn down that hallway and you

11    see what's in front of you, based on your training and

12    experience, did you have any concerns?

13       A.    I did not for me, no.

14       Q.    And why did you not have any concerns for

15    yourself?

16       A.    They had not proven themselves to be violent

17    towards us at that point.

18       Q.    Okay.  At that point what action did you

19    take?

20       A.    I walked down the hallway and I asked the

21    people to move out of the way.  And I just kept

22    proceeding.  They -- at some point they decided they

23    didn't want to move, so I put my hands together --

24           MR. CONWAY:  Your Honor, object.  He's using

25    the word they.  If he knows who.

1          THE WITNESS:  The group.

2          THE COURT:  Did you know the names of any

3    people at this point?

4          THE WITNESS:  No.

5          THE COURT:  All right.  So continue.

6    Overruled.

7          MR. BOYNTON:  Thank you, Your Honor.

8    BY MR. BOYNTON:

9      Q.    So you described coming down the hallway.

10   You were instructing people who were in front of you to

11   move to the side; is that right?

12     A.    Correct.

13     Q.    Did they say anything back to you?

14     A.    As best I can recall, somebody said, we

15   can't do that.

16     Q.    Did that statement concern you as a law

17   enforcement officer based on your training and

18   experience?

19     A.    Not me.  Not for me, no.

20     Q.    Did it suggest to you what was -- what you

21   were going to need to do to get to the end of the

22   hallway?

23     A.    It was -- if they had refused beyond what

24   they did, we were going to have to start arresting

25   people.

1     Q.   And do you recall anyone saying anything to

2 the woman you were escorting down the hall?

3     A.   I do not.

4     Q.   Now, you've testified that no one assaulted

5 you and you weren't concerned about being assaulted.  As

6 you got closer to the door to the office, did you have

7 any concerns about what you were continuing to face in

8 that hallway?

9     A.   The only concern that I had as I was walking

10 down the hallway, some people did step -- I don't know

11 who they were.  They did step in the way and I gently

12 moved them out of the way.  And I got to the door of the

13 clinic and there was a woman, I don't remember her name

14 at all, but she was in -- for lack of actually knowing

15 what this device is called, I'm going to call it a

16 wheelchair because I don't know its specific name.  But

17 she was sitting in front of the door.

18     Q.   I want to back up a second.  You said that

19 you had to gently -- people stepped in front of your way

20 and you had to gently move them?

21     A.   Yes.

22     Q.   Can you talk a little bit more -- did they

23 step right in front of you?  Describe for the jury what

24 you saw happen in front of you.

25     A.   Some people did step in front of me, not in

1  an aggressive, violent way, just in a

2  we're-blocking-your-way kind of method.

3      Q.    Okay.  And at that point could you get past

4  those people without placing hands on them?

5      A.    No.

6      Q.    And what did you do in response to that?

7      A.    I put my hands together out in front of me,

8  and then I moved them out to the side so that I could

9  create space to get down the hallway.

10     Q.    What happened when you did that, sir?

11     A.    They moved.

12     Q.    Okay.  After those -- you placed your hands

13 on those people, you then described seeing more people in

14 front of the doorway, is that right, and that's where

15 you're talking about the woman in the wheelchair?

16     A.    Yes.

17     Q.    Approximately how many people were then in

18 front of the door after you moved those two out of the

19 way?

20     A.    I would say two to four.  I remember her

21 specifically.  I don't remember many others.  I'm sure

22 there were some in the periphery, but I was -- had my

23 attention focused on the woman in the wheelchair.

24     Q.    After you moved those two people out of the

25 way, did the rest of the people in front of you move for

1  you?

2      A.    More or less.  There was not a whole lot of

3  resistance, even when they stepped in the way.  When I

4  moved them, they didn't offer any resistance to prevent

5  that from happening.

6      Q.    Okay.  So but what I'm getting at is at the

7  door itself.  So you've moved those two people out of the

8  way and -- to get closer to the door.  Did everyone just

9  move away from the door at that point or was there still

10 another group of folks in front of the door?

11     A.    I apologize.  I misunderstood.

12     Q.    No.

13     A.    They would not move from in front of the

14 door.

15     Q.    And that included the woman in the

16 wheelchair?

17     A.    Correct.

18     Q.    All right.  At that point based on your

19 training and experience, what did you feel you were going

20 to need to do?

21     A.    As politely and as gently as I could, I was

22 prepared to move the woman in the wheelchair.  I was

23 going to wheel her out of the way.

24     Q.    Why did you feel like you needed to do that?

25     A.    Because this woman had an appointment at the

clink, and it was my obligation to make sure that she
got to that appointment.

Q.   As this was happening, do you recall here
sitting here today the emotional state of the woman
behind you that you were escorting down the hallway?

A.   I know she seemed, from the sound of her
voice, that she was overwhelmed and no longer wanted to
be there.

Q.   Okay.  Did she say anything?

MR. CONWAY:  Objection, hearsay.

MR. BOYNTON:  Your Honor, it would be --

THE COURT:  Is it offered for the truth of
the statement?

MR. BOYNTON:  Your Honor, we'd offer it as
an excited utterance and a present sense impression.

THE COURT:  Overruled.

THE WITNESS:  I -- specific words, I don't
remember exactly.  The feeling I got from what she --
from what she said was that she was overwhelmed and she
was not going to stay and wanted to leave.

BY MR. BOYNTON:

Q.   What, if anything, did she do at that point?

A.   She turned around and left right -- the way
she came out.

Q.   At that point did you have any reason to try

1   to get into the clinic?

2       A.    No.

3       Q.    So there was no reason to move the woman in

4   the wheelchair or the other -- other individuals out of

5   the way; is that right?

6       A.    That is correct.

7       Q.    Okay.  I'd like to pass up to you what's

8   been marked for identification purposes as Government's

9   Exhibit 3I and Government's Exhibit 16.

10       Do you recognize these two things in front

11   of you?

12       A.    Yes.

13       Q.    Okay.  And what is Government's Exhibit 3I?

14       A.    Oh, there it is, sorry.  It is a video disk.

15       Q.    Okay.  And you've seen this video before?

16       A.    Yes.

17       Q.    Okay.  And how do you know that you've seen

18   that video before?

19       A.    I signed it and put the date on it.

20       Q.    And what is Government's Exhibit 16, sir?

21       A.    It's the -- it's a different disk, but one

22   that I also signed and dated.

23       Q.    Okay.  And it's a disk of what?

24       A.    It's a video disk of the incident -- both of

25   these are video disks of the incident that happened that

1   day.

2           Q.    Now, are these clips from police body worn

3   cameras?

