IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cr-00327-2 |
| | ) | Judge Trauger |
| HEATHER IDONI | ) | |

**DEFENDANT HEATHER IDONI'S POSITION REGARDING PRESENTENCE REPORT**

Comes now the defendant, Heather Idoni, by and through undersigned counsel, William J. Conway, submits the following objections and positions to the revised Presentence Report (PSR) dated September 19, 2024. Ms. Idoni was found guilty at trial in the above case that took place from January 23rd through 30th, 2024. Ms. Idoni would note her objections to the following sections of the revised Presentence Report.

I. **OBJECTIONS**

A. **Role in the Offense Enhancement Under U.S.S.G. § 3B1.1(b)**

Ms. Idoni objects to paragraph 30 of the revised Presentence Report because it incorrectly adds a three (3) level enhancement for "manager or supervisor" Role in the Offense. The Probation Officer claims that Ms. Idoni, "used social media to promote a series of anti-abortion events and identify blockade participants who would be willing to risk arrest. She coordinated travel and logistics…and arranged accommodation through a room share for the Nashville rescue." (*See PSR* p. 11, ¶ 30). The three-level increase should not be applied. Contrary to what is stated in the revised Presentence Report, there is no evidence that Ms. Idoni coordinated any travel or logistics. Ms. Idoni merely assisted others – many of whom were close personal friends – in booking their housing accommodations. Ms. Idoni did discuss the rescue events through

social media; however, it was at the direction of Chester Gallagher and to the same extent as nearly all the other participants, which should not elevate her specific role in the offense.

The United States Sentencing Guidelines increase the offense level for an Aggravating Role, "if the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." (U.S.S.G. § 3B1.1(b)). The purpose of this enhancement is to punish managers and supervisors more severely than other defendants because "persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate. *Id.* Cmt. N. 4 (background). To determine whether a defendant was a manager or supervisor, the court should consider the following factors:

> The exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *Id.* Cmt. N. 4.

A circuit split developed over whether a defendant needed to have control over another individual, or if management or supervision of "property, assets, or activities" of the crime were sufficient for the enhancement. (Construction and Application of U.S.S.G. § 3B1.1(b)). In 1993, the Sentencing Commission added the following application note:

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. An upward departure **may be** warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activity of a criminal organization. (U.S.S.G. § 3B1.1 Application Note 2).

### a) Ms. Idoni Did Not Exercise a Degree of Control or Authority Over Others in the Blockade.

Ms. Idoni was not a manager or supervisor of this offense because she did not exercise control over any other individual in the planning of the blockade. After the 1993 amendment, the Sixth Circuit continued to grapple with the question, to what extent did mere control over "property, assets, or activities," warrant the 3-level enhancement? In *United States v. Gort-Didonato,* 109 F.3d 318 (6th Cir. 1997) the court found, "where the defendant exerts control over at least one participant in a supervisory, managerial, leadership, or organizational capacity, a sentence enhancement is **required** under § 3B1.1. Whereas, when a defendant does not exercise control over an individual, but over property, assets, or activity, an upward departure **may be** warranted." at 321. The court emphasized for an enhancement there is a requirement "that a defendant supervise at least one defendant in a criminal enterprise." *Id.* at 322. The defendant's sentence was vacated and remanded for due consideration of Application Note 2 of the commentary. Although the defendant in that case "played a major role in planning the conspiracy" by "selecting her relatives" as the target of the crime, "made assessments as to their finances," and convinced them to give her the money, the district court had not found that she played "a managerial role over another participant in the scheme." *Id.* at 320.

This case has two, potentially three named leaders or managers, Chester Gallagher, Calvin Zastrow, and Paul Vaughn. At trial codefendant Caroline Davis testified that Calvin Zastrow planned the blockade with Chester Gallagher. *See* Trial Transcript, Docket Entry #547, p.146:10-14. Zastrow personally invited Davis to participate. *Id.*, 147:15-16, and 149:22-23. Davis prayed daily with Ms. Idoni, but was recruited to the Tennessee blockade by Zastrow. *Id.* 152:3-18. Ms. Davis also discussed a camping trip before the blockade that many defendants, including Ms. Idoni, were present for. *Id.*, 126:23-25. There is no mention of Ms. Idoni's

involvement or planning at this camping trip, Davis describes Gallagher and Zastrow leading a discussion on F.A.C.E. Act violations and codefendant Boyd encouraged others to go to Tennessee. *Id.*, 127:3-25.