4           A.    Not to my -- no, they're not.

5           Q.    Do you know who recorded them?

6           A.    I do not know who recorded them.

7           Q.    But do these clips depict any events that

8   you just described?

9           A.    Yes.

10                MR. BOYNTON:  Your Honor, we'd move to admit

11  Government's Exhibit 3I and Government's Exhibit 16.

12                THE COURT:  Any objection?

13                MR. CONWAY:  No objection.

14                THE COURT:  Received.

15                (Government Exhibits Nos. 3I and 16 were

16  admitted.)

17                MR. BOYNTON:  Ms. Andrews, can we play

18  Exhibit 3I --

19                I'm sorry, may I publish to the jury?

20                THE COURT:  Yes.

21                MR. BOYNTON:  Thank you.

22                THE COURT:  3I as in India?

23                THE COURT:  3I, yes.

24                MR. BOYNTON:  And then Exhibit 16.

25                THE COURT:  Oh, 16, I'm sorry.  I thought

1    you said 6T.

2                COURTROOM DEPUTY:  Would you tell them not

3    to mess with the screens over here, the jury?

4                THE COURT:  Yeah.  Well, we just need to

5    tell the jurors to just be very gentle.  If you move the

6    screen, be very gentle with it.  It is on an arm and you

7    can move it, but if you can look at it without moving it,

8    we might not have any technical difficulties.

9                MR. BOYNTON:  Your Honor, may the jurors

10   follow along in their transcript books?

11               THE COURT:  Yeah.  What are the transcripts?

12               MR. BOYNTON:  The transcripts are 3I and for

13   16.

14               THE COURT:  Okay.  Are you going to do 3I

15   first?

16               MR. BOYNTON:  Yes, Your Honor.

17               THE COURT:  Well, 3I is the recording.  And

18   what is the transcript?  I just have a page in here.

19               MR. BOYNTON:  I apologize.  Court's

20   indulgence, Your Honor.

21               MS. KLOPF:  I understand there should be a

22   tab on the side that says 3I.

23               THE COURT:  3I says a recording clip 9 disk,

24   that is all that's under 3I.  There's no transcript under

25   3I.

1            MS. KLOPF:  You may not have a transcript
2       binder, Your Honor.  I think you're looking at the
3       exhibit binder.
4            THE COURT:  Yes, I am.
5            MS. KLOPF:  Yes.  There's a separate
6       transcript binder.
7            THE COURT:  Well, where's the transcript?
8            MS. KLOPF:  Let me see.  Your Honor, I
9       think, unfortunately we have one too few binders today.
10      We'll make sure this evening that we get one for you as
11      well.
12           THE COURT:  Well, do they have a transcript?
13           MS. KLOPF:  Yes, Your Honor.  The jurors
14      each have a transcript binder.
15           THE COURT:  Do they have two binders?
16           MS. KLOPF:  No, they only have a transcript
17      binder.  You have an exhibit binder.
18           THE COURT:  Oh, okay.
19           MS. KLOPF:  They do not have an exhibit
20      binder.
21           THE COURT:  That's my confusion.  Do you see
22      a transcript that says 3I?
23           JUROR:  Yes, ma'am.
24           THE COURT:  Wonderful.  You're the ones that
25      need to see it.  Go ahead.

         1              MR. BOYNTON:  Thank you.

         2     BY MR. BOYNTON:

         3         Q.    (Playing video.)

         4              Sergeant Schneider, I just want to orient us

         5     quickly to what we see in the video.  Did you see

         6     yourself there?

         7         A.    Yes.

         8         Q.    Okay.  And you were the lead law enforcement

         9     officer in that video that we just watched?

        10         A.    Yes.

        11         Q.    Okay.  And the patient that -- or the woman

        12     that you were leading down the hallway that I asked you

        13     about before, did you see her in that video?

        14         A.    Yes.

        15         Q.    Okay.  And can you just describe for the

        16     jury where she was?

        17         A.    She was behind -- I'd say probably about

        18     three or four feet behind me from what I could tell.

        19         Q.    Okay.  Now, Sergeant, you said before you

        20     were not concerned for yourself in going down the

        21     hallway; is that right?

        22         A.    Correct.

        23         Q.    But you -- you were escorting the patient

        24     down the hallway?

        25         A.    Yes.

1     Q.    And did you have any concerns for the

2  patient?

3     A.    There's always concerns for the patient or

4  any civilian in a crowd that could potentially be hostile

5  towards them.

6     Q.    You just didn't know; is that fair to say?

7     A.    Correct.

8     Q.    Ms. Andrews, can we play Exhibit 16.

9          (Playing video.)

10         Sergeant Schneider, approximately how many

11  officers were at Mt. Juliet -- from Mt. Juliet were at

12  the medical pavilion that day?

13     A.    If I had to guess, I'd say between 25 and

14  35.  Everyone that was available minus the officers that

15  were off duty.

16     Q.    And you testified earlier that when you

17  eventually made arrests, it was approximately two and a

18  half hours after you got there; is that right?

19     A.    Roughly, yes.

20     Q.    So approximately how many hours were

21  officers tied up that day?

22     A.    Total time, if you factor in the beginning

23  of the call, all the way up to getting done at the jail,

24  with the arrests and whatnot, I'd say probably six.

25     Q.    How's the department handling emergency

1    calls during that time period?

2         A.    We called in --

3               THE COURT:  Excuse me?

4               MR. CONWAY:  Objection, relevance.

5               THE COURT:  Stand for an objection.

6               MR. CONWAY:  I'm sorry.  Objection,

7    relevance.

8               THE COURT:  What's the question?

9               MR. BOYNTON:  Your Honor, the question was

10   how was the department handling other emergency calls on

11   that day, given the number of officers he had testified

12   to that were tied up at the medical pavilion.

13              THE COURT:  Is there a relevance to that?

14              MR. BOYNTON:  Your Honor, I think it

15   highlights the time that was involved with addressing the

16   issue that happened at the Providence pavilion, the

17   number of officers that they needed there for that reason

18   and the issue that they were facing there.

19              THE COURT:  Sustained.

20   BY MR. BOYNTON:

21        Q.    Now, you testified earlier about a woman in

22   a wheelchair who was immediately in front of the doors of

23   the clinic as you walked down the hallway.  Do you recall

24   that?

25        A.    Yes.

1     Q.   And do you recall whether she was an

2  individual who was arrested that day?

3     A.   Yes, she was.  I remember.

4     Q.   Okay.  And did you see any part of that

5  arrest?