Davis also testified to three meetings that occured before the blockade, and there is no mention of Ms. Idoni's management or supervision in any of the Tennessee meetings. Davis explained Gallagher, Zastrow, and Boyd did all the talking at the Tennessee meetings and the purpose of the meeting was to "solidify roles" for the blockade. *Id.*, 139:9-11, 170:16-20. Potential roles included blowfish, drivers, blockaders risking arrest, someone to engage with police, passing out pamphlets, and Gallagher was going to educate. *Id.*, 129:22-25, 130:1-15, 136:5-17, 176:11. Gallagher and Zastrow explained to Davis that she would be doing elevator sermons and notifying the rest of the group when a mom arrived at the clinic. *Id.*, 180:2-15. Ms. Idoni did not speak at these meetings, nor did she exercise control over others, she also did not have a specially assigned role herself.

Davis describes Ms. Idoni's limited participation and explains her hope was simply to "bless people by giving them a place to stay." *Id.*, 152:20-25. Ms. Idoni merely made her own plans to stay in Tennessee and used a room share service so her friends would be able to join her, as helping others is part of Ms. Idoni's good nature. Ms. Idoni did not assign Davis a room nor did she instruct Davis to stay with her, instead Davis found out about the room share while she was figuring out her own logistics. *Id.*, 151:8-20. Ms. Idoni also did not coordinate travel, nor did she drive participants to Tennessee. Davis explains, "I found out that I would have a car ride through Michelle Eddy." *Id.*, 151:15-16. Later in the trial, Davis is asked, "you also said you travelled down here from Michigan with it sounded like some female friends; is that right?" *Id.*, 261:11-13. Davis responds, "that is correct." *Id.*, 261:14. Ms. Idoni did not manage or supervise

travel logistics from Michigan for individuals, Michelle Eddy drove, and other "female friends" joined the carpool.

Davis describes her relationship with Ms. Idoni as a "mother-daughter" relationship, where she "took her under her wing," *Id.*, 105:8-9. Davis stayed with Ms. Idoni in Tennessee by her own choice and was not pressured by her to participate unlike the pressure Davis received from other co-defendants. On the drive down to Tennessee, Davis explains the women did not discuss logistics of the blockade - those were described in the meetings by Gallagher and Zastrow – Ms. Idoni simply explained she hoped the "holy spirit" would allow her personally to participate. *Id.* 153:17-18, 169:17-23. Through Davis's testimony, it is clear Ms. Idoni had no "managerial role over another participant." Unlike the defendant in *Gort-Didonato*, cited above, Ms. Idoni did not play a "major role" in planning the offense. Due to the statute's 1993 amendment requiring control over another individual, and Ms. Idoni's lack of control, the three-level enhancement is inaccurately applied to Ms. Idoni.

### b) Ms. Idoni Did Not Exercise Independent Decision-Making Authority Over Planning of the Blockade.

Ms. Idoni was not a manager or supervisor of this offense because she did not exercise decision-making authority independent from the leader of the offense. In *United States v. Hunsaker*, the 10th Circuit furthered the notion that control over another participant is necessary to add the three-level enhancement. 65 F.4th 1223 (10th Cir. 2023). The *Hunsaker* court vacated and remanded the defendant's sentence to remove the enhancement because the defendant did not have "decision-making authority *or* control over a subordinate necessary to a holding that Defendant was a 'manager or supervisor' under § 3B1.1(b)." *Id.* at 1230.