6     A.   Yes, I did.

7     Q.   And can you tell the jury what you saw?

8     A.   Well, she was escorted in her chair to the

9  elevator and to the back door of the pavilion where a

10  patrol car was pulled up under the awning.  Her -- she

11  got out of her wheelchair and stepped up into the police

12  vehicle.  We didn't have to carry her or pick her up or

13  anything.  And then we folded the wheelchair up and

14  transported it with us.

15     Q.   What was your reaction to that?

16     A.   I didn't know why she needed the wheelchair.

17     MR. BOYNTON:  Thank you, Your Honor.  No

18  further questions.

19     THE COURT:  All right.  Cross?

20              **CROSS-EXAMINATION**

21  BY MR. CONWAY:

22     Q.   What is your proper title now?  I don't want

23  to call you the wrong thing.  I know you were a sergeant,

24  but I didn't catch it at the beginning.

25     A.   I'm now a corporal.  It's one step below.

1      Q.    And I wasn't sure if we were going to see

2   the videos with you, but now that you've seen the videos,

3   were you able to identify the people that you had to put

4   your hands on as defendants over here?

5      A.    I remember -- I remember from the videos

6   having seen them there, yes.

7      Q.    Right.  I mean, would you agree with me that

8   if a picture speaks a thousand words, a video speaks a

9   lot more as far as accuracy?

10     A.    Yes.

11     Q.    Okay.  I mean, would you agree that a video

12  is going to be more accurate than someone's memory three

13  years later?

14     A.    That's a reasonable assumption to make.

15     Q.    Okay.  And so you've been a police officer

16  for 20-plus years; right?

17     A.    Yes.

18     Q.    At that point in time I think you had talked

19  about that you were a supervisor, a sergeant.  Prior to

20  becoming a sergeant, what other roles had you had before

21  becoming a sergeant?

22     A.    At Mt. Juliet or altogether?

23     Q.    Just in general.

24     A.    I've been a field training officer, corporal

25  on patrol.  Of course a patrol sergeant.  I was on

1  special operations at La Vergne.  Been a detective.

2      Q.  So a little bit of everything?

3      A.  Yes.

4      Q.  Now, you were first interviewed by federal

5  agents about this case in March 2022; is that correct?

6  Or about a year later.  I'm not going to marry you to a

7  date.

8      A.  I don't remember exactly when.

9      Q.  Roughly a year later?

10     A.  Okay.

11     Q.  And now do you remember at the beginning of

12 that interview they kind of went over what the FACE Act

13 was and so on and so forth and the purposes of the

14 interview?  Did you know what the FACE Act was at that

15 point in time?  I'll change my question.

16     A.  Not at that point in time, no.

17     Q.  After that interview, you kind of said, oh,

18 okay, now I know what the FACE Act is; right?  You were

19 informed of that and learned of it?

20     MR. BOYNTON:  Objection, relevance.

21     THE COURT:  What's the relevance?

22     MR. CONWAY:  I'll move on, Judge.

23 BY MR. CONWAY:

24     Q.  You were not arresting these people for FACE

25 Act.  You were arresting them for trespass violations at

1    that point in time; correct?

2            A.      Yes.

3            Q.      Okay.  And I'm not sure what the jury's

4    education is, but state and county police jurisdiction is

5    different than federal jurisdiction; correct?

6            A.      Yes.

7            Q.      Okay.  I'm going to go ahead and move on, I

8    want to speed through this.  On this particular date you

9    had planned to attend a training with other police

10   officers; correct?

11           A.      Yes.

12           Q.      Okay.  And then you and the other officers

13   got a call to respond to this carafem clinic; correct?

14           A.      Correct.

15           Q.      And all of y'all -- did y'all leave together

16   to go to the clinic?

17           A.      We all left in our individual patrol

18   vehicles.

19           Q.      Okay.  By the time you arrived at the

20   clinic, there were several other police officers already

21   there; correct?

22           A.      Yes.

23           Q.      Okay.  Would some of those be patrol

24   officers or more first responders?

25           A.      Most of them, yes.

1        Q.    And can you just tell the jury about what a
2   patrol officer or first responder would be?  Or what some
3   of their duties would be?
4        A.    The patrol officer or first responder?
5        Q.    Patrol officer.
6        A.    Okay.  Patrol officer's duty is to
7   obviously, you know, to drive around, patrol
8   neighborhoods, ensure the safety of the citizens of
9   Mt. Juliet, make traffic stops, arrests, write reports.
10       Q.    Kind of as it sounds.  They're on the
11  street; right?
12       A.    Yes.
13       Q.    Okay.  So it makes sense that they would be
14  at the clinic first; right?
15       A.    Yes.
16       Q.    Okay.  Does Mt. Juliet require patrol
17  officers to wear body cams?
18       A.    We do.
19       Q.    And what is a body cam?  They might not
20  know.
21       A.    A body cam is just a recording device that
22  is on the officer's person that records -- different
23  agencies have them set up different ways, but ours we can
24  activate either remotely or when the lights, the
25  emergency lights are turned on.

1     Q.    Okay.  And it would be a requirement going

2 to the scene to have your body cam turned on for these

3 patrol officers; right?

4     A.    Correct.

5     Q.    Okay.  Now, I know there wasn't official

6 briefing before you arrived, but you were kind of

7 apprized of the events that were going on, were you not?

8     A.    Yes.

9     Q.    So you knew it was a large group of

10 nonviolent protestors; right?

11     A.    Initially or after I got there?

12     Q.    Like initially.

13     A.    Initially I just heard it was a protest.  I

14 did not know what kind.

15     Q.    Didn't you specifically not get your riot

16 gear or anything like that because you didn't think it

17 was violent?

18     A.    Well, riot gear is not the -- unless we have

19 an actual riot, that's not the first thing we're going to

20 pull out of the car.

21     Q.    Okay.  So how about when you got there?  Did

22 you find out that it was a nonviolent protest?

23     A.    Yes, when I got up there, up to the second

24 floor, yes.

25     Q.    Okay.  Now, when you got to the second

1  floor, what were all of the people in the hallway doing?

2       A.    Mainly -- sorry.  Mainly standing in the

3  hallway that led directly down to the carafem clinic.

4  Standing there, sometimes they would sing hymns or --

5  sorry, they would sing, I'm not sure exactly what they

6  were singing.  And talking to each other.

7       Q.    Okay.  And they were praying; right?

8       A.    I'm not going to speculate as to what they

9  were saying.

10      Q.    A video would be a more accurate

11 recollection than your memory; would you agree with me on

12 that?

13      A.    Yeah, that's fine.  Yeah.

14      Q.    Okay.  I believe the initial plan was to

15 kind of, how do we handle all of these protestors; right?