The defendant in *Hunsaker* did have **extensive** control over the "property, assets, and activities" of the criminal enterprise. In *Hunsaker*, the defendant was part of a drug trafficking

organization, more specifically, was known as the "second in command" to the leader of the organization and made multiple trips to move the drugs and sold the drugs on various occasions. *Id.* 1226-1227. The court distinguishes the defendant's behavior from that of a manager or supervisor based on their lack of "decision-making authority." *Id.* at 1229. The court further carves out that "A 3-level increase under § 3B1.1(b) can be predicated only on evidence [D]efendant acted in a supervisory or managerial capacity *independent* of any intimate connection to [a] major player in the criminal activity." *Id.* at 1230. This specifically was to disprove the notion that "a close personal relationship" with the leader indicated the defendant was acting as a manager or supervisor. *Id.* at 1230.

      Here, Ms. Idoni only had control over activities at the direction of the leader, Chester Gallagher. To be a manager, following the rationale in *Hunsaker*, Ms. Idoni would have had to exercise "independent decision-making authority" from Gallagher. However, even the use of room share points to book the hotel for herself and close friends, was done at the direction of Gallagher. *See* Transcript of Proceedings, January 26, 2024, Vol. 4-A Docket Entry#548 p.132:17-18. Gallagher asked Ms. Idoni to reach out to Dennis Green and to find a small meeting room. *Id*. 133:12-15. Gallagher says to Ms. Idoni, "I will prequalify any [people] I send your way," further demonstrating he was in charge and Ms. Idoni was acting at his direction. *Id.*, 135:22-23. Gallagher also sends Ms. Idoni a lengthy message with all the details for the Tennessee blockade followed by direction to "forward the message above to others for me. Let me know who you sent it to. Thanks." *Id.*, p. 146-147. Like the defendant in *Hunsaker*, Ms. Idoni had some control over minimal aspects surrounding the blockade, however she lacked decision-making authority **independent** of Gallagher's direction, and therefore should not have a three (3) level enhancement for manager or supervisor role.

## B. Victim-Related Enhancement Under U.S.S.G. § 3A1.1(b)(1)[1]

Ms. Idoni objects to Paragraph 29 of the revised Presentence Report because it incorrectly adds 2 levels for a "vulnerable victim" enhancement. The revised Presentence Report states Ms. Idoni, "knew or should have known that the victim of the offense was a vulnerable victim." Specifically, the revised Presentence Report states Patient A was a vulnerable victim because she was, "anxious about being videotaped in front of a medical office because she believed it was a violation of her HIPPA rights," she was "asked personal medical questions," and she felt "uncomfortable, overwhelmed, intimidated, very scared, and violated as she attempted to access the clinic." *See PSR p. 11*, ¶ 29. Although it is not expressly stated that Patient A was vulnerable because of her pregnancy, it is assumed to be a part of the vulnerability.

The Sentencing Guidelines define a vulnerable victim as someone who is

> "(A) a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (relevant conduct), and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to criminal conduct." § 3A1.1(b)(1) Cmts. Note 2.

Additionally, the defendant needs to have "known or should have known of the victim's unusual vulnerability," and the enhancement cannot be applied "if the factor that makes the person a vulnerable victim is incorporated in the offense guideline." *Id.*

Patient A is a victim of the offense; however, she is not an unusually vulnerable victim. A victim's "susceptibility to the defendant's scheme alone is not enough to qualify victims as unusually vulnerable." *United States v. Medina-Argueta* (5th Cir. 2006, at 482). Rather, "an unusually vulnerable victim is one who is 'less able to resist than the typical victim of the offense of conviction.'" *United States v. Castaneda*, 239 F. 3d 978, 980 (9th Cir. 2001) (quoting

---

[1] Counsel is aware this enhancement has been found in every other co defendant's sentencing and is simply preserving the issue for appellate purposes.

*United States v. Wetchie*, 207 F.3d 632, 634). Patient A was actually the "typical victim" of the FACE Act, which was enacted specifically to protect "those seeking to obtain or provide abortion services." *See* Senate Bill 636. Here, the FACE Act already accounts for the vulnerability of women seeking abortions, and an "adjustment should not apply when vulnerability is already reflected in the offense guideline." *United States v. Wetchie*, 207 F.3d 632, 634 n. 4 (9th Cir. 2000).