16 Weren't you and the other officers discussing that?

17      A.    Yes.

18      Q.    And, you know, there's a lot of manpower to

19 arrest all of these people for simple trespass; would you

20 agree with that?

21      A.    Yes.

22      Q.    And the plan was kind of drawn out for

23 several hours because there were multiple officers

24 talking to some of the protestors?

25      A.    I'm not exactly sure why it was drawn out.

1    I just know that it was.

2         Q.    Did you ever see any of the other officers

3    like Watkins, Bancroft or the Chief Hambrick speaking

4    with any of the protestors?

5         A.    Yes.

6         Q.    Now, were they trying to negotiate a

7    diplomatic outcome to not make all these arrests?

8         A.    I can only assume so.  I was not involved in

9    those conversations.

10         Q.    Did you observe any of the group speaking to

11    the Chief and Watkins away from the rest of the group?

12    Any specific members of the group?

13         A.    I remember only one.

14         Q.    Can you describe what he looked like?

15         A.    It's an older gentleman, white hair.

16    Probably -- he was wearing a gray sweatshirt in the video

17    that we saw earlier.  Mustache.

18         Q.    Okay.  And you weren't privy to that

19    conversation?

20         A.    No.

21         Q.    And if we had a video of it, probably be way

22    more accurate than your memory; right?

23         A.    Yeah.  Even if I was standing present, I

24    wasn't paying attention to that.

25         Q.    Okay.  Now, you know we saw that the patient

1  come up the elevator.  At what point in time did you make

2  the decision to walk down the hallway with her?

3        A.    When I was told to.

4        Q.    Do you remember who directed you to do that?

5        A.    I do not.  I just remember I was closest and

6  I was the one elected to do it.

7        Q.    All right.  And we saw the video, and would

8  you agree with me that most of the people were getting

9  out of the way voluntarily until you ran across the man

10 that was bigger and the woman that you had to put your

11 hands on?

12       A.    Well, for me, yes.

13       Q.    So do you remember any particular defendants

14 offering any physical resistance to you?

15       A.    No.

16       Q.    Now, would you agree with me that as you

17 moved down the hallway that your safety concerns were

18 lowered as they kind of peacefully spread, as you said,

19 part the seas?

20       A.    My safety concerns were never that high to

21 begin with, but I wasn't concerned about my safety.

22       Q.    Okay.  Now, I did hear you say on direct

23 that you didn't know if the group would be hostile

24 towards somebody they didn't like.  Did they ever become

25 hostile?

1          A.     Not physically.

2          Q.     Did you arrest anybody for assault that day?

3          A.     No.

4          Q.     Did you arrest any of this group for

5     harassment?

6          A.     No.

7          Q.     Okay.  And the jury may not know, you can be

8     arrested for the apprehension of assault; correct?  In

9     Tennessee?  Just by fear of assault?

10         A.     Oh, that.

11         Q.     The B misdemeanor.  Answer out loud.

12         A.     You're referring to, like, assault by

13    intimidation?

14         Q.     Yes.

15         A.     Yes.

16         Q.     Nobody was arrested for that by Mt. Juliet

17    Police Department; correct?

18         A.     No.

19                MR. BOYNTON:  Your Honor, I object to this

20    line of questioning.

21                THE COURT:  Overruled.

22    BY MR. CONWAY:

23         Q.     We saw the video of getting to the door, so

24    I'm going to move on to that.

25                Would it be fair to say that, in your

1  opinion, the situation was pretty unpleasant for this

2  patient?

3       A.    You're asking for my opinion?

4       Q.    Your opinion, yes.

5       A.    Yes, I would say that she was not -- she was

6  not well received being there and it was extremely

7  uncomfortable for her to be there.

8       Q.    At the beginning of my questioning, Officer,

9  I didn't tell you that I represented Ms. Heather Idoni.

10 And I'm not sure if you can see her.  If -- Ms. Idoni, if

11 you can possibly stand up.

12            Do you remember having any interaction with

13 her whatsoever?

14      A.    No.

15      Q.    Okay.  Could you tell us from your memory

16 where she was in that hallway at all?

17      A.    I have no idea.

18      Q.    Okay.  Kind of once again, go to the video?

19 Be more accurate?

20      A.    That's fine with me.  If you have to.

21      Q.    Okay.  You've been interviewed by the

22 federal authorities multiple times as it relates to this

23 case; correct?

24      A.    Once, maybe twice.

25      Q.    Once in 2022, once in 2024?  Does that sound

1   about right, at the end of last year, December, maybe?

2          A.    I don't remember that far back for --

3          Q.    December of 2024, last month?

4          A.    No.  I've got two kids, a wife and barely

5   get any sleep.

6          Q.    Gotcha.

7          MR. CONWAY:  That's all the questions I

8   have.  There may be some other questions by other defense

9   counsel.

10              **CROSS-EXAMINATION**

11  BY MR. RUSS:

12         Q.    Corporal Schneider, I'm Ben Russ.  I

13  appreciate you've been here all day and I'll try not to

14  be repetitive.  I kind of want to focus on the video a

15  little bit, but I also wanted to ask you, you said on

16  your direct testimony that you had concern for people in

17  situations like this, not for yourself.  I think you made

18  that pretty clear, but just when there was a lot of

19  people around and there are civilians.  That was a

20  general concern on your opinion; is that fair to say?

21         A.    Yes.  What I was describing was a general

22  sense of someone, a person trying to walk down a crowded

23  hall in that type of situation.

24         Q.    Exactly.  So not -- not this particular

25  person.  You were just -- you're concerned in those kind

1    of situations, but there was nothing that the people in

2    the hallway were doing that was increasing your concern

3    for her safety?

4              A.    Not overtly, no.

5              Q.    Okay.  I wanted to ask you specific

6    questions about the video.  And obviously it's not very

7    long what we watched.  I think you said it better than I

8    did.  You moved them, but they were compliant I think was

9    maybe the way you put it.  You did have to lay hands on

10   two of the people, but they didn't resist you; right?

11             A.    Yes.  I mean, I guess my definition of lay

12   hands is a little different than yours, but yes.

13             Q.    I appreciate that.  You had to have a

14   physical interaction with them.  I wasn't trying to say

15   they moved out of your way without you having to do

16   anything, but as you say, you didn't have to be

17   aggressive with them or anything?

18             A.    Okay, yes.

19             Q.    As we saw, the young lady was following you

20   and you said she was three or four steps behind.  They

21   weren't preventing her from going down the hallway to

22   follow you; right?

23             A.    They did not get in her way.  They did not

24   assault her with me in front of her, no.

25             Q.    And as you said, you approached the door.

1    And once you got up to the door, you were telling them

2    they needed to move; right?