Furthermore, a victim is not automatically considered vulnerable due to her pregnancy. Case law supports that enhancements should be added only when extraordinary circumstances are presented such as violence and threats. In *United States v. James*, the defendant robbed a bank and used the vulnerability of a pregnant bank teller to successfully complete the crime. 139 F.3d 709. The Sentencing Guideline Comments explain that in a robbery case, the "bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in the bank." § 3A1.1(b)(1) Cmts. Note 2. However, in *James*, the defendant exploited the victim's vulnerability when he said, "don't give me any of the trackers, alarms, or magnets, or I'll kill you. I notice that you are pregnant, and I love children, but I will come back and kill you and the baby." 139 F.3d 709 at 714. The court "did not classify the teller as an unusually vulnerable simply because she was pregnant." *Id*. The court found the vulnerable victim enhancement was correctly applied because the defendant, "attempted to take advantage of the teller's pregnancy to frighten her and convince her to do what he wanted, and he succeeded. *Id.* at 715.

Here, Patient A was not singled out due to her pregnancy, she was not visibly pregnant and every individual that approached the clinic – employees, patients, and police – were talked to and prevented from entering the clinic. Unlike the defendant in *James* who threatened the pregnant teller, the defendants in this case were trying to assist Patient A. Like the bank teller,

Patient A is not unusually vulnerable simply because she is present as a patient at the clinic. The extraordinary circumstances necessary for the two-point enhancement are not present in this case.

Although the Presentence Report highlights Patient A's feelings of anxiety and discomfort on the day of the rescue, when adding a vulnerable victim enhancement, the court has been "primarily concerned with the impaired capacity of the victim to detect or prevent the crime, rather than with the quantity of harm suffered by the victim." *United States v. Gill,* (1st Cir. 1996, at 486). Vulnerability is a factor that is already present within the victim at the time of the offense, not what the offense makes a victim feel after the fact. Many victims of crime experience anxiety, it is not an enhancing factor.

Patient A was aware of the crowds around the Providence Mall, in the parking lot holding signs, and directly outside the clinic. *See* Transcript of Proceedings, January 26, 2024 Vol 4-A D.E. #548, p. 165:22-24. To access the restroom, Patient A walked directly towards the crowd outside of Carafem, aware that "people [were] standing directly in front of [the door to Carafem] blocking it." *Id.*, 99:12-13. Her pregnancy was not a special circumstance making her unaware of the crime at hand. Additionally, Patient A was accompanied by her then boyfriend, now husband, who has been in the military for 15 years, was deployed twice to Afghanistan, and received training for personal security details specifically navigating crowds. *Id.*, 163:7-15, 168:6-10. She agreed at trial he "was her protector," and she told him to go to the bathroom. *Id.*, 100:6-8. She willingly allowed her boyfriend to leave her with a group of people blocking the doors to an abortion clinic she was planning to access.

The vulnerable victim enhancement here is improper as Patient A was a usual victim of the crime and no extraordinary circumstances or threats are present.

## II. FACTORS THAT WARRANT A DOWNWARD DEPARTURE

### A). Defendant's Criminal History Category Over Represents the Seriousness of Defendant's Criminal History.

Pursuant to U.S.S.G. § 4A1.3 (Criminal History Adequacy)

If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.

Ms. Idoni has three (3) separately indicted cases related to FACE Act Violations and conspiracy against rights offenses in three different Federal District jurisdictions. All of the events happened in 2020 or 2021. However, the Federal Government sat on its hands and waited until 2022 to execute indictments in each of those cases and proceed with the prosecution of all three events sequentially. Now, they seek to use the convictions in sequential order to enhance and stack the sentences Ms. Idoni will receive in each subsequent jurisdiction. Presumably, they will do this exact same thing during sentencing of Ms. Idoni's case out of the Eastern District of Michigan wherein she was just convicted of a FACE Act violation and conspiracy against rights, again. (*See PSR* p. 14 ¶ 41). They are stacking the proverbial deck of criminal history points to ensure they maximize the amount of incarceration time facing Ms. Idoni.