3        A.    Yes.

4        Q.    And she's behind you and pretty quickly, I'd

5    say within about 10 seconds, she decides, this isn't the

6    right day, I'll just come back a different day; right?

7        A.    That's what I heard, yes.

8        Q.    She never got to the door?  Of the clinic, I

9    mean.

10       A.    I guess -- I don't know if that's semantics

11   talking about getting to the door.  I don't know if her

12   getting to the door is the same as me being in front of

13   her trying to move someone out of the way right in front

14   of the door.

15       Q.    Right.  I wasn't suggesting that she had to

16   leapfrog you or something like that, but the two of you

17   were together approaching the door?

18       A.    Yes.

19       Q.    And you got up to the door and you were

20   instructing them that they're going to have to move;

21   right?

22       A.    Yes.

23       Q.    But -- and you were saying, I think, that

24   the woman in the wheelchair, if she wasn't going to do

25   that voluntarily, you were going to wheel her out of the

1    way; right?

2            A.      I was going to move her, yes.

3            Q.      But it never got to that point?

4            A.      Correct.

5            Q.      But you personally didn't try to open the

6    door to the clinic?

7            A.      No.

8            Q.      And the young lady who you were with, as you

9    said, you were guiding her through this and she made the

10   decision on her own that, even though you were helping

11   her, she wasn't going to wait and see.  She just left.

12           A.      Yes, she turned around and left, yes.

13           Q.      So you can't really speculate whether they

14   would have gotten out of your way like the other people

15   or whether you would have had to move them or what would

16   have happened.  We just don't know; right?

17           A.      Correct.

18           Q.      That was the only person that you assisted

19   trying to do that the whole time that you were at the

20   building that day; correct?

21           A.      Correct.

22           Q.      And you're not aware of any other patients

23   that needed that kind of help while you were there?

24           A.      So far as I know, she was the only one.

25           Q.      And I think you already said that, just so I

1    cover it, they didn't make any threats towards this woman
2    while you were accompanying her down the hallway?
3          A.    Not that I heard.
4                MR. RUSS:  Those are the questions I have
5    for him, Your Honor.
6                THE COURT:  Okay.  Who wants to go next?
7                MR. CRAMPTON:  We're all out of order here,
8    Your Honor.
9                THE COURT:  Okay.
10                      **CROSS-EXAMINATION**
11   BY MR. CRAMPTON:
12         Q.    Hi, Corporal Schneider, my name is Steve
13   Crampton.  I'm here representing defendant Paul Vaughn
14   over here.
15         A.    Okay.
16         Q.    You don't recall Mr. Vaughn from the day you
17   were out there at the carafem clinic, do you?
18         A.    I can't see him, so I don't know who he is.
19                THE COURT:  Mr. Vaughn, would you stand up.
20                (Complies.)
21                THE WITNESS:  No, I don't.
22   BY MR. CRAMPTON:
23         Q.    Now, if I heard you correctly in response to
24   a question from the government a few minutes ago, you
25   indicated that the problem arose there because the

1  protestors had been requested to leave by the property

2  owner.  Did you say that?

3         A.    That was my understanding, yes.

4         Q.    That was your understanding?

5         A.    Yes.

6         Q.    You yourself didn't encounter the property

7  owner that day, did you?

8         A.    I never spoke to the property owner, no.

9         Q.    Did you see the property owner that day?

10        A.    I didn't.

11        Q.    Okay.  So with regard to this incident, as I

12  count them and I believe my colleague asked you this, you

13  have given at least three different statements.  One on

14  the day of when you arrested the juveniles, you remember

15  filling out an incident record?

16        A.    Uh-huh (affirmative).

17        Q.    Is that a yes?

18        A.    Yes, I had to fill out incident reports for

19  that.  Sorry.

20        Q.    In that incident report, you indicated, did

21  you not, that MJPD officers requested the protestors

22  disperse, but the protestors refused.  You didn't mention

23  the property owner, did you?

24        A.    Not in the report, no.

25        Q.    Okay.  Was that just an oversight?

1      A.    No, the property owner asked us to have them

2  leave.  We tell them to leave.  That's all that needs to

3  happen.

4      Q.    As we sit here today, you don't know that

5  the property owner made that request on this day?

6      A.    But the property owner doesn't have to make

7  the request if we show up because of a call at that

8  business, and that's why we were called there because of

9  the protest.  We asked them to leave, they don't leave,

10  that becomes the violation.  That's where the problem

11  exists.

12      Q.    So if I'm following you, some tenant in the

13  building, in this case in the carafem clinic --

14          MR. BOYNTON:  Your Honor, just object on the

15  basis of relevance.  We're trying a FACE violation here.

16          MR. CRAMPTON:  Your Honor, if I may, two

17  points.

18          THE COURT:  Well, you can impeach him --

19          MR. CRAMPTON:  That's what I'm doing.

20          THE COURT:  -- but I'm not sure you're on

21  the right track, but go ahead.

22          MR. CRAMPTON:  And likewise the dispersement

23  order.

24          THE COURT:  He did not say someone from the

25  carafem clinic called.

```
 1              MR. CRAMPTON:  No, now he's saying
 2   somebody --
 3   BY MR. CRAMPTON:
 4         Q.   Was it someone from carefem that called, do
 5   you know?
 6         A.   It could have been the Vanderbilt clinic, it
 7   could have been the business downstairs.  I have no idea
 8   who called.  I was in training.  I know we got the call.
 9         Q.   Thank you, all right.
10              And is it fair to say, sir, that in your
11   third 302 report regarding this incident, you never
12   mentioned the property owner --
13         A.   I'm sorry, my what?
14         Q.   Your third written statement or interview by
15   the FBI you never mentioned that a property owner had
16   given an order to disperse, did you?
17         A.   Again, the property owner doesn't have to.
18   We got that information at some point.  I don't know
19   when.  I just -- I do know that, like I said, we got the
20   call for the protest.  We showed up, we asked them to
21   leave, they didn't leave.
22         Q.   Simple question.  You testified today for
23   the first time that the property owner had requested this
24   dispersement?
25              MR. BOYNTON:  Your Honor, objection.  I
```

1 think that mischaracterizes the officer's testimony

2 earlier in his direct examination.

3        THE COURT:  The jury will remember what he

4 said.  Move on to something else.

5        MR. CRAMPTON:  Okay.

6 BY MR. CRAMPTON:

7    Q.    Now, you also indicated in one of your

8 reports, didn't you, sir, that there was -- due to the

9 number of protestors I think you called them there, there

10 were like logistical issues; correct?  My cocounsel

11 mentioned some of them.  Making mass of arrests requires

12 a lot of police; right?