Additionally, Ms. Idoni objects to the revised Pre Sentence Report addition of one (1) criminal history point in paragraph 41 which increases Ms. Idoni's criminal history category to category III. As this court is well aware, Ms. Idoni was taken into custody following the verdict out of the District of Columbia on August 29th, 2023 where she has remained in continuous custody of the United States. (*See Notation on 8/29/2023* for case no. 1:22-cr-00096-CKK out of Federal District of Columbia). Due to her custodial status, she was unable to have a sentencing hearing during the week of July 15th like all but one of her codefendants. The government was

providing "diesel therapy" and shifting her location throughout the country from facility to facility eliminating her ability to be sentenced in July. If she would have been provided the opportunity to be sentenced along with her codefendants in July, then this additional point would not exist.

The series of events leading to the three Indictments began in October of 2020. Ms. Idoni was at an event in the Washington D.C. District wherein she was charged with the exact same offenses as the charged offenses before this Court. The Government waited approximately 17 months to Indict the defendants in that case on March 24th, 2022. (*See* District of Columbia case no. 1:22-cr-00096 Docket Entry #1) Similarly here, the charging event took place on March 5th, 2021, however, the Government waited 19 months to issue an indictment. (*See PSR* p. 6-7 ¶ 1-5)

There was absolutely no reason for the delay, as nothing in discovery or in the trial would suggest a lengthy investigation took place in any of the cases. In fact, everything suggests the opposite. Within a couple of months of the charged offenses in this case, the investigation was over. Now, the Government wants to use those stacked offenses to gin up her criminal history points to increase her guideline range and term of imprisonment. This style of prosecution eliminates an individual's capability to reform and their amenability to correction after a conviction. Counsel would draw an analogy to prosecutions of Driving Under the Influence (DUI) in the state court of Tennessee. A DUI first offense in Tennessee is punished with a mandatory minimum of 48 hours in jail. A subsequent offense is punished with a minimum of 45 days in jail, then 120 days, and it continues to go up with each subsequent conviction. (*See* Tenn. Code Ann. § 55-10-402 (West)). The idea is that hopefully 48 hours is enough of a punishment to convince the offender to never drive intoxicated again. The idea **is not** for the prosecution to gather evidence of multiple DUIs and sit on their hands in bringing an indictment for a DUI 3rd

offense to maximize the prison time an individual faces. It flies against any argument a prosecuting authority could make for the "safety of society" if they are allowed to sit on their hands in order to bring indictments that maximize incarceration time. However, that is exactly what happened in this case. Thus, a downward departure is supported because Ms. Idoni's criminal history is overstated.

      B). **Defendant's Prior Good Works are Extraordinary and Warrant a Downward Departure**

While not ordinarily relevant for purposes of sentencing, Counsel agrees with Probation that Ms. Idoni's prior good works are extraordinary and may warrant a departure for sentencing determination (*See* PSR ¶ 90(b)). As will be fleshed out in Ms. Idoni's sentencing memorandum, Ms. Idoni has devoted her entire life to helping others in difficult situations. She has done this without seeking reward, profit, or notoriety, but simply because her beliefs and good nature compel her to help others. A lifetime filled with good works is certainly worth consideration when determining whether any period of imprisonment is appropriate for Ms. Idoni.

## CONCLUSION

For the foregoing reasons, Defendant Heather Idoni respectfully requests that the proper adjustments be made with respect to the calculation of the Total Offense Level to be found at 14. With a Total Offense Level of 14 and a criminal history category of I, the Guideline imprisonment range is 15-21 months. However, as noted, downward departures as well as other factors in the companion sentencing memorandum warrant a significantly lesser sentence.

Respectfully Submitted,

*/s/ William J. Conway*
William J. Conway, #026808
214 Second Ave, N., Ste. 208
Nashville, TN 37201
(615) 260-5363
wjconway@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing motion has been delivered by the Court's CM/ECF system to **AUSA Nani Gilkerson,** 110 9th Ave. South, Ste. A-961, Nashville, TN 37203, and the other counsel of record on this the 20th day of September, 2024.

*/s/ William J. Conway*
WILLIAM J. CONWAY