13    A.    Yup, it does.

14    Q.    Likewise in this incident, weren't the

15 negotiators called out?  I think you mentioned they were

16 present; correct?

17    A.    Yes.

18    Q.    And isn't it also true that the EMS was also

19 called out at some point on this occasion; right?

20    A.    I would assume so.  I have no idea.  I was

21 inside.

22    Q.    Fair enough.  Are there not also issues --

23 you mentioned the woman in the wheelchair.  That required

24 some special accommodation, doesn't it?

25    A.    Yes.

1     Q.   And similarly, if you're making mass

2 arrests, it requires a certain number of officers with

3 either handcuffs or zip ties or something to effectuate

4 the arrest, doesn't it?

5     A.   Yes.

6     Q.   In other words, there's a process involved,

7 isn't there?

8     A.   Correct.

9     Q.   And that takes time; fair?

10     A.   Yes.

11     Q.   In your experience, in your many years as a

12 police officer, are you familiar with a formal protocol

13 involved in incidents like this that would apply?

14     A.   I've worked for smaller agencies.  We

15 haven't really -- we haven't come upon these type of

16 events very often.

17     Q.   Sure, okay.

18     I believe you indicated you weren't involved

19 in any of the negotiations themselves?

20     A.   No.

21     Q.   Okay.  So as you sit here today, you can't

22 really tell us definitively whether the resolution of the

23 incident was timely or not, can you?

24     A.   No, I have no idea.

25     MR. CRAMPTON:  Fair enough.  Thank you.

1    That's all I have.

2              THE COURT:  Who else wants to cross?

3              MR. THORNTON:  Thank you, Your Honor.

4              THE COURT:  Okay.  We'd like to finish this

5    witness today.  It's 12 minutes to 5:00.

6                    **CROSS-EXAMINATION**

7    BY MR. THORNTON:

8         Q.   Officer Schneider, I'm Steve Thornton.  I

9    represent the defendant Coleman Boyd.  I would like to

10   get a sense of the sequence of events if I could.  So I

11   understand that you were at the police station and you

12   received a call.  You were on a training day; is that

13   right?

14        A.   Yes.

15        Q.   And then you traveled from the police

16   station to the carafem clinic building?

17        A.   Correct.

18        Q.   And you called that the Providence pavilion

19   building?

20        A.   I can't remember the exact name of it.  But

21   I know -- I think it's like 5000 or 5002 Crossing Circle.

22   But I know exactly where it is.

23        Q.   That's close enough for my purposes.  When

24   you arrived what did you see?  Did you see people

25   outside?

A.    Yes, there was people outside and there were
a lot of -- there were several police cars, police
vehicles there.  And we were directed to go up to the
second floor.  I knew where the clinic was after having
been there before.

Q.    Having been there before, in your experience
on your time of service for the Mt. Juliet Police
Department, had you seen people protesting or rallying or
pro-lifers out in front of that building before?

A.    Yes.

Q.    When you arrived that day, this looked --
those people outside looked like those prior experiences,
did they?

A.    Not that day.  That was a different group --
I don't know if it was a different group of people, but
they weren't acting in the same manner yes.

Q.    Do you mean the people outside weren't
acting in the same manner?

A.    Yes.

Q.    So before you get inside, you arrive, you
see people outside.  They were acting how differently?

A.    Well, the -- I guess up to that point the
protests had taken place on the sidewalk in front of the
building -- in front of the property, the public
sidewalk.  Crossing Circle's right in front of the

1   business.  We had, on occasion, had to tell them not to

2   be in the road.  So we came to an agreement that they

3   would stay on the sidewalk and exercise their First

4   Amendment rights, and we would make sure that they got to

5   do that.

6          Q.    So when you got there that day, your

7   understanding was these folks were out there exercising

8   their First Amendment rights, and there was no problem

9   with that; correct?

10         A.    No.

11         Q.    No, it's not correct or it is correct?

12         A.    No.  If you're referring to the people

13  outside, that's not the reason we got called.

14         Q.    No, that's not my question.  Your impression

15  when you first arrived on the scene, you saw these people

16  outside.  It's your understanding that they were out

17  there exercising their First Amendment rights?

18         A.    No.  I bypassed them all together and paid

19  them no mind because that's not where the call was.

20         Q.    Okay.  Then you proceeded inside the

21  building; correct?

22         A.    Yes.

23         Q.    Did you take the elevator or the stairs

24  upstairs?

25         A.    I do not remember.

```
 1        Q.    Okay.  Your first recollection, you get off
 2   the elevator at the stairs, you see people in the hall?
 3        A.    Yes.
 4        Q.    Okay.  You did not see the defendant Coleman
 5   Boyd anytime when you're there?
 6        A.    Which one?
 7              THE COURT:  Stand up so he sees who you are.
 8              (Complies.)
 9              THE WITNESS:  Okay.
10   BY MR. THORNTON:
11        Q.    You didn't see him there, did you?
12        A.    I don't remember.
13        Q.    Okay.  You've been asked a question or two
14   about your interview statements with the FBI.  And was it
15   your impression, your assessment of the woman behind you
16   that she was overwhelmed and shocked to see law
17   enforcement officers in the building?
18        A.    I don't know if she was shocked to see law
19   enforcement in the building or not.  I can only assume
20   she was.
21        Q.    You assume that.  And that's what you said
22   to the FBI in your interview; correct?
23        A.    Not in the way that you're stating, no.
24        Q.    Let me ask you if you remember these words.
25              MR. BOYNTON:  Your Honor, this is improper
```

1    impeachment.

2                    THE COURT:  Overruled.

3    BY MR. THORNTON:

4        Q.    These may not be your words, but let me ask

5    them if they were your words.  The woman was overwhelmed

6    and shocked to see law enforcement officers once the

7    elevator doors opened.  Were those your words?

8        A.    I don't remember.  What are you talking

9    about exactly?

10       Q.    I'm asking you your assessment of the woman

11   that you're escorting down the hall.

12       A.    Oh, my assessment.  You're not asking me

13   what I said.

14       Q.    Well, there are two things.  I'm asking you

15   about your assessment of the woman you're escorting down

16   the hall.  And then did you say to the FBI that it was

17   your assessment that she was overwhelmed and shocked to

18   see law enforcement officers once the elevator doors

19   opened?  If you remember.

20       A.    I don't remember exactly what I told the FBI

21   previously.  That's been over a year ago.

22       Q.    Fair.  Now, I think I'm like you -- someone

23   said laying hands on folks.  In your definition of laying

24   hands on folks, you didn't lay hands on anybody, did you?

25       A.    No, not in -- not in my definition, no.

1     Q.    You just parted the seas?

2     A.    Correct.

3     Q.    And they were gentle and moved out of the

4   way I believe you said?

5     A.    Yes.

6     Q.    Okay.  In terms of the lady in the

7   wheelchair, you've known older people who have had to use

8   a wheelchair that can't walk very far or stand very long?

9     A.    Yes.

10    Q.    Okay.  So it wouldn't be unusual to have an

11  older person who uses a wheelchair but she gets in your

12  police car without the wheelchair's assistance?

13    A.    It seems reasonable.

14          MR. THORNTON:  That's all I have,

15  Your Honor.

16          THE COURT:  All right.  Anybody else?

17          MR. PARRIS:  No questions.

18          MS. BELL:  I just have a few, Your Honor.

19  They will be quick.

20                    **CROSS-EXAMINATION**

21  BY MS. BELL:

22    Q.    Good afternoon, Officer.

23    A.    Good afternoon.

24    Q.    You had said that you saw a gentleman from

25  the group of protestors speaking with police; is that

1    correct?

2          A.    Yes.

3          Q.    And on older gentleman; is that right?

4          A.    Yes.

5          Q.    Do you see that gentleman in the courtroom

6    at all?

7          A.    I do.  I can actually see him.

8          Q.    Can you identify him, please?

9          A.    Well, he's standing.

10          THE COURT:  Where's he standing?

11          THE WITNESS:  He's standing right now.

12   BY MS. BELL:

13          Q.    What was your impression or what -- strike

14   that.

15          THE COURT:  Do you want the record to

16   reflect that he identified your client?

17          MS. BELL:  Yes, Your Honor.  Thank you.

18          THE COURT:  The record will reflect he

19   identified Mr. Gallagher.

20   BY MS. BELL:

21          Q.    Do you recall what you told the FBI about

22   that gentleman?

23          A.    I do not.

24          Q.    Did you think -- let me ask you this.  Did

25   you think he was one of the leaders of the group because

1  he was talking with police?

2      A.    I want to say that he identified himself as

3  one of the leaders of the group at some point.

4      Q.    And didn't you also tell the FBI that he

5  identified himself as former law enforcement?

6      A.    I do not remember.

7      Q.    If the FBI interview report says one of the

8  leaders purported to be a former law enforcement

9  officer --

10     A.    If that's what you have, that's what I'll

11 have to go with, but it's been over a year.

12          MS. BELL:  Fair enough.  Those are all my

13 questions.

14          THE COURT:  Anybody else?

15          Any redirect?

16          MR. BOYNTON:  Yes, Your Honor.

17          THE COURT:  All right.

18                **REDIRECT EXAMINATION**

19 BY MR. BOYNTON:

20     Q.    You were asked a number of questions on

21 cross-examination about nonviolent protest and being

22 asked about what you characterized as putting hands on

23 somebody.  Do you recall those questions?

24     A.    Yes.

25     Q.    I want to talk a little bit about your

1  training as a law enforcement officer.  Do you know

2  whether or not you have a use of force policy at

3  Mt. Juliet PD?

4          A.    We do.

5          Q.    Can you talk a little bit about the -- is it

6  a -- is it a wheel or is it a force continuum?  What type

7  of policy is it?

8          A.    It's a reasonableness standard that the

9  FBI -- or that the Supreme Court adopted.  We kind of use

10  that to guide because we used to use the force continuum,

11  but the force continuum kind of confines you to one level

12  of force above the force that's being used against you.

13  And situations evolve too rapidly for that to be

14  reasonable.

15          Q.    Let me ask you this.  Based on your training

16  and experience as an officer, what is the foundation

17  level of coercion that a police officer uses at the scene

18  that an officer responds to?

19          A.    Officer presence.

20          Q.    Okay.  And what do you mean by officer

21  presence?

22          A.    Merely showing up with the authority that

23  the City of Mt. Juliet and the State of Tennessee have

24  bestowed on me as a police officer.

25          Q.    That's the lowest level because most people

1    will comply with officer presence; is that right?

2          A.    Yes.

3          Q.    And that's the level above that?

4          A.    It's verbal.

5          Q.    And what do you mean by verbal?

6          A.    Well, it's just -- establishing verbally

7    that I'm a police officer, these are the things that I

8    would like you to do.  And if -- more forcefully put,

9    that I need you to do or you have to do.

10         Q.    That's just using oral orders; right?

11         A.    Correct.

12         Q.    And what's the level above that?

13         A.    The level above that would be, like, soft,

14   empty-hand control, which is just essentially maybe grab

15   somebody or push them -- you know, push or move them out

16   of the way, whether that be gently or up to a point it

17   becomes hard empty hand when you start using punches and

18   kicks and elbows and things like that.

19         Q.    So I want to take you back to March 5, 2021,

20   and put you back in that hallway.  You were asked a

21   number of questions about going down that hallway and

22   what you needed to do to get down that hallway?

23         A.    Yes.

24         Q.    Can you talk about in the terms that we just

25   discussed, your levels of force based on your training

1  and experience as an officer, was your command presence
2  enough to get folks to move out of your way?
3  　　　　A.　　No, it was not.
4  　　　　Q.　　Okay.  Were oral commands, your verbal
5  commands enough for individuals to get out of your way?
6  　　　　A.　　No, sir.
7  　　　　Q.　　Okay.  And what did you -- what level of
8  force did you need to use, then, to clear people from
9  your way?
10 　　　　A.　　I apologize.  The soft, empty-hand control.
11 　　　　Q.　　You were asked a number of questions about
12 whether you knew certain defendants up here.  Your
13 involvement that day based on your testimony and -- when
14 I was first asking you questions was that you were
15 involved in arresting four juveniles; is that right?
16 　　　　A.　　That is correct.
17 　　　　Q.　　So were you involved in arresting any of the
18 adults?
19 　　　　A.　　No.
20 　　　　Q.　　Okay.  You were present for some of it, but
21 that wasn't your focus; is that fair to say?
22 　　　　A.　　Yes.
23 　　　　Q.　　Do you personally know anybody who was there
24 that day other than the officers?
25 　　　　A.　　I do not.

1    Q.    You were asked questions about mass arrests

2 and whether or not the amount of time that was expended

3 that day by the Mt. Juliet Police Department was I

4 guess -- kind of consistent with this mass arrest, the

5 planning involved, the number of handcuffs that would be

6 involved, flex cuffs.  How many individuals ultimately

7 were arrested, if you can recall?

8    A.    I know that it was the -- of course, the

9 four juveniles were given summons, and I know of four --

10 well, two adults, possibly four.

11    Q.    Okay.

12    A.    Because I think at least one of the parents

13 of the juveniles were arrested.  Yeah, sorry, that's it.

14    Q.    Okay.  So at the time -- you testified

15 earlier that the arrest of the juveniles didn't involve

16 any handcuffs, right, because it was just a summons?

17    A.    Correct.

18    Q.    Now, at the time you were a patrol sergeant;

19 right?

20    A.    Yes.

21    Q.    And you supervised a shift of officers?

22    A.    Yes.

23    Q.    Okay.  Based on your training and experience

24 as an officer, if you had been the senior officer on

25 scene, what would you have done to address that issue

1  upon first arriving on the scene?

2      A.    Upon first arriving on scene determined

3  whether or not it was violent or peaceful gathering or

4  protest.  And find out the validity of them being there.

5  If they did not have any, then try to get them to leave

6  as peacefully as possible.  If that broke down and they

7  refused to leave, decide when and how we were going to

8  make arrests.

9      Q.    Given the number of individuals that

10  ultimately needed to be arrested based on your

11  recollection, how quickly would you have estimated that

12  would have taken you as a patrol shift sergeant at the

13  time?

14          MR. PARRIS:  Objection, relevance.

15          THE COURT:  Overruled.

16          THE WITNESS:  Continue?

17  BY MR. BOYNTON:

18      Q.    Yes.

19      A.    Several hours because, I mean, you're

20  talking -- if -- and that's looking at the crowd and

21  assuming that everybody's going to jail.  You're looking

22  at an hour, hour and a half per person to process.

23      Q.    Okay.  When you said looking at the crowd

24  and assuming everyone was going to go to jail, you

25  didn't -- taking you back to reality, you didn't know

1  whether or not everybody who was in that crowd was going

2  to go to jail that day; is that right?

3       A.   No, I had no -- I assumed everybody was

4  going because none of them were willing to leave.

5             MR. BOYNTON:  Court's indulgence,

6  Your Honor.

7  BY MR. BOYNTON:

8       Q.   You mentioned a moment ago assessing whether

9  it was a peaceful nonviolent protest.  It's your

10  testimony, right, that it was nonviolent; is that

11  correct?

12       A.   Yes, correct.

13       Q.   When you talk about peacefulness as a police

14  officer, what do you mean by peaceful?

15       A.   Not violent.

16       Q.   Okay.  And so based on your training and

17  experience, are there things that are nonviolent that are

18  nonetheless disruptive?

19       A.   Yes.

20       Q.   And nonetheless require police response?

21       A.   Yes.

22       Q.   And nonetheless require police intervention?

23       A.   Yes.

24             MR. BOYNTON:  Thank you, Your Honor.  No

25  more questions.

1          THE COURT:  Any additional cross?

2          All right, you may step down.  Thank you.

3          **\*\*\*\*\*WITNESS EXCUSED\*\*\*\*\***

4          THE COURT:  All right.  Members of the jury,

5   I want to reinforce three of my instructions.  Do not

6   talk about this case with anyone or amongst yourselves.

7   Ignore any news coverage on any media.  Turn it off right

8   away.  And do not do any investigation on your own by

9   Internet or any other means about anyone or anything

10  connected to the case.  We'll see you back at 9:00 in the

11  morning.

12          Everyone in the courtroom will remain seated

13  while the jury has access to the elevators.  You may

14  leave first.  Leave your notes and your notebooks on your

15  chairs.  And we'll see you back in the morning at

16  9 o'clock.

17          (Whereupon, at 5:04 p.m. the jury retired

18  from open court.)

19          THE COURT:  Will you radio us when they are

20  all on the elevators.

21          Okay.  You can be seated.  We'll wait a few

22  minutes here.

23          You want to give us the next few witnesses,

24  Counsel?

25          MS. KLOPF:  Yes, Your Honor.  We're

1  anticipating tomorrow calling Sarah Flowers, Caroline

2  Davis, and then actually hopefully the remaining

3  witnesses; although, at this point I think that's a

4  little bit questionable --

5              THE COURT:  Okay.

6              MS. KLOPF:  -- if we can get through them,

7  but --

8              THE COURT:  But they're all available.

9              MS. KLOPF:  They're all available.

10  Aspirationally we will get through everyone tomorrow.

11  Given how long the cross was today, I think maybe we

12  underestimated how long crosses would take.  I do think

13  at this point there is a solid chance we'll go into

14  Friday morning, but aspirationally we're calling the

15  remainder of the witnesses tomorrow.

16              THE COURT:  Okay.  Very good.

17              MR. PARRIS:  Any particular order?

18              MS. KLOPF:  We're starting with Sarah

19  Flowers and then we will follow with Caroline Davis.

20  They will take up a big chunk of time.  And then after

21  that I believe it will be Courtney Forbis, Cassie Speck,

22  Officer Kamer -- I'm sorry, Melissa Ashby, Wood and then

23  Nicko Ashby.

24              THE COURT:  Yes, sir.

25              MR. PARRIS:  Is there an instruction on

1    what -- I'd like to get this thumb drive with all the
2    confidential questionnaire information out of my hands.
3    Is there something --
4                    THE COURT:  You would like to get it where?
5                    MR. PARRIS:  Out of my hands.
6                    THE COURT:  Out of your hands.  Well, I
7    think you could give it to Ms. Beasley.  She'd probably
8    love to have it to put in a drawer.
9                    MS. KLOPF:  Can the record reflect the
10   United States is also returning ours?
11                   THE COURT:  Does everybody want to turn in
12   their questionnaires?  They do have a lot of confidential
13   information on them.  We may as well gather them up as
14   we...  We're keeping track.
15                   Is the jury safely in the elevator?
16                   COURT SECURITY OFFICER:  Yes, Your Honor.
17                   THE COURT:  All right.  We'll let these
18   people go first.  People from the government on this
19   side, you may exit.
20                   Okay, everybody may leave now.  We are in
21   adjournment.
22                   (Whereupon, at 5:07 p.m. these were all of
23   the proceedings had in the above-captioned cause on the
24   above-captioned date.)
25

**REPORTER'S CERTIFICATE PAGE**

I, Roxann Harkins, Official Court Reporter for the United States District Court for the Middle District of Tennessee, in Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on January 24, 2024, in the matter of UNITED STATES OF AMERICA v. CHESTER GALLAGHER, ET AL., Case No. 3:22-cr-327; that said proceedings were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate transcript of said proceedings.

This is the 12th day of March, 2024.


                         s/ Roxann Harkins_____
                         ROXANN HARKINS, RPR, CRR
                         Official Court Reporter