UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS | ) | No. 3:22-cr-327 |
| | ) | |
| EVA EDL [8] | ) | |
| EVA ZASTROW [9] | ) | |
| JAMES ZASTROW [10] | ) | |
| PAUL PLACE [11] | ) | |

---

BEFORE THE HONORABLE JEFFERY S. FRENSLEY,

MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

April 2, 2024

---

---

**Roxann Harkins, RPR, CRR**
Official Court Reporter
719 Church Street, Ste 2300
Nashville, TN 37203
615.403.8314
roxann_harkins@tnmd.uscourts.gov

**APPEARANCES:**

For the Government: AMANDA J. KLOPF
US Attorney's Office
719 Church Street, Suite 3300
Nashville, TN 37203

KYLE RANDOLPH BOYNTON
WILFRED T. BEAYE , JR.
U.S. Department of Justice
150 M St. NE
Washington, DC 20530

For the Defendant Eva Edl:

DAVID R. HEROUX
Haymaker & Heroux
545 Mainstream Drive
Suite 420
Nashville, TN 37228

For the Defendant Eva Zastrow:

DAVID LEE COOPER
208 Third Avenue North
Suite 300
Nashville, TN 37219

For the Defendant Jams Zastrow:

RAYBURN McGOWAN, JR.
8005 Church Street East
Suite 219
Brentwood, TN 37027

For the Defendant Paul Place:

LEONARD EARL LUCAS
315 Deaderick Street
Suite 1550
Nashville, TN 37238

# I N D E X

Opening statement by government......................9
Opening statement by Defendant Eva Edl..............16
Opening statement by Defendant Eva Zastrow..........19
Opening statement by Defendant James Zastrow........20
Opening statement by Defendant Paul Place...........13

Government witnesses

**SARAH FLOWERS**

Direct Examination By Mr. Boynton ..................23
Cross-Examination By Mr. Lucas .....................52
Cross-Examination By Mr. Heroux ....................55
Cross-Examination By Mr. Cooper ....................73
Cross-Examination By Mr. McGowan ...................81
Redirect Examination By Mr. Boynton ................92

**CAROLINE DAVIS**

Direct Examination By Ms. Klopf ....................99
Cross-Examination By Mr. Lucas ....................191
Cross-Examination By Mr. Heroux ...................198
Cross-Examination By Mr. Cooper ...................226
Cross-Examination By Mr. McGowan ..................237
Redirect Examination By Ms. Klopf .................255

**MICHAEL CORDLE**

Direct Examination By Mr. Beaye ...................264
Cross-Examination By Mr. Heroux ...................280
Cross-Examination By Mr. McGowan ..................282

**MELISSA ASHBY**

Direct Examination By Ms. Klopf ...................288
Cross-Examination By Mr. Heroux ...................301
Cross-Examination By Mr. McGowan ..................312
Redirect Examination By Ms. Klopf .................318
Recross-Examination By Mr. McGowan ................319

# E X H I B I T S

Government No. 1F....Photo of building entrance ..141
Government No. 1A....Coleman Boyd Recordings .....147
Government No. 1C-1E....Coleman Boyd Recordings ..147
Government No. 2A-C....Dennis Green Recordings ...147
Government No. 2E....Dennis Green Recording ......147
Government No. 2J....Dennis Green Recordings .....147
Government No. 2L....Dennis Green Recordings .....147
Government No. 2O....Dennis Green Recordings .....147
Government No. 2P....Dennis Green Recordings .....147
Government No. 3A....Chet Gallagher Recordings ...147
Government No. 3D....Chet Gallagher Recordings ...147
Government No. 3J....Chet Gallagher Recordings ...147
Government No. 3L....Chet Gallagher Recordings ...147
Government No. 3M....Chet Gallagher Recordings ...147
Government No. 3O....Chet Gallagher Recordings ...147
Government No. 3P....Still shot from Gallagher ...148 recording
Government No. 4....Cell phone recording made by ..41 Sarah Flowers (cd)
Government No. 4A....Stills from Flowers' cell ....41 phone recording
Government No. 4C....Stills from Flowers' cell ....41 phone recording
Government No. 6....Still shot from Office ........50 Surveillance camera
Government No. 16....Clip from Google Drive Video 170
Government No. 17....Clip from Google Drive Video 190
Government No. 25....Stipulation ..................98

Government rests .................................320

Defense rests ....................................330

Closing argument by government....................332

Closing argument by Defendant Eva Edl..............348

Closing argument by Defendant Eva Zastrow..........355

Closing argument by Defendant James Zastrow........358

Closing argument by Defendant Paul Place...........345

Rebuttal Closing argument by government............365

Verdict...........................................373

The above-styled cause came to be heard on April 2, 2024, before the Hon. Jeffery S. Frensley, Magistrate Judge, when the following proceedings were had at 9:16 a.m., to-wit:

THE COURT: Good morning. Everyone. Welcome. We're here this matter in the United States of America versus Eva Edl, Eva Zastrow, James Zastrow and Paul Place. It's Case No. 3:22-327. At this time I'd like if the lawyers would please announce yourself, introduce yourself for the record, starting with the government.

MS. KLOPF: Good morning, Your Honor. Amanda Klopf on behalf of the United States.

MR. BEAYE: Good morning, Your Honor. Wilfred Beaye on behalf of the United States.

MR. BOYNTON: Good morning, Your Honor. Kyle Boynton on behalf of United States.

THE COURT: Very good, thank you.

For the defendants, please. You can start at that end.

MR. LUCAS: Leonard Lucas on behalf of Mr. Paul Place.

THE COURT: Thank you.

MR. HEROUX: David Heroux, Your Honor, on behalf of Ms. Eva Edl who's seated behind me.

MR. COOPER: Morning, Your Honor. David Cooper on behalf of Eva Zastrow, and she's here in the courtroom.

MR. McGOWAN: Rayburn McGowan on behalf of James Zastrow.

THE COURT: Good morning, everyone.

This matter is set today for a petty offense trial as a result of an order by Judge Trauger in this case found at Docket No. 340 granting the government's motion to sever the four defendants who are present in court today. And we will proceed with this petty offense trial today as a bench trial pursuant to the Federal Rules of Criminal Procedure, as well as the criminal code.

There is one pending motion in limine I've heard argument on previously, I've reviewed the filings of the parties, and I'm going to go ahead and give you a ruling on that before we get started. I have also reviewed Judge Trauger's rulings on the similarly filed motion in the other trial, and generally agree with her rulings in that case.

I will allow, as she did, cross-examination with regard to medical issues as it's relevant related to

the particular witness in question, but I do caution counsel to limit that examination to relevant issues. And I'll deal with any contemporaneously-made objections related to that.

With regard to the other issue related to employment, I think that the defense for Ms. Zastrow, at least in this case, has articulated a slightly different basis for inquiry and opposition to the government's motion in that regard. I will allow some limited examination regarding the employment issue, but it will be very limited in nature related to what and whether the witness has any knowledge about the reasons related to her termination.

And I suspect, based upon the government's filing, it will be a real narrow examination, but I will allow some leeway on that. Again, we'll address any contemporaneous objections related to any particular examination of that particular witness.

I also want to address the spectators that are here today. You're welcome in this courtroom for the trial of this case. When you're in this courtroom, you cannot express in any way approval or disapproval of the testimony. Behavior that you cannot engage in includes, but is not limited to, nodding or shaking your head, making facial expressions or hand gestures or speaking

out. If you do so, you'll be removed from the courtroom.

You may not use cell phones in any way while you're in the courtroom. You cannot record the proceedings on your cell phone or any other recording device. If court security officers see you utilizing your cell phones or have your cell phones out, you'll be asked to leave the court for the remainder of the proceedings today.

Also, electronic devices may not be used for photographing. There's no photography allowed in federal court and in this particular courtroom or audio recording on the floors of the courthouse occupied by the court. I need you to all please conform your behavior to those expectations. And I anticipate that the court security officers and others will be monitoring this, and if there is any issue, we'll deal with that and proceed accordingly.

Are there any additional preliminary matters from the government's standpoint?

MS. KLOPF: No, Your Honor.

THE COURT: Very good, thank you.

For any of the defendants?

MR. HEROUX: No, Your Honor.

THE COURT: All right. As I mentioned, this is a little bit different proceeding than you're all

used to. This is a bench trial. It's a petty offense trial; however, if you wish to make a brief opening statement, I'll allow you to do so. And then we'll proceed with the government's proof.

GOVERNMENT OPENING STATEMENT

MS. KLOPF: Good morning, Your Honor.

On March 5, 2021, these four defendants and many other people physically blocked the doors of a reproductive health clinic in Mt. Juliet, Tennessee. This lasted for more than two hours. They were there because the clinic provided reproductive healthcare and they wanted to stop as many patients as possible from accessing this clinic. The blockade ended the only way it was going to, with arrests.

Protests are part of the fabric of our nation, but our society has drawn lines on what constitutes a crime and what constitutes a protest. And this is why we are here today. The FACE Act prohibits people from using physical obstruction to interfere with someone because that person was getting or giving reproductive health services.

In order to establish a violation of the FACE Act, the government need only prove three elements:

First, that the defendant engaged in physical obstruction, that happened here;

Second, that the defendant by his or her physical obstruction intentionally interfered with a patient or the employees of the clinic or that the defendant attempted to do so, that happened here;

And third, that the defendant acted as he or she did because the patient was obtaining or the clinic was providing reproductive health services, and that happened here.

But as the Court well knows, United States can also prove this violation by aiding and abetting, which only requires that the United States prove that the defendant helped to commit the crime or encouraged someone else to commit the crime and that the defendant intended to do so, and that happened here.

During this trial Your Honor will learn how this blockade in Mt. Juliet came to be. The clinic, called carafem, was on the second floor of a medical building in -- that housed multiple businesses in Mt. Juliet.

The blockade of this clinic was planned because the blockaders believed that the local lawful protesters who stood outside the clinic's building weren't successfully accessing the patients that were going to the carafem clinic. So these defendants and others, many of whom are not from Mt. Juliet, decided to

travel here, join together, go inside the building and block the doors.

One of the participants in this blockade, Caroline Davis, will testify before you. She was charged in this case and she has pleaded guilty. She'll describe some of the planning that went into the blockade and her role. The morning of the blockade the clinic was set to open at 8:00 a.m. The blockaders came prepared with a preprinted flyer that already said that arrests had been made. Their intent was to get arrested before they even entered the building.

The clinic had two access points: A main entrance for patients, and a second entrance that could only be accessed by employees. These four defendants and others blocked this main entrance, positioning themselves directly in front of the door. Others positioned themselves in front of the employee entrance, and others filled the hallway.

During the course of the morning, multiple blockaders filmed the blockade. The whole blockade is on video. Some of that we'll play for you today. During those videos patients turn away from the clinic because of the blockaders. An employee exits the clinic but can't go back in because another codefendant is blocking the employee entrance. When the police arrive, the

defendants were told to leave, and none of them complied.

When a codefendant asked, who is going to be arrested today, all four of these defendants raised their hands. And Your Honor will see, as the morning wears on, these four defendants never moved from their position in front of that main clinic entrance. These defendants were critical to physically blocking the door. And as a result of their action and the other blockaders' actions, no patient accesses the clinic for the duration of the blockade.

A patient who was turned away by these defendants and the other blockaders will testify. She was unable to access the clinic for her appointment because some of these defendants and other blockaders blocked her. In fact, she wasn't able to access the clinic until after the blockade cleared because of the presence of these four defendants and the other blockaders.

You'll hear from an employee of the clinic who will explain that her coworkers were trapped inside the clinic for hours because the defendants would not leave their positions in front of the clinic doors and that services could not resume until the blockade was finally cleared.

The blockade went on for more than two

hours before police finally arrested these defendants and other blockaders and allowed the clinic to go back to normal, providing reproductive health services to patients, including Patient A.

People are entitled to believe whatever they like, that's a fundamental part of America. But another fundamental part of America is the rule of law, which means that when a person violates the law, they are held accountable.

These defendants broke the law. And as a result, at the end of this trial, we will ask you to find these four defendants guilty. Thank you, Your Honor.

THE COURT: Thank you.

What we'll do is we'll just go in the order down starting at that end of the table, and we'll use that order for all the proceedings, for examination of witnesses and any statements, including opening statements.

MR. LUCAS: May I approach, Your Honor?

THE COURT: Yes, Mr. Lucas. Thank you.

MR. LUCAS: Good morning, Your Honor.

THE COURT: Good morning.

DEFENDANT PLACE OPENING STATEMENT

MR. LUCAS: I'm here today representing Mr. Paul Place. There is no proof that my client, Paul

Place, interfered with or attempted to interfere with anyone's access to reproductive services or the provision of these services. There's no proof that he intended to do so or to aid and abet anyone else or encourage someone else to do so. He participated in a nonviolent expression of his faith, something that is woven into the fabric of this country, as the prosecutors stated.

Since the beginning of this country, there have been people who have stood up, based upon their faith, and objected nonviolently. There were certain aspects of paying taxes that Thomas Jefferson found to be sinful; abolitionists opposed slavery on the religious grounds and exercised a nonviolent expression of their rights; environmentalists who oppose the destruction of God's planet and exercise a nonviolent expression of their right; people who oppose the death penalty on religious grounds express the -- express their rights nonviolently.

All these people have inconvenienced someone in that expression of rights, but that does not mean that they did not care about the individuals or were -- or to suggest, similar to the overreach that has brought us here today, by suggesting that they didn't care is wrong.

It is also not the case that in each one of

these situations people were interfered with or attempted to interfere with in order to express these rights. The question here, obviously, is whether my client intended to interfere or attempted to interfere with someone's access to reproductive services or the provisions of the same. Or did he aid and abet others. And the answer is no. And I must say, the defendants who raised their hands, who risked arrest, weren't raising their hands to be arrested on that day for the FACE Act violation but rather, for trespass, which is what the -- which is what the law enforcement had instructed and told them on that day.

Your Honor, our country is in a situation where we disagree, we have many disagreements with one another. The question is: How do we handle those disagreements? In this particular case, our disagreements have resulted in the overreach of using our laws to prosecute people who are simply expressing their religious beliefs in a nonviolent way.

In fact, the proof will show that at no point, in terms of my client, did he ever get the opportunity to -- did he ever actually interfere with anyone or actually stand up and attempt to interfere with somebody entering the clinic. In fact, it will show that other people made that -- made the decision to turn

people away or to ask them to leave.

Your Honor, I believe the proof will show that my client is not guilty in this case, and I would ask that Your Honor return a verdict of not guilty.

THE COURT: Thank you, Mr. Lucas.

Mr. Heroux, do you have any statement you want to make?

MR. HEROUX: A brief one, Your Honor.

THE COURT: All right.

MR. HEROUX: Good morning, Your Honor.

THE COURT: Good morning.

DEFENDANT EDL OPENING STATEMENT

MR. HEROUX: I represent Eve Eva Edl who is seated somewhat behind Mr. Cooper. And she's just waved at you.

THE COURT: Thank you. I see her.

MR. HEROUX: I think it's fair to say that these people gathered at the carafem Healthcare Clinic for a purpose. What was that purpose? They sought to pray and sing and worship, and Your Honor will see that in the videos that are played in the government's exhibits. They were hoping to change minds. They were hoping to change the minds of moms who were making decisions that would affect the lives of two people, the mom and the child they carried. That's what they were

doing.

How were they doing it? They sought to give people they were there with an opportunity to speak, to educate, to talk to these moms, to persuade these moms to maybe not make this decision, to maybe give it another day or to maybe hear what alternatives there may be. That's what they were doing, and they were doing so in service of their faith with their God.

So we come to the criminal charge here with the violation of the FACE Act. I agree with Mr. Lucas that when people raised their hands at the clinic about -- after being told that they were going to -- you know, who was willing to be arrested, the Court will see that Ms. Edl was one of those people who was willing to be arrested for trespass.

However, the proof in this case, the charge in this case, is that Ms. Edl, by way of creating an obstruction, intentionally interfered with Patient A, Employee A and other employees of the clinic. The proof will not bear that out.

The proof will show that Ms. Edl was not even present when Patient A or Employee A were on the second floor where the carafem clinic exists. Not even present. The proof will not establish that Ms. Edl even knew there were other employees in the clinic. The proof

will not show that Ms. Edl was ever asked to move so that -- so that a patient or an employee could proceed by. That never happened.

Ms. Edl was there for a purpose: To help save lives, two lives. The lives of a mom in making a decision -- give it another day or at least hear us out; there was no proof that she wouldn't have stepped aside and allowed someone through -- and that of the child that mom may be carrying.

At the end of the proof, the government's proof, we expect that the Court will see Ms. Edl had no interaction with Patient A, Employee A, and was never aware there were other employees -- or there's no proof that she was aware there were other employees in the clinic; and, therefore, we would be asking at that time for the Court to find Ms. Edl not guilty of the charges.

This case will come down to what was the intent because what -- and that is to say, what was Ms. Edl's intent. The government must prove her intent was to intentionally interfere with. That proof is not here.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Heroux.

Mr. Cooper, do you have any opening statement you want to make?

MR. COOPER: Yeah, just briefly, I would.

DEFENDANT EVA ZASTROW OPENING STATEMENT

MR. COOPER: I'd like to sort of piggyback on what Mr. Heroux just said. The Court's going to see a lot of videos in this case, and one of the videos is by a gentleman by the name of Coleman Boyd. And that video is down this long hallway to the carafem clinic. And this Patient A and Employee A have interaction up there on the floor. You'll see that on the video. And you'll see Employee A ultimately go down -- and she won't go into the employee entrance or even through the clinic door. She walks down the stairwell and leaves.

You'll also see Patient A come back to the elevator, presumably, I guess, with her husband and leave the floor. And at that point some, I don't know, 15, 20 seconds later, you will see my client, Eva Zastrow coming up on the elevator and pushing the other Ms. Eva down to the hallway to that carafem clinic door. And so it's kind of like what Mr. Heroux just said. My client, Eva Zastrow, was not even on the floor when the alleged crimes occurred against Employee A and Patient A.

And so then if you just watch Mr. Boyd's video for the next two hours, you see my client, and she's just really standing there at the clinic door. She's not in front of the door, she's just kind of

holding up the wall. And she's praying and she's singing and she's praying and she's singing some more. And that's what she does for two hours. And then, of course, she's arrested.

So you look to see how in the world can someone be arrested for literally just standing there? And she's never asked to move or do anything -- she certainly doesn't say anything ugly to anybody -- and then is arrested. So the government's going to have to prove that those -- those actions, either overtly or aiding and abetting, somehow violated this FACE Act. I would respectfully suggest to the Court, after all this is over with, a not guilty would be appropriate for Eva Zastrow. Thank you.

THE COURT: Thank you, Mr. Cooper.

Mr. McGowan.

MR. McGOWAN: Thank you, Your Honor.

DEFENDANT JAMES ZASTROW OPENING STATEMENT

MR. McGOWAN: On behalf of Mr. James Zastrow, I find it ironic how many times the government mentioned block or blockade in their opening statement, because depending on who you talk to will depend on the word that was used for this incident. You'll hear in the video clips the word block. You'll hear the word protest, you'll hear the word worship, you'll hear the

word rescue.

Without a doubt, the folks there were there for a spiritual purpose, to help mothers make a good decision or a better decision in their life. But what this Court is concerned with is -- and it boils down to this one simple issue, is my client's intent. His intent of mind as to whether he intended to interfere with the providing of reproductive services or preventing someone to obtain reproductive services.

The Court is going to have to look at the video and determine from his action what his intent was. The Court's not going to hear someone who can read his mind. What the video's going to show is that he was positioned down at the end of the hallway near the carafem clinic seated on the ground sometimes, and then at other times he's standing in the hallway.

I think maybe a critical part of the testimony that the Court's going to hear is going to be from Caroline Davis. And she's going to say that it was the intention of these protestors to blockade the door, to not allow them in. But she also will testify, if she's consistent in her testimony -- she's testified in several other locations, several other courtrooms. She also testifies that it is an individual choice; that that was between the person who decided to do that and the

Lord.

And that choice, even her own decision, to sit there and blockade a door was made, and she wasn't sure whether she wanted to be arrested or not. She explains how there are people there who act as what she calls blowfish that are just there to talk to people that are standing along the wall, talk to people, pray, give support in prayer, give support in Bible readings, give support in singing songs.

So this Court is going to have to determine what my client's intent was. And what -- what, respectfully, what I argue is that there's no way to determine what his intent was when we have the cooperator saying that that was one's own involvement.

I agree, just because someone says, I am going to be arrested today, doesn't mean that they were there to blockade the door, doesn't mean that at all. So at the end of the day you're going to see that my client was sitting there at the door, standing in the hallway, singing songs, and that he never was approached or -- he never approached or talked to anyone, and he never was asked to move.

It never even got to the point that someone seeking reproductive services tried to enter that door or that someone tried to -- that worked there tried to enter

that door. Thank you.

THE COURT: Thank you, Mr. McGowan.

All right. Government, are you ready to put your proof on?

MR. BOYNTON: Yes, Your Honor. The government calls Sarah Flowers.

THE COURT: All right. If we can bring Ms. Flowers in.

**SARAH FLOWERS**

called as a witness, after having been first duly sworn, testified as follows:

COURTROOM DEPUTY: Could you please state your full name for the record.

THE WITNESS: Sarah Flowers.

COURTROOM DEPUTY: Could you please spell your first and last name.

THE WITNESS: S-a-r-a-h F-l-o-w-e-r-s.

COURTROOM DEPUTY: Thank you so much. Please be seated.

**DIRECT EXAMINATION**

BY MR. BOYNTON:

Q. Good morning, Ms. Flowers.
A. Good morning.
Q. Ms. Flowers, where did you grow up?
A. In Alabama.

Q. And where did you go to school?
A. In Tennessee.
Q. What was your highest level of education here in Tennessee?
A. I have a bachelor of arts in history.
Q. Okay. And at some point did you move to Nashville?
A. I did.
Q. Okay. And how old were you when you did that?
A. 22.
Q. Are you currently working right now?
A. I'm not.

MR. HEROUX: Your Honor, I'm sorry. I'm older and I'm having a harder time hearing and we have the air conditioner running. If the witness could just speak up. I apologize.

THE WITNESS: Is that better?

MR. BOYNTON: No, no problem at all.

MR. HEROUX: Yeah, that's better.

BY MR. BOYNTON:

Q. All right. Ms. Flowers, I need to ask you a little bit about your substance abuse disorder. Can you tell the Judge a little bit about that.
A. Sure. I'm an alcoholic and struggle

with -- I've struggled with that for some years.

Q. And can you talk about your -- how you kind of experience your substance abuse disorder, periods of sobriety versus periods of relapse.

A. Yeah. For me, periods of relapse tend to last a day or two, and periods of sobriety from months to years.

Q. I'd like to ask you about particular moments in time related to the case here today. Back on March 5, 2021, were you in a period of sobriety at that time or a period of relapse?

A. A period of sobriety.

Q. And you've met with the FBI several times before your testimony here today; is that right?

A. That's correct.

Q. During those meetings with the FBI, were you in a period of sobriety or a period of relapse?

A. A period of sobriety.

Q. You testified at a trial in this case in January in this courthouse; is that correct?

A. That's correct.

Q. At the time of your testimony, were you in a period of sobriety or a period of relapse?

A. A period of sobriety.

Q. And here today, Ms. Flowers, are you in a

period of sobriety or a period of relapse?
A. A period of sobriety.
Q. So you were 22 years old when you moved to Nashville; is that right?
A. That's correct.
Q. And in approximately March of 2021 where were you working?
A. For carafem.
Q. And where did you work previously before carafem?
A. I, directly before carafem, worked for a birthing center in Nashville.
Q. Can you tell the Court a little bit about what a birthing center does.
A. Yeah. So the birthing center I worked for was staffed predominantly by midwives who provide services to people who don't want to birth in a hospital with drugs.
Q. Okay. Are any of these services provided by the birthing center that you worked at related to abortion?
A. No.
Q. Okay. Prior to working at the birthing center, you worked at Planned Parenthood; is that right?
A. That's correct.

Q. I'd like to ask you a little bit about your role at carafem. But first, are you still employed with carafem?
A. I'm not.
Q. When did your employment end?
A. In January.
Q. Do you know why it ended?
A. I do not.
Q. The carafem clinic that you worked at was in Mt. Juliet, Tennessee; is that right?
A. That's correct.
Q. And what kind of -- what kind of clinic is carafem?
A. Yeah. Carafem provides reproductive health services, which include abortion, contraception, dating ultrasounds, miscarriage management and some limited STI testing.
Q. I'd like to ask you about a couple of those things. Can you explain to the Court a little bit what a dating ultrasound is?
A. Yeah. The ones that we performed were mostly in the first trimester to determine the age of the fetus.
Q. Okay. And that's relevant for healthcare purposes; right?

A. Sure. Yeah.
Q. And can you tell a little bit -- explain to the Court a little bit about miscarriage care. What does that mean?
A. Sure. So there's certain criteria that an ultrasound would meet: The size of fetus, a lack of fetal cardiac activity that would determine that someone was having a miscarriage, and we would help to treat those folks as well.
Q. We're not talking about a lack of a fetal heartbeat brought on by any action by the carafem clinic; right?
A. That's correct.
Q. In March of 2021, what were your duties at the carafem clinic?
A. I was a health services coordinator. So I would do things like check patients in, take payments. I did occasional ultrasounds, assisted in surgical abortion procedures, things like that.
Q. On a typical day, based on your experience working for carafem, approximately how many patients would come through your doors for reproductive health services?
A. 20 or 30.
Q. All right. In March 2021, all these

procedures that you described, these were lawful procedures in the state of Tennessee is your understanding?

A. That's correct.

Q. I want to talk a little bit about the location of the carafem office. Was it a stand-alone office or was it part of a complex?

A. The carafem office was on the second floor of a medical pavilion, which is a three-story building with other medical services in it.

Q. Can you just describe for the Court approximately how many other medical offices there were there?

A. Gosh. A couple of dozen maybe.

Q. And can you give some examples of the other medical services that were provided by some of those businesses?

A. On our floor directly down the hall was an orthodontist office. Vanderbilt also had an orthopedic office on that floor.

Q. And just to be clear, those other businesses, all those other businesses in that medical pavilion, none of those were associated with the carafem clinic?

A. That's correct.

Q. The layout to the carafem office -- you said it was on the second floor of the medical pavilion. How many entrances were there to the clinic office itself?

A. Two.

Q. What were those entrances?

A. The first entrance that you come to is the staff entrance, which we all had keys to. And the second that you come to was the patient entrance.

Q. Okay. So you mentioned keys to the staff entrance. I do want to talk a little bit about how you would access each of those doors just briefly. So the staff entrance, did it have a window on the door, was it just a solid door?

A. The staff entrance was just a solid door.

Q. Okay. And you said that you had had a key to enter it. Is it a physical key?

A. That was a physical key, yes.

Q. So metal key, old school, unlock the door and you're able to get in?

A. That's right.

Q. Once you're through that staff entrance, what kind of space do you find yourself in?

A. The first space that you walk into was our lab; tile floor, counter, sink.

Q. Okay. So you're inside the office space at that point?
A. That's right.
Q. There's no second locked door that you'd have to get through?
A. That's right.
Q. Let's talk a little bit about the patient door. How would -- how would somebody access the patient door?
A. So we had an intercom system. So there was a buzzer and a speaker right next to the -- right next to the door. If someone were coming for an appointment, they would ring the bell. We would ask if they had an appointment, what their last or first name was, confirm they were a patient, and then hit the unlock button to buzz them in.
Q. Once they're buzzed in, are they just inside the office at that point or are they inside kind of another secured space?
A. They're in the waiting room in the office.
Q. Okay. But between the waiting room and the clinic itself, the interior of the clinic, there's another locked door; is that right?
A. Yes. Uh-huh (affirmative).
Q. Did you have a key to the patient entrance?

A. I did not.
Q. Okay. So to get through the patient entrance, you would have to follow the same procedure that a patient would. You'd ring the intercom; is that right?
A. That's correct.
Q. Okay. I want to direct your attention to March 5 of 2021. Do you recall that day?
A. I do.
Q. And you were working at carafem on that day?
A. That's right.
Q. All right. Approximately what time would you arrive at your office?
A. Our clinic would usually start -- we would start seeing patients around 8:00, so I would get there around 7:45 most days.
Q. And you arrived approximately around that time on March 5; is that fair to say?
A. Approximately, yes.
Q. And when you arrived there, did you have any reason to think that something unusual was happening at your office that day?
A. When I pulled into the parking lot, no.
Q. Okay. At some point did you get a text

message that suggested something unusual was happening?
A. I did.
Q. Without saying who that came from, is it fair to say that came from a coworker of yours?
A. Yes. Uh-huh (affirmative).
Q. All right. And it just conveyed that there were an unusual number of people there; is that right?
A. That's correct.
Q. Okay. Was that unusual for your day-to-day work experience at carafem that there would be a number of people outside your office?
A. Absolutely unusual, yes.
Q. And just to go back to the layout for a moment, your office is at the end of a long hallway?
A. That's correct. With no other offices next to it.
Q. That was my next question. So once you passed the orthodontist office, there's no other office that's down that hallway towards carafem?
A. That's correct.
Q. Okay. Did the text message cause you to not want to go to work?
A. No.
Q. Okay. So you went up to the second floor. And what did you see when you got there?

A. I stepped off the elevator and saw a tall man holding a camera -- or holding a phone and who looked to be filming. And I turned left down the hallway and saw a couple dozen people in the hallway.

Q. Okay. And at that point did you have any reservations about walking down that hallway and going into your office?

A. Yeah.

Q. Tell the Court a little bit about that.

A. Yeah. It's not customary when you work in reproductive health to have lots of people surrounding your office. It kind of sets off some red flags in your brain. Or in my brain. Does that answer your question?

Q. I think so. So what did you decide to do, if anything, at that point?

A. I pulled out my phone and thought that I had started recording as well.

Q. Okay. And can you explain to the Court why you pulled out your phone and started -- or thought that you'd started recording, tried to start recording.

A. Yeah. Protection, documentation. Also was a little bit scared and panicked myself.

Q. So you have your cell phone in your hand. You think that you're recording. Where do you go at that point?

A. I took out my keys and went into the staff entrance at the office.

Q. Did anyone try to stop you from getting into the staff entrance at that point?

A. No.

Q. Okay. And, again, this was approximately 15 minutes before your office was even open to patients; is that right?

A. Approximately.

Q. Okay. Did anyone try to talk to you out in the hallway?

A. Not that I recall.

Q. Once inside the office -- you testified a second ago that you thought you had tried to record a video or started recording a video. What actually happened?

A. Yeah. I'd gotten in the office and set my things down and realized that, in fact, I had not recorded anything.

Q. Okay. Was there anyone else inside your office when you got there? Without naming names.

A. Yes. Our front office person, our clinic manager and our medical doctor.

Q. Okay. So all three of those are employees of the clinic; is that right?

A. Yes, that's correct.
Q. And two of those -- is it fair to say that two of those employees, the medical doctor and the office manager, are both directly involved in the providing of reproductive health services?
A. Yes.
Q. Okay. Were there any patients inside at that point?
A. No.
Q. And, again, at what time did you expect patients to arrive to the clinic that day?
A. A little closer to 8 o'clock maybe.
Q. And what were your business hours at carafem at that point, if you can recall?
A. 8:00 to 5:00 usually.
Q. All right. So during those nine hours, you expected to see 20 to 30 patients; is that fair to say?
A. Yes.
Q. Did you stay inside the carafem clinic?
A. I did not.
Q. Why did you leave?
A. Once I realized that I had not, in fact, gotten a recording on my phone, I decided to go out into the hallway and get a recording.
Q. What was going through your head at that

point?

A. Not sure. Lots of adrenaline. Wasn't really thinking clearly.

Q. So sitting here today, do you think it was a good idea to go back into the hallway?

A. No.

Q. Can you explain a little bit to the Court why it was not a good idea.

A. Yeah. Well, it wasn't a good idea for me to go in in the first place because, in theory, I've given whomever is in the hallway access to the clinic. And then doing that once again by opening the door and leaving.

Q. Okay. So opening the door, both the first time and the second time when you returned out to the hallway, you believe was a mistake?

A. Yes.

Q. Okay. At that time on March 5 of 2021, did you know whether carafem policies addressed this situation?

A. Yes.

Q. All right. What did you understand those policies directed you to do in a situation like this?

A. The general policy is do not engage. So when I arrived at the building and got up to the office

and saw that there were people in the hallway, I should have turned around and gone back to my car and left. And should not have left the office again.

Q. So were these policies in your mind when you made the decision to walk back out of the clinic into the hallway?

A. No.

Q. Sitting here today, do you know why you weren't thinking about those policies?

A. Lots of adrenaline, fear, panic.

Q. When you went back out into the hallway, you said that you were going back out to record; is that right?

A. That's correct.

Q. And so when you went back out into the hallway, what did you do?

A. I did record.

Q. All right. And do you know whether you were successful at recording the second time?

A. I was.

Q. Have you reviewed the footage from that video?

A. I have.

Q. Before we watch that video, I'd like to talk to you about some of the things that you say in it.

We'll hear you refer to the people in the hallway as superpro life and talk about them not wearing masks; is that right?

A. That's correct.

Q. Why did you comment on people not wearing masks?

A. This is March of 2021, sort of at the height of the coronavirus pandemic.

Q. Sitting here today, how do you feel about the language that you used in the video recording?

A. I wish I hadn't. It's unkind and antagonistic.

Q. You came in this morning to the US Attorney's Office and you reviewed a disk; is that right?

A. That's correct.

Q. Okay. So I'd like to show you what's been marked as Government's Exhibit 4. Do you see that in front of you? It will be one of the disks there in the stack.

A. Okay.

THE COURT: Are the exhibit stickers what's marked? Is that what she needs to be looking at or is it on the front as well?

MR. BOYNTON: It is on the top of the CD,

Your Honor. I believe she'll recognize a marking on it as well.

THE COURT: Okay.

MR. BOYNTON: Court's indulgence.

THE COURT: I understand.

THE WITNESS: Yes.

BY MR. BOYNTON:

Q. It's always the last one.

A. Yes.

Q. So do you recognize this CD in front of you?

A. I do.

Q. What is it?

A. It's a disk that has my signature and today's date.

Q. Okay. And do you know what's on that disk?

A. I do.

Q. How do you know what's on that disk?

A. I reviewed it this morning and signed and dated.

Q. I'd like to also direct your attention to the exhibit book in front of you and to Exhibits 4A and 4C in that exhibit book. Can you take a look at those.

A. Yes.

Q. So you're on 4A; is that right?

A. Uh-huh (affirmative).
Q. If you could flip over to 4C. Do you recognize these two documents?
A. I do.
Q. What are they?
A. They are stills from the video that I took.
Q. Okay.
MR. BOYNTON: Your Honor, at this point move to admit Government's Exhibit 4, 4A and 4C.
THE COURT: They'll be admitted without objection.
(Government Exhibits Nos. 4, 4A and 4C were admitted.)
BY MR. BOYNTON:
Q. Ms. Andrews, can we play for the jury Exhibit 4 from the start to approximately the 12-second mark, please. Sorry, play for the Judge.
(Playing video.)
Ms. Flowers, what has happened here in these first 12 seconds of your video?
A. I have walked out into the hallway from the staff entrance and sort of panned the crowd.
Q. And at this particular moment in the video, the video captures something that's going on, but can you describe to the Judge what you recall seeing yourself at

that point?

A. Yeah. So I saw someone speaking to another person that I had seen downstairs when I got into the elevator to come upstairs, and I assumed that this person that she was speaking to was a patient.

Q. Okay. Why did you assume that?

A. When I saw this person and who I assumed was her partner downstairs sort of looking through the office numbers, I kind of got a sense that they might be coming to see us.

Q. Okay. So when you say you thought she might be a patient, specifically a patient coming to the carafem clinic; is that right?

A. Yes. Yeah.

Q. In fact, where she is in this hallway, we are now past the last other medical office; is that right?

A. That's correct.

Q. What was your reaction to what was happening in this moment when you saw the person you believed to be a patient up there?

A. To protect her.

Q. And why was that your reaction?

A. When I chose this line of work, I knew that things like this were a possibility. But she didn't sign

up for that; she just needed some healthcare. Yeah.

Q. And sitting -- at that point did you know what kind of reproductive healthcare she was coming to the carafem clinic for?

A. I did not.

Q. Ms. Andrew, can we play from 12 seconds to 1 minute and 17 seconds, please.

(Playing video.)

I want to ask you a couple questions about some of the things that we just saw on that clip. Why did you instruct the person you believed to be a patient to go back to her car?

A. Seemed like the safest option, I guess, at the time just to get her away from what was happening.

Q. Okay. And at that point do you know whether or not any decision had been made to cancel appointments at the carafem clinic because of what was occurring in the hallway?

A. Yeah. So when I stepped into the office initially, I overheard the manager on the phone with one of our call center agents letting them know --

MR. HEROUX: I'm going to object to hearsay, Your Honor.

MR. BOYNTON: I think it's a present sense impression that she overheard.

THE COURT: I'll overrule it. I'll let you go ahead and testify.

BY MR. BOYNTON:

Q. Go ahead with your answer, please.

A. I heard her talking to who I thought was a call center agent telling them to reschedule appointments for the day and contact patients to let them know what was happening.

Q. Okay. And you -- you also -- in that clip we heard you say, we'll call you in a few minutes; is that right?

A. Yes.

Q. Okay. And why did you say we'll call you in a few minutes?

A. That's what I assumed would happen. If they're there early, I imagine they're at the top of the list to be called.

Q. All right. So at that point out in the hallway, you already knew that patients were going to be called?

A. Yes.

Q. Okay. I asked you a little bit about why you're instructing her to go back to the car, but I want to hone in on access to the office. Why didn't you try to get her into the carafem office at that point?

A. Not sure. Wasn't thinking clearly. Probably couldn't have if I'd tried.

Q. Okay. And why do you say probably couldn't have? Why was that your perception?

A. There's a large line of people in front of both the staff and the patient entrances.

Q. Ms. Andrew, can we play from 1:17 to 2 minutes, please.

(Playing video.)

Ms. Flowers, the door that you're at at that moment -- I'm sorry, do you need some tissues?

A. I think I'm okay. Thank you.

Q. You're okay?

A. Yeah.

Q. Let me know if you need a moment. Okay?

A. Yeah.

Q. That door that you're at in this moment in the video, can you describe for the judge which door that is. Is that the patient entrance or the employee entrance?

A. That's the employee or staff entrance.

Q. And the door that we're seeing right here in this still frame behind you, which door is that?

A. That is the patient entrance.

Q. And the door to the left of that, what does

that door lead to?

A. The stairs.

Q. The stairs to exit the building; is that right?

A. That's correct.

Q. So after you instructed the person you believed to be a patient to go back to her car and wait for a phone call in a few minutes, you attempted to enter back into the office; is that right?

A. Yes.

Q. Again, that would have been inconsistent with carafem security policies?

A. Yes.

Q. Again, sitting here today, do you think that was a good idea?

A. No.

Q. Okay. Were you able to get back into that staff entrance?

A. I was not.

Q. And why was that?

A. There were two men sitting on the floor blocking the door.

MR. McGOWAN: Judge, I couldn't hear what she said.

THE COURT: Would you repeat that, please.

THE WITNESS: Sure. There were two men sitting on the floor blocking the door.

BY MR. BOYNTON:

Q. What was your reaction to that?

A. Panic. I guess I felt like that was my way to get out of what was happening, and that was not available to me.

Q. Okay. Do you think it's fair to say, in reviewing this video footage, that you might not appear to be panicked in the footage?

A. Yeah. I think that's fair.

Q. Can you -- can you explain what your reaction is to that?

A. Yeah. I can experience multiple things at one time, I guess. And maybe put on a bigger front than what I was experiencing.

Q. Did you try to force your way through the staff entrance to get inside?

A. I didn't.

Q. Why did you not do that?

A. Didn't want to hurt someone. Probably wouldn't have worked.

Q. Did you try to get in through the patient entrance?

A. I wouldn't have been able to. No, I did

not.

Q. Again, what we're seeing here is the patient entrance in this still frame; is that right?

A. Yes, that's correct.

Q. What did you do next?

A. I went down the stairs and out to the back parking lot.

Q. You testified earlier that there were three employees inside the clinic when you arrived. Did any of them leave with you?

A. Not that I saw.

Q. Did you see any of them outside the clinic while this event was continuing to go on?

A. I did not.

Q. Did you have any communication with the folks that were inside the clinic?

A. I did. We had a clinic group text.

Q. Okay. And on that group text, at some point did you receive a digital photograph?

A. Yes.

Q. I'd like to show you what's been marked for identification purposes as Government's Exhibit 6. It's right there in the book. So you're on 4A right now. If you flip a little bit back -- that's right, right there.

A. Okay.

Q. What are we seeing there in Government's Exhibit 6?
A. That is a still from our security camera in the office.
Q. Okay. So you've got a security camera in the office. What is that security camera facing?
A. We weren't allowed to have it face down the hall, so it faces directly -- like, right in front of the door, the window.
Q. So before when we were looking at Exhibit 4 and frozen right at the -- right at the two-minute mark, we were looking at the outside of the patient door. Is this showing the inside the patient door?
A. It is, yes.
Q. Okay. And so this is a cell phone camera picture taken of the screen displaying the footage from the video camera; is that right?
A. Yes.
Q. And during the course of this day, you received this picture via text message?
A. I did.
Q. And you recognized that to be the inside of the carafem clinic?
A. I do.
MR. BOYNTON: Your Honor, at this time we'd

move to admit Government's Exhibit 6 into evidence.

THE COURT: All right. It will be admitted.

(Government Exhibit No. 6 was admitted.)

BY MR. BOYNTON:

Q. Ms. Flowers, at some point during the course of the day, were you able to return to your office?

A. I was.

Q. Do you recall, sitting here today, approximately how much later in the day it was that you were able to get back inside?

A. Three or four hours.

Q. Okay. Do you have a hard number on that, like you wrote it down somewhere, or that's just your estimate sitting here today?

A. That's justing my estimate.

Q. When you returned to the office, was there anyone still in the hallway?

A. Not that I saw.

Q. And was there anyone in the clinic when you returned?

A. Yes.

Q. And without naming names, can you describe who was inside the clinic when you got back?

A. The same three people who were there when I arrived, our front desk person, our manager and our medical doctor.

Q. Based on your role as kind of a patient coordinator, do you know if any patients were seen that morning while you were absent?

A. No patient -- not that I know of. No patients were seen while I was gone.

Q. Okay. But after you returned to the clinic and you described the hallway was empty, the clinic was able to resume normal operations; is that right?

A. That's right.

Q. Okay. The woman we saw in Exhibit 4, the woman you believed to be a patient, did you see her again later that day, if you can recall?

A. Yes. Yeah. I'm not sure how much I can -- I want to protect her privacy.

Q. Yeah, without disclosing any kind of reason for it --

A. Yeah. I did see her.

Q. Your hesitation there was about patient confidentiality; is that right?

A. Yes.

Q. All right. Not because you had trouble remembering whether you'd seen her again?

A. Yes, that's correct.
Q. Thank you.
So, again, without divulging any specifics of her treatment, was she there for a medical service related to the human reproductive health system?
A. Yes.
Q. I'd like to play Exhibit 4 just from the two-minute mark to the end, please.
(Playing video.)
So this is -- that clip shows you heading down the stairwell; is that right?
A. Yes.
Q. And, again, sitting here today, you were only able to return to work that day after the hallway was cleared of other people; is that right?
A. That's correct.
MR. BOYNTON: No further questions, Your Honor. Thank you.
THE COURT: All right. Thank you.
Mr. Lucas, do you have any questions?
MR. LUCAS: Just a few, Your Honor.

**CROSS-EXAMINATION**

BY MR. LUCAS:
Q. Good morning, Ms. Flowers.
A. Good morning.

Q. When you came to work that day, were you able to get into carafem through the employee door?
A. Yes.
Q. No one was blocking your entrance; correct?
A. The first time I went in, yes, that's correct.
Q. And then you came back outside the office; correct?
A. That's correct.
Q. And no one blocked your exit from the office?
A. That's correct.
Q. When you came out that time, you saw a mom or a patient who the prosecution is calling Patient A; is that right?
A. I don't know what the prosecution's calling her, but I did -- yes, I did see her in the hallway.
Q. All right. And did you tell that patient to go back to her car?
A. I did.
Q. And at the time you told her to go back to her car, she was speaking with someone about her choice to have an abortion; correct?
A. I don't know what they were speaking about. I know what -- I know she was being told, but I don't

know what they were talking about.

Q. But she was having a discussion?

A. Yes. Yeah.

Q. No one was yelling or -- there was no fighting going on. They were just having a discussion; is that correct?

A. That's correct.

Q. And at that point the patient was close to -- like, on the other side of the bathrooms?

A. Yes.

Q. And she left after you told her and her partner to go back to the car. And at that point she had not made it to the clinic door; correct?

A. Not that I saw.

Q. Now, you stated that you couldn't get back into carafem through the staff entrance; correct?

A. That's correct.

Q. Because someone was laying in front of the door?

A. Two people were sitting in front of the door, yes.

Q. Okay.

A. Yeah.

Q. Did you hear anyone tell those individuals to go lay in front of the door?

A. No.
Q. To your knowledge the person -- the people that were sitting in front of the door made the decision on their own, to the best of your knowledge, to block -- to block your entrance?
A. To the best of my knowledge, yeah.
Q. Now, after you couldn't get in the employee entrance, you decided to leave the floor?
A. That's correct.
Q. And you went down the stairs closest to the carafem entrance?
A. Yes.
Q. And you didn't speak to anyone after the person -- after you spoke to the person -- the people laying at the staff entrance door?
A. That's correct.
MR. LUCAS: That's all the questions I have, Your Honor.
THE COURT: Thank you, Mr. Lucas.
Mr. Heroux, do you have any questions for this witness?
MR. HEROUX: Yes, Your Honor.

**CROSS-EXAMINATION**

BY MR. HEROUX:
Q. Good morning, Ms. Flowers. My name is

David Heroux. I represent Eva Edl in this matter.

A. Good morning.

Q. While you were on the carafem floor, on the second floor where the carafem clinic is located, did you ever see an elderly woman in a wheelchair?

A. I believe so.

Q. You believe you saw her in a wheelchair while you were on the floor?

A. I believe so, yes.

Q. Okay. And you're sure about that just as sure as the other testimony you've put forward today?

A. Yes.

Q. Okay. If we could, Your Honor, could we go to the Government's Exhibit 4. And if we could, could you go to about five seconds into the clip. If you could, are you able to see that?

A. Yes.

Q. If we could do that, run that one more time, Ms. Flowers wasn't looking at the footage quite... Go ahead.

(Playing video.)

If we stop right there. So that was you saying "yup" as you went back out into the hallway coming through the employee entrance or exit, as the case may be?

A. Yes.
Q. And you immediately panned to your right; correct?
A. Yes.
Q. And you looked down the hallway there, if you can look -- and you're looking at the door to the patient entrance. And I know it's blurry, but do you see -- are you able to see kind of the bottom part of the door; right?
A. Yes.
Q. And you're also able to see kind of a lighter part just above the brown part, and that's the glass that looks through the patient entrance; is that fair?
A. That's correct.
Q. And do you see a woman in the -- in a wheelchair there?
A. I don't.
Q. Okay. If we could then roll that to -- if we could watch the video from there. If you would watch this video.
(Playing video.)
And now you turn and you're -- you're turning and you go back up the hallway; correct? If we could stop here. Did you see anybody a wheelchair in

that footage?

A. No.

Q. And on the left-hand side, those are -- that is the person you believe to be a patient and you don't know that patient or -- you don't know the designation the government's given that patient as Patient A or anything like that. You're not aware of that?

A. That's correct.

Q. Okay. Could you continue to the video. Go forward.

(Playing video.)

And let's stop there. You're encountering that patient, you're telling her to go to her car; correct?

A. That's correct.

Q. Okay. And, again, you saw no -- nobody in a wheelchair; correct?

A. That's correct.

Q. All right. We can go forward, if you would, please.

(Playing video.)

You now turn back and if you can stop here, so now you're heading back down the hallway. You've left patient -- the person you believe to be a patient to go

to the elevator; correct?
A. Yes.
Q. She's behind you, and if you watch the video, she kind of turns as you turn; correct?
A. Yes. They stepped onto the elevator and I turned back down the hall.
Q. Well, not at that point in the video, that's my point. That's my point. You've just turned around and you're heading back down towards the people; correct? Towards the patient entrance door --
A. Yes.
Q. -- in that clip?
A. Yeah.
Q. All right. If we could go forward.
(Playing video.)
Let's stop there. So that's some of the language that you mentioned, you testified earlier about being somewhat antagonistic; correct?
A. That's correct, yeah.
Q. And it's fair to say that it sounds like you're -- is an appropriate word annoyed? Is that an appropriate word for maybe what you were feeling at that time?
A. I'm honestly not sure.
Q. Okay. So you were -- at that point in time

I think you used the word adrenaline and panicked, but it's certainly not cowering, are you?

A. No.

Q. You're not cowering?

A. No.

Q. You're letting them know what you think?

A. That's correct.

Q. Okay. Now if we could continue the video from this point, if you could watch it. We're going back up the hallway.

(Playing video.)

And let me stop you there. That's another confrontation you had with some of the people there; right? You said this: You need to leave her alone, that's harassment. Correct?

A. I don't know if I'd characterize that as a confrontation, but, yes, I did ask -- I did tell her that it was harassment.

Q. I think that's a -- I think that's a fair -- it's an interjection. You're interjecting, hey, you need to leave her alone; right?

A. Yes.

Q. And at this point in time you're -- I think what we're about to see is her male -- a male companion enter into the picture. And he doesn't know who you are;

right?

A. Yes, that's correct.

Q. And you let him know. If we could run the video.

(Playing video.)

Okay, let's stop it there. Now, you heard the -- a younger woman talking to the -- who you believe to be a patient. She wasn't saying offensive things, was she?

A. I think -- I think I would -- I think offensive depends on who you ask, maybe.

Q. Was she threatening?

A. No.

Q. She wasn't threatening?

A. No.

Q. And when the -- I guess when the male companion comes out, he's agitated; correct?

A. He did seem upset.

Q. Okay. Let's continue the video from there.

(Playing video.)

And this time... Let's stop it there. You can see the elevator door has opened; correct?

A. Yes.

Q. And you have actually escorted this person you believe to be a patient and the male companion up to

the door -- up to the elevator door. They get on the elevator door, don't they? I'm sorry, they get in the elevator through the elevator door, don't they?

A. They do.

Q. That is actually the closest elevator to the hallway that carafem is located on; right?

A. Yes.

Q. They get on the door. During this clip, as we've broke it down, have you seen anybody in a wheelchair?

A. I haven't.

Q. Let's -- if we can continue.

(Playing video.)

All right. Let's stop there. So that was the man you originally saw --

A. That's right.

Q. -- when you came into work. He's still there filming; correct?

A. That's right.

Q. And has he said anything to you?

A. Not that I recall.

Q. Okay. Let's continue the video.

(Playing video.)

You turn and you go back down the hallway; correct? Let's stop there. That's the second time, "no

mask, superpro life." And, again, those are words you wish you hadn't made, but you would agree with me that they're a little bit -- they express a little antagonism?

A. Yes. I mean, my own words, antagonistic, certainly.

Q. Okay. Let's continue down.

(Playing video.)

Let's stop here. This is the first person who has told you that you can't go where you want to go?

A. To the best of my recollection, yes.

Q. You haven't seen it in this video clip; correct?

A. Yes. Yeah.

Q. You have seen it in the video clip?

A. Sorry. No, I haven't seen it. I'm agreeing with you, yes.

Q. All right. And let's follow this through. If we run the video, if you watch -- and I'm going to try to pick it off right at the right time.

(Playing video.)

Let's stop there. And he says "no disrespect, ma'am;" right?

A. Yes.

Q. He's on the floor; right? That's his position?

A. Yes.

Q. He's kind of shying his face down. He's not -- did you feel threatened by him?

A. I don't remember.

Q. Don't recall?

A. I don't know.

Q. I'd ask you to look at the door there to the -- to the clinic entrance. That's certainly a less fuzzy picture of the clinic entrance, isn't it, than the last one we looked at? It's a little more clear.

A. It is.

Q. You can see the clinic -- the way to the clinic door is pretty much open. There was some people leaning against the wall. And you can see a person kneeling down on the floor at the clinic entrance; right?

A. I don't know that I would agree that the clinic entrance is open.

Q. Well, it is not completely blocked off.

A. There's not a wall of people standing in front of the door.

Q. That's right, there's not a wall of people, okay. And you can see the door clearly.

A. Yes.

Q. And there's not a woman in a wheelchair in there.

A. That's correct.
Q. Okay. So let us roll down, continue.
(Playing video.)
You pan here. And let you stop you there. You might not have caught it, but after the gentleman kneeling at the employee entrance says "no disrespect," you again kind of mock him by saying "no disrespect." You were upset by that?
A. I don't know that I was mocking him. It -- it felt disrespectful to bar me from my place of work.
Q. Right. Okay. But you were willing to voice that back to him?
A. Yes.
Q. Okay. Now you're turning into the -- this would be the staircase kind of diagonal across from the entrance to the -- the employee entrance to the clinic?
A. Yes. Stairwell sort of runs perpendicular to the hallway.
Q. Right. And I guess behind you and up the hallway a little bit is the clinic entrance for employees?
A. Yes.
Q. Okay. And this is where you enter the -- you're going to enter the clinic -- I'm sorry. You're going to enter the stairway, and that's when you left the

clinic. That's the -- that's the way you left the clinic from; is that correct?

A. That's correct.

Q. And you're going to go down that stairs, and as I understand or as I -- you have -- you go into the parking lot, is that where you go?

A. Yes.

Q. Okay. And it is my understanding or did -- someone picked you up?

A. Yes.

Q. Okay. And you go down that -- those stairs. And so we have now kind of very closely gone through the entire video of your experience, at least in that hallway, and there has never been a woman in a wheelchair, has there?

A. No.

Q. Okay. So when you said you thought you saw her, that might have been incorrect?

A. Sure. It's been -- you know, it's been three years.

Q. Completely understand.

A. Yeah.

Q. Let me -- let me, if we could, could we bring up -- I think it was Government's Exhibit -- I apologize, I have -- I'm a messy note writer. I know I

have it.

MR. HEROUX: Excuse me, Your Honor.

THE COURT: It's okay. Take your time.

Is it one of the exhibits that's been admitted at this point?

MR. HEROUX: Yes, Your Honor.

THE COURT: If you can describe it, we can probably help you.

MR. HEROUX: I think I've got it here.

THE COURT: Okay.

BY MR. HEROUX:

Q. It is 4C. Can we bring up 4C? Nope, not 4C. 6, I believe it's 6. So it is a screenshot, I believe, that was sent to you, is that correct, via text or -- text message?

A. Yes. I believe one of the staff took a picture of the security cameras and sent it to our group text.

Q. Okay. So if you look at that, I know it's kind of -- a little cockeyed there, but if you look at the picture, you can see a woman in a wheelchair; is that correct?

A. That's correct.

Q. But you never encountered that?

A. That's correct.

Q. So that woman in the wheelchair never had any interaction with you on that floor on that day?
A. Not that I recall.
Q. Okay. Now, you also saw the patient that you interacted with; correct? The one you have been describing, the one you thought was a patient?
A. Saw her when?
Q. You saw her in the hallway --
A. Yes.
Q. -- during this video clip?
A. Yes.
Q. You said you saw her down below, I guess, in the -- down on the first floor. And you said you got that just sense that she might be someone coming to see your clinic; is that right?
A. That's correct.
Q. And when she was on the floor at the clinic, okay, or on the second floor -- I'm sorry, second floor, she would not have seen -- there was nobody present in a wheelchair at that time either, was there?
A. Yeah, I clearly misspoke. I don't know what she saw. But it looks as if I did not see a woman in a wheelchair at that time.
Q. So after you escorted her to the elevator, you don't know what happened to her. I know she came

back, but she left the second floor?

A. Yeah, I don't know where she went. She was no longer on the second floor.

Q. Okay. And you never saw a wheelchair, a woman in wheelchair arrive on the second floor?

A. It doesn't -- it doesn't look like it.

Q. Now...

MR. HEROUX: One moment, Your Honor.

BY MR. HEROUX:

Q. You said when you got there you were experiencing panic; correct? You said -- you used the word panic; right?

A. Yeah, when I stepped off and saw a bunch of folks in the hallway, sure. Yeah.

Q. When you stepped off the elevator, you saw this man, right, with the -- we saw him earlier, but you saw -- you say you saw him when you stepped off the elevator?

A. That's right.

Q. Okay. When you -- did he do or say anything to you?

A. Not that I recall.

Q. You were able to walk all the way down the hallway to the employee entrance. Did anybody say anything to you?

A. Not that I recall.
Q. You went into the -- the employee entrance. That was not consistent with carafem policy; correct?
A. That's correct.
Q. You turned around and came back out and that was not in -- that was not consistent with carafem policy.
A. That's correct.
Q. In other words, when you came back out, you interacted verbally with multiple people, multiple times?
A. That's correct.
Q. That was not consistent with carafem policy?
A. That's correct.
Q. You then walked up the hallway, escorted -- well, there were a couple other things happened, but escorted the patient -- the person you believed to be a patient out. You said that we'll call you later; right?
A. Yes.
Q. Okay. During that time, up until you returned to the carafem employee entrance, nobody had said anything to you in opposition to what you wanted to do.
A. Not that I recall.
Q. Okay. You had earlier said that you

believed that these people who were going to be called -- during your direct testimony, you believed that this woman who you believed to be a patient, you said something about her being there early so you expected she would have been called early or at the top of the list I think you said?

A. Yes.

Q. So they were there before carafem opened.

A. Sure. Yes.

Q. Okay. And up until that time, you never, while you were there, nobody ever came down and told any of these people to leave; correct? You never saw that?

A. Could you clarify your question a little?

Q. Sure. While you were there on the second floor at carafem, you never saw anyone, police or security guard, come down and tell these people to leave; correct?

A. That's correct, yes.

Q. You can take down Exhibit 6.

While -- you've met with the government a number of times; correct?

A. Yes.

Q. You've reviewed your testimony, even today you've reviewed the video --

A. Yes.

Q. -- correct? And is it fair to say that while you have been involved in the business that carafem was in the business of, you were aware that some pro-life protestors protested very different than these people. Is that a fair way to put it?

A. I guess I would just want you to clarify what you mean.

Q. The panic that you felt, was that because of these people or was it because of what you've heard about protestors?

A. I -- I'm not sure. I'm not sure how to answer your question.

Q. All right. It's fair to say that nobody, during this time you were on the second floor, acted aggressively toward you?

A. Not that I recall.

Q. In fact, even the man who was seated on the floor blocking your reentry into carafem -- the carafem employee entrance, he was docile, behaving or acting small. He wasn't standing up to be threatening toward you?

A. He was not standing up.

Q. Was he being threatening towards you?

A. I don't think so.

MR. HEROUX: That's all I have, Your Honor.

Thank you.

THE WITNESS: Thank you.

THE COURT: Mr. Cooper, any questions?

MR. COOPER: Yes, I've got a few things.

**CROSS-EXAMINATION**

BY MR. COOPER:

Q. Good morning, Ms. Flowers.

A. Good morning.

Q. I'm David Cooper, I represent Eva Zastrow. Does that name mean anything to you?

A. Not particularly.

Q. I'm not going to try to cover any of the old ground my colleagues have covered, but I've got a few questions I want to ask you here.

Now, you started off in your testimony by telling the government's attorney that you were fired from carafem back in January of this year; is that correct?

A. I separated from carafem in January of this year, that's correct.

Q. Did you voluntarily resign or were you terminated?

A. I was terminated.

Q. Okay. And is it your testimony today, Ms. Flowers, that you do not know why you were terminated

from carafem?

A. That's correct.

Q. That's your testimony?

A. Yes.

Q. Did you file for unemployment benefits?

A. I have.

Q. Okay. Did carafem push back and file an objection to your request for unemployment benefits?

A. They did not.

Q. Okay. So are you currently receiving unemployment benefits?

A. There's some issues with my ID because it's still a Tennessee ID. But in theory, yes.

Q. All right. When you pulled into the parking lot that morning of March 5, 2021, I think you said it was about 15 minutes till 8 o'clock when you got there; is that correct?

A. Approximately.

Q. And you said it was an unusual morning because you saw a large crowd of people out in the parking lot. Is that what I'm understanding from you?

A. I -- I don't remember that at all. I remember feeling like it was just a normal day.

Q. Okay. You had gotten a text message, I think, that there was some unusual events going on; is

that correct?

A. That is correct.

Q. Do you remember if you were in the parking lot or you were starting to head to the second floor when you got the text message?

A. In my prior testimony, I think we clarified that it was sometime while I was already in the building.

Q. Okay. And so going up to the second floor, you knew that there was some -- an unusual event, that there were some people up on the second floor; is that correct?

A. I think so.

Q. Okay. And certainly when you got to the second floor, you knew that there was -- I think you said a couple dozen people on the second floor; correct?

A. Yes.

Q. Okay. And I think you have testified that the policy with carafem indicated that you should have gone back down and gotten into your car; correct?

A. That's correct.

Q. Just briefly, tell us kind of what that policy was with carafem when you saw a large group of people around the building or on the second floor. I don't think that's been testified about, but what was the policy?

A. General policy, as I know it, is not engagement. Get as far away as you can. Get to a place of safety.

Q. Okay. And you have been working at carafem about six months when this happened; correct?

A. Yes.

Q. I believe your previous testimony, October of 2023 was when you started working there, if I'm not mistaken?

A. October of 2020.

Q. 2020, I'm sorry.

A. Yes.

Q. I get my years mixed up. Yeah, 2020.

So you knew the policy was to not engage. But I think you would agree with me now that you violated policy on more than one occasion that morning; correct?

A. That's correct.

Q. You violated when you got up on the second floor and realized there were people there and continued down the hallway; right?

A. That's correct.

Q. You violated policy when you safely went through the employee door, saw that your video had malfunctioned, and you went back out into the hallway; correct?

A. That's correct.
Q. You would agree you violated it several times that morning; correct?
A. I would agree with that, yes.
Q. And as you told my colleagues, no one on that floor harassed you or threatened you or were antagonistic toward you in any way; correct?
A. I don't know that I would agree with the antagonistic or the harassment, but no one was threatening towards me.
Q. Okay. Now, I think you have testified -- well, you first said you think that you saw a lady in a wheelchair. But I think after reflection you're not really sure now, are you?
A. On my video it doesn't look like I saw her.
Q. Right. She's just not on the video; correct?
A. I didn't see her.
Q. And you didn't see anyone up there pushing a lady in a wheelchair, did you?
A. It didn't look like it, no.
Q. Okay. The exhibit -- Government's Exhibit No. 6, can we put that back up on the screen, please, ma'am.
Now, you've testified about this,

Ms. Flowers. That was from the security camera that was taken sometime that morning, I think, texted to you; is that correct?
A. Yes, sir.
Q. And just to be clear, this photograph was taken well after you had left the second floor and gone back down into, I guess, your car in the parking lot; is that correct?
A. I honestly don't remember when I got it.
Q. Okay. But clearly that picture was not something that you saw up on the second floor, correct --
A. This picture --
Q. -- as far as -- go ahead.
A. This picture does not look like the video that I took.
Q. Right. Because you never saw a lady in a wheelchair up on the second floor; correct?
A. It doesn't look like that, no.
Q. Now, I think you have met with the government to go over your testimony in this case leading up to today; is that correct?
A. Yes.
Q. Okay. And you looked at the video and marked it and all that; correct?
A. Yes, that's correct.

Q. Okay. And you have had previous meetings with the government about this case; correct?
A. Yes, that's correct.
Q. And I believe your attorney was with you during some of those visits; is that correct?
A. Yes.
Q. And that attorney is Ms. Joy Longnecker; is that correct?
A. Yes.
Q. Is that someone you employed or someone employed her on your behalf?
MR. BOYNTON: Objection, Your Honor.
THE COURT: Sustained.
BY MR. COOPER:
Q. Did the government employ Ms. Longnecker on your behalf?
A. I have no idea.
Q. You don't know?
A. I don't -- I don't think so.
Q. Okay. Did you employ her?
A. Yes, technically.
MR. BOYNTON: Your Honor, objection.
THE COURT: Where are we going, Mr. Cooper?
MR. COOPER: Bias. If the government has provided a lawyer for Ms. Flowers, I think it goes to her

bias. So that's why I was asking the question.

THE COURT: Okay. I think it's asked and answered then.

MR. COOPER: All right.

BY MR. COOPER:

Q. Ms. Flowers, would it be fair to say that when you went back out into the hallway, I guess we'll call it this second time after you realized that your video camera had malfunctioned, that you did not feel intimidated as far as going back out in the hallway; would that be a fair statement?

A. No, I don't think it would.

Q. You don't think that would be a fair statement?

A. No.

Q. Okay. You would agree that your statements to the people in the hallway on the video were certainly more harsh than anything that was said to you. You would agree with that, wouldn't you?

A. I would agree that my statements were antagonistic, yes.

Q. And that -- let's just stay with that. And that no one in the hallway said anything of an antagonistic nature to you; correct?

A. I mean, I guess I would want to flesh out

what that means. Yeah.

Q. Nobody looked in your video camera at you and said "you baby killer." They never said anything like that to you, did they?

A. No. No one said anything like that to me.

Q. Or "murderer" or anything ugly like that, did they?

A. Not on that day, no.

Q. In fact, the gentleman that was sitting there on the floor, I mean, he was actually almost apologetic to you, wasn't he?

A. I think he said "no disrespect."

Q. Right. Okay.

MR. COOPER: Thank you. That's all.

THE COURT: Mr. McGowan, do you have any questions for this witness?

MR. McGOWAN: Yes, sir.

**CROSS-EXAMINATION**

BY MR. McGOWAN:

Q. I'll pick up where Mr. Cooper left off. The person that was sitting in front of the door when you tried to reenter for the second time, that wasn't James Zastrow, was it?

A. I don't know who James Zastrow is.

///

Q. Mr. Zastrow, stand up, please.
The gentleman seated in front of the door that you interacted with that was apologetic about him sitting in front of the door, that was blocking the door, it was an older gentleman; right?
A. Yes. Looked to be.
Q. He had salt-and-pepper hair?
A. That's correct.
Q. That's not him, was it?
A. It doesn't look like it, no.
Q. Thank you.
And that was the only person blocking the door?
A. I believe there was a younger fellow that was sitting to the right of the older fellow.
Q. Was that a juvenile? Did that appear to be a juvenile?
A. I don't know. I don't remember.
Q. You had an opportunity with Mr. Heroux to review the Government's Exhibit 4C -- or 4; right?
A. Yes.
Q. Do you recall seeing Mr. Zastrow in that?
A. I don't know.
Q. Okay. So you can't tell us if you even saw him on the floor then?

A. I wasn't aware of what he looked like until a couple minutes ago.
Q. Did you have an opportunity to meet with the government regarding this case?
A. Yes.
Q. And you reviewed their exhibits before today?
A. Yes.
Q. And you testified in this matter prior to that?
A. Yes.
Q. Did they not ask you to pick out Mr. Zastrow in that video?
A. No.
Q. All right. And I'll take it they didn't ask you to pick out Ms. Edl in this video, the lady in the wheelchair?
A. No.
Q. Okay. So you can't tell us if -- you can't say that he interfered with your access at all, can you?
A. I cannot say that that person interfered with my access. No, I don't say that.
Q. And then you cannot tell us if he interfered with who you presumed to be a patient; correct?

A. No.

MR. BOYNTON: Your Honor, I think we're calling for a legal conclusion here.

BY MR. McGOWAN:

Q. Well, let me ask you this. Did you ever see a man talking to the woman that you expected to be a patron of your establishment?

A. I didn't see a man up close talking to her, no.

Q. And you said you at one point entered in -- entered in unobstructed to the clinic when you first got there; correct?

A. Yes.

Q. No one said anything to you or blocked the door?

A. Not that I recall.

Q. And then you were able to exit as well?

A. That's correct.

Q. So that means no one was sitting on the other side of the door?

A. Yeah.

Q. You were able to freely open the door?

A. Yes. I was able to freely open the door.

Q. And did you know what the young ladies were wanting to talk to -- or what they were saying to the

woman when you approached that conversation?

A. Did I know when I approached? Is that what you're asking?

Q. Well, I'm just asking, do you know what they were speaking about when you interrupted that conversation?

A. I guess not.

Q. But you'd already called some people pro-life or superpro-life. Did you not think that they were talking about different alternatives?

A. I'm honestly not sure.

Q. Well, you saw these people as a threat?

A. I guess.

Q. A threat to your business?

A. I recognized that these people were preventing us from opening our clinic as we usually would.

Q. Okay. And you felt like you needed to advance your position as an employee of that clinic; correct?

A. I don't think -- I don't know, to be honest. I doubt that that's what I was thinking. I don't know.

Q. You acted as if you had authority to tell them that they needed to leave and wait for a phone call;

correct?

A. I did act that way, yes.

Q. So were you the individual that scheduled the appointment?

A. I don't know who scheduled that person's appointment.

Q. Do you know their names?

A. I don't.

MR. BOYNTON: Objection.

MR. McGOWAN: I think they're going to be witnesses.

THE COURT: She's already answered she doesn't know their names. So we can move on.

BY MR. McGOWAN:

Q. So you obviously wasn't so panicked or frightened or scared -- I think you said you were scared or panicked. You weren't scared or panicked to, in the face of these people, to tell the patient to leave?

A. I think sometimes we do hard things scared.

Q. So why did you think that that was the best course of action?

A. I felt like getting her away from what was happening was a good idea.

Q. And what was happening?

A. There were people in the hallway around our

clinic.

Q. Were they praying at that point?

A. Not that I remember.

Q. They hadn't been ugly to you at all at that point?

A. Not that I remember.

Q. Had they started signing hymns at that point?

A. Not that I remember.

Q. And when you told her -- you thought -- or you told her that she should leave and go back to her car and wait for a call; is that right?

A. Yes.

Q. And is that protocol?

A. I mean, I suppose protocol would dictate that I wasn't there in the first place, so I guess not.

Q. Let me ask you this question. Did you tell her that in contemplation of what you were supposed to be doing? Were you thinking about what the proper protocol was going to be?

A. No. I was just thinking to get her away from what was happening.

Q. So this is just a knee-jerk reaction, then, to the surprise protest at the clinic?

A. Sorry, what was a knee-jerk reaction?

Q. All your actions were just a knee-jerk reaction. They weren't in contemplation of what you were supposed to be doing as an employee.
A. I was not thinking in terms of carafem policy in the way I was behaving, that's correct.
Q. When you say that you're not thinking, did you not think of it, it never came to mind that you were supposed to do or say a certain thing?
A. I suppose so.
Q. You never -- you never -- you never thought of, what am I supposed to do in this situation?
A. I mean, you know, there's a lot of adrenaline. And, yes, I was not thinking clearly.
Q. Okay. Let me ask you this: Had you been instructed on that?
A. On what?
Q. On the protocol of how you're supposed to -- how you're supposed to act and what you're supposed to say in these situations?
A. Yes.
Q. Okay. You had been instructed on that?
A. Yes.
Q. Prior to beginning your job at carafem?
A. When I began my job, yes.
Q. How much training did they give you?

A. I'm not sure how to quantify that.
Q. Okay. Well, how was it conveyed to you this protocol on how to handle these certain situations?
A. There's a written protocol and there's some meetings with our security officer.
Q. Were you given it in writing?
A. I believe so.
Q. Okay.
A. Yeah.
Q. And did someone go over it with you?
A. To be honest with you, I don't remember. It's been some time.
Q. Not well enough for you to remember that you actually were supposed to do certain things; correct?
A. Again, I think -- I'd had similar training at Planned Parenthood, I got this training with carafem. There was lots of adrenaline rushing, and I was not thinking clearly.
Q. Did you -- did you hear anything that any of the people in the hallway were saying?
A. Yes. Yes.
Q. You did?
A. Yes.
Q. And was that directed towards you or towards this woman?

A. Both.
Q. And you -- found that offensive?
A. Sorry, found what offensive?
Q. I guess if you weren't going by protocol, what I want to understand is why didn't you take her down to the clinic?
A. Uhm.
Q. You escorted her to the elevator; correct?
A. Yes.
Q. Why didn't you take her down to the clinic?
A. I -- again, I thought that the safest place for her to be was away from what was happening. And I'm not sure I could have gotten into the clinic.
Q. Do you have any medical training as to why that would be better for her?
A. I'm unclear about what that question means.
Q. I'm just --
A. What medical training?
Q. That's just your opinion that that was the better thing to do?
A. Yes.
Q. Okay.
A. Yeah.
Q. But you agree -- you agree that you told her to leave at the other end of the hallway before she

even got to the entrance to the carafem?

A. Yeah, I believe they were across from the bathrooms. Yes.

Q. And the video -- I don't know. The video doesn't know, I think, any -- it doesn't show my client in front of a door, does it?

A. Not that I could see.

Q. Okay. And it doesn't -- it doesn't -- not the --

MR. BOYNTON: Your Honor, just objection on best evidence rule. The video shows what it shows.

MR. McGOWAN: I didn't hear the objection.

MR. BOYNTON: Best evidence rule.

THE COURT: Overruled. You can answer the question if you understand it.

THE WITNESS: Could you repeat it for me.

BY MR. McGOWAN:

Q. That video doesn't show that door being blocked, does it?

A. Which door?

Q. The patient door.

A. I believe it does.

Q. It does? Okay.

A. It looks like there's a woman kneeling and another person off to the side there.

Q. But it doesn't show my client in that position.
A. Not that I could see.
Q. You don't remember talking to my client?
A. Nope.
Q. And the individual that was sitting in front of the door, the second time you tried to enter the employee door, definitely was not my client?
A. Didn't look like it, no.
Q. And you can't tell us where he was?
A. No.
MR. McGOWAN: Thank you.
THE COURT: Government have any redirect?
MR. BOYNTON: Yes, Your Honor, briefly.

**REDIRECT EXAMINATION**

BY MR. BOYNTON:
Q. Ms. Flowers, Mr. McGowan just asked you about freely opening doors. Do you recall that language?
A. Yes.
Q. We reviewed Exhibit 4 during your direct examination, and there came a time where you attempted to reenter through the staff door. Do you recall that?
A. That's correct.
Q. At that time, when you were trying to reenter through the staff door, could you freely open

that door?

A. No.

Q. Why not?

A. Because there were two people sitting in front of it.

Q. Okay. And a moment later you recall that your video shows the patient entrance to the door; right?

A. Yes.

Q. Okay. And at that time do you believe that you could have freely opened that door?

A. No.

Q. Again, why not?

A. There was someone sitting in front of it. They both open out in the hallway.

Q. All right. You testified during your direct examination that you only returned to the clinic after the hallway was cleared. Do you recall that?

A. Yes.

Q. Okay. And one of the defense attorneys showed you Exhibit 6. And, Ms. Andrews, can we pull up Exhibit 6 real quick.

Now, again, you weren't on the hallway when this image was taken as far as you know; right?

A. No, not as far as I know.

Q. But could you freely open the patient

entrance door that's depicted here in Exhibit 6?

A. No.

Q. Again, why not?

A. Because there are now multiple people sitting in front of it.

MR. McGOWAN: I object, Judge. That's speculation.

THE COURT: What's speculation?

MR. McGOWAN: Speculation. You don't know if they were going to move or not move.

THE COURT: The question was why could she not. And she said, because there were multiple people in front of it.

MR. McGOWAN: But she never -- she's not the one that took the picture, she's not even in the office and never went back to the office while that video was taken -- that time interval that it was taken. That's not her picture. That picture was sent to her. She wasn't on the floor at that time.

THE COURT: Right, I understand.

The objection is overruled. Continue.

MR. BOYNTON: Thank you, Your Honor.

BY MR. BOYNTON:

Q. Ms. Flowers, you were asked a number of times on cross-examination about what was happening in

the hallway when the young woman you believed to be a patient was in the hallway. Do you recall those questions?

A. I do.

Q. And I want you to turn back to Exhibit 4A there in the exhibit binder in front of you. And if you can -- do you recall when that -- that still image is from? It's also displayed on the screen behind you. Do you recall when in your video, Exhibit 4, that still image comes from?

A. I believe it's after I've left the office for -- after I've gone in and put my things down and left the office again.

Q. But do you recall whether or not the patient -- or the young woman you believed to be a patient was on the hallway at this point?

A. I think she was.

Q. Why don't we -- Ms. Andrews, can we just pull up Exhibit 4 then and play from the beginning.

(Playing video.)

Ms. Flowers, I think we're paused here at 28 seconds in Exhibit 4. And does this roughly track with what you're seeing there in Exhibit 4A?

A. Yes.

Q. Okay. So at this point where the still

image is, the young woman you believed to be a patient is on the hall; is that right?
A. Yes.
Q. And at this point can you freely access the employee entrance?
A. No.
Q. Why not?
A. There are multiple people standing in the hallway before the entrance.
Q. And can you freely access the patient entrance?
A. No.
Q. Again, why not?
A. Because there are multiple people sort of U'd up, blocking the hallway.
Q. Now, I know you're not familiar with the four defendants here. But you were asked several questions about Mr. James Zastrow. Do you recall that?
A. I think.
Q. The gentleman here on the end?
A. Yes. Yeah.
Q. And looking at Exhibit 4A, do you see anybody who's consistent with Mr. James Zastrow?
A. Potentially the fellow in the gray sweatshirt off to the very right side of the screen.

Q. Okay. You were asked on cross-examination several questions about whether you saw or you heard any people tell the folks in the hallway to leave. Do you recall that?

A. I do.

Q. Okay. When you were trying to get back in to the clinic, did you ask anyone to move?

A. I did.

Q. Okay. Did you tell anyone they were trespassing?

A. I did.

Q. What response did you get?

A. No, ma'am, I think, to the request to move.

Q. And what about your -- in response to your allegation that they were trespassing?

A. Something about, yes -- I think "yes, I am" is what he says. And "I need to humble my heart."

MR. BOYNTON: Thank you. No further questions.

THE COURT: All right. Thank you very much. Thank you, Ms. Flowers.

Can I release Ms. Flowers?

MR. BOYNTON: Yes, Your Honor.

THE COURT: All right. Very good. You're free to go, Ms. Flowers. Thank you very much.

*******WITNESS EXCUSED*******

THE COURT: All right. Let's take about a 10-minute comfort break. Be back in just a minute ready for the next witness.

(Whereupon, a break was taken from 11:09 a.m. to 11:27 a.m.)

THE COURT: Call your next witness.

MS. KLOPF: Before we call the next witness, I have a stipulation that I would like to enter into evidence.

THE COURT: All right.

MS. KLOPF: It is marked as Exhibit 25.

THE COURT: Okay.

MS. KLOPF: Normally in a felony trial I would read it into evidence. I don't know if the Court wants me to take the time.

THE COURT: Not necessary.

MS. KLOPF: So at this point I will move Exhibit 25, the stipulation of the parties, into evidence.

THE COURT: All right. Very good, thank you. It will be admitted.

(Government Exhibit No. 25 was admitted.)

MS. KLOPF: The United States calls Caroline Davis.

THE COURT: Stop right there. Raise your hand.

**CAROLINE DAVIS**

called as a witness, after having been first duly sworn, testified as follows:

COURTROOM DEPUTY: Could you please state your name for the record and spell your last name.

THE WITNESS: Caroline Hodges.

THE COURT: Please be seated.

MS. KLOPF: In the jury box.

**DIRECT EXAMINATION**

BY MS. KLOPF:

Q. Good morning, Ms. Hodges.

A. Good morning.

Q. First and foremost, did you used to be known by a different name?

A. Yes.

Q. What was your name?

A. Caroline Davis.

Q. Okay. To the best of your understanding to the people sitting behind me, would they know you as Caroline Davis?

A. They would.

Q. How old are you?

A. I'm 25.

Q. Where do you currently live? What state do you currently live in?
A. Georgia.
Q. Do you currently work?
A. I do.
Q. What do you do?
A. I'm a paralegal.
Q. Where were you born?
A. Atlanta, Georgia.
Q. What's the highest level of education that you've achieved?
A. Some college.
Q. Why did you stop college?
A. Mostly medical reasons.
Q. Okay. Very generally can you describe those medical reasons?
A. Yes. I started having seizures and I had to get a service dog at the time and the college did not -- they didn't allow service dogs. So I had to leave.
Q. And have you ever lived in Tennessee?
A. No.
Q. Have you ever lived outside of Georgia?
A. Yes.
Q. Which -- what different places have you

lived outside of George?

A. So when I was 11, I moved to Texas. I lived there until I turned 18. I moved to Pensacola, Florida, for college. And then I spent some time in Atlanta, I spent some time back in Texas, but ultimately moved to Michigan. And then I was there until May of 2021, I believe.

Q. What years did you live in Michigan?

A. Let's see. I lived there 2017 until I believe May of 2021.

Q. What part of Michigan were you living in?

A. Mostly Lapeer.

Q. During your childhood did you have any involvement in the pro-life movement?

A. Yes.

Q. What ages?

A. It would have started around when I was eight years old. I was a pretty young child. My mom would take all of us kids, me and my siblings, out to local abortion clinics, mostly on Saturdays, but sometimes during the week too.

Q. And what did you do at these legal abortion clinics?

A. Mostly it was just regular protesting. My mom would try to talk to ladies there going in to get

abortions, stuff like that. Hold signs.

Q. As an adult did you become involved in protests at reproductive health clinics?

A. Yes, I did.

Q. When did that first start?

A. It would have been around when I was 19 years old, I believe.

Q. And where were you living around 19?

A. Lapeer, Michigan. Or, let's see, Davison, Michigan, I think.

Q. Okay. So were these clinics in Michigan that you were going to?

A. Yes.

Q. Initially what did your involvement entail?

A. Initially I just went out there by myself and I made some signs and I tried talking to women. Mostly just -- really didn't know what I was doing. I just tried to do what I saw my mom do when I was little.

Q. How often were you going out to these reproductive health clinics?

A. Anytime that I had free time.

Q. Did the frequency of that change?

A. Yes.

Q. How did it change?

A. It changed because I met a group of people

out in front of a clinic and I ended up quitting my job and just doing it full-time.

Q. When you say full-time, what do you mean?

A. Like a regular workweek, anytime that I would have normally been at work, I was out in front of the abortion clinics.

Q. And in terms of the proximity to the clinic, where were you when you would protest?

A. I would usually always be where it was legally allowed. So I spent almost all of my time on the sidewalks or the grass, like the public easement. Anywhere that it was legally permitted for protestors to stand.

Q. You understood that there were limitations on where you could protest?

A. Yes.

Q. At that point did you make an effort to comply with those rules?

A. Yes.

Q. All right. You said you had met a group of people and that changed how you were going -- the frequency of which you were going to clinics. What was that group of people that you met?

A. Well, it was the Zastrow family to begin with.

Q. And let's just stop there. Who's in the Zastrow family that you met?
A. Eva Zastrow and Cal Zastrow.
Q. Okay. How did you meet Eva Zastrow?
A. She was out protesting that day at the Flushing abortion clinic in Flint. Like it was on Flushing Road, the abortion clinic there. We met -- it was, I think, May of 2020.
Q. Okay. Did you become friends?
A. We did.
Q. What kind of relationship did you have with her?
A. Very, like, sisterly, I guess. She kind of took me under her wing and started just sharing a lot of her own personal beliefs with me. And we clicked right away. I just really looked up to her and thought, oh, this is what holiness looks like. I need to be like that.
Q. Okay. Do you see her in the courtroom today?
A. I do.
Q. Could you please describe her using an item clothing?
A. Sure. She's wearing a sort of pink-colored top with like -- what looks like black lace around the

top.

MS. KLOPF: Can the record please reflect that the witness has identified Eva Zastrow?

THE COURT: So reflected.

BY MS. KLOPF:

Q. Now, you said you also met someone named Cal Zastrow?

A. Yes.

Q. How was Cal related to Eva Zastrow?

A. That's her dad.

Q. And what kind of relationship did you develop with Cal Zastrow?

A. Well, he -- he seemed to be kind of like the discipler, I guess that's how I could describe it. He was like -- he just seemed to be like the teacher. I learned pretty much everything from him. And similarly to how I wanted to emulate Eva, I wanted to emulate Cal.

Q. How much would you say you were seeing Eva after you met her?

A. Well, at least it wasn't as -- well, it was spotty at first, but then I, like, made an effort to see her as much as possible. And it got to the point where anytime I went out to the abortion clinics, I would try to have another female with me. And Eva was one of those females that would go out with me consistently. So it

became not daily, I would say, but very -- like, very consistently.

Q. And when you would go out with Eva, would you sometimes also see Cal Zastrow?

A. Yes.

Q. Okay. Does Eva have any siblings?

A. Yes.

Q. Are you familiar with a person named James Zastrow?

A. I am.

Q. Had you heard of him before March 5, 2021?

A. I think I had heard of him, but I didn't even realize that it was him on the day of the blockade. But I'm familiar with him now.

Q. And during the course of the blockade, have you become familiar with who he is?

A. Yes.

Q. Do you see him in the courtroom today?

A. I do.

Q. Can you please identify him using a piece of clothing?

A. He's wearing a black jacket, looks like a blue shirt.

MS. KLOPF: Can the record please reflect that the witness has identified James Zastrow?

THE COURT: It will be reflected.

BY MS. KLOPF:

Q. Now, you said that you preferred to go out to protests with other females. What other females would you go to these protests with?

A. Usually Heather Idoni, Eva Zastrow, my friend Megan Parsons, and sometimes her mom, Kendra Petty.

Q. During the time that you were regularly protesting, did you meet a person named Eva Edl?

A. I did.

Q. How did you meet her?

A. Oh, hmm. I don't remember the first time that I met her, but it was abortion clinic related.

Q. Can you describe how -- what your relationship was like around March 15, 2021?

A. I would say she was just somebody that I really respected. I knew that she had been through a lot, and I just viewed her as somebody I could learn a lot from.

Q. Would you say you spent a fair amount of time with her?

A. I wouldn't say I spent a fair amount of time with her only because she lived in the south and at the time I was in Michigan. So whenever there was a

blockade event happening or, like, a rescue event, I knew that she would try to be there.

Q. Okay. And I want to --

MR. HEROUX: Judge, I'm going to object to that she knew that she would try. She's speaking to my client's state of mind as to trying to be there. I think the witness might say she might -- the witness might have expected to see her there, but can't testify as to my client's state of mind to try to be there.

THE COURT: Just rephrase the question.

MS. KLOPF: Yes, certainly, Your Honor.

MR. McGOWAN: And, Judge, I'm going to object to her use of blockade. Evidently there's -- no foundation's been laid as to the legality of what she just referred to as a blockade or rescue. And so I don't know if she's going to mention my client at all in these other prior bad acts.

THE COURT: Ms. Klopf, if you want her to talk about the events of that day and characterize it in some way, just lay a foundation for it.

MS. KLOPF: Absolutely. And I was going to.

BY MS. KLOPF:

Q. I want to stay specifically talking about, if we're talking about a blockade, I only want to talk

about March 5, 2021.

A. Okay.

Q. Thank you. But generally you were aware of who Eva Edl was and you'd met her a few times. Is that a fair assessment?

A. That is a fair assessment.

Q. Do you see her here in the courtroom today?

A. I do.

Q. Can you please identify her using a piece of clothing?

A. Yes. She's wearing a black sweater and she has a necklace on and it looks like it might be a blue and white shirt.

MS. KLOPF: Can the record please reflect that the witness has identified Eva Edl?

THE COURT: It will be reflected.

BY MS. KLOPF:

Q. All right. So I'd like -- we've talked a little about your experience protesting at reproductive health clinics. Now I'd like to talk about something I'd like to use the word blockade for. What does the word blockade mean to you?

A. To me it's a form of rescue is how I'm familiar with it. Block -- when we would do a rescue with a blockade, it usually meant blocking the entrance

of an abortion clinic.

Q. Okay. When you say blocking the entrance of an abortion clinic, what do you mean?

A. I mean physically making it impossible for patients to get inside the clinic with your body.

Q. And you used the term rescue. Is the term rescue interchangeable with blockade?

A. It can be, but rescue can also be used for other things as well.

Q. Okay. So generally using the word rescue, can that be talking about a blockade?

A. Yes.

Q. Okay. Can the term rescue be used to describe something other than a blockade?

A. Yes.

Q. Can you just very generally cover what it might cover?

A. Well, there's types of rescue that do not involve blocking the entrance, such as going into the patient waiting room or going into the parking lot and just trying to get more face time with patients. And then --

MR. HEROUX: I'm going to object. The witness is testifying as to these terms that exist. I don't know -- I don't have a foundation as to where that

comes from or if this is just her words. So there needs to be a foundation laid for where these terms are coming from. Or if they're just a term she uses, then we need to establish that.

THE COURT: Ms. Klopf.

MS. KLOPF: We can cover that ground right now, Your Honor, if that's necessary.

THE COURT: Okay.

BY MS. KLOPF:

Q. Okay. Have you ever participated in any blockades of reproductive healthcare clinics?

A. Yes, I have.

Q. Did you participate in one during the time you lived in Michigan?

A. Yes.

Q. Where was that?

A. Well, I participated in two while I lived in Michigan. One of them was in Sterling Heights.

MR. McGOWAN: I'm sorry, I don't see the relevance in this testimony of what's going on in Michigan.

THE COURT: It's because -- she's -- the objection about her characterization of events, and so she's got to be able to lay a foundation. You get one way or the other. Either she gets to talk about it being

a blockade or she gets to explain how she gets to describe it as a blockade.

MR. McGOWAN: Okay.

BY MS. KLOPF:

Q. Okay. So I think you said you had participated in one in Sterling Heights?

THE COURT: Hold on. Mr. Lucas?

MR. LUCAS: I want to piggyback on that objection. I understand what my colleagues are saying. The other piece to this is, it's not just whether or not she gets to characterize it as a blockade or not. She's discussing it as if that's how it's characterized or labeled generically and just broadly. And if it's her, I think -- I think Mr. Heroux said it earlier. If this is just how she's labeling it and how she's describing it, then just lay a foundation that this is how she described it and how she labeled it versus this is just a broad -- this is just generic, like you call any pop a coke.

I think this is -- this is, I think, what we're talking about. Other people may characterize it differently. They're suggesting that it's a, quote/unquote, blockade. That has a certain connotation to it.

MS. KLOPF: Your Honor, I've asked her what the word blockade means to her. Now I'm asking her about

her experience using that word. We'll move on to what other people will discuss and whether or not that is a shared term amongst the community, but I think that if the Court is going to sustain any of those objections, if you would give me a little leniency, I'm certain we can get there, but I think you pointed out --

THE COURT: I'm going to overrule the objection and I'll let the witness testify.

MS. KLOPF: Thank you, Your Honor.

BY MS. KLOPF:

Q. Okay. So I think we were talking about Sterling Heights.

A. Yes.

Q. Okay. What kind of a -- what kind of a blockade was the Sterling Heights blockade?

A. It was like the traditional, just with your bodies. No extra -- no locking devices, no cars, no nothing like that. Just regular sitting in front of the doors.

Q. Okay. And was that in approximately August of 2020?

A. Yes.

Q. Were you indicted by the Department of Justice for your involvement in that blockade?

A. I was.

Q. Based upon that conduct, have you pleaded guilty in the Eastern District of Michigan to a superseding information?
A. I have.
Q. To misdemeanor charges?
A. Yes.
Q. And you pleaded that down from a felony?
A. Yes.
Q. And that was in exchange for an agreement to cooperate; is that correct?
A. That is correct.
Q. Okay. Did you admit in your plea agreement that you conspired to blockade the clinic in Sterling Heights?
A. Yes.
Q. Okay. And that you actually did blockade that clinic?
A. Yes.
Q. Were you also involved in the blockade of a clinic in Washington, DC?
A. I was involved, yes.
Q. Okay. Were you charged in that blockade?
A. No.
Q. Did you participate in the blockade of a clinic here in the Middle District of Tennessee?

A. I did.
Q. Did that blockade occur in March 5, 2021?
A. Yes.
Q. Was that in Mt. Juliet?
A. Yes.
Q. Were you indicted by the DOJ for your involvement in that blockade?
A. Yes.
Q. Have you also pleaded guilty here in the Middle District of Tennessee to a superceding information --
A. Yes.
Q. -- to misdemeanor charges?
A. Yes.
Q. Did you admit in your plea agreement that you had actually blocked the clinic in Mt. Juliet?
A. Yes.
Q. And that you conspired to do so?
A. Yes.
Q. Are you, in fact, guilty of those charges?
A. I am.
Q. Do you have attorneys in both the Eastern District of Michigan and here in the Middle District of Tennessee?
A. I do.

Q. Okay. Did they negotiate the terms of your plea agreement on your behalf?
A. They did.
Q. As part of those plea agreements, did the parties agree that you would cooperate with the United States?
A. Yes.
Q. Did that include that you would testify at any trials?
A. Yes.
Q. Are you testifying today pursuant to those agreements?
A. Yes.
Q. Have you testified before?
A. Yes.
Q. How many times?
A. Four times.
Q. Have you been sentenced yet?
A. No.
Q. Who will decide your sentences?
A. The judges.
Q. Are you hoping that by cooperating you'll get a lower sentence in the Eastern District of Michigan?
A. Yes.
Q. What does your plea agreement require --

your plea agreements, excuse me, require you to do in terms of cooperating?

A. To fully cooperate and to tell the truth.

Q. Do you understand that under the terms of your plea agreement, your cooperation does not depend --

MR. COOPER: Object to the leading.

THE COURT: Overruled. It's a bench trial, we can move along.

BY MS. KLOPF:

Q. Do you understand that under the terms of your plea agreement --

MS. KLOPF: I'm sorry. Are you suggesting I move along with these questions?

THE COURT: You can continue the questioning. I don't have any problem with the leading at this point.

MS. KLOPF: Thank you, Your Honor.

BY MS. KLOPF:

Q. Do you understand that under the terms of your plea agreements, your cooperation does not depend on whether anyone is found guilty?

A. Yes.

Q. Other than what's in your plea agreements, has the government made any other promises to you?

A. No.

Q. Prior to today, have you met with the government to prepare for this trial or the other trials?

A. Yes.

Q. Approximately how many times?

A. Gosh. I don't know, 15, 20 times. I'm not sure.

Q. Has anyone from the prosecution teams ever told you what to say?

A. No.

Q. So you've participated in multiple blockades?

A. Yes.

Q. Why did you agree to plead guilty and cooperate?

A. Because I had a massive change in my perspective and beliefs.

Q. And what was the change in your beliefs?

A. Well, I used to believe that my religious beliefs superseded the law when it was necessary, but I just don't believe that anymore. I don't believe that this is a wise course of action, given the legal ramifications and given that you can't force someone to have a heart change. And I -- I just don't stand by breaking the law to try and get any laws changed. It's just not wise. So ultimately it's not wise. I regret

that I did it, and I would like to take the responsibility to do the right thing.

Q. Have your views on abortion changed?

A. No, I still believe abortion is murder.

Q. Okay. So during the course of your participation in these different blockades, did you speak with other people about the blockade?

A. Sorry. Could you ask that one more time?

Q. Sure. During the course of your participation in these different blockades, did you speak with other people about the blockades?

A. Yes.

Q. Okay. Generally did other people use a term of art to describe what was happening?

A. Use a term of art?

Q. What word did they use to describe blocking doors of an abortion clinic?

A. Rescue.

Q. Would they also say blockade?

A. Usually the word blockade was thrown around not in a way that -- how do I say this. If the term blockade was used, it was usually used because someone else was calling it a blockade and it was being discussed. But in general the group would use the word rescue.

Q. Okay. When did you first learn about the concept of a rescue?
A. The first day that I met Eva and Cal Zastrow.
Q. Who told you about what a rescue is?
A. Cal Zastrow.
Q. Who was present when you had that conversation?
A. Let me see here. I believe Justin Phillips, Cal Zastrow, Eva Zastrow, myself. I don't remember if Heather Idoni was there. There was a couple different people. I have a hard time remembering all the people that were present. But the Zastrows and myself.
Q. To the best of your knowledge, of your recollection, when Mr. Zastrow was explaining to you what a rescue is, what did he generally convey?
A. That it was the historical Christian doctrine of, like, peaceful interposition.
Q. And in the course of your experience doing these different blockades, was it fairly consistent that people were using the word rescue?
A. Yes.
Q. Because rescue can mean a few different things, is it all right with you if I use the word blockade today?

A. Yes.
Q. What is the objective of a rescue that is a blockade?
A. To keep any abortions from happening.
Q. And when you say to keep any abortions from happening, what do you mean?
A. To basically -- the goal would be to ruin all of the appointments that are set for that day, to give more time to try and convince the patients away from abortion.
Q. Okay. And when you say to convince the patients away from abortion, what do you mean by that?
A. Try and talk to them, like argue with them, plead with them. Like, offer different things to help them. Anything that we could do to try and convince them not to get the abortion.
Q. What if a patient didn't want to be talked to?
A. That did not matter.
Q. If they decided that they didn't want to participate in that conversation, would they be allowed into the clinic?
A. No.
Q. Why not?
A. Because of the belief of the group was that

if the mom gets --

MR. HEROUX: Objection, Your Honor. I'm sorry, but she's testifying to the belief of the group. She can talk to her belief, what her understanding was, but not the belief of the group.

BY MS. KLOPF:

Q. I can -- what was your understanding about what would happen if a woman -- or if a patient opted not to have a conversation? Why would you not let that person into a clinic?

A. Because at the time I believed that it was more important to keep her from going inside and having the abortion than to allow her to make her own decision.

Q. Okay. Was that something that you shared with others?

A. Yes.

Q. Generally when would you discuss that?

A. All the time. I felt like every day was a discussion about abortion. Whenever we were all together as a group, rescue was brought up almost every single time, if not multiple times. The concepts of why rescue or blockading was important were discussed frequently. I don't know if I answered your question, I'm sorry. I got off trail.

Q. No, you did. Just give me one moment.

So during a blockade, would it also prevent the clinic from providing reproductive healthcare?
A. Yes.
Q. Why?
A. Because no patients could get inside.
Q. Do you know what the FACE Act is?
A. I do.
Q. When did you first learn about the FACE Act?
A. I believe the first day that I met Cal Zastrow and Eva Zastrow.
Q. And what was communicated to you about the FACE Act?
A. That the FACE Act was enacted by the Clinton administration back in the -- I think the late '90s, I can't remember, and it was to basically try and stop all of the blockades that were happening all the time from happening.
Q. So generally based on what Mr. Zastrow told you, what did you understand it to prohibit?
A. I understood that it was to prohibit people from blocking the access of abortion clinics.
Q. How frequently did Mr. Zastrow tell you about the FACE Act?
A. It was brought up a lot. I don't know if I

could tell you how frequently. Rescue was brought up all the time, specifically the FACE Act. Usually it was whenever someone would ask a question about, you know, what could happen. And then right before we were going to do a blockade, it would be talked about.

Q. Okay. Was Eva Zastrow ever present for these conversations with Mr. Zastrow about the FACE Act and blockades and rescue?

A. Yes.

Q. Did she participate in these conversations?

A. Yes.

Q. Generally what do you recall her saying about the idea of rescue?

A. I do not recall, like, a specific quote, but I know that she was in favor of rescue and she participated with me.

Q. So you understood that blocking access to a reproductive health clinic was against federal law?

A. Yes.

Q. Did you understand that prior to March 5, 2021?

A. Yes.

Q. Okay. So let's talk generally about how a rescue is implemented. Do people involved in a rescue have different roles?

A. Yes.
Q. Can you name some of the roles that might -- that people might have in a normal rescue?
A. Yes. One of the main roles is people blocking the doors. Another role is being a blowfish.
Q. What's a blowfish?
A. Blowfish is somebody who appears as if they were going to risk arrest. They appear as though they're willing to go to jail by blocking the doors, but then by the last warning of the police officers, they will get up and move away. So it makes the group look bigger than it actually is.
Q. Are they supportive of what the people -- the people who are actually in front of the door are doing?
A. Yes. They just are people that aren't willing to go to jail.
Q. Okay. But they're encouraging what the people in front of the door are doing?
A. Yes, and actively aiding it by trying to give us a bigger appearance. Or give them a bigger appearance.
Q. So what other roles might people have in a rescue?
A. Somebody to communicate with law

enforcement. Usually people out on the public -- like, where you're legally allowed to stand, usually there would be a group of people, if you have them, to try and communicate with anybody that goes through the driveway or, you know, moms that might try to go into the clinic but then turn away. And then usually there will be -- well, it just depends, but I'd say those are the basics.

Q. How far in advance might a rescue be planned?

A. Well, gosh, I think the one -- let's see. I knew about the one in Tennessee, I think -- I think I learned about it in February. So sometimes I think a month to two months in advance would be pretty common.

Q. Okay. And when are these roles that you just talked about, when are those determined?

A. Generally right when the blockade started to be planned that I was involved in, I noticed that it was clear, a rough number of how many people were going to be blocking the doors was established pretty early on. But then direct roles, like, for example, blowfish and stuff like that, I noticed from my personal experience those were established, like, right before. So the meeting beforehand or whatever.

Q. Well, let's talk specifically about the blockade on March 5, 2021.

A. Okay.
Q. What was the clinic that you blockaded called?
A. Carafem.
Q. How did you first learn about the Mt. Juliet blockade?
A. I believe Cal Zastrow.
Q. Okay. And was it in person or over the phone?
A. It would have been in person.
Q. Okay. Do you recall who else was present when you had the conversation? Or when you learned of it, excuse me.
A. Gosh. If I remember correctly, that would have been up in front of the Saginaw abortion clinic, if I remember correctly. And there would have been a handful of people there. But he would have been quiet -- it depends who was there. I don't specifically remember.
Q. Okay. How did you learn about it?
A. Well, he would have said there was going to be a rescue. That's how I learned about rescues that Cal Zastrow led.
Q. Okay. Did there come a time where you overheard a phone call?
A. Yes.

Q. Generally describe what you overheard.

A. Well, I overheard Cal Zastrow talking to Chet Gallagher about this rescue. And I overheard him take the phone call when I was at the Saginaw abortion clinic in Michigan.

Q. Generally what did you overhear?

A. I heard him say his name. And then I heard them discussing details about the rescue or the blockade.

Q. Okay. And how did you know it was Chester Gallagher that he was talking about?

A. Because he said his name.

Q. At that point did you know who Chester Gallagher was?

A. Yes. I believe so.

Q. So generally what did Mr. Zastrow tell you about the phone call?

A. Well, I recall him saying when we were in Saginaw -- I don't remember if it was directly after the phone call, but I recall him saying that they had a group of people there that had been struggling, specifically he was referring to the carafem abortion clinic. He didn't say carafem at the time because he tried to keep that on the down-low until right before -- we weren't allowed to know which clinic it was going to be at to try to keep the cops from finding out or anything like that.

MR. McGOWAN: Judge, that's what I want to object to. I don't know, did he tell her that he was trying to keep it on a down-low or how does she know that? How does she know Mr. Zastrow was --

BY MS. KLOPF:

Q. How do you know that?

A. Well, I know that because Cal Zastrow specifically said it.

THE COURT: Okay.

BY MS. KLOPF:

Q. So I think you were saying you didn't know the clinic that you were being -- going to protest -- or, I'm sorry, that you were going to rescue at, but generally why did you understand that a rescue was being planned?

A. Oh, because he said that we were going to have a rescue down there but that they were trying to find the perfect location. And so when he had talked with Chet, my understanding was that there was a group of Christians who were having trouble legally protesting at the carafem abortion clinic. Carafem wasn't named at that time.

MR. McGOWAN: Your Honor, object to hearsay. I mean, this is testimony based on what she heard someone else -- what she heard was going on down in

Nashville -- or Mt. Juliet.

MS. KLOPF: It's a co-conspirator statement under 801(d)(2)(E).

THE COURT: Overruled.

BY MS. KLOPF:

Q. Okay. So you were saying that there was a group that was having trouble with legal protests?

A. Yes.

Q. Can you please go on.

A. Well, Cal had talked in my presence, maybe not directly to me, but to, you know, multiple of us previously times -- previous times that we -- he would try to pick clinics where people doing legal protesting were having trouble because usually that meant they couldn't reach the patients.

So best way to reach the patients, unfortunately, was to establish, okay, we'll do a blockade and then they can't escape us. Like we'll be right in front of their face and they won't be able to get inside. So I understood that they had found a group of Christians that had been having trouble at the clinic that they were protesting at and that they were zeroing in on doing the rescue there.

Q. At any point were the conversations about this Tennessee rescue, did those happen in the presence

of Eva Zastrow?

A. Yes.

Q. Okay. Before the actual rescue happened, who did you generally understand would be attending of these defendants?

A. Well, Eva Zastrow. I heard that Eva Edl might be going.

MR. HEROUX: Judge, I'm going to object to the foundation, who she heard that from. If it's somebody else in the conspiracy, then it's not a co-conspirator statement.

BY MS. KLOPF:

Q. At any point did Cal Zastrow or Chet Gallagher let you know that Eva Edl may come to the rescue?

A. Yes.

Q. Generally what did they say about her presence at the rescue?

A. Well, that the -- if I recall correctly, that the Hebbs would be able to scoop her up from her home and bring her to Tennessee.

Q. Where did you understand her home to be?

A. Gosh, I think South Carolina, but it's been a while. I don't hundred percent remember.

Q. Would you be more comfortable saying

somewhere in the south, but not Tennessee?

A. Yes.

Q. Did you have conversations with Eva Zastrow about her planned attendance in Tennessee?

A. I did, but I don't specifically remember the contents of the conversation.

Q. Okay. So how did you get to Tennessee?

A. I rode in a car with Heather Idoni and Kendra Petty and Michelle Eddy.

Q. Okay. And how far in advance of the rescue did you leave Michigan?

A. It would have been I think a couple days before, if I recall correctly.

Q. When you left Michigan, what was your plan in terms of your role at the rescue?

A. Well, I had been praying about blocking the doors. So that was the plan, but I was waiting on the Holy Spirit to direct me.

Q. And what do you mean by that?

A. At the time I believed that I would receive some kind of, like, confirmation from God that I was to block the doors.

Q. Did there come a point where you had decided whether or not you were going to block a door?

A. Yes. I felt that God -- at the time I

believed that God was making it clear that I should block the doors, unfortunately.

Q. So when you got to Tennessee, where did you first go?

A. Would have been a hotel-like situation that Heather Idoni had set up.

Q. Okay. A hotel-type situation. Were you paying for it?

A. No. Heather Idoni paid for it, but I don't know how she went about doing that. It was like a room share situation.

Q. Okay. Who did you share a room with?

A. I shared a room with Eva Zastrow and technically was connected to another room where Eva Edl and I believe Heather Idoni were sleeping, if I remember correctly.

Q. Did you see anyone else at this room share -- is it fair to call it a hotel?

A. Yeah, I'd call it a hotel.

Q. Okay. Did you see anyone else, including any of these defendants, at that hotel in the days leading up to March 5, 2021?

A. Yes. There was a gathering -- there was actually two gatherings that took place on the property of this hotel. And I saw -- I saw Eva Zastrow and Eva

Edl at both of these. I don't remember Jim Zastrow until the day of the rescue. And I believe I met Paul Place under the pavilion at the hotel, but my memory is not good enough to be sure of that.

Q. Well, let's break those down a little bit. So you said there were two meetings. Where did the first meeting take place?

A. So first meeting, if I remember correctly, was at a large -- like probably a conference center room is how I would describe it in the main center of the hotel. And it was like -- it felt like a worship pep rally of some kind.

Q. Who led that meeting?

A. I'm having a hard time remembering. Yeah. I would have to give you a guess, and I know you don't want a guess.

Q. You are right. I do not want to guess.

Was Chet Gallagher there?

A. Yes, Chester Gallagher was there.

Q. Was Cal Zastrow there?

A. Yes.

Q. Generally what was that big meeting about?

A. It felt like a worship pep rally for the rescue. So it was rescue themed, but it felt like a lot of, like, hymn singing, praying and preaching.

Q. Did a later meeting with less people happen?
A. Yes.
Q. Where did that happen?
A. Under a pavilion with picnic tables right -- it was kind of out front of where I was staying. It was on the property of the hotel.
Q. Okay. Generally who do you recall being at that meeting?
A. Well, like the thing is I don't specifically recall Paul Place or Jim just because they were not familiar to me. But Eva Zastrow and Eva Edl I do specifically remember.
Q. What was discussed at this meeting?
A. The rescue. Or the blockade.
Q. Okay. What was discussed about the rescue or the blockade?
A. What to expect, kind of like a re-rundown of what the consequences would be if you go to jail or if you, you know, get arrested. Or if you block the doors. And like a reminder of the FACE Act and the consequences of that. Kind of of like an encouragement of listening to the Holy Spirit and then kind of, like, you know, we're going to have -- they kind of described the layout of the building, I remember that.

Q. What do you remember the layout of the -- excuse me. What do you remember the layout of the building being described as?

A. I remembered it being described as a hallway that we would be at the end of, that the clinic was at the end of the hallway and that it was not on the first floor. So I do recall it being discussed that there would be a stairway and the goal was to have everyone or almost everyone that was going to be blocking the doors waiting in the stairwell for a signal to move into position as to not draw attention to ourselves too soon.

The goal would be make this last as long as possible. So, you know, the longer we could sit there, the better the chance there is that no one is able to keep their appointment that day.

Q. Okay. When you said -- you said the people were going to be waiting in the stairs, can you explain that a little bit more? Not in front of the doors?

A. So there was a staircase that was very close -- the entrance into this floor, there was a staircase that was very close to the clinic door. Like, the patient entrance door. And so the goal was to have everyone kind of standing in there waiting for a signal that a patient would be arriving before moving into

position to block the door, because the fear was if they moved into position too soon, then they would be noticed and the cops would be called and the whole thing would be over before it began.

Q. Okay. And you said a signal. Let's talk about your role in terms of the signal.

A. Okay.

Q. What was your role in terms of the signal?

A. My role was to text Paul Place if I saw someone that looked like a mother or a patient getting onto the elevator to go up to the clinic.

Q. Prior to this early March 2021 period, did you have Paul Place's phone number in your phone?

A. No.

Q. Okay. Did you know Paul Place before that early March period?

A. No, I did not.

Q. Okay. Do you see him here in the courtroom today?

A. Yes, I do.

Q. Could you please identify him.

A. He's wearing khakis and he's wearing a black suit jacket and white shirt.

MS. KLOPF: Can the record reflect that the witness has identified Paul Place?

THE COURT: It will be reflected.

BY MS. KLOPF:

Q. Did you get his phone number?

A. I did.

Q. Okay. Did anyone discuss steps that could be taken to slow a police response?

A. Yes.

Q. Okay. Can we talk specifically about what -- let's talk about, do you know a person named Coleman Boyd?

A. Yes.

Q. What steps, if any, did Coleman Boyd suggest that could be taken to slow a police response?

A. I -- I don't know off the top of my head. I'm not sure. Maybe I don't understand. Is there a different way you could ask the question?

Q. Of course. Was ever there a discussion of the use of a wheelchair?

A. Oh, yes.

Q. Tell us about the discussion about the use of a wheelchair.

A. Well, Coleman brought up, actually at the pavilion meeting, I witnessed him talk about how we could use different medical devices to appear to blend in to the building in which the carafem abortion clinic

resided.

So I know that he gave one kid crutches. It could have been his own kid, I don't remember. Eva Edl had a wheelchair. Eva Zastrow pushed her in the wheelchair, just to, like, blend in. Before it was go-time, before a patient -- you know, before I sent the message or something happened up on the floor that I wasn't there for, we were supposed to blend in. Yeah, wheelchair, crutches, anything like that. Face masks. Those were Coleman Boyd's idea.

Q. When you say blend in, do you mean appear like a patient of perhaps another clinic or another office in this building?

A. Yes.

Q. So by the end of this meeting at the pavilion, did you have a pretty general sense of what the plan was for the next morning?

A. Yes.

Q. Okay. So let's talk about the morning of March 5, 2021. Did you go to the clinic?

A. Yes.

Q. How did you get there?

A. In Michelle Eddy's car.

Q. What papers, if any, were in the car?

A. Michelle Eddy had a stack of papers in the

car that were, like, little flyers. And they were going to be -- my understanding was right before I went inside, was that there was going to be individuals like herself putting them on the windshields of the cars in the parking lot.

Q. What, if anything, did the flyers say about arrest?

A. The flyers said that a bunch of -- if I remember correctly, a bunch of Christians were going to be arrested or were arrested already for peacefully interposing on behalf of preborn children, something like that.

Q. At this point had any arrests been made?

A. No.

Q. Okay. So I'd like to show you in that binder what's been marked as Exhibit 1F. Do you recognize that? I'm sorry, I thought you were there.

A. Sorry. Yes.

Q. You found 1F?

A. Yes.

Q. Okay. What is that?

A. That is the facility where carafem is located.

Q. Is it a true and accurate depiction of the exterior of the building in which carafem was located?

A. Yes.
MS. KLOPF: Move to admit and publish, Your Honor.
THE COURT: All right. It will be admitted.
(Government Exhibit No. 1F was admitted.)
THE COURT: And you can display if you want to.
MS. KLOPF: Thank you.
BY MS. KLOPF:
Q. So what are we seeing here?
A. That is the entrance of the building where there was a bunch of facilities, and one of the facilities was carafem.
Q. Okay. So when you first got to this building, what did you do?
A. I sat in the car for a little bit and then around the time that we had agreed upon me going inside, along with everybody else, we began to trickle inside, kind of broken up so we didn't all look like we were one group going in together. So I went inside and I sat down on the bench right across from the elevators inside.
Q. Why did you sit on the bench right across from the elevators?
A. Because I was going to sit there and wait

and see if anyone who looked like a patient was getting on the elevator.

Q. Okay. How long do you think you sat on that bench?

A. Maybe a grand total of five to ten minutes. Not very long.

Q. And what did you see?

A. Eventually I saw a woman get on with what I assumed was her boyfriend.

Q. When you say get on, what did she get on?

A. The elevator, sorry.

Q. Okay. And what did you do when you saw this woman get into the elevator?

A. I texted Paul Place.

Q. Okay. At that point, when you sent this text, where are you?

A. I was still sitting on the bench facing the elevator.

Q. Okay. Generally who else is downstairs?

A. Eva Zastrow and Eva Edl, and then Dennis Green and one of his children.

Q. So after you've sent this text, what do you do?

A. I kind of tried to get the attention of Eva -- both Evas, Eva Zastrow, Eva Edl. And then Dennis

Green actually already started moving towards the elevator. And we all got onto the elevator, and he said that he could tell that it had already started, and I was trying to say, oh, I signaled. And he's, like, oh, I can see from the livestream it's already going down. So we get on the elevator to go up to the floor with carafem.

Q. And just to be clear, who is we?

A. Eva Zastrow, Eva Edl, Dennis Green, one of his children, if I remember correctly, and myself.

Q. And when Dennis Green said he saw it on the livestream, what did you understand that to mean?

A. Well, I knew that there was going to be, like, livestream -- usually Coleman -- at the previous rescue Coleman Boyd had a livestream going, and I knew that was like a common thing. So I figured someone was taking a video on Facebook, and that's what he was referring to.

Q. When you got to the second floor -- or did you get to the second floor?

A. I can't remember what floor it was on, so I'll take your word it was the second.

Q. Did you get to a different floor than the first floor?

A. Yes.

Q. When you got to this different floor, did

you exit the elevator?
A. Yes.
Q. And generally what did you do?
A. I walked to the end of the hallway and tried to get in position in front of the door of carafem for the patient entrance.
Q. When you got up there, did you see Paul Place?
A. I'm sure I did, but I don't specifically remember identifying him in that moment.
Q. Okay. Were other people filming on their phones when you were walking through that hallway?
A. Yes.
Q. Who were you aware that was filming?
A. Coleman Boyd.
Q. Anyone else?
A. I think in that moment that was the only one that I registered as filming.
Q. Through the course of the morning did you become aware that others were?
A. Yes. I knew that Chet Gallagher's phone was recording. And at one point I held the phone for the recording and I knew that Dennis Green was recording as well.
Q. In preparation for trial, have you reviewed

footage taken by Dennis Green?
A. Yes.
Q. By Coleman Boyd?
A. Yes.
Q. By Chet Gallagher?
A. Yes.
Q. Is it correct to say that the blockade was filmed by your codefendants from multiple perspectives?
A. Yes.
Q. And that the United States has prepared clips from each of those perspectives?
A. Yes.
Q. Okay. Have you reviewed clips of those videos?
A. I have.
Q. Were clips from Coleman Boyd's recording marked 1A and 1C through 1E?
A. I will say yes. I did look at all of them, so I believe so, yes.
Q. Well, let's get to that first. Yesterday did you review a stack of DVDs?
A. I did.
Q. And after you watched them, what did you do?
A. I signed them.

Q. Okay. So during the course of watching all of those, did you review clips from Coleman Boyd's recording?

A. Yes.

Q. And were they marked 1A and 1C through 1E?

A. I believe so, yes.

Q. Were clips from Dennis Green's recording marked Exhibits 2A through 2C, 2E, 2J, 2L, 2O and 2P?

A. I believe so, yes.

Q. Excuse me, and 2S?

A. 2S, I believe so.

Q. Were clips from Chester Gallagher's recording marked Exhibit 3A, 3D, 3J, 3L --

THE COURT: Can you slow down just a little bit, please?

BY MS. KLOPF:

Q. Of course, I'm sorry. I'll start again. 3A, 3D, 3J, 3L, 3M and 3O.

A. I believe so, yes.

Q. Were those all true and accurate clips of those portions of those videos?

A. Yes.

MS. KLOPF: Move to admit, Your Honor.

THE COURT: All right. They will be admitted.

(Government Exhibits Nos. 1A, 1C-1E, 2A-C, 2E, 2J, 2L, 2O, 2P, 3A, 3D, 3J, 3L, 3M and 3O were admitted.)

BY MS. KLOPF:

Q. Prior to testifying today, were you provided with transcripts of those clips?

A. Yes.

Q. Were the speakers that you recognized properly identified on the transcripts?

A. I believe so, yes.

Q. Are those transcripts generally accurate transcriptions of those clips?

A. I believe so, yes.

Q. Were some still shots prepared from Chester Gallagher's recording?

A. I believe so.

Q. Take a look at -- take a look at Exhibit 3P in that binder.

A. Thank you. Okay.

Q. Is that a still shot from Chester Gallagher's recording?

A. Yes.

Q. Is that a fair and accurate depiction of that moment in time from that recording?

A. Yes.

MS. KLOPF: Move to admit, Your Honor.

THE COURT: All right. It will be admitted.

(Government Exhibit No. 3P was admitted.)

MS. KLOPF: Your Honor, I was going to start playing many video recordings.

THE COURT: All right. Let's go ahead.

BY MS. KLOPF:

Q. Let's please take some looks -- let's start with Exhibit 1A, please.

(Playing video.)

So whose voice did we just hear on that?

A. Coleman Boyd.

Q. And what are we generally seeing?

A. The end -- like, you're seeing the length of the hallway facing the patient entrance of carafem.

Q. All right. Can we please play 1C.

(Playing video.)

Did you hear Boyd say moms are starting to be here at 8:00?

A. Yes.

Q. What was -- was that your understanding that morning?

A. Yes. My understanding was that patients were going to start arriving at 8:00 a.m.

Q. Okay. And that word moms, rather than patients, why was the word moms used to the best of your understanding?
A. Because from my perspective, I'll speak for myself, was that I believed that -- and still do, that the women that were going to the abortion clinic that day were pregnant and they were going to have an abortion. So we referred to them as mothers.
Q. So even though he said we thought it was a mom and ended up being a worker?
A. Yes.
Q. Were generally any women who were not associated with the blockade called moms?
A. Yes.
Q. Are you aware that carafem provided services other than abortion care?
A. Yes.
Q. But still just used the word moms?
A. Well, the reason would be usually on -- on a day especially a rescue was going to take place, some research would have taken place. I personally did not do it for this blockade, but I do know about it having been done. Usually it will be done on what the group would call a kill day, so a day where only abortions are being performed.

MR. COOPER: Your Honor, object to the relevance.
MS. KLOPF: I'll withdraw the question.
THE COURT: All right.
BY MS. KLOPF:
Q. But generally you understood that carafem provided multiple different services?
A. Yes.
Q. Okay. When Boyd said, we're just waiting, what were you waiting for?
A. I think in that moment I may have been seeing the -- the patient and her boyfriend or what I thought was. I was still down on the bench in that moment.
Q. So you were not on the floor at this point?
A. No, he said 7:45, I was still down on the bench. And I hit the scene in front of him, I believe, at 7:51.
Q. Is Eva Edl up there?
A. Not yet. She was down with me.
Q. Okay. And how about Eva Zastrow?
A. She was also down on the first floor with me.
Q. Again, why isn't everyone up on the floor at this point?

A. Still trying -- we thought we were trying to give the effect of blending in. We weren't aware that everyone had already kind of moved up into position.

Q. So when you say we were trying to blend in, who do you mean by we?

A. At the time Dennis Green, his child, Eva Zastrow, Eva Edl and myself.

Q. Okay. Let's please play Exhibit 1D.

(Playing video.)

Okay. So where are you at this point?

A. At this point I'm still downstairs, probably was preparing to get onto the elevator waiting for it to come back down.

Q. Did you see a woman in a gray sweatshirt in that video?

A. Yes.

Q. Did you see that woman downstairs while you were waiting?

A. Yes, I believe it was her and that guy that I texted Paul Place over.

Q. All right. Can we please play Exhibit 4 without sound, if that's possible.

(Playing video.)

Okay. Can you walk us through the people that you recognize. And if you need to pause, we can.

Let's pause that.

A. If you pause, me and Maya --

Q. Let's not use any children's names.

A. Oh, sorry.

Q. If it's a juvenile, just say a juvenile.

A. Okay. There's a juvenile in the blue that I recognize. And then in the green jacket, that's Amanda Place. She was not married to Paul at the time, but they were -- I think they were dating. And then Heather Idoni is the one closest to the person holding the phone. She has the glasses on.

Q. Okay. And do you see a man with white hair in the back?

A. I'm having trouble with this blurriness.

Q. Yeah, we can keep playing.

A. Okay. Okay. So Cal just walked by.

Q. When you say Cal, do you mean Cal Zastrow?

A. Cal Zastrow. And then Chet Gallagher is the one that's in the back with the white hair.

Q. Okay. And do you see a gentleman with dark hair right there?

A. Yes. It looks like Paul Place from this angle, but it's kind of hard to tell.

Q. Let's keep playing, please.

A. That's Cal Zastrow in the hoodie to the

right. And Paul Vaughn we just passed by.

Q. All right. So the people at the end of the hall right now, what are we seeing?

A. We're seeing Cal Zastrow and there's a group of juveniles, Jim Zastrow, some individuals that I'm not familiar with. And they are all preparing to try and keep any patients from passing through and they just had that encounter with the employee.

MR. HEROUX: Objection, she's testifying to those individuals' state of mind, what they're trying to do. Furthermore, the video speaks for itself. She wasn't present on the floor. The video speaks for itself.

THE COURT: Sustained.

MS. KLOPF: I'll withdraw the question.

BY MS. KLOPF:

Q. Now I'd like to show part of Exhibit 4 at half speed. Ms. Andrews, could you please play Exhibit 8 at half speed.

(Playing video.)

Okay. And can you please narrate who you're seeing?

A. A juvenile, Amanda Place, Chet Gallagher, Paul Place.

Q. Okay. And now I'd like to show you a

different part of Exhibit 4 at half speed.

(Playing video.)

A. Okay. There's Chet Gallagher, Heather Idoni. What looks like Amanda Place, but I can't be sure with the blurriness.

Q. Who's the gentleman next to the door with the blue face mask on?

A. That looks like Paul Place --

Q. Okay.

A. -- from here.

Q. Okay. And then can you please push play.

(Playing video.)

Who is that gentleman?

A. That's Jim Zastrow.

Q. Okay. Keep playing, please.

(Playing video.)

All right. Now can I please show Exhibit 4A -- I'm sorry, I'm not sure we've admitted that. Can you please -- I'm sorry, it came in through the last witness, I believe.

Can I show you Exhibit 4A. All right. Can you walk through the adults that you recognize here?

A. Yes. There is Jim Zastrow on the far right side. Paul Vaughn, he's looking down at his phone. Cal Zastrow, he's looking at his phone as well. He's

straight ahead. Those are the only adults that I recognize.

Q. And I'd like to show you Exhibit 4C. Can you please identify the adults that you recognize?

A. Yes. It would appear Paul Place by the door, Chet Gallagher in front of him and Amanda Place in front of him.

Q. Okay. So, again, you weren't physically in front of the door when this patient -- patient was on the carafem floor; is that correct?

A. That is correct.

Q. Were you helping or encouraging those people upstairs to interfere with that patient?

A. Yes.

Q. Okay. Did you intend to help or encourage them?

A. Yes.

Q. Why?

A. Because at the time I believed that rescue was a good idea and something good.

Q. And was that part of your plan for that day?

A. Yes.

Q. What were the people who were with you downstairs doing?

A. Just trying to blend in.
Q. All right. So now I'd like to look at a clip from Dennis Green. Can we please play Exhibit 2A and pause it before the doors shut, please. I think sound's still off.
(Playing video.)
MR. COOPER: Which exhibit's this?
MS. KLOPF: Exhibit 2A.
MR. COOPER: Thanks.
BY MS. KLOPF:
Q. (Playing video.)
Please pause it right there. Okay. So what did we just observe there?
A. We just observed Dennis Green, that's his camera on his phone. And he's walking over to the elevator. You can see my leg poking out from the bench as he is passing by. I just got on the elevator with him and Eva Zastrow, Eva Edl and I believe Dennis Green's child.
Q. And we've talked a lot about a bench this morning. Tell us about the bench in this picture.
A. That's the bench I was sitting on.
Q. Okay. Where was Eva Zastrow and Eva Edl while you were sitting on this bench?
A. They were to my right, kind of like closer

to the entrance of the entire building.

Q. Okay. When you got up, what did you observe them to do?

A. I believe I got up because I was observing them move towards the elevator.

Q. Okay. So you're in the elevator at this point?

A. Yes.

Q. Okay. And who else is -- I'm sorry, you already answered that question.

Can you please play until the doors open back up. (Playing video.)

When Green asked did y'all see the couple, who did you understand him to be talking about?

A. The patient in the gray sweatshirt and the guy that was with her.

Q. And when you said I was the one that signaled, what did you mean?

A. I sent a text to Paul Place that I saw them get on the elevator.

Q. Okay. And, again, who else is in the elevator as you're having this conversation?

A. Eva Edl, Eva Zastrow, Dennis Green and I think Dennis Green's child.

Q. All right. Let's play the rest of the

exhibit, please. (Playing video.)

Okay. Who are we seeing coming out of this elevator?

A. You just saw me come out of the elevator.

Q. Who did you just pass?

A. Coleman Boyd.

Q. So that's you in the orange skirt?

A. Yeah.

Q. Who are you passing right now?

A. Jim Zastrow.

Q. All right. And who's that getting up off the ground and moving a little bit?

A. That looks like Paul Place.

Q. Okay. When you passed Coleman Boyd, what was he doing?

A. He was recording and talking on the phone.

Q. To the best of your knowledge, why was he talking on the phone?

A. Probably telling somebody else in a different spot what was going on.

MR. McGOWAN: Objection, speculation.

MS. KLOPF: I just asked to the best of her knowledge why was he talking on the phone based on the plan.

THE COURT: She can talk about what her

understanding was but not what he said.

BY MS. KLOPF:

Q. What was your understanding, based on the plan, why he was talking on the phone?

A. My understanding was that he was talking to someone else on the premises what was going on so that they could know what he was seeing.

Q. Okay. Where were you going?

A. I was going for the door to block the door.

Q. Why?

A. Because I had decided that's what I was going to do.

Q. Had other people, to the best of your knowledge, also made that decision that day?

A. Yes.

MR. HEROUX: Objection, Your Honor. She can't testify as to what other decisions people have made unless a foundation has been laid that she was told by those people. It's hearsay and there's no foundation.

MR. COOPER: I want to join that objection.

MR. McGOWAN: Same here, Your Honor.

MS. KLOPF: I can rephrase the question.

THE COURT: Please.

BY MS. KLOPF:

Q. Had anyone communicated to you that they

made a similar decision?
A. Yes.
Q. Who had communicated to you that they had made a similar decision?
A. Eva Zastrow and Heather Idoni.
Q. Let's please play Exhibit 1E. (Playing video.)
Okay. Can you please describe what we just saw happen in this clip?
A. You saw myself and Dennis Green, Dennis Green's child and then Eva Edl in the wheelchair and Eva Zastrow pushing it walking from the elevator towards the doors of the clinic.
Q. Is it correct to say that part of this clip is just a different angle of the clip that we watched immediately prior?
A. Yes.
Q. Okay. The woman in the light tan skirt, who is that?
A. That's Eva Zastrow.
Q. And who is she pushing?
A. Eva Edl.
Q. Okay. And, again, they came off the same elevator as you?
A. Yes.

Q. Can we please play Exhibit 2B. (Playing video.)

Okay. Since it's up, can you just identify the two people -- I'm sorry, the three people on that image?

A. Yeah, there's Eva Edl is the one sitting in the wheelchair, Paul Place is the one crouching down beside her and Heather Idoni is the one standing.

Q. Okay. Did you hear a man with white hair talking in the course of that clip?

A. Yes. Chet Gallagher.

Q. And what were you doing in this clip?

A. I'm sitting on the floor, kind of like right in front of Eva Zastrow. And I'm just listening.

Q. Okay. Did you hear when Gallagher said it's very important if you're not planning on being arrested, do not sit in front of the door?

A. Yes.

Q. Okay. What did you do in reaction to that?

A. I stayed seated.

Q. Why?

A. Because I was planning on being arrested.

Q. Of the current defendants, who was present when Gallagher said that?

A. I believe all of them were right there.

Q. And did anyone react?
A. Not that I noticed.
Q. Okay. When Gallagher said I don't want anybody having their picture taken sitting in front of the door unless you're being arrested, again, what did you do?
A. I stayed seated.
Q. What did any of these defendants do in response to that statement?
A. They kept on doing what they were doing. No one seemed to get up or try to move away.
Q. When you say doing what they were doing, do you mean sitting directly in front of the door?
A. Yes.
Q. Let's switch to some clips from Chester Gallagher's recording. Can we please play Exhibit 3.
(Playing video.)
When the police officer was talking, what were you doing?
A. Singing.
Q. Okay. Did you comply with the police officer's orders?
A. No.
Q. In fact, did more people move in front of the doors while he was talking?

A. Yes.
Q. So in that, did you see a person holding a video camera?
A. Yes.
Q. Do you know who that person is?
A. No.
Q. Can we please play Exhibit 2S. (Playing video.)
Is part of this the same angle as part of what we just saw in the prior exhibit?
A. Yes. It's a different perspective.
Q. Did you hear the police officer's commands?
A. Yes.
Q. How did Paul Place respond to the officer's commands?
A. Well, he stayed in his spot and he kept singing.
Q. How about Eva Edl?
A. She stayed in her spot.
Q. Eva Zastrow?
A. She stayed in her spot.
Q. And James Zastrow?
A. He also stayed in his spot.
Q. When you say the spot, you mean --
A. Seated in front of the doors.

Q. All right. Let's switch back to some clips from Dennis Green's recording.

THE COURT: Ms. Klopf, I think now might be a good time for us to take a lunch break.

MS. KLOPF: Absolutely.

THE COURT: I know we had talked about finishing this trial today, but I'm not sure -- you-all know better than I do the pace of the case. So do you have any suggestion about how long we should break for lunch?

MS. KLOPF: I think we are completely open to a shorter lunch.

THE COURT: Okay.

MS. KLOPF: I will tell you I am more than halfway through with my script, but this is the part where we're playing some clips. So they're short.

THE COURT: Okay.

MS. KLOPF: I think cross of the first witness took a little longer than we were anticipating. So our schedule is behind where we were hoping too.

THE COURT: Okay.

MS. KLOPF: But the last two witnesses of the day are much shorter. This will be our longest witness.

THE COURT: Okay. What if --

MS. KLOPF: My hope is I have maybe an hour and 15 minutes.

THE COURT: All right. What if we took maybe 45 minutes, do you think that would be okay to everybody? Anybody got any issue with that?

MR. COOPER: No, sir.

THE COURT: Let's do that. We'll take a 45-minute lunch recess and we'll come back. That will put us at 1:30, be back at 1:30. And we'll pick up from there. Thank you very much.

(Whereupon, a break was taken from 12:46 p.m. to 1:40 p.m.)

THE COURT: All right. Ms. Hodges, you're still under oath. Ms. Klopf, you may begin when you're ready.

MR. HEROUX: I'm sorry, Your Honor, if I may just address the Court.

THE COURT: Yeah, I'm sorry.

MR. HEROUX: Would it be acceptable for my client to stand for a while and then sit for a while?

THE COURT: Yeah, sure.

MR. HEROUX: She's got a bad back.

THE COURT: Of course, whatever you need to do, that's totally fine. Thank you.

MR. HEROUX: All right. Thank you.

MS. KLOPF: Your Honor, in the effort of expediency, we have a number of clips that are admitted into evidence.

THE COURT: All right.

MS. KLOPF: I know the Court has already received them. Would the Court prefer that I play them in court or are these clips that the Court has already reviewed and, you know, would prefer that we only played a certain number of them?

THE COURT: I'll leave that to y'all. I'll let you put your case on however you want to, but I've reviewed what you've provided me. So if you -- whatever you want to do, that's fine.

MS. KLOPF: All right. Thank you, Your Honor.

BY MS. KLOPF:

Q. Okay. I think we were switching back to clips from Dennis Green's recording. Can we please play 2C. I think the volume might not be on. (Playing video.)

If we can stop right there, please. So who was speaking in that clip?

A. Chet Gallagher.

Q. Did you hear when he said -- so when he says when he gives the final dispersement order, if you

don't want to be arrested, you must and then it kind of fades off?

A. Yes.

Q. What did you understand that he was communicating to you?

A. That if we did not want to be arrested, we better get our butts away from the door when the final dispersement order is given.

Q. How did you respond? Did you move?

A. No.

Q. Did anyone around you move?

A. No.

Q. Can we please play Exhibit 3D. (Playing video.)

We can pause right there. Okay. Again, who was speaking in this clip?

A. Chet Gallagher.

Q. Okay. And at one point do you see he's kind of speaking to the group in front of the door and then at another point he's speaking down the hallway?

A. Yes.

Q. When he's speaking down the hallway, what would you call that group of people?

A. The blowfish.

Q. Why would you call them the blowfish?

A. Because they were only -- or their job in that moment was to appear as though they were going to be risking arrest to buy time. So he was -- you know, talking to them like, here's what to do next.

Q. And when you say buy time, what do you mean by that?

A. To buy time for the blockade to last longer. So if the police officers saw a bigger number of people that they thought they would eventually have to arrest, they might wait longer and try and argue with us longer to buy more time for us to stay in front of the clinic doors.

Q. And what's the ultimate result of the blockade taking longer?

A. That hopefully for the blockaders that no abortions would happen.

Q. Okay. Can we please play Exhibit 2E.

(Playing video.)

Okay. So what are you doing during the course of this clip?

A. I was singing.

Q. And what was Eva Edl doing?

A. I think she was singing with me too.

Q. And had anyone moved from their position -- any of the defendants moved from their position in front

of the door?

A. No.

Q. Okay. When Mr. Gallagher said, over here to the left you'll see seated at the door the other rescuers, to the best of your knowledge, who was he talking about?

A. The group of us that were sitting in front of the door.

Q. Did that include the defendants?

A. Yes.

Q. Okay. And to be clear, were you physically blocking the door at this point?

A. Yes.

Q. Now, during the course of that clip, Mr. Gallagher referenced the defendant Eva Edl by name.

A. Yes.

Q. To the best of your knowledge, did Gallagher know Edl before March 5, 2021?

A. I am not sure.

Q. Okay. Did he know of her?

A. Yes.

Q. All right. Can we please show Exhibit 3P. Can we blow that up a little bit.

All right. What are we seeing here?

A. That is the defendants, myself and a

juvenile singing and blocking the door.
Q. And what door?
A. The door to the -- the patient entrance to carafem.
Q. Now, there's two DVDs left in front of you. During the course of trial preparation, have you reviewed Exhibit 16?
A. Yes.
Q. Very generally, is it fair to say that this is a video recording of the blockade on March 5, 2021?
A. Yes.
Q. Does it fairly and accurately portray the events of that day?
A. Yes.
MS. KLOPF: Move to admit and publish.
THE COURT: All right. It will be admitted and you may play it.
(Government Exhibit No. 16 was admitted.)
BY MS. KLOPF:
Q. (Playing video.)
MR. HEROUX: Could we be heard on this?
MR. COOPER: Yeah, this is Exhibit 16; is that right?
THE COURT: Yes.
MR. COOPER: Your Honor, I'm going to

object to the relevancy of it and also the hearsay. I think we've stipulated to authenticity, but I wanted to object to the relevancy of it.

MR. HEROUX: Yes, Your Honor. And I'm going to object -- same objection. There are going to be statements made in the video, and those statements are hearsay as to the status of the -- of a woman being escorted down the hallway. And so that's the objection.

THE COURT: Okay.

MS. KLOPF: Your Honor --

MR. COOPER: Your Honor, if I could elaborate on that. I didn't really do that when I was up on my feet. There's a woman that's going to be appearing in this video, and allegedly she might be a patient, she may not, I'm not really sure about that. She's not listed in this indictment as a patient B, for example. And so I'm going to object to the relevancy of now the government bringing this -- really what I'll call almost a second victim in to prove up their case. So that's -- I wanted to elaborate a little bit more on my relevancy objection.

THE COURT: Okay. Ms. Klopf, what's the government's position?

MS. KLOPF: Your Honor, this case is charged as a blockade that interfered with Patient A,

employees and a specific employee.

THE COURT: Right.

MS. KLOPF: So throughout the course of this blockade they're interfering with employees' ability to interact with patients by blocking the door. Their intent is, as they make very clear in their openings, is a key part of this case. This clip shows that their intent is not allow to anyone in, no matter what they say, including this police officer who is asking them to move out of the way and, in fact, has to put hands on someone to move people out of the way and they still do not move.

So I think there was an argument made, particularly in opening, that there was no physical interference. This very much goes to whether or not people were physically interfering, which means making it physically difficult for somebody to pass. I think this goes very squarely to that.

The words that they're saying are not being admitted for the truth of the matter asserted. I think that they are present sense impressions, though, and I think that they can be considered by the Court as evidence in the -- of how the defendants are responding to these statements by the police officer of saying -- he's saying things like she has an appointment, is this

the clinic, and how the defendants respond to it. So it is incredibly relevant to what's charged here and the issues that the Court has to consider.

THE COURT: And what about the issue about back dooring a victim? Is that -- is it your intention to suggest that this individual, whoever it is, is a victim in this case?

MS. KLOPF: They're not a named victim in this case. But, again, the case is charged as employees. So they're --

THE COURT: So you're saying this person is an employee?

MS. KLOPF: No, no, this patient appears to be a -- appears to be a patient. They are making statements that are conducive with them being a patient.

THE COURT: Right.

MS. KLOPF: But more importantly, the case is charged that these defendants interfered with the employees' ability to do their job, to provide reproductive healthcare.

THE COURT: Right.

MS. KLOPF: And what matters is not whether or not this person is a patient, but these folks' intent to keep the employees from seeing this patient, who is presenting as a patient.

THE COURT: So evidence that they kept a patient not identified in the indictment out is evidence of intent --

MS. KLOPF: Yes.

THE COURT: -- on the issue of keeping employees from being able to perform the functions.

MS. KLOPF: Exactly, Your Honor.

THE COURT: All right.

Mr. Lucas, I'm sorry.

MR. LUCAS: I want to be clear. It's not that they're keeping a patient out. It's keeping someone who might or may not be a patient. We don't know who this person is. The other thing I would say to it is, in the video when she's talking about the police officer having to move defendants, that's not necessarily true. None of these defendants -- the police officer doesn't move anybody that's a defendant in this particular trial today. That's another reason why I don't think it's relevant to this particular case.

THE COURT: I mean, this feels like a motion in limine. How do I know until I see the video? I think we need to let the video in and then I'll let you argue about the weight of what it goes to. I think that as it's been suggested to me, it seems that the video was at least evidence of intent. So I find that it's

relevant as far as specific hearsay objections or other objections related to the actual content of the video. I can't rule on that until I've actually seen it.

And I'll let you renew your objections -- let's play the video, then I will hear any objections and then I'll make a ruling about it at that point in time. Again, we don't have to worry about it being in front of a jury, so we'll deal with it on the back end in that way. You can go ahead and play. I think there's been a foundation for it, so we'll go ahead and let it be played and then I'll hear you on the rest of the issues.

BY MS. KLOPF:

Q. (Playing video.)

THE COURT: All right. Anybody have an objection that you need to make for the record?

MR. COOPER: Well, no more than what I made before, Your Honor. Again, this is outside the four corners of this indictment with this person. They're bringing a new quote/unquote victim into this case and we don't even know if it's a victim or not. That's my objection on relevancy.

THE COURT: Okay. Mr. Heroux.

MR. HEROUX: Yes, Your Honor. I join in the objection as to relevancy. As the Court -- as Your Honor heard, the officer is saying this person's

a patient, this person's a patient. That's clearly hearsay. And so it can't be -- those statements can't be used to establish this person as a patient.

In addition, the Court -- the last thing the Court heard is this person saying this is making me uncomfortable, okay. All this. She says this makes me uncomfortable. But you also saw the officer push two people up against -- separating two people.

I can't cross-examine this witness as to say, hey, what made you uncomfortable if you were uncomfortable. She may be talking about I'm not comfortable the way the officer's pushing people around. We don't know. So, therefore, that's also hearsay.

I can't -- I don't think it qualifies as a present sense impression. And if it does, I still need to be able to confront this witness, okay. And I can't.

THE COURT: All right.

MR. HEROUX: I say this witness. This person in the video.

THE COURT: Right. Understood.

Mr. Lucas.

MR. LUCAS: Your Honor, again, I review my objection in terms of relevance. Again, there are three people that the officer tell them to move and face different sets -- or different variety of sort of

resistance. But none of them are seated here.

THE COURT: Okay. Is that it? All right. Thank you.

MR. McGOWAN: Judge, note, for the record, all of the previous objections.

THE COURT: I can rule on the relevancy issue. I find it's relevant. Ms. Klopf, let me hear your position about the statement that this person is a patient and about the statement about it making the individual feel uncomfortable.

MS. KLOPF: First to speak to the officer saying this person is a patient. It's not being offered for the truth of the matter asserted. We are not saying that she is a patient. What we are saying is that it goes to the effect on the listener. What matters here is how these defendants are responding to a police officer saying, this is a patient.

Again, this is charged as these defendants interfered with the employees' ability to provide reproductive healthcare or that the defendants attempted to do so. To prove attempt, for this Court to find attempt, that a defendant attempted to interfere with a clinic employee by physical obstruction. All that the government must prove is that the defendant actually intended to interfere with clinic employees by physical

obstruction and that the defendant intentionally performed an act that constituted a substantial step towards interfering with the patient or clinic employees by physical obstruction.

Here a police officer is saying, I am presenting that I have a patient and these folks -- yes, the physical contact is with other people. But there is quite a bit of action happening on the part of the defendants. First, it's the opposite of a substantial step. They make no movement, even though a police officer is demanding of them multiple times that they need to move.

And then Ms. Edl is indicating to this police officer, this is a death camp. She says it twice to him when he's saying is this the clinic. Her response is, this is a death camp, indicating her intent. She believes that this -- this clinic is a death camp. That's what she's describing it as.

So it's incredibly relevant to her intent, not -- not the truth of the matter asserted of what the police officer is saying, but instead her reaction to his question, that's very important. It's also very important we have James Zastrow sitting on the floor. He's looking directly at the police officer. The police officer is asking him to move. He's doing nothing to

comply with that. Just off screen, I think you can see it a few moments before, but Paul Place is sitting right in front of the door. He does not move, even though the police officer has commanded him to move a few times. And indicated that he is trying to get a patient to the door.

And then we have Eva Zastrow on the far right who's very emotional and responding to this police officer but, again, not moving. So this is very probative of intent. Also probative of it doesn't need to be -- that each patient be -- this isn't about the patient. This is about the employees' ability to provide reproductive healthcare. But what's most important is their intent. Their intent to stop those employees from providing reproductive healthcare. And this particular vignette is very probative of what they're doing and why they're not moving.

THE COURT: All right. And what about the issue about the individual statement that it's making them feel uncomfortable?

MS. KLOPF: Your Honor, all that we have to prove in this particular case is interference. The terms interfere with means to restrict a person's freedom of movement. If the Court would like to discount that particular line that it's making her feel uncomfortable,

what's important here is that her freedom of movement -- I'm sorry, what's important here is that the employees' freedom of movement is completely restricted by these defendants' actions. She is indicating that.

I think it's an excited utterance in the moment where she's expressing how she's feeling. She's saying I'm very uncomfortable by this situation. So I think it is admissible under this exception to the hearsay rule, but what's most important here is the fact that these defendants are interfering.

THE COURT: Okay. All right. I will overrule the objection as to the relevance. I'll overrule the objection as to the statement that the person is a patient in that it doesn't -- that it's not -- it doesn't matter whether the person is a patient or not. It's relevant to the issue of the -- of the intent of the defendants and it will not be considered for purposes of establishing that that individual would be a victim under the -- that count in the indictment.

I'll sustain the objection as to the statement about the individual's alleged discomfort. I think Mr. Heroux is correct, it's not subject to cross-examination. And it could be based on any number of things as to why she might be uncomfortable in those circumstances. So that will be my ruling on the issue,

and I'll allow it to be considered for those purposes.

BY MS. KLOPF:

Q. Ms. Hodges, during this video clip that we just watched, where are you?

A. I'm sitting on the floor, like right in front of Eva Zastrow and Eva Edl.

Q. Could you hear the police officer as he was walking down the hallway?

A. Yes.

Q. Okay. To the best of your knowledge, would the people in front of him have moved if the police officer hadn't put hands on them?

MR. COOPER: Objection, Your Honor, that calls for her to speculate about what the others were doing.

THE COURT: How would she know what they would do?

MS. KLOPF: Let me rephrase, Your Honor.

THE COURT: Okay.

BY MS. KLOPF:

Q. In the planning and the communications that you had leading up to this, was there any discussions about how to respond to police officers?

MR. LUCAS: Your Honor, I'm going to object because there's been no foundation laid that any of these

people were a part of that planning.

MS. KLOPF: If I'm not mistaken --

THE COURT: Well, I think there's been testimony about that. Why don't you just rephrase the question to ask, was there any discussions where these individual defendants were present.

BY MS. KLOPF:

Q. Was there any discussion where these individuals were present about how to respond to police officers?

A. Yes.

Q. Okay. And generally what was the plan of how to respond to police officers?

A. The plan, as far as I understood it, was that there would be a chance that we would experience violence from the police officers or from patients or from anybody else. And our response was to be peaceful, to stay in front of the doors, but to remain peaceful.

Q. Okay. Were you going to move based on his commands?

A. I was not planning on it. I was, like, bracing for pain in that moment.

Q. Did you move?

A. No.

Q. When the officer said move out of the way,

she has an appointment, did anyone move?

A. I watched -- in that moment I watched Cal and Amanda kind of like make a small wall and them get separated. Everyone else around me stayed in their spot.

Q. Let's talk specifically about these defendants. Did any of these defendants move or comply with this officer's commands?

A. No.

Q. Did this woman end up going into the clinic?

A. No.

Q. During the course of the whole blockade, did any people enter the clinic while you were there?

A. While I was there, no.

Q. Was that the goal of the blockade?

A. Yes.

Q. We've talked a lot today about preventing patients from entering the clinic. At any point on March 5, 2021, did you have any conversations with patients?

A. I did not have any conversations with patients.

Q. Why not?

A. There was so many people talking at any point in which I may have had the opportunity that I just

chose to sing and pray and otherwise be quiet.

Q. On a high level, what was your role in regards to patients?

A. Just to keep them from getting inside the clinic.

Q. All right. Can we please play 2J.

(Playing video.)

What's happening here?

A. From my perspective, Chet was kind of just giving the rundown of what was going on to whoever was watching the videos.

Q. How close is he to you?

A. I mean, he's probably, like, a few steps in front of me.

Q. Okay. Could you hear him when he was talking?

A. Yes.

Q. Could the -- and all the other defendants were sitting in close proximity to you?

A. Yes.

Q. Did you hear Cal talk about Eva when he said Eva's here?

A. Oh, Chet?

Q. I'm sorry, Chet. Thank you. I'm sorry, Mr. Gallagher.

A. Mr. Gallagher, yes.
Q. Do you know which Eva he was talking about?
A. I believe he was talking about Eva Edl.
Q. Did you hear when he said we expect to be arrested soon?
A. Yes.
Q. The blockade, in fact, continued for much more time, didn't it?
A. Yes.
Q. Okay. All right. Can we play -- please play Exhibit 3J.
(Playing video.)
Again, where were the defendants during this clip?
A. Seated against the door.
Q. Okay. Again, we discussed this a little bit this morning, but you were aware that carafem provided services other than abortions?
A. Yes.
Q. Were you going to allow someone into the clinic if they told you that they were not there for an abortion?
A. No.
Q. All right. Can we please play 3L.
(Playing video.)

All right. And can we please play -- let's do -- let's please play Exhibit 20. (Playing video.)

Can we please pause there and start with 3M. (Playing video.)

Can you pause it really quick.

MS. KLOPF: I'm sorry, Your Honor, I think the sound is not tracking with the image.

THE COURT: Is there any way to get any more volume either?

MS. KLOPF: Unfortunately, we tried. But I think you've been provided a copy of the transcript binder?

THE COURT: Yes.

MS. KLOPF: Okay. We were told there would be too much feedback if we put a microphone at that screen.

THE COURT: Okay.

BY MS. KLOPF:

Q. That's much better, thank you. (Playing video.)

Okay. So by the end of the clip, who is holding the camera?

A. That would be me.

Q. Okay. And did you hear when Mr. Gallagher said -- sorry -- raise your hands when he was trying to

count the people who were staying?

A. Yes.

Q. Okay. Did you raise your hand?

A. Yes.

Q. Why?

A. Because I was planning on staying till the end.

Q. And what does staying till the end mean?

A. Staying until you get arrested.

Q. Did other people around you raise their hands?

A. Yes.

Q. What did Eva Zastrow do?

A. She raised her hand.

Q. What did Eva Edl do?

A. She raised her hand.

Q. What did James Zastrow do?

A. He raised his hand.

Q. And what did Paul Place do?

A. He raised his hand.

Q. When you said at the end the blowfish are leaving, the blowfish are leaving, what are you talking about?

A. I was talking about everybody that was not willing to get arrested and who was just there to make it

appear as though we had more people there to block the door.

Q. Okay. So this is -- that clip was towards the end of the blockade, is that a fair assessment?

A. Yes.

Q. Okay. During the whole time that you're sitting in front of the door, does any patient -- or any person access the clinic?

A. No.

Q. Today we've just watched some of the clips. What was happening generally during the times of the blockade where we didn't play a clip?

A. Just more of the same. Lots of talking and singing and praying, and for the most part it was -- I just sang most of the time. So that was kind of my perspective. Chet went around and taught people on the videos and explained things to everybody that was there. Yeah.

Q. Did you or the other defendants move from your general position in front of that clinic door?

A. No. We stayed put. I know at one point somebody went to the bathroom, but other than that, everyone stayed in their spot.

Q. Approximately how long do you think you were there?

A. Felt like three hours, but I'm not a hundred percent sure.

Q. Why did the blockade come to an end?

A. Because the police finally decided to arrest us.

Q. Who remained after the final order of dispersal was given of these defendants?

A. All of them.

Q. Have you had an opportunity to review Exhibit 17?

A. Yes.

Q. Generally what is Exhibit 17?

A. It is something to do with this trial, something to do with this blockade. I don't remember specifically what's on that disk.

Q. Okay. Is it fair to say that it's a series of clips that are edited together of footage from that day?

A. Yes.

Q. Okay. Does it fairly and accurately depict the events that you observed from that day?

A. Yes.

MS. KLOPF: Move to admit and publish, Your Honor.

THE COURT: All right. It will be

admitted.

(Government Exhibit No. 17 was admitted.)

BY MS. KLOPF:

Q. (Playing video.)

I'm sorry, Your Honor. It's doing it again. Can you jump ahead to where the police officer was talking. (Playing video.)

So is some of these clips different angles of some of what we've watched today?

A. Yes.

Q. Can you kind of walk us through what we were seeing in that clip?

A. The beginning is -- the beginning of the video is where everybody that was waiting in the stairwell was moving into position of blocking the door, standing in the hallway. And then it continued on with the police officers giving us warnings to please remove ourselves from in front of the clinic.

And then Cal arguing back with the police officer and the officer trying to make a logical, rational conclusion that if you go to jail, then you're not able to continue to fight abortion.

Q. Did anyone comply with the officer's demands?

MR. McGOWAN: Objection, Your Honor, that's

her opinion.

THE COURT: That's what she was asked for, I think.

MS. KLOPF: What's that?

THE COURT: That's okay. It's overruled. You can ask the next question.

MS. KLOPF: Thank you, Your Honor.

BY MS. KLOPF:

Q. Did anyone comply with the officer's orders or requests?

A. No.

MS. KLOPF: One moment, Your Honor.

No further the questions.

THE COURT: All right. Mr. Lucas, any questions of this witness?

**CROSS-EXAMINATION**

BY MR. LUCAS:

Q. Good afternoon, Ms. Hodges.

A. Good afternoon.

Q. I represent Paul Place. My name is Leonard Lucas. I just have a few questions for you.

A. Okay.

Q. Mr. Place was not in the group of people that you did rescues with normally; is that correct?

A. I'm sorry, I had a hard time hearing your

question.

Q. I'm sorry. I'm going to speak a little bit louder, I'm soft-spoken sometimes. Mr. Place was not in the group of people that you normally did rescues with; is that correct?

A. Yes.

Q. Yes, that's correct?

A. Yes. I've only done two, like, blockades, so. But sure, yes. I had never blockaded with Paul Place before.

Q. All right. But he also wasn't someone that you had protested in front of abortion clinics with before either, is it?

A. Yes, that's correct.

Q. Now, you stated that the roles for the Mt. Juliet rescue would have been established early on; is that correct?

A. I'm sorry, I did not understand what you just said. I'm sorry.

Q. The roles, like the roles that you would take at the Mt. Juliet rescue were established early on; is that correct?

A. They were established before we got to the clinic for the blockade.

Q. All right. But you also said that you were

contemplating your role at least on the trip to Mt. Juliet?

A. Yes. My intention was to rescue, but I would always tell people that I was waiting on the Holy Spirit to direct me on what to do.

Q. And if the Holy Spirit directed you not to do that, you would have complied?

A. It's hard for me to answer that question because what is the Holy Spirit and who's to -- you know what I mean? That's hard for me to answer. The best way I can explain this is that my intention, when I left for Tennessee, was to block the doors of the abortion clinic.

And I would say I was waiting on God to give me a confirmation, but my intention was to go do that unless I felt that perhaps I shouldn't for some reason, which didn't present itself, so I did.

Q. But that's -- but that was how you worked it out. Other people could just be praying and actually waiting for God to speak to them; is that correct?

A. I can't say for other people. I can only tell you, like -- that was my personal experience.

Q. I want to talk a little bit about the police officer that showed up and was leading the lady to the clinic door. You recall testifying in regards to that video clip?

A. Yes.
Q. And you testified that you were bracing for violence when the officer asked you to move. Do you remember that?
A. Yes.
Q. And you also testified you weren't going to move. You remember that?
A. Yes.
Q. But you don't know if Paul Place would have stepped aside without violence, do you?
A. I have no idea what Paul Place would have done. I could make an assumption, but I don't know. I wasn't in his head.
Q. In the videos there are several mentions of trespass. You recall that?
A. Yes.
Q. And on that day, I mean, people talked about trespassing at carafem?
A. Yes.
Q. So when everybody raised their hand, when Chet asked, do you want to -- are you going to risk being arrested today, they were really raising their hand to risk being arrested for trespass?
MS. KLOPF: Objection, Your Honor, calls for a legal conclusion.

BY MR. LUCAS:

Q. Did you receive a citation for trespass in Mt. Juliet?

A. I believe it was for trespassing. One -- the one in Michigan and the one in Tennessee are slightly different, but it was similar enough to trespass. It could have been, but I don't specifically remember the charge. But I think so.

Q. Now, in the videos you saw, Mr. Place, sometimes he was in front of the doorknob or sitting in front of the doorknob, carafem's doorknob; is that correct?

A. I don't -- I remember him to the left of Eva Edl and at some points his body was more in front of the door than at other times. Is that what you're asking?

Q. Yes.

A. So yes.

Q. And sometimes he wasn't even in front of the door or near the door. For instance, you were showing a clip with another lady kneeling in front of the door, but Mr. Place wasn't there; is that correct?

A. Like, there was times where he wasn't by the door, is that what you're saying?

Q. Yes.

A. I did not keep my eyes on Paul Place the whole time, but I know that I saw him in the videos that he was there and I remember him being there. I don't recall the times that he wasn't in front of the door.

Q. And that's because you weren't on the floor the entire time. There were times when you were still down in the lobby.

A. For the first six minutes of when videos started being recorded, I was in the lobby. And then after six minutes, I came up and sat in front of the door and I stayed there for the rest -- for the duration of the rest of the blockade.

Q. Were you up there when the -- when the initial patient came upstairs?

A. I was sitting on the bench downstairs. I saw her -- I believe I saw her get on the elevator with her partner, go up the elevator, and then I sent a text to Paul Place believing that that was a patient. And then that's when I proceeded to wait for the elevator, get on the elevator with the defendants and go upstairs. By that point I did not see the patient after that. So I -- that is the only time I recall seeing the patient with my own eyes.

Q. But you don't know if Paul Place was standing in front of the door when the patient got

upstairs?

A. I do not remember. I know we saw in the videos what happened specifically at the beginning before I got up there. I don't remember where Paul Place was before I got up there from the videos.

Q. Okay. I'm sorry, I didn't want to interrupt you. And you stated that you received Mr. Place's phone number to let him know -- or to text him to let him know when -- I'm going to use your term -- a mom or a mother was coming upstairs; is that correct?

A. Yes.

Q. Who -- who -- who gave you those instructions to get Mr. Place's number?

A. That is a great question. I do not remember who specifically gave me that role. I don't. I don't remember, but I do know that I have Paul Place's number on my phone and that I was told to text him and to sit -- like, wait, watch. I just don't remember who gave me the role.

Q. And you don't know what Mr. Paul -- when you texted Mr. Place, you don't know what Mr. Place did from that moment, whether he instructed people, hey, go and talk to that person about -- about making a better choice. Do you know that?

A. Well, I know what happened because of the

videos and it shows that everyone moved into position far before I sent Paul Place that text. Like, at 7:45, you know, Coleman Boyd has them on camera already out of the staircase. So by the time I sent a text, it would have been minutes after that. So, in my opinion, I think that Paul Place didn't need to rely on my text because someone already had decided let's move in front of the doors.

Q. So your text -- you don't think your text played a role in everybody moving --

A. Not based off the footage of before I got there, no.

MR. LUCAS: Your Honor, those are all the questions I have.

THE COURT: Thank you, Mr. Lucas.

Mr. Heroux, do you have any questions?

**CROSS-EXAMINATION**

BY MR. HEROUX:

Q. Good afternoon, Ms. Hodges. My name is David Heroux, I represent Eva Edl.

A. Good afternoon.

Q. Good afternoon. Let me start off, on your direct testimony, you had a discussion about how roles were given out, okay. How jobs and roles were given out for a blockade; is that correct?

A. Yes.

Q. Was a person assigned a role or did a person say, hey, I'm willing to do this? Is that --

A. Usually it was people saying what they wanted to do. Like -- I'm trying to think specifically, do you want to ask about a specific time because I've been a part of two blockades where I physically blockaded, I attended a blockade, and then I've been part of a rescue that wasn't a blockade. And each situation was different, so.

Q. So each situation -- that's a fair point. Each situation is different. It's hard to say that this blockade and this blockade are going to be the same?

A. Yeah. It's different people usually.

Q. That's right. And there are also, when it comes to roles, I think you assigned -- you said some people are blockers and some people are blowfish; right?

A. Yup.

Q. And with respect to this blockade here at carafem in March 5, 2021, you indicated that you were going to be a blocker; correct?

A. Yes.

Q. But you also indicated that you were praying about it?

A. Yes.

Q. When was -- when you say you were praying

about it, I think on direct you said you were waiting for God to put his -- what he wanted to do -- you to do on your heart; right?

A. I don't know if I would break it down exactly like that, but more or less I was waiting for a sign that I shouldn't do it from my perspective at that time and my beliefs and values.

Q. Okay. So you were waiting for a sign that you shouldn't do it?

A. Yeah.

Q. And your -- is it fair to say that your relationship with God at that time was your relationship. It wasn't a public relationship?

A. It wasn't a what?

Q. Public relationship. In other words, that was your private interaction with God?

A. Sure, yeah.

Q. And the other defendants in this case, they might have their own private relationship with God; right?

A. Yeah.

Q. And a person could go to -- or engage in a role, let's say they said I'm going to be a blocker, but then they decided, I don't want to be a blocker, I think the Lord is telling me I don't want -- he doesn't want me

to do this. Does that make them a blowfish?

A. If someone had done that -- like I knew all the people that are the defendants and the people from the previous trial. I knew they were planning to block and they stayed there. So it didn't happen. But had it happened I would say, yes, that person played a blowfish role.

Q. Well, in this case did Eva Edl ever tell you what her intention was to do?

A. Yes, through conversation, my understanding -- I had a conversation with Eva Edl where she specifically said any chance to rescue that she would have, she'll take it.

Q. Okay.

A. Like, that was -- and it's known across the board in this whole group.

Q. I'm -- you don't know what other people know.

A. I know what's said in front of me.

Q. Right.

A. Okay.

Q. That's fine, you know what's said in front of you. So you're saying Eva Edl told you -- when did she tell you that?

A. She talks about it all the time. There's

been multiple instances where I've heard her talk about how she'll rescue any time. She said it in jail with me. She said it in front of abortion clinics with me. She said it in front of many of the people who are in this room today while I was there too.

Q. When Eva Edl spoke with you, she never -- did she speak to you about this particular blockade and that she was going to -- going to be -- or I should say, this particular rescue and that she was going to block?

A. She raised her hand when we were at the pavilion --

Q. No, ma'am. I'm sorry, I don't mean to cut you off. Did she ever speak with you about it?

A. Oh.

Q. I'm not asking how you interpreted her actions. I'm asking you whether or not she told you before this blockade, okay, on March 5 whether she was going to -- whether she was -- I'm sorry. I keep saying blockade. At this particular rescue did she ever tell you, I'm blockading, I'm blocking?

A. Well, I watched her announce it to the room, not just to me specifically.

Q. At this particular blockade?

A. Yes, for this blockade, before the blockade.

Q. Okay. And where did that happen?
A. The pavilion at the hotel that we stayed at.
Q. Okay. And that would be on the night you -- would that have been on March the 3rd?
A. I believe it was the day before the rescue, if I remember correctly. It was either the day or the day before the rescue.
Q. So that would be the 4th or possibly the 5th?
A. Yes, I believe so.
Q. Now, with respect to that statement, Ms. Edl was praying while she was at the clinic; is that correct?
A. Was she praying at the clinic?
Q. Yes. When she was there at the clinic, she was praying; correct?
A. I could assume so.
Q. I'm not asking you to assume. Did you see her praying?
A. I don't know if I remember seeing her pray, to be very honest.
Q. Okay. But it's possible she could have been praying?
A. Most likely.

Q. And she could have been asking the Lord for the same things you were asking; correct?
A. Very possible.
Q. Asking, Lord, what do I do; right?
A. It's possible.
Q. And in asking for the Lord to intercede -- to put his word or what his desires and make that known to her, you don't know what that conversation was. You don't know what that relationship was?
A. That's true, I don't.
Q. So when we say -- when you say that she raised her hand saying she was going to be -- willing to be arrested, correct?
A. Yes.
Q. That doesn't also mean that -- that doesn't mean that she was going to be arrested for a FACE act violation or any other violation. She just said I'm willing to be arrested; right?
A. I believe the question that was asked of all of us at the pavilion was --
Q. I'm not asking that.
A. -- who's going to blockade. She raised her hand, I'm willing be arrested. I think it was, like, who's going to blockade, who's going to block the doors, who's gonna...

Q. While this was all going on, she continued to pray to seek God to direct what she wanted?

MS. KLOPF: Objection, Your Honor.

THE COURT: What's the objection?

MS. KLOPF: Both relevance and firsthand knowledge. She didn't know what's going through the defendant's head in terms of praying.

MR. HEROUX: I'll withdraw that.

THE COURT: Okay.

BY MR. HEROUX:

Q. You were praying about it and looking for God to tell you what to do; right?

A. Yes.

Q. And if we could, when you got to the carafem facility, you said you waited downstairs in the -- on the first floor; correct?

A. Yes.

Q. And Ms. Edl and Ms. Zastrow -- and they're both Eva; right? So it gets a little confusing. But Eva Zastrow and Eva Edl were both downstairs with you; correct?

A. Yes.

Q. When you decided -- excuse me. When you decided to come up, that's because, I believe, Dennis Green came in; correct? When you decided to go into the

elevator?
A. Yeah. From my memory, I had sent the text to Paul and then -- I don't remember if I, like, saw them walking towards the elevator or then if I began to and they were following, but I'm pretty sure I stayed on the bench and I saw them approaching the elevator and I decided to go with them. It was after I sent the text.
Q. I'll call it -- you passed one elevator door and went into the second elevator door. Do you recall that?
A. I don't recall that, but I'll take your word for it. I don't recall.
Q. All right. And as your door was closing, Mr. Green has a conversation with you; correct?
A. Yes.
Q. And he says, hey, did you see those people, those people up on the second floor? And he talks about the livestream; right?
A. Yes.
Q. Okay. And you indicated that you're the one who sent the signal up?
A. Yes.
Q. Okay. And he said, I just saw them come down?
A. Okay. I don't remember what he responded

with, but I'm sure.

Q. Okay. Let's -- well, I'll move on. When you got to the second floor, your elevator doors open up, you don't see that person who you thought might be a patient?

A. Yes.

Q. You do see them?

A. No, I didn't.

Q. You do not see them.

When you enter the second floor, you kind of turn left out of the elevator and turn left again to go down the hallway. Eva Edl's behind you; is that correct?

A. Yes.

Q. So she wouldn't have seen that patient on the second floor?

A. She would have seen the patient on the first floor, most likely, like I saw them while we were waiting. But, yeah, she wouldn't have seen them on the second floor if I didn't, most likely. Unless we both -- I don't know, yeah.

Q. You indicated on your direct testimony that you know Coleman Boyd; right?

A. Yes.

Q. And you indicated that he talked about

providing a chair and crutches to blend in at this facility?

A. Yes. I recall him bringing up the idea to blend in using medical equipment.

Q. Okay. Do you know how old Ms. Edl is?

A. Well, I don't want to be disrespectful. But I know that -- I believe she's in her late 80s.

Q. Late 80s, okay. And at the time of this rescue at carafem, if you were to be told she was 85 years old at that time, would that shock you?

A. I already knew how old she was and I was familiar with her, so.

Q. Okay.

A. Yeah, it wouldn't have shocked me. I know her story.

Q. Are you aware that she was in physical pain?

A. I knew that she was uncomfortable. We spent a lot of time in jail together right after that. But I knew that she didn't need the wheelchair.

Q. I'm not suggesting that she was crippled. I'm suggesting, did you know that the wheelchair provided her a place to sit?

A. Of course.

Q. And for instance, you sat on the ground?

A. Yes.
Q. You're young.
A. I am young.
Q. You were even younger then; right?
A. Yes.
Q. Okay. And when you go to get up, that's not a big deal. But you have experienced older people have difficulty getting up; correct?
A. Yes.
Q. So the fact that she was in a wheelchair or a chair that could be wheeled, right, that doesn't mean that -- or the fact that Coleman Boyd might have had an ulterior motive to provide that, doesn't mean that Ms. Edl was engaged in some type of subterfuge, some type of trickery; right?
A. I witnessed the conversation between Coleman Boyd and Eva Edl when the wheelchair was brought.
Q. And she was thankful; right?
A. She was thankful. She said it was perfect and that it would work out great for her. And I know she was real thankful for it when we were stuck in jail for a while.
Q. She had to sleep in it, didn't she?
A. I don't know if anyone got sleep that night, but...

Q. Well, that's where she was.
So there's nothing necessarily about having the wheelchair for Ms. Edl that was -- she never feigned being crippled, did she?
A. Like, she never pretended to be crippled.
Q. That's correct.
A. I mean, I know it was used as a way to blend in. That was an agreed-upon thing that I witnessed.
Q. Did she -- did you see her at the time that she was taken into custody?
A. I believe we were all taken into custody at the same time.
Q. Same -- transported in the same vehicle?
A. No. Eva was not in the same vehicle as me, that I remember.
Q. Did you see her getting into a vehicle?
A. I remember -- oh, gosh, so long ago. Let me think.
I don't remember seeing her get into a vehicle.
Q. Okay. All right. I'll move on.
The government played Exhibit 16. I'm going to go into Exhibit 16, if I can. And I'm going to join you in a drink right now. If you could bring up 16.

(Playing video.)

If you could pause it there. If you can look at the video, I'm going to ask you a couple questions about it. Based upon your recollection, is that the hallway that carafem was located?

A. Yes.

Q. And in that -- in that video you can see a door all the way behind the officer on the left-hand side. Do you remember seeing that door?

A. The door on the left-hand side of the hallway all the way back?

Q. Yes.

A. Yes, I do.

Q. As we look at it on our left.

A. Yes, that was another office.

Q. That was another office. Do you remember if it was -- it was a dental office; correct?

A. I don't remember.

Q. Okay. But you walked by it when you got off the elevator; right?

A. Yes.

Q. And as you come down the hallway to -- do you know how long that hallway is?

A. No.

Q. Can you -- based on your best guess, how

long of a hallway is it?
A. Gosh.
Q. I'm not saying from here. I'm asking you to recollect from your experience on March 5. And I realize that's a ways back.
A. Yeah. More of it has to do with my concept of measurement.
Q. Okay.
A. I don't know, quite a few feet.
Q. Many feet. To the back of the courtroom?
A. Yeah, it's probably a good guesstimate.
Q. Fair distance. And that first door that you see on the right, correct, where the officer is?
A. Yeah.
THE COURT: Whose right? His right?
MR. HEROUX: I'm sorry, our right. I apologize.
THE COURT: That's all right.
BY MR. HEROUX:
Q. I'm using left and right from our perspective, okay, not the officer's left or right.
A. Uh-huh (affirmative).
Q. Because, frankly, that conversion would mess me up.
So our right, that first door, do you know

what that first door is?
A. I think that was the bathroom, but I'm not a hundred percent sure.
Q. Okay. And obviously that's closer to the end of the hallway where the -- where the patient entrance is than the wall behind the officer; correct?
A. Yes.
Q. Okay. Do you -- and would you agree -- and we don't have a way of gauging this, but when that officer was at that point, okay, you were seated on the floor?
A. Yes.
Q. And you were seated on the floor pretty much all the way back at the entrance, the patient entrance to the clinic; is that fair?
A. Yes.
Q. You had probably one body behind you. And that may have been Eva Edl or maybe Eva Zastrow based on where you were seated?
A. Yeah, Eva Zastrow directly behind me.
Q. Okay.
A. And Eva Edl was a little bit to my right but behind me as well.
Q. Okay. And when the officer in this video comes -- starts down the hall where this video picks up,

he tells people -- he uses a phrase, part the seas; right? Do you remember that?

A. I don't remember his phrasing, I'm sorry.

Q. Okay.

A. I don't understand people --

Q. We're going to watch the video. But at that point in time, I won't -- what I want to know is, was your view of him, your perception of him, was it obscured? Did you have people in front of you?

A. I'm pretty sure I did have people in front of me. Cal and Amanda for a little bit, but then he moved them out of the way.

Q. Right. And that would mean that Ms. Edl also had people in front of her?

A. Yes.

Q. Can we play this clip for about two seconds. Stop there.

He says, part the seas, she has an appointment; right?

A. Yes.

Q. Okay. Is he yelling?

A. No.

Q. Okay. And he says, part the seas, she has an appointment. And where we see him now, where we see this police officer, he is now -- it appears as though --

do you see the little -- what do they call that --
A. Hand sanitizer.
Q. Thank you. Hand sanitizer. He's pretty much where the hand sanitizer is; right?
A. Yeah.
Q. And this is still a fair distance away from the door that you're at, right, where you are?
A. Yes.
Q. And your perception or your ability to see the officer is still obscured?
A. Yes.
Q. Okay. Can we run the -- and I want you to pay close attention to what the officer is saying. And if we could run that. (Playing video.) Stop there.
Now he is encountering an individual, I believe this is Chester Gallagher; correct?
A. Yes.
Q. You know Chester Gallagher?
A. I do.
Q. And the officer is talking to Chester Gallagher and saying -- now he's saying move out of the way, she has an appointment; right?
A. Yes.
Q. And Chester Gallagher is still between you and the officer?

A. Yes.
Q. And Cal Zastrow is between -- Cal Zastrow and another person is between you and the officer. You're still obscured to this officer; right?
A. Yes.
Q. Okay. If we could -- and the officer while he raised his voice, he's not yelling, is he?
A. Not up to this point. I think he's just talking loudly.
Q. Okay. But he's not yelling. He's using what we might call a police voice. Would you call it that?
A. Sure.
Q. Okay. Can we run the video again. (Playing video.) You can stop there.
He says, excuse me. And he says excuse me twice and he kind of moved Mr. Gallagher to -- to the left side of the hallway, our left side of the hallway as we watch it. And now he's walking down and he's taking steps; right?
A. Yes.
Q. And they're kind of stagger steps in that I mean he's not walking normally, he's kind of take a step and take a step like that. Are you able to tell that from the video?

A. No.
Q. Let's run the video.
(Playing video.) Stop there.
He's now saying excuse me; correct? And he's walked to a door that is on the left side, a wooden door that's on the left side of the hallway?
A. Yes.
Q. And that door that's on the left side of the hallway, that's the entrance to the -- that's the employee entrance to the clinic. Are you aware of that? I'm not trying to put words in your mouth. Do you know what that door is?
A. I do know that that is the employee entrance.
Q. Okay. If we could continue the video.
(Playing video.) Stop there.
He has -- if we could go back just a little bit, I'm sorry.
(Playing video.) So we'll play it from here. I want you to watch. When he gets to Mr. Cal Zastrow, okay, can you tell what he's saying at that point in time? Go ahead and play it.
(Playing video.) Stop there.
Do you know what he said?
A. I couldn't make it out.

Q. You couldn't make it out. If I suggested to you that -- is he saying where is the clinic? Do you remember him asking, where is the clinic?
A. I don't remember it, but if you play it again, maybe I can make it out.
Q. Sure, we'll do that. If you could back it up about five, ten seconds. Maybe five seconds. (Playing video.) Stop there.
A. Yes, I heard it.
Q. He says where's the clinic; right?
A. Yes.
Q. And he's turned around and he's talking to someone behind him. Do you know who that was? Can't see it, but from your experience --
A. I know there was a lady behind him. I remember that.
Q. And he says, where's the clinic?
A. Yes.
Q. Now he's going to put his hands up and he is going to separate Cal Zastrow and this -- I don't know who that female is, but this female; correct?
A. Yeah, Amanda Place. Yes.
Q. Okay. He's separating them. And you can see, is that you down in the corner?
A. No, that's Eva -- the one in the video,

that's Eva Zastrow. But I am right in front of her down --

Q. So you're obscured behind Ms. Place?

A. Yes, in the video.

Q. If we can listen to what is being said and what happens. Go ahead. (Playing video.)

Let me stop you there. He's, again, asking two more times, is this the clinic, is this the clinic; correct?

A. Yes.

Q. When he's up at this position, he is probably equal with the doorjamb to go down the stairs; correct? Do you see --

A. I guess so, yeah.

Q. Okay. And he still has -- how many feet would you say it is to the door from where he is? Do you have any recollection?

A. Maybe four feet.

Q. Maybe four?

A. Maybe.

Q. And has he -- he hasn't asked anyone to move at that point in time, has he?

A. Not using -- I don't think he's said to move. I think he's just used his hands and asked where the clinic is and stuff.

Q. Asked where the clinic is. So you can play it again. Or finish it off. (Playing video.) And that's the end of the clip, okay.

So is it fair to say that when that officer says part the -- excuse me, part the seas, he's pretty far up the hall?

A. Yes.

Q. He takes a few steps, he encounters Mr. Gallagher and says, you need to move, she's got an appointment?

A. Yes.

Q. And then takes a couple more steps and he is, at that point in time, where the employee door is. And he -- after that he has not said to anybody to move; correct?

A. That's how it appears.

Q. How it appears. And the video clearly is going to be better than your recollection because I guess the video captures it forever; correct?

A. Yeah.

Q. Okay. And from the employee entrance door, all he's asked is where the clinic is; correct?

A. Yes, I think so.

Q. Okay. All right. And at this point in time, the female who was with him, this person being

escorted down the hallway, she has decided -- she said, I'm out of here. She left; correct?

A. Yes.

Q. And essentially what happens is that officer turns around and leaves?

A. Yes.

Q. Okay. I'm going to ask you about that hallway. One of the things when we listen to these videos, it's very echoey in that hallway, isn't it? Do you recall?

A. Well, I remember the stairwell being echoey, but I didn't feel the hallway was particularly echoey.

Q. No? And there were people singing, people talking; correct?

A. Yes.

Q. Not necessarily during that clip, but throughout the day?

A. Yes.

Q. And people had their own conversations going on. They might be praying, that's a conversation. And they might be singing, technically I suppose that's a conversation. But people had their own conversations going on. As a matter of fact, they might be talking to one another; correct?

A. Yes.
Q. And it's not at all impossible to not be aware what's going on around you at a particular time; correct?
A. I did not understand that question, sorry.
Q. Well, I didn't phrase -- I phrased it really poorly.
When you're in a crowded place like this hallway, there can be multiple events going on and you're not aware of all of them when they're going on. It's entirely possible you're just aware of the ones that you're dealing with?
A. Yes.
Q. Okay. If we could, could we look at 17, please. (Playing video.) Can we stop there.
You're not there in that interaction?
A. No.
Q. That's just something that you've seen the video of; correct?
A. Yes.
Q. It wasn't livestreamed at that point?
A. I don't know if that part was livestreamed.
Q. Well, you didn't see it on livestream, let me put it that way. Correct?
A. Not while it was happening, no.

Q. No. So then this is when people are going into the hallway. It's safe to say that you weren't there, Ms. Edl wasn't there, Eva Zastrow wasn't there and Dennis Green was not there; correct?
A. Yes.
Q. Okay. And as far as the time of day, this is before you even walked up the stairs; correct? Went up the elevator; correct?
A. Yes.
Q. Okay. So that's -- that time of day, if that time of day -- well, that time of day is early in this event; correct?
A. Yes.
Q. If we can play the clip. (Playing video.)
And now this clip is going to stop -- stop there. This clip is now transitioned to another event. And this event are officers addressing the group here. Do you know what time of day this happened?
A. I don't know what time of day, but it was further along in the event, for sure.
Q. You believe that was after the people -- you believe that was after the people entered the hallway from the staircase, after people did that, but you don't know when this is?
A. Well, the police are there. And if I

recall correctly from my own memory, we made it to the door before the police. Like, me, Eva Zastrow, Eva Edl and Dennis Green, we made it to the end of the hallway before the police arrived, if I remember correctly.

Q. You also made it to the door before the clinic opened; correct?

A. Let's see. 7:51, so before the first -- before we knew of the first scheduled appointment.

Q. Before 8 o'clock you got to the clinic door; correct?

A. Yeah.

Q. And these officers came down there not long after that; correct?

A. I don't remember how long it was.

Q. You don't recall, okay. And do you know -- but is it possible that these officers got there before the clinic opened?

A. I guess so. I feel like nine minutes would be really impressive. But I don't remember.

Q. Well, you don't know when they were called; correct?

A. Yeah, I don't remember.

Q. Okay. Were you there when they were called? In other words, you weren't there on the phone call that resulted in the police officer showing up;

right?

A. I don't recall hearing the phone call that was made.

Q. Okay. So the officers -- this could be before the clinic even opens up. If we can finish the video. (Playing video.)

Let's stop here. This is a completely separate -- that's a completely separate interaction with law enforcement. Do you know what time of day that happened?

A. I don't remember. I don't remember what time of day it would have been.

Q. So this -- this clip is different times, different events throughout the day?

A. Yes.

Q. Okay. Do you recall this time when you were on the second floor, did you ever see any employees enter the facility?

A. I do not recall ever seeing an employee with my own two eyes.

Q. And were you ever -- did you know whether or not there were, in fact, employees in the facility at the time?

A. I did know because there was discussion in front of me about the initial employee that you see -- we

saw earlier in some of these clips. She had the pink pepper spray on her key chain. She's the one that Coleman Boyd references at the beginning of all these videos, yup. So I knew about her, but I didn't see her myself.

Q. You didn't see her, that's because you were on the first floor at the time; right?

A. Yes.

Q. And she -- well, since you didn't see her, you didn't see her. But you never saw anybody else go into the clinic; correct?

A. I never saw anybody go in.

Q. And you were not aware that there were other people in the clinic?

A. I had no idea that there was people inside the clinic.

MR. HEROUX: Thank you. That's all I have, Your Honor.

THE COURT: Thank you. Mr. Cooper?

MR. COOPER: Yes, sir.

**CROSS-EXAMINATION**

BY MR. COOPER:

Q. Ms. Hodges, I'm David Cooper, I represent Ms. Zastrow. You started off your testimony by explaining that you have pled guilty both in Michigan to

a misdemeanor charge -- reduced charge and a misdemeanor charge here, reduced charge to a felony charge; is that correct?

A. Yes. I pled guilty to two Class B misdemeanors in Michigan and in Tennessee.

Q. Okay. And your testimony is that your obligation under that plea agreement, both plea agreements, is to cooperate with the government and to testify truthfully; correct?

A. That is correct.

Q. Do you have any other obligations other than those two things such as making restitution to any facility as a result of your plea agreement?

A. I have no idea, to be fully honest with you. I don't think so, but I don't know off the top of my head.

Q. Okay. I think you started off your testimony by saying that you were like sisters with Eva Zastrow; is that correct?

A. Yes.

Q. You two are about the same age, I believe; is that correct?

A. Yes.

Q. And I think you testified that you -- as you began to, in your adult life, to get into protesting

against abortion clinics that you learned of the FACE Act through Cal Zastrow, I believe; is that correct?

A. Yes.

Q. And that you did not ever recall any specific quotes from Eva Zastrow about this FACE Act. Do you remember testifying about that?

A. Yes. I don't remember a specific quote from her. We discussed the FACE Act, but I couldn't tell you a time and date of when that occurred.

Q. And you don't remember the specifics of any conversations with Eva Zastrow leading up to this Mt. Juliet blockade or rescue that you've been testifying about; correct?

A. Could you ask that question one more time, please?

Q. I'll try. I think you testified that you could not remember any -- the contents of any specific conversations with Eva Zastrow leading up to this Mt. Juliet rescue; is that correct?

A. I don't remember saying that. I don't remember you referencing --

Q. I wrote it down and put a star beside it, so maybe my notes are incorrect. Do you remember saying something like that in response to the government's question?

A. Yeah, but it would help to have the context of that question so I can recall specifically what I was saying. I don't remember saying that exactly, but it's possible.
Q. All right. I just want to be clear about this. And if we could put up a couple exhibits. The first one to put up is 4A. You do not see Eva Zastrow in that photograph; correct?
A. That is correct.
Q. And at that time you were downstairs on the first floor; correct?
A. I believe so, yes.
Q. And then if we could put up 4C, please.
Same question. You don't see Eva Zastrow in that picture; correct?
A. No.
Q. You were down on the first floor; correct?
A. Yes.
Q. And am I also clear that when this person that's alleged to be Patient A in the indictment and Employee A in the indictment, when they're having that conversation on the second floor that Coleman Boyd filmed, you were on the first floor; correct?
A. Yes.
Q. And Eva Zastrow would not have been on the

second floor when any of that conversation was taking place; correct?

A. Yes.

Q. And, in fact, when you got to the second floor, you did not see this person that's supposed to be Employee A; correct?

A. No, I don't recall seeing Employee A.

Q. And Patient A and her either boyfriend or husband -- and I'm not sure which -- they were off the second floor as well?

A. I believe so. I did not see them except for on the first floor.

Q. So Eva Zastrow did not interfere in any way with Employee A or Patient A on the second floor, to your knowledge; correct?

MS. KLOPF: Objection, Your Honor. Calls for speculation.

THE COURT: Hang on a second. What's the objection?

MS. KLOPF: Calls for legal conclusion and calls for speculation.

THE COURT: Mr. Cooper.

MR. COOPER: I'm asking her from her own observation if she saw my client interfere in any way with Patient A or Employee A on the second floor. That's

my question.

MS. KLOPF: I believe the question was framed as whether or not she did interfere, which invades the province of the --

THE COURT: I think the way you've asked the question now, did she see your client interfere, did she believe it was an interference is an appropriate way to ask the question.

BY MR. COOPER:

Q. Did you see Ms. Zastrow interfere in any way with this person that's been labeled as Patient A, Ms. Hodges?

A. I did not see a direct conversation or anything like that, but we all blocked the doors of the abortion clinics. So in that sense, yes, but in the direct one-on-one sense, no.

Q. We'll get to the blocking of the door here in just a minute. I'm talking about on the second floor. When you go up on the second floor, you're with Eva Zastrow; correct?

A. Yes.

Q. And you do not see Eva Zastrow do anything or say anything to this person that's alleged to be Patient A; correct?

MS. KLOPF: Objection, Your Honor, asked

and answered.

THE COURT: Overruled.

BY MR. COOPER:

Q. How about it?

A. Could you ask one more time? Sorry.

Q. I'll try. Did you see Eva Zastrow either say or do anything to this person that's alleged to be Patient A on the second floor?

A. No.

Q. And same question as to Employee A. You didn't see Eva Zastrow have any contact with that employee; correct?

A. That is correct. I did not.

Q. Okay. Backing up just a minute, I think when you were sitting on the first floor, you recognize the lady and her either boyfriend or husband going up, you suspected that they were there for reproductive healthcare; correct?

A. That is correct.

Q. And I think you said Ms. Zastrow was somewhere close to you; correct?

A. Yes, she was to my right with Eva Edl.

Q. And Ms. Zastrow did not say anything or do anything to either one of those people on the first floor; correct?

A. I don't know that.
Q. You didn't see that, did you?
A. I did not see if they had words or anything like that. All I know is I saw them enter into the building and get on the elevator and they passed by Evas, both Evas, and myself to do that.
Q. And we'll stay with that. When they were passing by Eva Zastrow, you didn't hear Eva Zastrow say anything of a negative context to them, did you?
A. I don't remember. I don't remember if there was words or not.
Q. Now, after you got to the second floor, of course, you've testified and we've seen in the video, you set down along with some others there in front of that door; correct?
A. Yes.
Q. And Eva Zastrow literally stood behind you holding up that wall for some two to three hours while you were there; correct?
A. Yes.
Q. And during that time Eva Zastrow sang songs; correct?
A. Yes.
Q. Did you ever hear her pray while she was standing up there or squatting down?

A. I'm pretty sure I did, but I couldn't tell you a specific prayer that I heard from her.

Q. All right. And you have testified that no one went in or out of that door during that two to three hours that you were sitting there at the carafem door; correct?

A. Yes.

Q. And we have seen the videotape from the police officer. I think it's Exhibit No. 16. And did that police officer ask to go through the door?

A. Well, I believe, based off what we just watched, that all he did was ask, is this the clinic, is this the clinic. And he said things I couldn't make out to the girl. And he said part the seas, like we just walked through all of that. That's what I remember too. I don't specifically remember him saying anything else.

Q. It seemed like he was a little confused as to whether or not that was even the clinic; correct?

A. I mean, I would assume so based off what he said, but --

Q. It just didn't seem like he knew if it was the clinic or not; right? It's not a trick question. I'm just asking if that's what your understanding from his statement on the video.

A. My understanding was that he was a

frustrated cop. He was mad that we were there and he was trying to assert dominance in the situation. That's how I personally perceived it in that moment.

Q. And that mad, dominating police officer did not ask to go through that door; correct?

A. He did not say those words, no.

Q. And that mad, dominating police officer did not attempt to go through that door. He didn't walk up there and say, get out of my way, I'm going in. He didn't do any of that, did he?

A. No. We saw what he did in the video.

Q. Right. Now, you testified that at some point Ms. Zastrow told you that she planned to block the door. Am I correct on that?

A. Yes.

Q. And when did she tell you that, Ms. Hodges?

A. Well, she would have indicated it before we left --

Q. I'm not asking about the indication, ma'am. I'm asking you when she spoke words to you that she planned to block that door. It's a simple question. When did she ask you -- when did she tell you that?

A. Yeah. So she would have said it -- one of the times would have been before we left for the trip. And then we talked about it specifically the night before

we rescued. We had a discussion and we prayed together in our bedroom.

Q. And so were you allowed to change your mind? Or once you made that decision, was it just full steam ahead?

A. I feel like I've indicated that clearly, that though the decision would be made, everyone was trying to let the Holy Spirit lead them like I talked about my personal experience, so I'm not speaking for everyone else. But for me -- and I watched everyone else do the same thing -- it would be like I'm going -- you know, I'm willing to do it and then letting the Holy Spirit lead you would be the way that we communicated it.

Q. So you could change your mind?

A. Absolutely.

Q. So if that dominating police officer would have walked up to the door and said, I want to get in, at that point Eva Zastrow could have walked away from that wall she was holding up; correct?

A. She could have, yeah.

MR. COOPER: That's all.

THE COURT: Mr. McGowan, do you have any questions for this witness?

///

///

**CROSS-EXAMINATION**

BY MR. McGOWAN:

Q. I guess I'll just take it from there. Everyone there was there voluntarily; is that right?

A. Well, I don't know about the juveniles, but for the adults, I believe so.

Q. Okay. And everybody there prayed for guidance on how they were to behave that day; correct?

A. Sir, I did not understand that question. I also had a hard time hearing it. I'm sorry.

Q. Okay. Everyone there it seemed like participated in some type of prayer; correct?

A. I believe so.

Q. Okay. And that wasn't uncommon among this group of people, is it?

A. No.

Q. Sometimes you'd pray together; is that right?

A. Yes.

Q. And sometimes you'd pray privately, individually?

A. Yes.

Q. And on that particular day you did both; right?

A. Yes.

Q. And sometimes when you prayed privately, you were praying that the Lord show you guidance on how or what you should do; correct?
A. By the time I had sat down, I wasn't really praying for guidance anymore because I'd already made the decision that I wasn't going to get up. So maybe that's bad Christian Caroline, but I did not pray for God's guidance. After the point that I sat down, I made the decision and I felt that it was God's will for me to risk arrest and block the doors. That's just a personal -- just --
Q. But you were praying after you sat down?
A. Yes.
Q. And were you leading that prayer in a group of people?
A. I do not recall leading a prayer.
Q. Okay. So what were you praying for, strength?
A. I was praying that day that babies wouldn't be killed and I was praying that God would change the heart of the cops and I was praying that moms would choose life and turn to Jesus. Those are the kinds of prayers that were in my head that day.
Q. So you're saying by the time you sat down, you had decided to go with what you were initially

inclined to do, and that is block a door --

A. Yes.

Q. -- is that right?

A. Yes.

Q. I want to talk to you a little bit about that. I asked you -- are you saying that a rescue is synonymous with a blockade or are there different types of rescues?

A. There's different types of rescues, in my opinion.

Q. Okay. And you're saying in this particular rescue, you felt like that there would be a blockade enacted on that day?

A. Well, it's not like I felt like it. It was discussed in great detail before the day by the leaders.

Q. By the leaders.

A. Yes.

Q. And you never saw James Zastrow in any part of those discussions?

A. I don't remember him just because I had never met him before. And I didn't notice him until he was sitting next to me during the rescue because...

Q. That was the first time you'd met him?

A. Yes, but it's possible he was there and I just didn't notice him. There was a lot of people.

Q. Okay. Well, you do recognize this gentleman here at the -- sitting at the end of the table --
A. Yes.
Q. -- as James Zastrow now?
A. Yes, I do.
Q. Can you identify him as being the one that was sitting beside you at certain times during the day?
A. I can identify -- remember it was him next to me for the whole rescue.
Q. You're saying he never got up and left and then came back?
A. I don't recall him moving away.
Q. Okay. And other than that, you really don't know him, do you?
A. Well, I spent some time with him in court in Tennessee back when it was a much smaller charge. I remember talking to him then a little bit.
Q. Okay.
A. But I don't know him well.
Q. Prior to this day you really didn't know James Zastrow the man?
A. I'll really don't know James well, no.
Q. You thought well of his father, Calvin Zastrow; right?

A. I did.
Q. You compared him to a disciple?
A. I felt like I was a disciple of his is kind of how I meant to describe it.
Q. You referred to him as a teacher?
A. Yes.
Q. Now, I want to understand, you felt like you knew for sure that you were going to be a blocker?
A. Yes.
Q. But James Zastrow never said anything to you to make -- anything verbally to you to make you think that he was going to be a blocker; correct?
A. Yes.
Q. Okay. And you decided to -- to do or participate in this rescue the way you wanted to do it; correct?
A. Yes.
Q. Okay. I mean, you said that there was part of the plan -- your understanding was part of the plan was for a group of people to be in the stairwell?
A. Yes.
Q. And to come out so that they wouldn't -- their presence couldn't necessarily be discovered and the cat is let out of the bag; right?
A. Yes.

Q. And that group of people was supposed to move out of the stairwell in front of the door --
A. Yes.
Q. -- is that right?
A. Yup.
Q. Are you saying that group of people are the same people that were supposed to be in front of the door all day long?
A. Some of those people were blowfish and some of them were blockaders.
Q. Okay.
A. Some of them maybe had other roles, I have no idea. It was a large group in the stairs, and obviously not all of those people you saw on the video were indicted or sitting in front of the door the whole time, but they were all involved in the rescue.
Q. Right. And the blowfish, they could have either been sitting or they could have either been along the -- in the hallway or along the hall, up next to the hall walls; is that right?
A. Yes.
Q. Is that right?
A. Yes.
Q. And so -- and you're saying a blowfish is to make it appear like the -- the impression, it's

people's impression that the more people that there are, the less willing they are to approach the clinic. Is that what your testimony is?

A. No.

Q. No? Okay.

A. Do you want me to explain it?

Q. No, let me ask you -- let me ask you a different way.

A. Sure.

Q. You don't know whether Mr. Zastrow was intent on blockading or not; correct?

A. Well, I know he was sitting next to me for the blockade, heard everything Chet Gallagher said, all the warnings given, and he stayed seated next to me.

Q. Okay. So he had everything that Chet Gallagher said. Was that -- was that what Chet Gallagher said when he was talking to the police or when he was coming back and reporting to you?

A. When Chet Gallagher was saying if you don't want to get arrested, don't be caught sitting in front of the door, we don't want -- like, all that stuff, Jim heard and he stayed seated next to me.

Q. In your mind you feel like you're being arrested because you're blockading the door or because you're trespassing? What were you thinking you were

going to be arrested for?

A. Well, I knew if I got arrested, initially it would be small. My understanding was if a FACE case was brought, it wouldn't be right away. That was my understanding at the time.

Q. So your understanding -- well, you've never had any discussion with a FACE case or given Mr. James Zastrow any advice on what his legal ramifications would be if he's eventually charged federally, have you?

A. Have I given him?

Q. Yeah. You've never -- you've never discussed the FACE Act with him, have you?

A. I personally have not had -- we've had very few discussions.

Q. Okay.

A. And, no, we didn't personally one-on-one discuss the FACE Act.

Q. And so you're -- you're saying -- let me make sure I get this correct. You're saying that while you're sitting there and people were -- are saying, hey, if you don't want to get arrested, you need to leave. Right? People -- Mr. Gallagher said that?

A. Yes.

Q. Okay. And when Mr. Gallagher said that, you heard that?

A. Yes.
Q. Okay. And there were a lot of things going on in that hallway that day; right?
A. Yes.
Q. How many times do you think that that was said?
A. A lot of times.
Q. Okay. And because Mr. Zastrow didn't move, you assumed that he was -- that he realized that he was going to be arrested?
A. I don't understand your question, I'm sorry.
Q. I'm just saying, you don't know what was in this gentleman's mind?
A. Well --
Q. Are you -- all you can really say is he didn't move. You can't say why. He could have been a blowfish and stayed too long, could he not have?
A. I mean, given that I know he's an intelligent man and has the ability to listen and knows reason and logic, I -- I'm sorry, but I think that would be really out there to say. I don't agree with that at all.
Q. All right.
A. I think he knew what was going on.

Q. Let me ask you this. So everybody -- everybody that was there praying that day, you think that they were insincere in their prayer?

A. What?

MS. KLOPF: Objection, Your Honor. Argumentative and relevancy.

THE COURT: What's the relevance of that?

BY MR. McGOWAN:

Q. Was there not people praying for the moms that were coming into the clinic?

MS. KLOPF: Objection again, Your Honor. Relevance.

THE COURT: What's the relevance?

BY MR. McGOWAN:

Q. Wasn't that part of y'all's ministry to do the rescue?

MS. KLOPF: Objection, Your Honor. Relevance.

THE COURT: Before you ask another question, explain to me why you're asking these questions. What do these questions have to do with any of the charged offenses in this case?

MR. McGOWAN: The way her testimony's been presented is that either you were a blockader or you were a blowfish helping blockaders. There are a lot of

legitimate people that were there that were ministering to these people coming into the clinics. In fact, in one of the clips, there's a conversation about approaching the women and talking to them about their options. That was, I think, the first woman that come in.

I'm just asking, is it her testimony today that in her opinion she's -- she's laid out this plan that is weighted on the entire group. I would like to know -- and my question is directed towards -- in her opinion, was everybody there not participating in helping the unborn survive? In a means or manner not associated with the blockade.

THE COURT: I don't understand. I'm not following you, I don't think.

MS. KLOPF: If I could just address a simpler point, I think.

THE COURT: Go ahead.

MS. KLOPF: I think this is mischaracterizing her testimony a little bit. I don't think she's absolved any of the blowfish of guilt. I think that they are simply then -- you know, for the folks who are not directly in front of a door, they are aiders and abettors. Clearly under the statute if someone is helping to commit the crime and encouraging someone else to commit the crime and that they're

intending to do that, they are guilty as an aider and abettor, not as a principal, but as an aider and abettor.

So just if -- I'm just miss -- I don't think I'm quite following the question, but someone acting as a blowfish does not pull them out of the conversation. I guess that's part of my relevance objection.

THE COURT: Mr. McGowan.

MR. McGOWAN: My question is: Not everyone there was to blockade the door; they were there for other reasons.

MS. KLOPF: But if they're actively encouraging the people who are sitting in front of the door or participating and committing a FACE act violation, they're guilty as aider and abettors.

MR. McGOWAN: That's what this trial was for, my client's state of mind, was he -- was he blockading the door -- or interfering with access to or aiding someone to interfere.

MS. KLOPF: And I think intent can be inferred from his actions and how he responds to other peoples' statements. She's testified she doesn't know what was going through his mind.

THE COURT: Why don't you --

MR. McGOWAN: One other question and I'll

proceed down a different direction.

THE COURT: Very well.

BY MR. McGOWAN:

Q. How did my client help you make your decision to blockade the door?

A. How did he help me make my decision? Is that what you asked?

Q. Did he help you in any way in your decision to blockade the door?

A. I mean, the argument could be made from my personal --

Q. I'm asking you, did he help you. We'll make the argument. Did he help you in any way?

A. I guess, like, in the sense, like, the community aspect, you're not in it by yourself. Like, other people doing it with you is very motivating. So perhaps from that perspective, sure.

Q. So birds of a feather flock together?

A. I would definitely say in this environment doing it with a group of people is a very motivating factor.

Q. Him participating and singing hymns, did that give you encouragement to block the door?

A. I would say, yes, it did.

Q. Did you ever convey to him that that was

your intention of blocking the door?

A. Yes, he heard me convey it, I'm sure. Unless he was not paying attention during the gatherings before this where everybody talked about what they were going to do, I'm sure that he knew my intentions were -- was to be a rescuer and a blockader that day.

Q. How did -- did you convey that to him? How are you sure that he knew what you were thinking?

A. Well, here's the thing that makes this difficult. I only specifically remember seeing Jim for the first time when he was next to me because I wasn't paying attention to all of the individual people at the meetings beforehand. However, if he was attending the meeting beforehand, he heard me say in front of everybody --

MR. McGOWAN: I'll move to strike that, Judge, because there's been no showing that my client has attended any meeting.

THE COURT: That's what she just testified to. She's not saying he was there. She's answering your question about what he would have heard, how she would know he would have heard that.

BY MR. McGOWAN:

Q. But you don't know that he heard anything that you said prior to him sitting beside you that day.

You don't know.
A. I didn't say that I did. I'm just giving -- I'm just answering your questions based off what I do know, that's all.
Q. No, what you said was --
THE COURT: Well, let's not argue with her. I'll take into account what I think she said, but you can ask a question if you want to.
BY MR. McGOWAN:
Q. In fact, y'all really never even spoke to one another there that day at the rescue?
A. Yes, we barely spoke to each other during the rescue.
Q. You saying you're sitting beside him a very large part of the day, at certain points and times during the day, and you still didn't speak to him?
A. I guess I'm rude, I don't know.
Q. But you sang hymns with him?
A. Yes.
Q. Okay. And you're saying the singing of those hymns was to stall for time?
A. I don't recall ever saying that singing hymns was stalling.
Q. What was your purpose for singing hymns?
A. To glorify God with my voice.

Q. Okay. And on direct you said that you identified an exhibit that there were people standing at the end of the hallway, and you said that those were all blockers. And they were looking towards the -- I guess for lack of better words, the altercation between the employee and -- let me rephrase that, Your Honor.

In your definition of blocking, the people along the hallways, they're not actually blocking; is that correct?

A. I don't know if I have an argument to be made on that front, to be honest. I would -- I'm not sure which exhibit you're referencing. I guess that's not the question you asked.

I don't know what you would consider a block and what you wouldn't. For me, I believe that the people on the sides of the hallway were, you know, aiding and abetting. They were there -- they were there to make it look like there was more of us than there was.

MR. HEROUX: I'm going to object. That's asking for a legal conclusion. She's giving a legal conclusion.

BY MR. McGOWAN:

Q. Are you in law school?

THE COURT: He asked the question. She gets to answer it. Answer the question the way you think

it's appropriate.

THE WITNESS: I think --

THE COURT: Do you think those people in the hallway were blockers?

THE WITNESS: Do I think they were blockers? I think they were aiding and abetting the appearance of a bigger blockade. If a patient had tried to go through that door, the person down the hallway obviously isn't going to be very effective in blocking them, so I don't know how you want to make that distinction. I know they were helping. I know that they were playing the role of the blowfish and I know that they agreed to that and knew that's what they were doing during that entire excursion. That's my answer.

BY MR. McGOWAN:

Q. So we've kind of come back full circle. You're saying that everyone there was either a blocker or a blowfish?

A. No, not everyone there was either a blocker or a blowfish.

Q. Can you tell me who was there that wasn't either a blocker or a blowfish?

A. Okay. Gosh, what's her name. There's a girl that shows up in these videos frequently. She has brown hair with bangs and a bandana, and she's frequently

found in the staircase. I wouldn't -- I don't think she was playing blowfish or a rescuer. I think she was there just being a supportive aid to the effort that was taking place. There was lots of people like that that were there. Ruth Washburn, that's her name.

Q. And you said that up until the point that you got arrested that you felt like that if you had been given a sign from God that you could have changed your mind?

A. Could you ask that one more time, I'm sorry.

Q. You said up until the point that you were actually arrested, physically arrested, you were seeking a sign from God as to whether you were going to go through with that or not?

A. I feel like I made my decision when I sat down in front of the door, that I was going to block for sure. Of course, I did reconsider that decision right before I got cuffed because the police officer gave me another chance. They were really nice. They were like unbelievably patient. And he was, like, are you sure you want to do this? And I had the opportunity to not do it. It would have been that easy.

And nothing would have changed regarding the effort of the rescue, but I felt a sense of, like,

well, everyone else is doing it, so don't want to, you know, back out now, so. That was my personal experience.

Q. And the only -- to your knowledge -- it's your testimony that, to your knowledge, the only way to achieve what you'd call this objective of the group, the only way to achieve y'all's objective to deny reproductive services to women, to prevent an abortion occurring that day, was either blockading or blowfishing? Is that your testimony today?

A. No, that's not my testimony.

Q. Okay. There were a lot of people there that weren't doing that, wasn't there?

A. Yeah, there was a lot of people that weren't specifically blowfish or blockaders, yes.

Q. Now, you were able to name one.

A. Yup.

MS. KLOPF: I'm going to object to this line of questioning. I think that's --

MR. McGOWAN: No further questions.

THE COURT: All right. Ms. Klopf, do you have any redirect?

MS. KLOPF: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. KLOPF:

Q. Ms. Hodges, what did you understand you

were risking arrest for on March 5, 2021?

A. Well, I knew I was risking arrest for most likely something as basic as trespassing, but I knew that there was a possibly of being charged with FACE and that I was risking it for blocking the doors of the abortion clinic.

Q. You were asked a lot of questions about blowfish. Would you agree with me that the blowfish were encouraging you to commit the crime of a FACE violation?

A. Yes.

Q. Were they helping you?

A. Yes.

Q. Okay. We talked -- you talked a lot on cross about Exhibit 16. That's the video of the sergeant coming down the hallway. Please let me know if you need me to play it again, I will. But I feel like you probably have seen it enough today.

Were you generally understanding what was happening?

A. Yes.

Q. Okay. Generally what did you understand to be happening during that video?

A. In that moment I remember feeling panic. I thought that a police officer was bringing a patient into the clinic and that he was going to push past us. So my

understanding was, okay, we're going to have to squeeze together and try to keep him from opening the door. And I specifically recall in that moment thinking, like, oh, I need to protect Eva Edl. That was what was in my mind. And preparing for impact.

Q. If he'd asked you to move, would you have?

A. No, I would have tried to protect Eva Edl and gotten more in the way.

Q. Were you aware that you were blocking a door at that point?

A. Oh, yes.

Q. Okay. Even though there were other conversations around you happening?

A. Yes, I was aware. I was aware.

Q. And why were you there in front of that door?

A. Because at the time I believed that my religious views superseded the law, unfortunately.

Q. And what was your ultimate goal that day?

A. Was to keep any patients from going inside the abortion clinic.

Q. Based on your experiences that day and what you heard and what you saw, why were the defendants there? What was their ultimate goal?

A. Because they wanted to keep any patients

from going inside the abortion clinic.

Q. Did your actions, by sitting in front of that door, restrict the ability to use that door?

A. Yes.

Q. To move through that door?

A. Yes.

Q. Could Patient A have come inside?

A. I don't believe so, no.

Q. Employee A, could they have come inside?

A. Uhm...

Q. I know you're not on the floor, but based on -- when you're up there, could a patient or employee come through the door?

MR. McGOWAN: I think her testimony was she wasn't on the floor when Patient A --

MS. KLOPF: I just rephrased my question.

THE COURT: Yeah, she's not talking about the initial opportunity. She's talking about when she was in front of the door, could Patient A have entered that door.

BY MS. KLOPF:

Q. Yeah.

A. No.

MR. LUCAS: Your Honor, I would want to object to relevance.

MR. McGOWAN: Hypothetical.

MR. LUCAS: That's not the circumstances that were there when Patient A was presented to the -- to that hallway. I mean, that's --

MS. KLOPF: I think she was directly asked on cross whether or not Patient A could have asked to go past her, if I'm not mistaken.

THE COURT: I don't recall that testimony, but objection's noted and overruled. You can answer the question.

BY MS. KLOPF:

Q. If Patient A had tried to come back upstairs while you were in front of the door, could they have gotten through?

A. No.

Q. How about Employee A?

A. I do want to clarify with Employee A that it's possible the employee would have been able to get back into the clinic and been let in and out, only because I've heard through discussions that I was a part of, that the importance of keeping the employees out did not --

MR. HEROUX: Judge, we -- foundation issue as well as a hearsay.

THE COURT: Do you want to withdraw that?

MS. KLOPF: Yes, I'll withdraw and rephrase.

THE COURT: All right. Sustained.

BY MS. KLOPF:

Q. During the course of the time that you were there blocking the door, did any employees access the clinic?

A. No.

Q. Were you doing what you did on March 5, 2021, because the clinic was providing reproductive health services?

A. Yes.

Q. Could you have done this blockade for so long by yourself?

A. No.

Q. Did these four defendants help you commit the crime?

A. Yes.

Q. Did they encourage you to commit the crime?

A. Yes.

Q. Did they react the same way you did to the same statements that you heard from officers? Meaning not move?

A. Oh. Yes.

Q. When Chester Gallagher warned you about

that you needed to move if you didn't want to be arrested, you didn't move; correct?

A. That is correct.

Q. Did these defendants also not move?

A. That's correct.

Q. And you were arrested with these four defendants; correct?

A. Yes.

MS. KLOPF: No more questions, Your Honor.

THE COURT: All right. Can Ms. Hodges be released?

MS. KLOPF: Yes, Your Honor.

THE COURT: All right. Thank you, Ms. Hodges. Appreciate your testimony. You're free to leave.

THE WITNESS: Thank you.

*******WITNESS EXCUSED*******

THE COURT: All right. Let's take an afternoon comfort break before we begin the next witness.

Ms. Klopf, can you give me a little preview about what the proof looks like here on out.

MS. KLOPF: Certainly. We have two witnesses out. Mr. Beaye will be handling the first of the two. I think that will be about 10 to 15 minutes. And then the second will be Patient A. And, actually,

while we have the opportunity and there isn't a witness present, just so the information is unmasked. Employee A -- or they're identified in the indictment as Employee A as Sarah Flowers. She testified this morning.

THE COURT: All right.

MS. KLOPF: Patient A is a person named Melissa Ashby. She'll be testifying this afternoon. I anticipate her testimony will be a little under 30 minutes. I've been wildly underestimating cross.

THE COURT: I understand.

MS. KLOPF: So I'm very hopeful that we can be done by 5:00.

THE COURT: All right. We'll see where we get. Does anybody have any sort of conflicts this afternoon later in terms of how late you-all can go tonight?

MR. HEROUX: Judge, we've discussed that -- and I hate to speak for everybody, but we have discussed that. We're willing to go later if the Court needs that --

THE COURT: Okay.

MR. HEROUX: -- to bring this -- to resolve this today.

THE COURT: All right. Okay.

Any conflicts?

MS. KLOPF: No.

THE COURT: All right. Well, then I'll think about that issue as well. We'll see where we get and what the proof looks like, and then we'll make a decision about how late to go this evening.

Thank you. Let's take a recess.

(Whereupon, a break was taken from 3:40 p.m. to 4:08 p.m.)

THE COURT: All right. Are there any matters we need to take up before we call the next witness?

MR. BOYNTON: Judge, just before the next witness, we'd ask that you take judicial notice that Mt. Juliet, Tennessee is in the Middle District of Tennessee.

THE COURT: All right.

MR. BOYNTON: Without objection.

THE COURT: Very good. I'll do so.

Anything else before we get started?

All right. You may call your next.

MR. BEAYE: Your Honor, the government calls Detective Michael Cordle to the stand.

THE COURT: Is somebody getting him?

///

///

**MICHAEL CORDLE**

called as a witness, after having been first duly sworn, testified as follows:

COURTROOM DEPUTY: Could you go over to the seat over there and state your name for the record and spell your first and last name.

THE WITNESS: My name is Michael Cordle. M-i-c-h-a-e-l C-o-r-d-l-e.

COURTROOM DEPUTY: Thank you so much.

**DIRECT EXAMINATION**

BY MR. BEAYE:

Q. Good afternoon, Detective.

A. Good afternoon.

Q. I know you just did it a second ago, but just one more time, would you please state and spell your full name for the court reporter.

A. Michael Cordle. M-i-c-h-a-e-l C-o-r-d-l-e.

Q. Where are you from, Detective?

A. Mt. Juliet.

Q. And what do you do for a living?

A. I am currently a detective for the Mt. Juliet Police Department.

Q. What did you do before that?

A. Pertaining to this case, I was a corporal on patrol for the City of Mt. Juliet.

Q. So you were a police officer; is that right?
A. Correct.
Q. How long have you served as a police officer overall?
A. It will be 12 years in August.
Q. I believe you referenced you were a corporal for some time. How long were you a corporal?
A. Seeings how these all -- detectives, they all hold a corporal rank, probably six or so, maybe seven years.
Q. And what were you before you were a corporal?
A. Just a regular patrolman.
Q. And how long did you spend in that role?
A. Three or four years.
Q. So in total how long have you served as an officer with -- I think you said Mt. Juliet Police Department?
A. Yes. It will be 12 years this August.
Q. Were you a police officer before your time in Mt. Juliet?
A. No, sir. Just with the City of Mt. Juliet.
Q. And briefly just -- I want to talk about your duties and responsibilities as a police officer.

What were they when you were a patrol officer? Start there.
A. As a corporal on patrol or as a patrol officer, our duties are first to respond to calls for service. If we are not busy on a response for service for the citizens, we are told to go out there and be proactive and traffic -- deal with traffic issues, whether it's stop cars for speeding, write citations, handle accidents, things of that nature.
Q. And how about as a detective?
A. We do a little bit of everything. Anything from felony shopliftings all the way up through homicide.
Q. Were you a patrol officer or a detective on March 5, 2021?
A. I was a patrol corporal.
Q. And were you on duty on that day?
A. Yes.
Q. Did you respond to the carafem clinic in Mt. Juliet on that day?
A. Yes.
Q. What caused you to respond there?
A. Dispatch sent a lot of us out there for a disturbance in the building or by the carafem suite.
Q. In your years as a patrol officer with Mt. Juliet Police Department, had you responded to a call

from the carafem clinic before?

A. I believe it was afterwards, after this incident. Leading up to it, we had responded to that building for people on the sidewalk, but not actually carafem until after this incident and then once after, I believe.

Q. Just focusing on -- just any calls from carafem clinic or in that area, had you responded to calls from the clinic before?

A. I think it was after this, yes.

Q. So you only responded to calls to carafem after the March 5, 2021?

MR. COOPER: Your Honor, object to relevance.

MR. BEAYE: Your Honor, the point of the question is just to get a sense of the officer's response to calls from carefem generally.

THE COURT: All right. How about any calls before this?

BY MR. BEAYE:

Q. Yeah. Any calls before this?

A. We've been to the building on a few occasions for protesters on the sidewalk and then walking onto the private property.

Q. Were those previous responses related to

trespass of any sort?
A. Yes.
Q. Could you say more?
A. Yes. Basically there were individuals that was protesting the carafem clinic being in the city of Mt. Juliet, and they would stand on the sidewalk.
MR. COOPER: Your Honor, again, object to the relevance.
MR. BEAYE: I'm going to move on, Your Honor.
THE COURT: All right. Let's go then.
BY MR. BEAYE:
Q. Did you have an understanding of what kind of clinic carafem was?
A. Yes.
Q. What was that understanding?
A. That they handled in, I guess, abortions.
Q. And prior to March 5, 2021, had you ever arrested anyone on a trespass call to the carafem clinic?
A. No.
Q. Approximately what time did you arrive at the clinic on March 5, 2021?
A. If memory serves me correctly, it was early -- it was early in the morning. I think according to my incident report, if I remember correctly, it was

sometime around 8:00 or 9:00 -- or 7:00 or 8:00 a.m.
Q. So a pretty -- so around, you said, 7:00 or 8:00 a.m. or so?
A. Roughly.
Q. You testified previously that you had responded to the carafem clinic for trespass calls on the sidewalk, I think you referenced. Were you facing a similar situation on March 5, 2021?
A. No. The ones we were dealing with on that date, they were actually inside the building.
Q. How many other officers responded there with you?
A. It was quite a few. I don't remember the total number. I would guesstimate 15 to 20 in total throughout the entire -- the entire event.
Q. At that time how many officers were normally on patrol at a given time?
A. For patrol, I believe our minimums was six. So we'd have six officers that would cover the entire city.
Q. And you said the call was about people inside -- inside the building --
A. Yes.
Q. -- this time. Why was that a police issue?
A. I think they were not supposed to be there.

They weren't a patron of that building, and so they'd been asked to leave by security.

Q. How did you come to know that?

A. Dispatch call.

Q. That information was provided to you by dispatch; is that right?

A. Yes, sir.

Q. When you arrived on the scene, did you have any understanding as to what the police department's plan was for addressing the situation?

A. I did not.

Q. Did you know what your role would be at the outset?

A. I didn't know my role until well into the event.

Q. Just during that time when you arrived, did -- did you become aware of any officers offering -- you referenced people being inside the building. Did you become aware of any -- of your officers offering the people in the building the opportunity to leave without being arrested?

A. Yes.

Q. Can you say more about that.

MR. HEROUX: Your Honor, I'm sorry. The air condition's on. If we could -- both counsel and the

witness, if they could just speak up a little bit.

MR. BEAYE: Certainly. I'll use this a little more. And I'll repeat the question.

BY MR. BEAYE:

Q. During the time that you arrived at the clinic, did you become aware of any officers offering the people you referenced as being in the building the opportunity to leave without being arrested?

A. Yes. Through the event there were officers that arrived prior to my arrival that had gotten there. And I know, once on scene, there was some mediations going on between some of our administration and a couple other officers or I think detectives at the time. And one person that I -- come to find out later on, it was multiple people they were talking to about leaving the establishment.

Q. You referenced mediations going on when you arrived. Who on the police side was handling those conversations?

A. Our former chief James Hambrick was one of them. You had Travis Watkins and Sarah Bancroft.

Q. And do you know approximately how long those conversations went on for, between the police department and the other individuals?

A. I would guesstimate pretty much the length

of the incident. So a few hours.
Q. At some point did you understand that the negotiators had given a final warning to the group?
A. Yes, I did.
Q. And just -- at that point, what was your understanding about what would happen to people in the hallway who did not leave after that warning?
A. The individuals that would not leave at the final warning would be arrested for criminal trespassing.
Q. Why would they be arrested for criminal trespassing?
A. They weren't patrons of the building and the people that -- the management staff at the building and the suite did not wish for them to be there and they would not leave.
Q. You testified before that the whole incident lasted several hours. Approximately when within those hours was the final warning given?
A. Without reading my report, offhand I would say around 10:00 a.m., estimated.
Q. You testified that you didn't have a clear understanding of your duties when you first arrived on the scene. Did you have a clear understanding of your role after the final warning had been given?
A. Yes. When the final warning was given, I

was instructed to go downstairs and hold open a door leading out to the parking lot.  Once that was done, they would have officers place the people that remained inside in cuffs and bring them down through there.  After that, it was my duty to go to the Wilson County Sheriff's Office and swear out the warrants for them for criminal trespass.

Q.    And just -- after that warning, did the police department, MJPD, did they make arrests?

A.    We did.

Q.    Just for the record, I'm using the term MJPD to reference Mt. Juliet Police Department, just for our purposes for the conversation and for our record. Okay?

A.    Yes, Mt. Juliet Police Department.

Q.    Of those who were arrested, how many were adults?

A.    Off my recollection, 10, 12.

Q.    Do you recall how many were juveniles?

A.    A handful, maybe four or five.

Q.    Do you recall what the charges were?

A.    My charges were criminal trespass, and I think one individual I had charged with contributing to the delinquency because his children were on scene and he allowed them to defy law enforcement.

Q. You referenced your citations or charges you brought up. What was your role in the arrest of the adults, if you could just give us a description?

A. I believe I transported one individual. Most of them went into a large van and were transported, and there was another lady that was transported by another officer that was in a wheelchair at the time. So basically it was get them out there, swear out the warrants and get them --

Q. So is it fair to say that you had a two-part role, arrest and also transport some folks?

A. Well, the actual physical hands-on arrest was not done by me. But the actual swearing out of the warrants through the entire thing, yes, was done by me. And transporting one, yes.

Q. Is that referred to as the legal arrest?

A. Yes.

Q. So the physical arrest wasn't done by you, but the legal arrests were completed by you?

A. Correct.

Q. And you also had a transport role; is that right?

A. I believe one individual I transported.

Q. Did you arrest an individual by the name of Eva Edl?

A. I swore out a warrant for, yes.
Q. I meant -- when I use arrest, I'm going to be referencing the legal arrest, not the physical arrest.
A. Yes.
Q. Did you perform a legal arrest of an individual by the name of Eva Edl?
A. Yes.
Q. For what offense?
A. Criminal trespass.
Q. Do you recall her state of residence at the time of this arrest?
A. Not off the top of my head, no, sir.
Q. Is there a document that would refresh your recollection as to her state of residence?
A. My incident report, I believe, will have the home address on those.
Q. If -- there's a -- your incident report is before you -- there's a document before you.
A. Okay.
Q. It's flipped over. It's a stack. Would you mind taking a look at that document and seeing if it refreshes your recollection.
A. May I? Is this going to be -- this is it?
Q. Yeah.
A. Okay.

Q. If it will help move things along, if you could take a look at page 29. It ends in 29.
A. Okay. Miss Eva Edl, this is --
Q. You don't have to say anything from the document. Just let me know -- once you've taken a look at it and you've reviewed it, I'll sort of ask you some questions.
A. Okay.
Q. Does that refresh your recollection as to the state of residence of Ms. Eva Edl at the time of her arrest?
A. Yes.
Q. What state was that?
A. South Carolina.
Q. Did you arrest an individual named Eva Zastrow? Talking about the legal arrest. Did you make that arrest?
A. Yes.
Q. For what offense?
A. Also criminal trespass.
Q. Do you recall her state of residence at the time of her arrest?
A. No, sir.
Q. Is there a document that would refresh your recollection?

A. I will assume it's going to be in the -- these arrest affidavits.
Q. So there's a document that will refresh your recollection?
A. Yes, sir.
Q. Would you take a look at page 17 of that document before you, and I'll ask you a few questions.
A. (Complies.)
Q. Does that refresh your recollection as to the state of residence --
A. Yes.
Q. -- of Ms. Eva Zastrow?
What state was that?
A. Michigan.
Q. Did you arrest James Zastrow, a legal arrest for James Zastrow?
A. Yes.
Q. For what offense?
A. Criminal trespass.
Q. Do you recall his state of residence at the time of arrest?
A. Well, I will put two and two together and say yes, his state of residence would probably be Michigan.
Q. Did you arrest an individual by the name of

Paul Place?
A. Yes.
Q. For what offense?
A. Criminal trespass.
Q. Do you recall his town or residence at the time of arrest?
A. I do not.
Q. Is there a document that would refresh your recollection?
A. I would assume it's in there. May I reflect?
Q. Yes. Take a look at page 13 of the document in front of you.
A. Okay.
It says state of residence is Tennessee.
Q. Where in Tennessee?
A. Centerville.
Q. You'd testified earlier that -- based on your recollection that James Zastrow was from Michigan. What was that based on?
A. I would based -- because of the same last name.
Q. Do you recall where he was from?
A. No, sir.
Q. Is there a document that will refresh your

recollection?
A. I will assume it's in here as well, sir.
Q. Could you please take a look at page 21 of the document in front of you.
A. (Complies.)
Q. Does that refresh your recollection?
A. Yes, sir.
Q. At the time of his arrest, where was James Zastrow --
A. Michigan.
Q. Was the answer Michigan?
A. Yes.
Q. That's based on your --
A. Yes.
Q. Understood.
MR. BEAYE: Nothing further from the government, Your Honor.
THE COURT: All right. Mr. Lucas, any questions of this witness?
MR. LUCAS: I have no questions for this witness, Your Honor.
THE COURT: All right. Very good.
Mr. Heroux.
MR. HEROUX: Just a couple. Very briefly.
THE COURT: All right.

**CROSS-EXAMINATION**

BY MR. HEROUX:

Q. Detective -- do you prefer to go by detective or is it corporal?

A. Whatever you'd like, sir.

Q. Detective it is.

Detective, I didn't catch the number of your report. Maybe the government could help, the page that it's on, in case you need to refer to it. 29, I think. It may be on page 29.

So you did the legal arrest of Ms. Edl. You didn't do the physical arrest; correct?

A. That's correct.

Q. And when -- did you observe the physical -- the physical arrest of Ms. Edl on March 5, 2021?

A. No, sir.

Q. Okay. You indicated that Ms. Edl is from South Carolina; correct?

A. According to the documents here before me, yes, sir.

Q. Right. Do you also know her date of birth?

A. Not off the top of my head, sir.

Q. If you could look at the document. Would you.

A. Yes, sir.

(Complies.)

THE COURT: Does that refresh your recollection?

MR. HEROUX: I'm sorry.

THE WITNESS: Yes, Your Honor.

BY MR. HEROUX:

Q. How old did your report indicate Ms. Edl was?

A. The year -- excuse me. I apologize. The month and date are blocked out, but it does show the year of '35. 1935.

Q. Okay.

A. Showing her age to be, at that time, 85 years old.

Q. 85 years old. Okay. And I'm going to look at your -- you swore out an affidavit under oath, correct, supporting the arrest --

A. Yes, sir.

Q. -- is that right?

And I thought I read it in there. Did you indicate in that report that the defendants all surrendered peacefully?

A. I don't know if I used those words in it, but it was.

Q. Let me put it this way: If there had been

some problem regarding their arrest, if they had been violent or obstructive or anything like that, you would have been advised of it?

A. Yes, sir.

Q. And you would have put it in your report?

A. Yes, sir.

Q. And you would have put it in the affidavit possibly?

A. Yes, sir. Or other officers, if they would have been resist (sic), would probably have charged those.

Q. Okay.

MR. HEROUX: Your Honor, that's all I have. Thank you.

THE COURT: Thank you.

Mr. Cooper, do you have any questions of this witness?

MR. COOPER: No questions, Your Honor.

THE COURT: Mr. McGowan, do you have any questions of this witness?

MR. McGOWAN: Just one second, Your Honor.

**CROSS-EXAMINATION**

BY MR. McGOWAN:

Q. You said that you weren't the actual officer that placed the defendants under arrest; is that

correct?

A. Yes, sir, that is correct.

Q. Okay. But was that done in your presence?

A. No, sir.

Q. Okay. You were downstairs holding a door; is that right?

A. Yes, sir.

Q. And you were holding it for people who were leaving the building?

A. For the individuals they had placed in cuffs and were bringing out and the officers that were walking them out, yes.

Q. So is it your understanding that the people that weren't arrested had already left the building?

A. Yes, sir.

Q. Okay. And, in fact, I think you testified that everybody who left the building was not going to be arrested?

A. Prior to the final warning, yes, sir.

Q. Okay. And were you present when that warning, that final warning was given to the people that ended up being arrested?

A. Yes, sir.

Q. Okay. And were you the officer that gave them that warning?

A. No.

Q. Okay. But it was their presence within the building that they were going to be charged with; correct?

A. That's what my -- criminal trespass, yes, sir.

Q. Okay. So it doesn't matter where they were in the building. The fact that they were in the building, in a private building, was what was -- was the basis for the charge of criminal trespass?

A. After they were given lawful command by police officers, yes.

Q. Maybe I should... If they had been given that command and that command had been communicated to them, it didn't matter where in the building that they were. They could have been in the stairwell, in the bathroom, on the first floor, on the second floor, in the hallway, in front of a door, it could have been anywhere. If they were told to leave, then they were going to be arrested?

A. Yes.

Q. Okay. Did you actually transport any of the --

A. I believe there was one individual. I do not remember the name of the individual that I actually

transported.

Q. All right.

A. But, to my recollection, there was one person that was actually in my patrol car. Most everyone else was in a large van-like type. And I think Ms. Edl, I apologize, was transported by the officer that showed up first, Wentzle.

MR. McGOWAN: Your Honor, could I see the document that he's refreshed his memory with?

THE COURT: Sure.

MR. BEAYE: I'll give you a copy.

BY MR. McGOWAN:

Q. So these documents are several arrest warrants from the individuals here today; is that right?

A. Yes, sir.

Q. And you were the officer that filled out these arrest warrants?

A. When we -- back then, we would swear and affirm in front of the judicial commissioner. They were the ones that actually typed up what we said, and then we would sign off on them at the bottom. Those are my words. I just did not type those. And I swore and affirmed to them.

Q. Who would have filled out the -- you know, the general characteristics of the defendant, like race,

sex, hair, employer, that kind of stuff?

A. I believe what you're looking at on there -- has that got the picture with it, sir?

Q. That's correct.

A. That's a booking sheet. That, sir, that would be the deputies at the jail. Once they are in the jail, they would go and ask them certain things about themselves to make sure they didn't put them with other people that would cause some issues.

Q. And it says -- on that sheet it says "phone" and it says "refused." Do you know what that would be about?

MR. BEAYE: Objection to the -- objection, Your Honor, to this line of question on relevance grounds.

MR. McGOWAN: I'm just asking it -- I'm just asking if he knew.

BY MR. McGOWAN:

Q. Do you know if that information is all correct in there?

A. From what the deputies put down, we take those, yes, sir, as being true.

Q. All right. But that's not --

THE COURT: Hang on just a minute. Go back in front of the microphone if you're going to ask a

question. I can't hear you.

BY MR. McGOWAN:

Q. The defendant never told you that he lived in Michigan; correct?

A. Not to my recollection.

Q. You just assumed that because another defendant has the last name of Zastrow; right?

A. Yes, sir. And then looking at the booking sheet, it also showed his --

Q. It shows Michigan on there?

A. As being his state of residence, yes, sir.

Q. You wouldn't know if that was an error or not, would you?

A. Well, according to the booking sheet, no, sir. We take what they say on there as being correct.

MR. McGOWAN: Thank you.

THE COURT: All right. Any redirect?

MR. BEAYE: No redirect, Your Honor.

THE COURT: Can I release this witness?

MR. BEAYE: You may.

THE COURT: Mr. Cordle, thank you for your testimony. Appreciate you being here today. You can step down and you're free to go.

THE WITNESS: Thank you.

*******WITNESS EXCUSED*******

MS. KLOPF: The United States calls Melissa Ashby.

THE COURT: All right.

**MELISSA ASHBY**

called as a witness, after having been first duly sworn, testified as follows:

COURTROOM DEPUTY: Could you please take a seat in the chair right behind you. And please state your name for the record and spell your first and last name.

THE WITNESS: Melissa Ashby. M-e-l-i-s-s-a A-s-h-b-y.

COURTROOM DEPUTY: Thank you so much.

**DIRECT EXAMINATION**

BY MS. KLOPF:

Q. Good afternoon, Mrs. Ashby.

A. Hi there.

Q. In March 2021 where were you living?

A. In Oak Grove, Kentucky.

Q. And on March 5, 2021, did you have a reason to come to Mt. Juliet, Tennessee?

A. Yes, ma'am.

Q. Are you familiar with a clinic called carafem?

A. Yes, ma'am.

Q. Where is it?
A. It's in Mt. Juliet, Tennessee.
Q. On March 5, 2021, what was your reason for coming to Mt. Juliet, Tennessee? Did you have an appointment at carafem?
A. Yes, ma'am.
Q. Okay. The term reproductive health services includes medical/surgical counseling or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.
Was your appointment for reproductive health services?
A. Yes, ma'am.
Q. When was your appointment?
A. I believe it was about 8 o'clock in the morning.
Q. What time did you get to Mt. Juliet?
A. About 20, 15 minutes prior to 8 o'clock, so 7:40, 7:45.
Q. How long was the drive to get there?
A. From Oak Grove to Mt. Juliet, I would say an hour 15, depending on traffic.
Q. How did you get there?
A. Vehicle.

Q. Was anyone else with you?
A. Yes.
Q. Who?
A. My now husband, Nicholas.
Q. What's his name?
A. Nicholas Ashby.
Q. Okay. I'd like to show you what's been admitted as Exhibit 1F.
A. Okay.
Q. And it's -- if you can either twist or it's in the binder in front of you. What is that?
A. That's the clinic, the outside of the clinic.
Q. Okay. When you and Mr. Ashby arrived at the building, what did you generally see outside of the building?
A. There was protesters outside on the sidewalk. There were people walking in and out. And then just that building.
Q. Okay. What was your understanding of why those protesters were there?
A. For abortion.
Q. Okay. So once you get to this general area, what do you do very first?
A. We get out and look at the directory inside

when we walk inside the building to see where we need to go and what floor it was on.

Q. Where was this directory? Was it in the main lobby?

A. Yes, ma'am.

Q. So once you look at the directory, did you see anything else of note in that lobby?

A. There was -- I mean, there was other people that were hanging out down there, people coming in and out.

Q. When you say "hanging out," what do you mean by that?

A. Just standing there talking, just -- doing normal things, hanging out down there.

Q. At this point did you know -- did you feel like anything was amiss?

A. Not inside the building, but outside the building, yes.

Q. So I'd like to talk to you today about just your general level of anxiety.

A. Okay.

Q. Okay. So at this point, you've gone from the car, you've seen some protesters and you've gone into the lobby. Where are you feeling -- in terms of on a scale of 0 to 10, where are you with your anxiety?

A. Inside the lobby, not that bad. Probably like a 1.

Q. Okay. So where did you go from the lobby?

A. We looked at the directory, saw that we had to go to the second floor, and we got into the elevator.

Q. At this point was there anything that Mr. Ashby needed to do?

A. No. Oh, actually, yes. He had to go to the restroom. He did.

Q. Were you able to find a restroom on the first floor?

A. No.

Q. Okay. So you get into the elevator. What do you do in the elevator?

A. Press the 2 button and go up.

Q. Does anyone else get in the elevator with you?

A. No. It was just Nicko and I.

Q. Okay. So I would like to play for you Exhibit 1D.

And Ms. Andrews, if you could please pause at 17 seconds.

(Playing video.)

Can you please tell the Judge what we saw in the video so far.

A. That's the hallway, and then the woman that walked into the clip was myself.
Q. Okay. And did you look down the hallway?
A. Yes. Down that hallway, yes, I did.
Q. When you looked down the hallway, what did you see?
A. A whole bunch of people standing.
Q. How did that make you feel?
A. I didn't like it. It made me anxious. I would say probably about a 6.
Q. A 6?
A. Yes.
Q. Okay. So initially did you hear a person ask you questions and you respond?
A. Yes.
Q. Okay. Why did you say that you needed to find a bathroom?
A. Because Nicholas needed to use the restroom. We just drove for over an hour and he was probably about two or three energy drinks in. We woke up early.
Q. Okay. So when you went off of screen here, where did you go?
A. We -- there was another hallway on the other side of the elevator where we got off. Because I

did not want to walk down that way because of all the people, so we went to go look for a restroom somewhere else.

Q. Did you hear the man say, are you trying to come to the abortion mill?

A. Yes.

Q. How did that make you feel?

A. Very uncomfortable.

Q. Okay. So you've walked away. Did you find a bathroom?

A. No.

Q. So what did you do next?

A. Decided that if there was a restroom, it was probably down that hallway because there was only two hallways.

Q. Okay. So can we please go back to Exhibit 1D and start playing until 45 seconds.

(Playing video.)

Do you see the person in this image?

A. Yes.

Q. Did that person try and talk to you?

A. Yes.

Q. How did that make you feel?

A. Uncomfortable. Very unwanted.

Q. Can we please play until 1:10.

(Playing video.)

All right. So the gentleman in the white shirt that we saw walk through the picture, is that Mr. Ashby?

A. Yes.

Q. So tell us what was happening in that little section of the clip.

A. We walked down there to see if the restroom was there, and it was on the left-hand side. And we were being followed by that lady, the young lady.

Q. And what's -- to the best of your knowledge, what's at the end of this hallway?

A. A door.

Q. And what was the door to?

A. For the clinic.

Q. What do you see at the end of the hallway?

A. Not the whole door, just everybody standing in front of it and around it.

Q. Okay. And how did that make you feel, all those people there?

A. Extremely uncomfortable.

Q. Okay. So we were talking about the anxiety scale 0 to 10. Where are we now?

A. A 10 or over.

Q. Okay. So at this point, Mr. Ashby has

stepped out of frame; correct? Or is about to step out of frame?

A. About to, yeah.

Q. Where is he going?

A. Into the restroom.

Q. Okay. Given that these people are there, how did it make you feel to have him leave you in the hallway?

A. I mean, I felt as if, like, I would be perfectly fine by myself because it was kind of an emergent situation that he needed to use the restroom. And I at least knew where he was through those doors if I actually needed him.

Q. Okay. At this point seeing all those people at the end of the hallway, what are you thinking about your ability to get to the clinic?

A. It wasn't going to happen.

Q. Why not?

A. Because there's one of me and so many more of them.

Q. Okay. Can you please start playing again until 1:40.

(Playing video.)

Okay. So at this point what's going through your head?

A. I wanted them to leave me alone. And I verbally expressed it for them to leave me alone.
Q. Okay. Were they listening to you when you said, please don't talk to me?
A. Absolutely not.
Q. Okay. How did this make you feel?
A. Uncomfortable.
Q. And, again, I think we've already maxed out your anxiety scale?
A. Yeah. Absolutely.
Q. Are you feeling even more anxious?
A. Yeah. It was unwelcome conversation that I didn't want to have.
Q. Just to be clear, at no point no one yells at you; correct?
A. No.
Q. No one's violent towards you?
A. No.
Q. Okay. Can we please start playing again and stop at 2 minutes 25 seconds.
(Playing video.)
Okay. So what's just happened -- let's start at the beginning of the clip. What's happening there?
A. The girl that walked down the hallway, she

approached me and she made me feel more comfortable because she wasn't in my face, like, harassing me and saying what the other two girls were saying. And then Nicko came out of the restroom and, of course, saw someone standing up against me and got ruffled a little bit. And then she made it known that she worked for the clinic, and then she told us to go down, back to our car and that they'll call us when pretty much everything is resolved.

Q. If she had not come out and told you to go to the car, would you have gone down the clinic -- gone down the hallway to the clinic?

A. Absolutely not.

Q. Why not?

A. Because I felt that there was no way we were going to get through those doors or through the people.

Q. Okay. I'd like you to push -- put up Exhibit 4A.

Why didn't you push through the people?

A. There's too many of them. It's not -- not a comfortable situation.

Q. Okay. Did you feel that it was impossible for you to get to that door?

A. Yes.

Q. Can we please play Exhibit 4 without sound to a minute and 17.

(Playing video.)

This will be playing without sound. If you could kind of tell us what we're seeing here.

A. It's the hallway with all the people. And then I'm standing right there at the end.

Q. That's you?

A. That's me.

Q. Why are you holding your phone like that?

A. I was trying to distract myself from what was going on around me.

Q. To your understanding, the clinic door is behind all of those people?

A. Yes.

The man that was right there at the end of the hallway, that's the man that spoke to me when we walked off the elevator.

Q. Is that you?

A. That's me.

Q. Okay. And then who's that?

A. That's Nicko.

Q. What's going through your head at this point?

A. I just wanted to get out of there.

Q. So where did you go from here?

A. We went downstairs and we sat on the bench of the lobby for probably about five minutes and discussed what we were going to do. And then we decided to go wait out in the car where the harassment just continued.

Q. Okay. And when you say "the harassment continued," what do you mean by that?

A. We would sit in our car, and there would be people approaching the windows and telling me that I'm going to hell and that I'm a murderer and that I'm killing my baby and this, that and everything else. We sat out there for hours with that happening.

Q. Ultimately were you able to go back to carafem?

A. Once everybody came and got everybody out, yes, I was able to go.

Q. Okay. And were you able to get an appointment?

A. Yes. I had an appointment.

Q. And was it that day?

A. It was that day.

Q. Were there people in front of the door when you went to the appointment?

A. The second time?

Q. Uh-huh (affirmative).
A. No.
Q. Were you able to access the clinic?
A. Yes.
Q. And get reproductive healthcare?
A. Yes.
MS. KLOPF: No further questions, Your Honor.
THE COURT: Mr. Lucas, any questions of this witness?
MR. LUCAS: Your Honor, I don't have any questions for this witness.
THE COURT: All right. Very good.
Mr. Heroux.
MR. HEROUX: Just briefly, Your Honor.

**CROSS-EXAMINATION**

BY MR. HEROUX:
Q. Ms. Ashby, my name is David Heroux, and I represent Eva Edl who is seated over at the table. If I could have you recall back to the events of March 5, 2021, when you were on the second floor, do you ever see a woman in a wheelchair?
A. No.
Q. And when you were on the floor, you saw an employee came out to you, correct, from the clinic?

A. Yes.
Q. Did you ever see any other employees go in that clinic?
A. No. Just one come out.
Q. Okay. And then when you -- they came -- that employee came out, she spoke to you and said to go back to your car, but your now husband, correct --
A. Yes.
Q. And I think you referred to him as Nicko, but Nicholas?
A. Yes.
Q. -- he was in the restroom at the time; correct?
A. When she told me to go back to the car?
Q. Yeah, initially.
A. No. He -- he was out already.
Q. Okay. So you're saying she came back -- the employee came -- the first time the employee contacted you, was Nicko in the -- in the restroom?
A. When she spoke to me?
Q. Yeah, initially.
A. Yeah, she walked up and she spoke to me. When he came out the restroom, she told us to go back to our vehicle.
Q. At some point in time, then she escorts you

to the elevator, doesn't she?

A. Yeah.

Q. And you get on the elevator?

A. Uh-huh (affirmative).

Q. And you leave?

A. Uh-huh (affirmative).

Q. And when you leave, you never see a woman in a wheelchair?

A. Not that I recall.

Q. Not that you recall. Okay.

Can we bring up Exhibit 5D -- I'm sorry, 1A. This is the exhibit -- this is the video that the government has had you look at. I just want to step through it briefly, if we could. Is that okay?

A. Uh-huh (affirmative).

Q. So you'll need to turn to face the video.

If we can start the video.

(Playing video.) Let me stop there.

In this frame you don't see anybody in a wheelchair?

A. No.

Q. If we proceed forward. (Playing video.) Let me stop it there.

That was you who just peeked around the corner and looked down the corner. That's the first time

you looked around the corner; right?

A. Yeah.

Q. Okay. And then if we could go forward to -- I'm trying to truncate this. Go to 12 seconds, if we could, please, and play it. Oh, that's the video we just saw, I apologize. Stop it there. If you could run the video from that point forward, I'll just go through it.

(Playing video.)

As we're watching this video, you never walked down all the way down the hallway; correct?

A. No.

Q. Okay. We'll stop it there. At this point in time, if you look above Nicko's head, you can see a door opening up on the right side of the video, on the right side of the hall. Can you see that?

A. Yeah.

Q. That's the -- is that the door that the woman who came up the hallway to talk to you, is that the door she's coming out of?

A. I'm not quite sure.

Q. You're not sure, okay. Please run it forward.

(Playing video.)

Okay. And let me stop it there, okay.

At this point in time, you're a bit down the hallway, but Nicko is still by your side; correct? Your husband is still by your side?

A. Yeah.

Q. Okay. Go forward.

(Playing video.)

And he has now just stepped into the restroom; correct? And we'll stop it there.

A. Yeah.

Q. Okay. At this point in time you indicated that you felt like you were safe; correct?

A. Yes.

Q. Okay. Run the video forward.

(Playing video.)

Okay. Let me stop it there.

Now, that -- what we see there is the employee has come up and talked to you, hasn't she?

A. Yeah.

Q. And she's told you to leave?

A. Not at the very moment. It was more like me -- me moving because she was telling them to leave me alone.

Q. She was telling them to leave you alone.

A. Yes.

Q. Okay. So then you end up walking a few

steps up the hallway, and you stop; right?

A. Uh-huh (affirmative).

Q. The two girls -- the two females who contacted you, who were talking to you, they didn't say anything mean toward you, did they?

A. They said some offensive things that I took offense to.

Q. You took offense to. What offensive thing did they say?

A. The fact that the three children that were on the screen saver of my phone were more important than the one that was -- that was growing in my stomach.

Q. Actually, didn't they say that -- that -- "doesn't the baby in your womb mean as much to you" --

MS. KLOPF: Your Honor, this is starting to get very, very close to what this Court has ruled on from the trial brief that was briefed at page 12 of Docket Entry 530. I also think the video speaks for itself.

MR. HEROUX: Okay. I'll withdraw the question, Your Honor.

THE COURT: All right.

BY MR. HEROUX:

Q. If you could just run the video. (Playing video.)

So you step forward. Now the employee is

walking away from you briefly; correct?
A. Yes.
Q. And the girls who are standing across the hallway from you, she's -- let me stop it there. Now the employee has returned back to you; correct?
A. Uh-huh (affirmative).
Q. And moments after this, Nicko is going to come out of the restroom; correct?
A. Yes.
Q. Okay. So the females have contacted you twice, okay, or they contacted you. The employee came up and said, you know, leave her alone, and you stepped up the hallway. And now Nicko is about to come back out; is that fair?
A. Uh-huh (affirmative). Yes.
Q. Okay. Can we run the video.
(Playing video.)
If we could stop there. That's Nicko's voice; correct?
A. Yes.
Q. And you've just stepped up the hallway a piece?
A. Uh-huh (affirmative).
Q. And he is talking in that video at that time with the employee; right?

A. Yes.
Q. She's telling him, hey, I work here?
A. Uh-huh (affirmative).
Q. Run the video please.
(Playing video.)
And now... You're about -- let me stop it there. You're about to go -- the elevator door, you can just see, has opened up and you're about to go into it. And we just saw the employee cross in front of the camera; correct?
A. Yeah.
Q. Okay. And you're about to get in. If we can run it.
(Playing video.) Stop it there.
The doors have just shut, and you're about to go -- did you go down or did you go up from that point?
A. Went down.
Q. Okay. If we can run the video forward.
(Playing video.)
That's the employee who spoke to you and she's walking down the hallway; right?
A. Yes.
Q. Okay. If we can look at that, that's where she's going down the hallway.

Can we go to Exhibit 1E. And we can play that.

MS. KLOPF: I'd object to this on relevance grounds. This witness is not present during the course of this video.

MR. HEROUX: I'm going to -- the video is going to depict Ms. Edl's arrival after the witness has left. I was going to have the witness recognize that Ms. Edl or this person in the wheelchair arrives at this point and she's not down at the end of the hall.

MS. KLOPF: I think she's already testified she didn't see anyone in a wheelchair, and the exhibit speaks for itself.

THE COURT: I'll sustain the objection.

MR. HEROUX: That's fine.

BY MR. HEROUX:

Q. You talk about -- on direct you talked about -- well, let me do this. If we could go to -- you talked about on direct that the people in the parking lot were saying things to you; correct?

A. Yes.

Q. And the things they were saying, nobody said stuff like that to you while you were on the floor; correct?

A. No.

Q. Nobody said anything -- you were offended by the fact that the somebody was asking you about your children?

A. No.

Q. No?

A. I was offended by the fact that they were harassing me. I didn't go there to talk to anybody. And I was offended by the things that they -- the personal questions that they were asking me and their comments that they were making.

Q. Nobody was threatening you; correct?

A. Nobody was threatening me, but absolutely making me feel uncomfortable.

Q. Okay. And you were feeling -- it was an awkward feeling, and you were feeling that even when you looked around the corner; correct?

A. Yeah.

Q. Even when you looked down the hallway. Because there were a lot of people; right?

A. There was a lot of people blocking a door that I was going to. Absolutely.

Q. Well, when you say they were blocking the door, were they all piled up against the door?

A. They were spread out around it, and there was no -- they were barricading it.

Q. Well, that's your word. You felt like they were barricading it. You never walked down to the end of the hall to see what was down there; correct?
A. I knew that the door that I needed to go to was at the end of the hall.
Q. Okay. I understand that.
A. Okay.
Q. But you never saw how the people were -- you never saw who was down at the end of the -- down by the entrance to the clinic?
A. Are you talking about a specific person?
Q. Yeah. I'm talking about specific people. You just saw an array of people; correct?
A. Yeah, I wasn't going to walk down the hallway regardless of who was down there.
Q. You just saw an array of people?
A. Yeah.
Q. Okay. So when you left and you were -- when you left, is it fair to say that nobody ever threatened you while you were on the second floor and nobody was -- you were offended by somebody asking questions about your personal effects, your personal matters, but nobody ever said harmful or harsh things to you; would you agree with that?
A. I mean, it depends on what you consider

harsh.

Q. Okay. Nobody called you -- nobody told you you were going to go to hell?

THE COURT: Hang on just a second.

MS. KLOPF: Objection, argumentative.

BY MR. HEROUX:

Q. Nobody --

MR. HEROUX: Well, I'll leave it at that, Your Honor. I'll leave it at that.

THE COURT: Very good, thank you.

Mr. Cooper, any questions of this witness?

MR. COOPER: No, sir.

THE COURT: All right. Mr. McGowan, any questions of this witness?

MR. McGOWAN: Just a couple.

**CROSS-EXAMINATION**

BY MR. McGOWAN:

Q. So your testimony today is that when you got off the elevator on the second floor that you were already feeling uncomfortable?

A. Not as much as the degree that I was when I peeked around the corner.

Q. Okay. So you were -- you'd already encountered some group of protestors or something outside; correct?

A. Yes.
Q. And they'd said some ugly things to you; is that right?
A. Not before.
Q. Not before?
A. It was after.
Q. After you came in the building. Okay.
So you're saying that you had no other reason to feel uncomfortable when you got off the elevator on the second floor until you turned the corner?
A. No, I actually did. There was a man standing there in front of me.
Q. Okay. That's the first time that morning that you started feeling uncomfortable?
A. I mean, pulling up to a clinic and seeing a group of protestors outside most definitely gives you a little knot in your stomach.
Q. Okay. So seeing the protestors outside made you feel a little uncomfortable, but you didn't hear anything that they'd said?
A. That they said to me?
Q. When you first pulled into the clinic at 7:45, before 8 o'clock.
A. Okay.
Q. Okay. When you first pulled into the

clinic from your long drive, you're saying that you felt completely comfortable at that point?

THE COURT: That's not what -- she's already testified to this. That's not what she said.

BY MR. McGOWAN:

Q. I'm just asking you: At what point did you start feeling uncomfortable?

A. At what level? Because as soon as I pulled into the parking lot, I just said that there was -- there was a knot in my stomach because there was protestors outside.

Q. Okay. And then you carried that feeling with you and you're saying up to the second floor. And then you got off the elevator and you felt even more uncomfortable because there was a man standing there filming?

A. More uncomfortable?

Q. Yes.

A. Absolutely.

Q. Then you're saying when you turned the corner, is the large crowd of people that made you feel uncomfortable?

A. Yes. They made me feel uncomfortable.

Q. Okay. So it was just -- at that point there's nothing that that crowd of people had really done

other than just being in the hallway?
A. Absolutely wrong. They were just -- no one wants to go to an appointment that they have at a medical clinic and have a dozen people standing outside.
Q. Okay. That -- that is what you found offensive?
A. That there was a dozen people standing outside?
Q. Outside the --
A. Outside the door?
Q. Yeah.
A. No. I found it offensive that I was being harassed by people and being spoke to when I didn't want -- I wasn't there to speak to them. I was there to go to an appointment.
Q. Well, other than those -- other than the two people that came from that crowd of people that you saw at the end of the hallway, other than those two women, you didn't speak to any of the other people.
A. Down at the end of the hallway?
Q. Right.
A. Yeah, I didn't want to. They all spoke to me.
Q. Okay. The two -- the two ladies.
A. What about them?

Q. The two ladies came out and spoke to you?
A. Yeah.
Q. And that -- that made you feel uncomfortable about what they were -- what they were saying to you?
A. Absolutely.
Q. Okay. And they never told you that they were -- wanted you to turn around and leave?
A. They didn't need to.
Q. All right. They didn't need to?
A. No. Based off of what they were saying to me, they didn't need to say anything like that.
Q. All right.
A. I could tell what their intentions were.
Q. The only person that really denied you access to the clinic that day was the healthcare worker, and she told you to leave, that they would call you later?
A. She didn't deny me access.
Q. She did not tell you to leave?
A. She told me to go down to my car and wait and they would call me and I was welcome to come back. There was nothing welcoming about a dozen people standing in the hallway and blocking the door.
Q. So you felt like you were entitled to

privacy. Is that why you were feeling uncomfortable, that you didn't want a dozen people to see you walk --

MS. KLOPF: Objection, asked and answered, I think relevance, and at this point I think -- well, it's argumentative.

THE COURT: I'll let her answer that question.

THE WITNESS: Can you repeat it, please.

BY MR. McGOWAN:

Q. Were you expecting a little more privacy?

A. Absolutely.

Q. Okay. And you felt like, since they were there, you assumed that they weren't going to give you access to the clinic?

A. They weren't or they were?

Q. My question is: You assumed that they weren't going to give you access to the clinic because they were there in the hallway?

A. That they were going to give me access or that they weren't?

Q. They were not going to give you access to the clinic.

A. Yeah.

Q. Okay. But that was never conveyed by anyone?

A. I mean, it's body language. How else do you look at a dozen people standing in a hallway blocking a door?

THE COURT: Any redirect?

MS. KLOPF: Yes, Your Honor.

**REDIRECT EXAMINATION**

BY MS. KLOPF:

Q. Ms. Andrews, would you please bring up Exhibit 4A.

All right. On cross you were asked if you assumed that the blockaders weren't going to give you access to the clinic. Could you please describe what this looks like.

A. A barricade of people.

Q. Okay. If you were to get to that door, what would you have to do?

A. Force my way through.

Q. Okay. Would you agree with me that that passage was rendered impassable?

A. Yes.

Q. Okay. And that it was unreasonably difficult or hazardous for you to go through those people?

A. Absolutely.

Q. Would you agree with me that your freedom

of movement was restricted?

A. Yes.

MS. KLOPF: No further questions.

THE COURT: All right. Thank you.

MR. McGOWAN: Could I follow up on that one question, that one picture?

THE COURT: You can follow up on something that she asked, but it's going to be limited to that.

**RECROSS-EXAMINATION**

BY MR. McGOWAN:

Q. Do you see the gentleman to the far right in the foreground of that, right there with the beard?

A. Okay.

Q. Okay. Do you recognize him from that day? Do you remember seeing him that day?

A. No. There was a lot of people.

Q. But you considered him to be in that crowd of people that was obstructing the doorway?

A. Yeah.

Q. And he has his back against the wall and you're saying that, because of the number of people and his position, he was blocking access to that door?

A. Absolutely.

MR. McGOWAN: No further questions.

THE COURT: All right.

Ms. Klopf, anything on that point?

MS. KLOPF: No.

THE COURT: May Ms. Ashby be excused?

MS. KLOPF: Yes, Your Honor.

THE COURT: Thank you, Ms. Ashby. Thank you for being here. You're free to leave.

*******WITNESS EXCUSED*******

MS. KLOPF: Your Honor, the United States rests government.

(Government rests.)

THE COURT: All right. Mr. Lucas, do you have any proof you want to put on or any matters for the Court to consider?

MR. LUCAS: No, Your Honor.

THE COURT: All right. Have you discussed with your client testifying?

MR. LUCAS: Yes, we have discussed that. The one thing I did want to do is I wanted to -- given that there's been no testimony that links my client to any conspiracy, I think any of the testimony that Ms. Hodges talked about in regard to co-conspirators should not be used against my client. I think she gave a lot of testimony about what co-conspirators state. And I

think initially, in the government's trial brief, they noted that there would be some sort of proof by the preponderance of the evidence that perhaps --

THE COURT: Hang on just a minute. Would you step to the podium, please. I'm having a little trouble hearing you.

MR. LUCAS: I'm sorry.

THE COURT: That's okay. And you can swivel it around if you need to.

MR. LUCAS: I just believe that there was -- my understanding that the reason why initially the -- Ms. Hodges's testimony included a lot of testimony from her co-conspirators was because the government was going to prove by the preponderance of evidence that my client or any of the other defendants were also somehow conspirators, and I don't think that there's -- that proof's been made. So I would say that any of the testimony from Ms. Hodges in regards to anything her co-conspirators have stated should not be used against my client.

THE COURT: So you're moving to strike Ms. Hodges' testimony as to your client?

MR. LUCAS: Anything Ms. Hodges is going to say in regards to my client that would serve as co-conspirator testimony should be struck.

THE COURT: Okay.

MS. KLOPF: Your Honor --

THE COURT: Anything further?

MS. KLOPF: Oh, I'm sorry.

THE COURT: Anything further, Mr. Lucas?

MR. LUCAS: No, Your Honor. May I return?

THE COURT: Well, just to clarify, you've spoken with your client. He does not wish to testify in this matter?

MR. LUCAS: No, Your Honor.

THE COURT: Very good, thank you.

Ms. Klopf, I'll hear from you.

MS. KLOPF: Given Mr. Lucas's motion, we could ask the Court to find -- make an *Enright* finding and find, 1, that the conspiracy existed; 2, that the defendant was a member of the conspiracy; and, 3, that the co-conspirator made the statements in furtherance of the conspiracy.

Here I think there's been quite a bit of evidence about the existence of a conspiracy. Most notably, in regards to Mr. Place, there was testimony that she -- that Ms. Davis was assigned the role of texting Mr. Place the night before and actually did so. And then went -- when she went upstairs, he was in place as she expected.

There was a lot of testimony about the meetings beforehand, what the plan was, all of that. This is simply a preponderance of evidence standard. I can go into it more if you'd like me to, Your Honor, but I think it's pretty clear given the record.

MR. LUCAS: Your Honor --

MS. KLOPF: Oh, I'm sorry. And the common action of all of these defendants, that the preponderance of the evidence standard has been met. But if the Court has any questions or would like me to address anything else in further detail, I'd be happy to.

MR. LUCAS: Your Honor, can I just make one...

One thing is for sure: In regards to Mr. Place, Ms. Hodges specifically said she doesn't remember Mr. Place or recall Mr. Place being at any meetings the night before, the day before. She does mention that she was given his number -- that she was given his number to text. But the problem with that is is that there's no -- there's been no proof that -- that he was going to do anything other than let the people know who were going to speak to these -- to speak to anybody that came up -- came up to the hallway about making a different choice.

In all honesty, there's nothing to suggest

that, if there was some sort of conspiracy just between Mr. Place and Ms. Hodges, that it would count as a criminal conspiracy. There was nothing about him -- her just getting his number and texting him. In fact, she said she didn't even -- she didn't even know what Mr. Place was thinking in terms of whether or not he was willing to participate by blocking access to others. She said she didn't know what was going on in his mind.

Just getting a number from a person makes you an accomplice in a criminal conspiracy? That seems farfetched. And definitely a preponderance of the evidence hasn't been made, especially when she says that she does not recall him being at any meetings. That's on the record. That's in the transcript.

MS. KLOPF: Your Honor, it's not farfetched. It's based on case law, *United States versus Martinez*, Sixth Circuit case from 2005 that's cited in our trail brief. It's at 430 F.3d 317. Co-conspirator statements are admissible so long as circumstantial evidence permits a finding that there was a conspiracy involving the declarant and the defendant.

There's been ample evidence here of Mr. Place's participation here. There is the common action that they both happened upon the same place at the same time; neither are from Mt. Juliet. They both

appeared on scene at the same time, same day. Ms. Hodges had his phone number and texted him. She received his phone number that day.

Happy to go into anything else in further detail, but the case law is very clear, the co-conspirator standard is met here.

Oh, and I'm sorry, one last point. I think there was argument about this needing to be a criminal conspiracy. It need not even be a criminal conspiracy to meet the standard of 801(d). It need just be a conspiracy. It doesn't have to have a particular criminal purpose.

So given all of that case law -- there's a lot more case law cited in our trial brief about this -- but the standard is met.

THE COURT: All right.

MR. LUCAS: Your Honor, the case law -- initially when she was, like, well, I've got case law on this, I thought she was going to give some situation that was applicable. But all she's really stating are the -- are the actual variables to meet the standard.

What I'm suggesting to you, Your Honor, is that just giving somebody your phone number that you -- your phone number so they can call up to you to let you know when somebody's coming up, that's not a conspiracy.

There's no -- there's no testimony that my client was even at the meetings that Ms. Hodges claims things were discussed.

They talk about the FACE Act. They talk about -- my client wasn't there. The fact that the government is trying to put him there is another example as to why this is just wrong. I mean, he -- my client -- they can't -- they cannot -- they don't have any proof that my client did anything other than get a text message. In fact, Ms. Hodges said the text message wasn't even relevant because basically people already knew before she text that there was somebody coming up and people had already mobilized.

I just don't -- my -- our position is: There's been no proof, particularly in terms of Mr. Place, that there was any conspiracy between Mrs. Hodges -- certainly with nobody else that he -- that he -- he wasn't at any of the meetings. So how could he be in a conspiracy with anybody else when he was at none of the meetings where the planning took place?

THE COURT: All right. Any of the other defendants want to speak to that issue?

MR. McGOWAN: I'm -- my client's in the same situation, Your Honor, except for the purpose of -- there is no text messages. There's nothing liking that.

It was pretty clear Caroline Davis didn't even recognize my client, even when he was there at the rescue. Could not recall any participation that he had or if he was even there at any of the meetings that were conducted up to -- up to the day of this rescue.

And then even after that, she testified that -- that she barely had any conversation with him there at the rescue, that they spoke just briefly a couple of times, and they were sitting there -- or in the vicinity there for at least two hours.

As far as the government's argument -- I know the Court's heard all the proof and is going to weigh that testimony for each witness. I didn't hear where they arrived at the rescue at the same time, at the same place. They were in totally different places. She wasn't even on the floor when -- when the Patient A and then the employee were approached and then ended up leaving the floor. And clearly the video shows he was not -- he was not in front of the door.

And I think a large part of Ms. Davis's testimony is based on what happens at these rescues and who is willing to be a blocker. And as you can see in the -- that Exhibit 4A, I guess someone can say, hey, they felt like, you know, he was there; therefore, he was a blocker. But it shows that he is 30, 40 feet from the

door at that point and he's just leaning against the wall. There's a path right down the middle of all of it.

He can't -- I hate to see that co-conspirator statements coming from -- coming -- being used against him to show his state of mind. And that's what's important for this Court to decide, to show his state of mind about why he was -- eventually ended up sitting there. It's going to be used against him when there hasn't been any showing that he's part of this conspiracy.

THE COURT: All right. Thank you.

Ms. Klopf.

MS. KLOPF: Just briefly, Your Honor. As this Court well knows, conspiracy is a fluid thing. People don't all need to join at the beginning. You can join at any point. What's key here is common action. That is what's happening here.

I think, again, the *Martinez* case is very helpful. It describes that a statement is made in the course and furtherance of the conspiracy where it's intended to promote co-conspirator -- I'm sorry, conspiratorial objectives, including where the statements are made, to apprize a co-conspirator of the progress of the conspiracy to induce his continued participation or to allay his fears.

Here we have common action. They are acting in concert to achieve a common goal. Again, it's preponderance of evidence. And I do just want to emphasize that blocking the door is not an element of the offense. It's simply using physical obstruction, engaging in physical obstruction for -- that's the first element, not block the door.

Physical obstruction is defined as "rendering impassable an entrance to or an exit from a facility that provides reproductive health services or rendering passage to or from such a facility unreasonably difficult or hazardous." So it's not simply that a door needs to be blocked. I just do want to clarify that for the record.

THE COURT: All right. Very good, thank you.

All right. I've heard the arguments. The Court's familiar with the standard. I do find that, based upon the testimony that was presented, that the government has established by a preponderance of the evidence that a conspiracy, including a defendant and the declarants, existed that the statements were made in the course and furtherance of the conspiracy and, therefore, I'm going to accept the testimony. The objections are noted.

Mr. Heroux, do you have any proof or any other matters to bring to the Court's attention?

MR. HEROUX: Your Honor, we have no proof. And, Your Honor, my -- I have discussed my client's testifying, and she has -- she does not wish to testify.

THE COURT: All right. Thank you, Mr. Heroux.

Mr. Cooper.

MR. COOPER: No proof, Your Honor. And I have talked with Ms. Zastrow about testifying, and she does not wish to testify.

THE COURT: Very good, thank you.

Mr. McGowan.

MR. McGOWAN: No proof. And I have discussed whether he wishes to testify, and he does not wish to testify.

THE COURT: Very good. Thank you very much.

(Defense rests.)

THE COURT: Would the government like to make a closing argument?

MR. BEAYE: We would, Your Honor, just briefly.

THE COURT: All right.

Everybody okay to just plow on or does anybody need a comfort break?

MS. KLOPF: If we could just flag before we start closings, during the course of openings, some statements were made and argued that, with a jury present, we would have objected to because they amounted to jury nullification. I think Judge Trauger had briefed these pretty extensively in two memorandum and orders, which are Docket Entry 440, and I think we briefed it in 282. This is about -- I'm sorry. Thank you. 282 is the motion to dismiss on First Amendment grounds. The Court denied that motion; therefore, the First Amendment arguments just -- they're inapplicable here. And 440 is the argument about jury nullification. I.

Do just want to flag that, if things go too far afield, we will be objecting. While there's not a jury present, still we do have -- you know, we want the record to reflect the issues that are at the heart of the issues here and not jury nullification. I know the Court is completely capable of separating out the actual arguments about the elements and everything else, but I did just want to flag it.

THE COURT: All right. It's noted.

MR. BEAYE: Court's indulgence for a brief

moment. I need to try to get this technology working.

THE COURT: You're making me a little nervous about that computer hanging off the edge.

MR. BEAYE: I got you, Your Honor. Got a good grip over here.

THE COURT: I understand.

GOVERNMENT CLOSING ARGUMENT

MR. BEAYE: Your Honor, this was a coordinated blockade of a reproductive healthcare clinic in Mt. Juliet, Tennessee on March 5, 2021. Dozens of people, including the defendants here, crowded the hallway leading up to the clinic and directly blocked access to the clinic's doors.

There's overwhelming evidence that each of -- each of the defendants you see here today traveled to Mt. Juliet, whether it be from South Carolina or Michigan or elsewhere, and sat at the front door of the clinic for over two hours. There is eyewitness testimony; there's tons of video; and there's photographic evidence. There's just no doubt that each of these defendants blocked access to the Mt. Juliet clinic in violation of 18 USC Section 248.

Patients had medical appointments that day, and they came to the clinic and could not get in. The medical staff at the clinic could not get in or out.

Officers responded to this incident and, one by one, told the defendants to leave or they would be arrested.

Members of the group defendants came with also advised them numerous times that "if you want to leave, now's your chance." Not one of them left, Your Honor. The defendants stayed right there blocking access to the clinic when another officer directed the defendants and other blockaders to part the seas for a woman to make her medical appointment that day.

Defendants blocked access even when a woman claimed that she wasn't there for an abortion. This is all on video, Your Honor, image after image of these defendants blocking access to the clinic.

Now, establishing a violation of 18 USC Section 248 requires proving three elements: The first is that the defendants used physical obstruction; the second is to intentionally interfere with patients and employees; and the third is because those patients were seeking or the clinic was providing -- or the employees were providing reproductive health services.

Each defendant is guilty if they directly use physical obstruction in a way that I just described for the Court, attempted to do so, or aided and abetted someone who obstructed. In this case the defendants are guilty in every which way.

First, physical obstruction. The videos prove this beyond a reasonable doubt. As you heard in the videos, Your Honor, the clinic had two doors, the front door and the employee door. Defendant Eva Edl was put in a wheelchair and placed directly against the front door of the clinic while another member of the group defendants came with was against the employee door.

Defendants Eva Zastrow, James Zastrow and Paul Place sat right beside Edl the entire two hours plus. Eva Zastrow is actually the one who placed defendant Edl against the front door. James Zastrow and Paul Place were part of that barricade you heard about just a moment ago from Ms. Ashby themselves.

Together the defendants ensured that neither Ms. Ashby, Ms. Sarah Flowers, who also confronted that barricade, another member of the defendants' group or any of the patients, ensure they all stayed away from the clinic during those two hours.

Exhibit 3P is what Your Honor is looking at right now, and that shows the obstruction in progress. This is a still shot from a recording from a member of the group defendants came with. The shot shows you all of the defendants forming a human blockade at the front door of the clinic. There you see James Zastrow, Eva Zastrow, Paul Place and Eva Edl in a wheelchair just as

Caroline Davis described to Your Honor. You also see Caroline Davis right alongside the defendants as well.

Exhibit 6 shows the same blockade but from the security camera that's inside the clinic. Here again, you see some of the defendants against the wall and the door of the clinic.

Exhibits 4A and 4C are what you see now, Your Honor, and these are also screenshots from live footage. Defendants James Zastrow and Paul Place are a part of that barricade or horseshoe of blockaders. This is the blockade that patient Melissa Ashby confronted when she showed up to the clinic that morning and which Sarah Flowers confronted when trying to return to her place of work. You can see in Exhibit 4C, which is to the right, Paul Place is just behind that horseshoe. All of this shows Your Honor the defendants used physical obstruction.

The defendants' coordinated conduct in this planned blockade proves the second element. Everything from the travel, to the planning meeting that happened days before, to the location, to the timing and even down to the precise blockading positions defendants took before the door proves that each of them intended to prevent patients from entering the clinic and clinic workers from providing services.

You saw Exhibit 4. This is the video of Melissa Ashby in the hallway. Ms. Ashby had come to receive reproductive healthcare at the clinic that day. You heard, Your Honor, how she felt anxious, overwhelmed, intimidated by the crowd in front of you blocking her path. Exhibit 4A is a still shot that comes from the end of that clip.

You saw that Melissa Ashby and her husband were facing that morning -- you saw what they were facing. Defendants acted together to ensure that neither she nor her husband were going to make the medical appointment that morning.

And in that same footage, you also saw Melissa Flowers -- Sarah Flowers, forgive me, the clinic worker who tried to return to her work but was unable to do so. You saw her confront that barricade of blockaders that Ms. Ashby described to you. And you also saw her encounter another member of the group defendants came with when she was trying to get into -- get into the employee entrance. So she was also denied access to her place of work, Your Honor.

And neither Ms. Flowers nor Ms. Ashby could get inside the clinic until after defendants were arrested. Ms. Ashby -- you heard from her -- went back to her car and waited the entire two hours plus to be

able to make her appointment that morning.

And make no mistakes, Your Honor, there was no chance of Ms. Ashby or anyone else returning and entering the clinic while defendants were still blocking the front -- the front door. You heard a lot about some of the defendants, Ms. Edl and Ms. Zastrow, not being on the floor when Ms. Ashley and Ms. Flowers were there, but it's also true that neither one of them could have answered if they came back later on because of the blockade that included Ms. Edl, defendant Edl and defendant Ashby (sic).

Exhibit 16 proves that beyond a reasonable doubt, Your Honor. This is a live video of another woman who, with police escort, attempted to enter the clinic during the blockade. In that video, the officer's told by a member of the defendants' group that he is leading a baby to be murdered. The woman begs for access, telling defendants and other blockaders that she isn't there for an abortion. Her words did not make a difference. It didn't matter what particular reproductive healthcare service the woman was -- or any other patient was there for.

The defendants maintained their position. They held that same position that you saw in Exhibit 8P. None of them moved out of the way, none of them. In

fact, you see some of the other blockaders move into the way of the patient and the police officer to reinforce the blockade.

And lastly, Your Honor, motivation. So in addition to Ms. Davis's testimony, the preprinted flyers Your Honor heard about, the videos and the planning, defendant Edl's words ring loudly as to why she, the Zastrows and defendant Place were blocking the front door. The clinic provided reproductive health services, which made it what defendant Edl referred to as a death camp. The defendants plainly intended to violate the law in order to prevent woman from accessing those reproductive health services.

It was no coincidence that Caroline Davis and these defendants from various states showed up at a clinic on the second floor of the three-story Providence Pavilion at 7:45 in the morning. None of them were just there looking for the bathroom. They traveled to that location specifically to block access to the clinic. They each had the same role in the blockade.

None of them, not Edl, not either of the Zastrows, and not Place were going to leave unless they were arrested. This message was put on flyers printed before any of the defendants even got to the clinic that morning. It was posted on Facebook.

And it was all recorded, Your Honor, live by the defendants' group like it was just one big training video. Those recordings have given us hours of live footage, including what I'm going to show Your Honor, which are Exhibits 3D and 2J. I'm going to play for Your Honor now from the first minute mark of Exhibit 3D to the end of that exhibit.

(Playing video.)

Now I'm going to play for Your Honor Government's Exhibit 2J.

(Playing video.)

Your Honor, what the speaker calls rescue is a blockade of a reproductive healthcare facility. It's against the law. And these defendants knew that. The speaker made sure that defendants understood that what they were doing was against the law and that there could be -- they could be arrested for it.

The group -- what I mean is that the group defendants came with had two kinds of members: Those who came planning to be arrested and those who did not plan to be arrested. And you can hear the speaker on the videos remind everyone throughout not to be caught in front of the doors unless you were among those who wanted -- who intended to be arrested.

At the very outset in Exhibit 2B, which

Your Honor has, the speaker is speaking directly to defendants. And this is -- this is what he states: Listen. It's very important. If you're not planning on being arrested, do not sit in front of the door. Hallway is one thing. I don't want anybody having their picture taken sitting in front of the door unless you're being arrested.

Here he is again. This is a snapshot from Exhibit 3M. He's looking directly at the defendants and he states as follows: Anybody here risking -- not risking arrest? Everybody here understanding what can happen even as a juvenile? You will be arrested by the police and cited. Are you guys understanding that? Anybody here want to go home, this is the time to tell me.

And again in Exhibit 3D, which Your Honor just took a look at, the officer's last stated warning, the camera pans to the defendants and the speaker reminds the defendants and the blockaders -- and this is the first 40 seconds of Exhibit 3D which Your Honor took a look at -- "anyone that is not risking arrest, as soon as you hear the announcement, go down the stairway."

Each defendant is right there for each reminder. None of them leave despite being warned that they are breaking the law and that there will be

consequences. None of the defendants stopped their criminal conduct. None of them followed the officers' commands.

Your Honor, you also heard testimony from Caroline Davis who worked with these defendants to blockade the clinic, to deny access to patients and medical staff alike. Ms. Davis is pictured right next to the defendants the entire time. You can see that from this still shot from Exhibit 3D.

She told you there was an agreement to blockade this clinic and that she and the defendants were part of it. She told you about the goal of this agreement. Before any one of them went up those stairs that morning, defendants knew the crime they were about to commit and their roles in carrying it out.

As Ms. Davis testified to, these defendants were going to blockade that clinic and be arrested while others will film them doing it, sending it out over the Internet, using it to recruit others to join them. And this was all because the clinic provided reproductive health services and the patients were seeking those services.

But you heard a lot about words. You don't have to take Ms. Davis's words for it or anyone else's. The defendants' actions in this case speak for

themselves. Starting with defendant Eva Edl, defendant Edl traveled from South Carolina to Mt. Juliet. She attended the strategy meeting that Ms. Davis described to you that happened before the blockade. She sat in a wheelchair in front of the clinic's doors. She blocked the entrance to the clinic for over two hours, and she had to be arrested by the police before she was no longer in front of the door.

Now, the defendant Eva Zastrow traveled all the way from Michigan, also attended the strategy meeting. She was the one that wheeled defendant Eva Edl into her blockade position. She also blocked the entrance to the clinic for over two hours and also had to be arrested.

Ms. Zastrow's brother, defendant James Zastrow, traveled from Michigan, attended the strategy meeting, formed part of the initial horseshoe of blockaders that helped turn away Melissa Ashby and Sarah Flowers, blocked the entrance to the clinic for over two hours as well and also had to be arrested.

Last and certainly not least, defendant Paul Place, he -- you heard testimony from Ms. Davis that he solicited help from Cal Zastrow and Chet Gallagher to plan this blockade, that he was a sidewalk counselor before and raised concerns about --

MR. LUCAS: Your Honor, I know this is highly frowned upon, but she didn't testify to that. She didn't testify that he -- she didn't testify -- in fact, she testified she couldn't even tell you whether Paul Place had been at any -- had been at any meeting prior to -- prior to that day -- the day of. And she also testified that she doesn't even know how she got his phone number.

So I just want to interject because that's, to me, that's -- I understand that you can make an argument in closing, but you can't make an argument out of thin air.

THE COURT: Mr. Lucas, this is argument. You can make your argument when it's your turn. I'll overrule the objection.

You can go forward.

MR. BEAYE: Thank you, Your Honor.

And briefly referencing, Ms. Davis testified to concerns by protestors in the area that were sidewalk protestors who were having concerns about reaching patients and a phone call that was made to Cal Zastrow, and she was present to that. That's the basis for that argument.

Defendant Paul Place solicited help for this blockade to be planned; communicated with Caroline

Davis when she signaled that Ms. Ashby and her husband had arrived; and she testified to sending him a text message and getting his phone number for that purpose.

He also formed part of that initial barricade or horseshoe of blockaders that help turned away Ms. Ashby and Sarah Flowers. He too blocked the entrance to the clinic for over two hours and had to be arrested and removed by the police.

Your Honor, defendants are guilty here not only as principals, but also as aiders and abettors. As Your Honor knows, aiding and abetting only requires proof that a defendant intentionally helped or encouraged someone else to commit the crime. Defendants here certainly helped each other as well as the other blockaders that day to shut down the clinic for as long as possible. They worked together to block the doors. They worked together to stop patients from getting in, and they worked together to keep the police at bay.

The defendants here, Your Honor, each violated federal law on video in broad daylight and in front of multiple witnesses, including police officers. From the flyers distributed and the videos taken at the scene, each of them knew that they were violating the law and they chose to do it anyway.

This Court should hold each defendant

accountable for what were clear, intentional livestreamed violations of a federal criminal statute. This Court should find each of those defendants guilty.

Thank you, Your Honor.

THE COURT: Thank you.

Mr. Lucas, would you like to make a closing argument?

MR. LUCAS: Thank you, Your Honor.

DEFENDANT PLACE CLOSING ARGUMENT

MR. LUCAS: First thing I do want to mention is that being cited for trespass is much different than being brought into federal court and tried on FACE Act grounds. There is no proof that my client, Mr. Place, interfered with Patient A or Employee A or attempted to do so or aid and abet someone else in doing so.

At best there's testimony he got a text that Patient A was coming, but Ms. Hodge (sic) testified that, before he received the text, rescuers had already mobilized to speak with Patient A. She also testified she doesn't know how she actually received his number or what he was -- what he was supposed to do once he received her text. There's no proof that Mr. Place was to do anything at all. No one testified to having the discussion with Mr. Place about whether he would prevent

moms from entering the clinic if faced with that decision. Ms. Hodge testified she had no idea what his intent was or what he was thinking.

There was no testimony that he was just behind a blockade in Exhibit 4A. There is a picture, but there was no testimony in regards to -- at what point that picture was taken and whether they both matched up to the same time period. In Exhibit 4A you will not find Mr. Place in that horseshoe semicircle.

He did not interfere with Patient A. No one did. Employee A told her to leave without -- without Patient A or Employee A attempting to access the clinic. The testimony is clear on that. Again, Mr. Place is not in Exhibit 4A. Mr. Place did not interfere with Employee A accessing the clinic. Initially employee -- the employee went in and out of the staff door. Her access was not blocked by Mr. Place when she tried to get back in the clinic.

And then there is no proof that Mr. Place encouraged or aided and abetted the individual who did block her access. There's no proof my client contemplated being arrested for anything other than trespass. Ms. Hodge testified that trespass was mentioned that day. Ms. Hodge testified that she doesn't recall Mr. Place being in any planning meeting where the

FACE Act would have been discussed. And she certainly did not testify that Mr. Place reached out to Chet Gallagher or Cal Zastrow or anybody else during this particular -- during this particular proceeding.

Government Exhibit 16 shows Mr. Place seated in front of the clinic door with others. But he is not charged with interfering or attempting to interfere or aiding and abetting others with that woman's rights to reproductive services. She is not included in the indictment. Only Patient A and Employee A and other employees. However, there's no testimony that Mr. -- that Mr. Place even knew other employees were there. Patient A didn't, and neither did Ms. Hodges who testified.

At the very, very least, there is reasonable doubt that Mr. Place committed these violations he's charged with. There is reasonable doubt that he intended to interfere with, attempted to interfere with or aided and abetted anyone else.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Lucas.

Mr. Heroux.

MR. HEROUX: Thank you.

THE COURT: You're welcome.

///

DEFENDANT EDL CLOSING ARGUMENT

MR. HEROUX: I draw the Court's attention to the testimony of Ms. Davis. Ms. Davis testified about how she was praying for God to tell her not to block or to not interfere, otherwise she was going to do it. But she can't testify as to what the other defendants might have been praying about or what their mental state was.

And I find it interesting, when you look at the total of the proof that we've seen because when one looks at Ms. Ashby, when one looks at what happened on the second floor of the building where carafem is located, you would see Ms. Ashby show up. And if you listen or if you take Ms. Davis at her word, they were not going to let Ms. Ashby through. They weren't there to persuade, but yet two individuals approached her.

Now, she was taken aback by that, but the videos will speak for themselves. There were people who asked her and were pleading with her to consider "we have help for you." I don't think that that's consistent with the plan to just barricade and that be it; nobody's getting through. In fact, I think it shows that was a plan. The whole purpose of being there was to allow people to counsel with these would-be -- or these moms as she uses that term.

I think that what Ms. Davis was saying

about how this whole thing operated is inconsistent with what we see on the video in many respects. I'd like to draw the Court's attention also to Ms. Davis's testimony regarding -- regarding the -- and I'm just -- drew a blank here. Regarding the -- what the government -- Government's Exhibit 16, okay.

When we look at Government Exhibit 16, I think the Court will remember me going through that very closely with Ms. Davis and the various stages where things are said by the officer. And the government said, we're only -- we're not offering it for the truth of the matter asserted. But I would bring to the Court's attention, while I've got it in my mind, the government's closing argument was making reference to the very words said by the woman being escorted down the hall. And Your Honor ruled that that was not being used for the substantive purpose.

So it shouldn't be used for that purpose to say she wasn't -- we don't know if she was a patient, we don't know anything. But what we do know is the officer was a pretty long distance when he first says "part the seas, she's got an appointment." And she -- he first -- that officer first encounters -- says that one time. He gets further up and first encounters Chet Gallagher, okay. And that's the individual -- and now he's saying,

"get out of the way. She has an appointment. Move. You need to move." That's still a long distance from the door.

And as Caroline Davis said, her view -- and there were a lot of people in the way, people standing, people talking, people singing, a lot of things going on. I suggested and I think the Court -- I think when the Court listens to the video, reviews the video, if the Court is so inclined, it is echoing in there. It is hard to hear.

But at that point in time, the officer switches from "get out of the way" to "is this the clinic." He says it one time. And then he asks the woman he's escorting, "is this the clinic?" And then he encounters Cal Zastrow and another female standing there, and he splits them, moves them apart. They bang off the wall, Cal Zastrow bangs off the wall a little bit. He steps forward and then, "is this the clinic?" And he never really goes any further than that.

And Ms. Davis admitted at that point in time, he says "is this the clinic" two or three times. And my client does respond and saying, "this is the death camp." But nobody -- one time she says that. But nobody ever asked them to move. And the government's use -- or the government's reason for putting this in, their

argument was, well, this goes to show the intent of the people at the door, the intent of what the government calls the blockers. Their intent was to prohibit the people inside the clinic from getting at their patients. That's what they show.

Interesting thing, Ms. Caroline Davis said -- and I keep calling her Davis. It is hard -- if -- I just call her Davis because that's what works in my brain. What she says, when questioned, I didn't even know there were any people in there. She didn't know there were any employees in there at that time. Just as applicable to the other defendants. There was no reason to know there was anybody in there. She said, "I was aware that one left," but she didn't know there were any inside there.

So this case comes down to a few things. One, as to Ms. Edl, did she interfere with -- intentionally interfere with Melissa Ashby. The proof would show she wasn't even on the floor at the time Ms. Ashby was there. Ms. Ashby was escorted to the elevator by a Ms. Flowers, the employee. She got on the elevator, and the elevator goes down.

Ms. Flowers walks down the end of the hall and encounters Cal Zastrow. Ms. Flowers initially showed up at the clinic. She testified she was able to walk

into the employee door, walk out of the employee door. On returning back, Cal Zastrow has now decided, apparently, that she can't go back through the door. He does so nonviolently, submissively, but nonetheless that's the decision he made. We know his intent. At that point in time, she leaves.

And only after Employee A, Ms. Flowers, only after she leaves does Caroline Davis, Dennis Green, Eva Edl, my client and Eva Zastrow appear on the second floor. So as to the question asked by the indictment, did Eva Edl intentionally interfere with Melissa Ashby or the employees, nobody -- there's no proof they even knew the employees were there, and there's no proof my client was even on the floor when Ms. Ashby and Ms. Flowers were present.

So we come down to -- I think you come down to then the question of intent. Intent, intent, intent. Can the government prove the intent of Ms. Flowers -- of Eva Edl. She said she was going to block. She said she was going to be an obstruction there. I think -- if that block is an obstruction. But we don't know whether she was going to intentionally interfere. She was never asked, "can I go through, can I go by?" She was -- that was never put to her.

And, again, I submit to you the reason

these persons were engaged as they did is they wanted any moms to have a chance to second -- second-guess what they were about to do. Have a chance for the -- what I will call the people in the hallway to talk with them softly and say -- let them know, "we have services here for you, we can do things."

The government has, multiple times, indicated who's getting -- who's risking arrest, who's risking arrest. I submit to the Court, arrest for what? Trespass? Maybe that's what people are raising their hands for. FACE Act violation? I don't know. Maybe that's what some of the people were raising their hand for. I don't know. The Court doesn't know, and the government can't prove what they were facing. And the government hasn't proven that.

And the fact that they were willing to risk arrest doesn't mean that they were willing to risk the arrest for a FACE act violation. We don't know whether or not Ms. Edl would have gotten out of the way. We don't know her intent. And that's why Exhibit 16 is so important to the government.

And, unfortunately, the officer doesn't ask them to move out of the way. He asks, "is this the clinic?" That intent argument, that intent position goes to the substantive offense: Did Ms. Edl violate the FACE

Act by intentionally obstructing? I think the answer has to be: Hasn't been proven of her intent. And she didn't interfere with Melissa Ashby and she didn't interfere with employee Ms. Flowers and -- or other employees because she didn't know they were there.

The next intent or the next place for intent to apply, well, did she attempt. Again, we -- there's no establishment of Ms. Edl's intent. That never -- we never got that far in this case. There's no proof as to her intent.

Caroline Davis herself said she, Caroline Davis, were praying as to what I'm going to do. We don't know what would have happened had they -- had a person said -- had Ms. Ashby gone down and said "excuse me" and walked through the crowd. We don't know.

Now, the government raised a word that's not in this case, that's not an element of the charge here. The government used the word intimidate. This is not an intimidation case. That is one way of violating, but it has a very specific definition, and the government has chosen not to pursue that. That's -- in their sentencing memorandum, this is an interference case.

And then finally, there's intent as to aiding and abetting. The intent must be there. The intent must be there, according to the indictment, to

obstruct or -- to obstruct and interfere with Melissa Ashby, Sarah Flowers or other employees. Ms. Ashley -- Ms. Edl was not there as to the first two. And the last one, there's no proof that she knew they were there.

As such, Your Honor, the government's proof fails as applied to Ms. Edl, and the Court should return a verdict of not guilty.

THE COURT: Thank you, Mr. Heroux.

DEFENDANT EVA ZASTROW CLOSING ARGUMENT

MR. COOPER: Your Honor, I'll try not to be too long with this. It's been a long day. I think the -- I would submit the proof as to Eva Zastrow as to any involvement with either Ms. Ashby or Ms. Flowers on the second floor has been extinguished. I think I told you when I stood up here this morning that there wasn't going to be any testimony of any interaction between those two ladies and Ms. Zastrow. And I think the proof now is clear from the videotape evidence that that is, in fact, what happened.

That is, of course, the indictment against Ms. Zastrow is she interfered with either Ms. Flowers or Ms. Ashby on the morning of March 5. So we have to move, I suppose, because it's now the government's argument is that Ms. Zastrow was intending to interfere with employees coming in and out of this clinic because she

was up there for some two to three hours standing -- as I told Your Honor before, standing or squatting against that wall of the clinic.

And interfere with -- and I'm just reading from the government's trial brief. The term "interfere with" means to restrict a person's freedom of movement. And, of course, Exhibit 16 talks about that officer bringing that lady up to the door and the conversation that he had. Of course, as Mr. Heroux has pointed out, that officer never attempted to go into the clinic. I'm not sure he even knew that that was the clinic because he just seemed confused, but nevertheless he didn't ask to go in. Certainly no one was attempting to come out.

So, you know, where's the proof by the government that Ms. Zastrow intentionally interfered with anyone going in and out of that door? Is it just simply the group up there?

I think back last Thursday I had to walk from my office up to the courthouse to pick up the government's exhibits, coming up Church Street from Third Avenue. Pick up the exhibits, I walk back down Church Street. Now I'm on the north side on the library side. And as I approach Fifth Avenue, you can look across right there at the base of the Presbyterian Church. And I'm standing there at the street corner, and there was about

12 guys standing there on the street corner. And, you know, it's a typical Friday or Thursday afternoon in Nashville where people are out. And you could tell these guys were just basically blocking the sidewalk. And they were milling around looking for something. And so I stood there, and I'm thinking, "well, do I go across the street? Are they going to move? Or do I walk across Church Street and on down to where my office is?"

Now, if I'd chosen to walk across Church Street, from this day forward I would tell everybody, those guys interfered with me. They kept me from walking across that street. What I did was walk across Fifth Avenue. When I got to them, they just began to part. They moved out of my way, except for one guy who had his back to me. And I walked up to him, I said, "excuse me," and he looked and he moved. And I walked on to my office. They did not interfere with me, although I looked across and they were going to.

And I say that because I think that's what we have here. That officer walked up to this group -- and what the government is trying to make the Court believe that that officer walked up to this group, and because that group is there and they're singing and praying and whatnot, is that they're not going to move. But we don't have any proof of that.

And my whole point is: If he would have just asked, then we would have known. We would know that. Because Caroline Davis said, "yes, Eva Zastrow said I'm there to block the door," but she also testified, you could change your mind. And maybe she would have if that police officer would have asked that.

And so there is a lack of proof here on a conviction for this act. Maybe criminal trespass and it's just, you know, guilty per se, but not this act with what the government has got to prove. And I would respectfully ask the Court to find Ms. Zastrow not guilty. Thank you.

THE COURT: Thank you, Mr. Cooper.

DEFENDANT JAMES ZASTROW CLOSING ARGUMENT

MR. McGOWAN: There's not a lot left for me to cover, and I'm not going to attempt to re-cover it, but I would like to expand on what my colleague just said.

What proof do we actually have before this Court? Of course, the Court ruled that these statements by co-conspirators could come in. But do those statements rise to the level of beyond a reasonable doubt to show what this Court has to determine is whether -- simply whether Mr. James Zastrow interfered with -- intentionally interfered with Patient A or the employee

or employees.

And what do we have? We have -- what does the government rely on, more importantly? They rely on what Caroline Davis said about her knowledge of rescues and blockades. And I would submit that this Court can evaluate her credibility and her bias of -- in her testimony. She was unwilling to admit that anyone there was there for a legitimate purpose. She said -- the government argued that she was a part of -- that all these defendants were a part of an agreement and that they set out goals.

So let's take a look at what that -- what the agreement that she says that they had, and that was to blockade or obstruct or interfere -- interfere with patients seeking services there that day. She said that an example of that is them setting in the doorway. She -- the first patient, Ms. Ashby, she obviously -- the defendants in that were not doing what she thought that they were supposed to be doing.

So she has changed her definition of a blockade of a door to a blockade of a hallway. And I think it speaks volumes when you look at what she says that the intent of Mr. Zastrow was and what he is actually doing in the photograph in Exhibit 4A.

He's standing -- true enough, there's a --

what appears to be people along the wall and some people standing in what people have referred to as a horseshoe. Is that what is going on in that picture? Are we accepting what Caroline Davis, who wasn't even on the floor, who doesn't even describe the blockade in that manner? Are we saying that, well, that was their way of blockading, they deviated from the plan. They were supposed to come out and get in front of the door, and yet this is how it really happened.

Is she -- are we accepting her -- her testimony as to what was in the mind of James Zastrow, what he was doing there? Because what he was doing wasn't what she expected him to be doing if there was a plan.

So this Court's going to have to look at that Exhibit 4A and see if that's what -- do you feel like -- objectively view that exhibit. Do you feel like James Zastrow was blocking anybody? I think it's just -- just as reasonable that picture was taken, a still frame shot was taken, just right after -- right after there was an encounter that -- between Ms. Ashby and the employee and two female workers.

And couldn't it be that people were along the hallways, and you see this horseshoe, you see this very clear path, one big enough for that officer who was

a great big gentleman came down that path later, a big path there. Could it be that people were looking down the hallway to see what was going on with this mom, with this interaction between obviously an overbearing -- I don't want to say aggressive, but maybe an overbearing and definitely-not-afraid employee?

They're looking -- what they're doing, they're not blocking. And certainly my client who's standing right up there -- they're all looking up the hallway to see what's going on. That doesn't rise to the level of interfering with this -- this patient.

And it certainly isn't the description of the plan or their agreement that Caroline Davis gave this Court as to how this was supposed to be handled and who was supposed to do what. So James Zastrow, in an encounter with Patient A and the employee, he was never in front of the door. He was never standing in the path of anyone. And he certainly wasn't in front of the employee door.

I think it's Exhibit 4C. There was an older gentleman there. And there's a -- what appears to be a juvenile in a blue jacket there who's not necessarily even in front of the door. But he is not standing there. In fact, the videos up to that point will not show him even sitting at the door.

So Caroline Davis does not know what she's talking about. But that's not necessarily surprising because she told this Court that she doesn't even know whether -- and doesn't recall him ever being at any of these strategy meetings. That's the first time I'd heard that term "strategy meeting" in closing, but there's no evidence that Mr. Zastrow was there. James Zastrow.

And there's no evidence that they discussed what his intent was. She said to this Court that she assumed that he was an intelligent person and that he knew -- he assumed that because he was sitting at the door -- and I say sitting at the door after these other encounters, sitting at the door, that he -- she assumed that he was there to block the door.

But she also testified that some people who would sit at the door could very well have been blowfish who had no intention of doing anything and -- or being arrested and that there were blowfish along the hallways. And I thought that she testified that everyone there at some point in time was either a blowfish or was seeking to block access.

I just felt that that -- I just felt like that was not true and candid testimony, because there were great many people, a great many people there that was preaching the gospel, preaching a different way,

preaching alternative to the decision that they felt like that these women were making. And I say women, we don't know what decisions -- what the other woman was there for.

But, again, it never came to the point where Mr. Zastrow was asked to move, and I completely -- I completely agree with my argument of co-counsel, and I just wanted to reiterate, it has nothing to do with -- willing to be arrested has nothing to do with an affirmation or confirmation that he was intending to block anything.

In fact, even the Mt. Juliet Police Department stated that "if you don't leave, then you will be arrested." It doesn't -- nothing was said. And there's a lot of statements, there's a lot of things that I feel like Caroline Davis -- you cannot attribute much emphasis and you can't just sum up, "well, the group was -- the group did this this way and the group does things this way and this was the agreement we had" when she doesn't even know and didn't even really recognize who it was that was sitting beside her.

She wants this Court to make the quantum leap that he is -- he is doing what she was doing. Again, she wasn't for sure she was going to continue to do it. All these people are praying, they're all

singing, they're all doing different things. But what you don't see is James Zastrow block that employee door or block -- or block the door for Patient A. You don't see that. I guess he could make the argument that -- like Mr. Cooper said, we'll never know. You could make that argument that he might have -- might have blocked it with the lady that came down with the police officer, but it never came to that point because he was -- he was -- he wasn't told to stand up, get out of the way, pushed aside. It never came to that point.

I just -- I'll also point out that it wasn't that Ms. Ashby didn't leave. I know what she testified to. I know she felt uncomfortable. She kept using that word uncomfortable. I can't imagine that that's -- seeing a crowd of people is what made her feel uncomfortable. I'm sure that there are other things that were on her mind that day that this Court can recognize the circumstances for even why she was there should have made her feel uncomfortable.

But I just -- I would -- I would submit to this Court that the government's theory -- argument relied heavily on Caroline Davis as to what my client's frame of mind is, what his intent was and never even having met him, never planned anything with him, and -- and inconsistently identified -- inconsistently stated

the plan and actions that weren't -- his actions in that first -- in that first setting had nothing to do with the way that she expected the way things would be handled if he were going to block somebody. Thank you, Judge.

THE COURT: Thank you.

GOVERNMENT REBUTTAL CLOSING ARGUMENT

MR. BOYNTON: Your Honor, I'd like to start off by addressing head on some of the arguments that were made that deal with, I think, statements that are inconsistent with the law that Judge Trauger applied in the case.

I don't cite the law that Judge Trauger used in the January trial to say that Your Honor should be boxed in on it. I cite it to say that I think it is an accurate representation of the controlling law in this circuit of what constitutes a violation of the FACE Act and how certain terms are defined, such as attempt, such as interference, such as engaging in physical obstruction itself, aiding and abetting.

The idea that defense counsel has put forward that you need to be somehow specifically trying to block one particular person is just not consistent with the law. Intentionality in the statute is "absence of mistake or accident." There's intentional interference here. It's not just about what happened on

the floor before 8 o'clock. It's about what continued to happen, what built during the course of the day.

The defense has asked you, Your Honor, to consider the early disorganization in the infant minutes of this blockade and ask you to find that that's somehow exculpatory of the overall effort by these four defendants to blockade the entrance of that clinic for over two hours. It's not.

Once the blockade began, Patient A, Employee A, they could not return. It was both of their testimony that they were able to return after the hallway was cleared. Your Honor knows how the hallway was cleared; it was cleared by arrest.

I just wanted to clarify the idea that -- raising your hand and what that means and risking arrest. It's not that the government is sitting here arguing that they raised their hand saying I'm guilty of a FACE Act violation. Not at all. The reason that testimony is important, the reason the evidence of that is important is that it highlights the commitment of these four defendants to stick it out to the end.

If you are not there to prevent patients from accessing and providers from providing reproductive health services, why are you in front of that door? Why are you there for over two hours? And why are you there

until you have to be arrested by the police and charged with trespass? No one's going to submit to an arrest for trespass and get that on their criminal history if they're there because they wanted to, I don't know, use the bathroom for two hours. That's not what happened here. What happened here was these defendants and others occupied that hallway. They rendered it impassable.

I think that leads to a few of the statements of law made during the defense closings that are inconsistent with what the law actually is. There's no requirement in the law, there's no requirement in case law or in the statute as passed by Congress or anywhere in these jury instructions, that a patient or an employee approach the people sitting in front of the door and politely ask them to move. Or say, "hey, may I get through here?" There's nothing about it.

The definition of physical obstruction, as Ms. Klopf previously cited, "rendering the passage to or from a facility unreasonably difficult or" -- it doesn't even say impossible. It doesn't say impossible. But there is testimony here, there's evidence here in the video, in Ms. Davis's testimony, from Ms. Flowers, from Ms. Ashby that, indeed, the entrance was impassable that day. And the reason why specifically the patient entrance was impassable was because of these four

defendants. Clearly others were involved, but at issue here is these four defendants.

If the Court were to adopt, I think, some of the arguments that defense counsel makes, it would lead to the idea that, if you put on a blindfold and headphones and you couldn't see or you couldn't hear, you could just sit in front of a clinic door all day and you could never be culpable under Section 248 because you didn't see anything, you didn't hear anything, even if there was evidence that someone asked you to move, "please move, please move, please move."

Well, we don't have evidence that they heard it, so, you know, how does that show that their intentionality is there to blockade that door? As Your Honor knows, it's in these instructions. It's in the instructions we cited in the trial brief, the -- the idea that -- I apologize, Your Honor. Lost my train of thought.

The idea that the interference has to be -- has to have occurred just at a specific moment is just not consistent with that. Another implication of that interpretation would be that you could nail a 2x4 to the entrance of a reproductive health clinic and walk away and somehow you haven't violated the law.

And I think more appropriate here for these

four defendants, particularly for the two defendants who arrived on the hallway after Patient A and Employee A have left, you know, let's say hypothetical Defendant A nails the 2x4 up to the door, walks away, and patients, employees, they can't get in because of that 2x4. That passage is rendered physically inaccessible. And then if another defendant comes in later and adds a couple nails when no one else is present, they're still reinforcing that blockade.

And that's exactly what these four defendants did here. They enforced it with their bodies. They sat there for over two hours. They had to be removed by the police.

Intent, as Your Honor knows, can be inferred from the surrounding circumstances. That's one of the legal instructions on intentional interference that Judge Trauger issued to the jury back in the January trial. And it's defined as "any statement made or acts done or omitted by the defendant and all other facts and circumstances received in evidence that indicate the defendant's intent or knowledge."

Absolutely, I agree with defense counsel. Absolutely impossible to get inside these defendants' mind. All Ms. Davis could testify to was her own intent at that time. But it's not just Ms. Davis's testimony.

It's the video. It's -- it is the -- the refusal to leave, repeatedly refusal to leave in the face of statements by their co-conspirator. "You're going to be arrested soon" and they refused to leave. This all shows intentionality. This all shows that this was not a mistake; this was not an accident; and this was a planned effort by these four defendants and others to sit in front of this clinic door for as long as possible.

There's been some reference to distances and, like, how close you have to be to the door. I don't see that in the legal instruction anywhere. I don't see how that's relevant, given the definition of rendering a passage to or from a facility unreasonably difficult or hazardous.

If you -- if you surrounded the pavilion -- the Providence Pavilion with a human blockade and deprived access and it was focused on the carafem clinic, obviously it would have incidental impact on all the other medical facilities there, but that's very far from the door to the carafem clinic.

It's still a blockade of that clinic. It's still a violation of 248. Just because it happens outside the doors to the pavilion doesn't make it any less of a violation of federal law for folks to be there blockading that entrance to the pavilion.

So where somebody like Mr. Zastrow was in the hallway when Ms. Flowers is there when Ms. Ashby is there, is not relevant to the Court's consideration as to whether the violation occurred. Again, it's continuing the blockade. This was a single blockade that started before 8:00 a.m. that day on March 5 and continued on for over two hours.

Your Honor, there have been references to kind of the constitutionally protected activity that was going on that day. And it is absolutely the case that there was constitutionally protected activity occurring in and around the Providence Pavilion and the carafem clinic that day.

The defendants are not on trial in any way for their beliefs, not at all. They are beliefs that are held by so many Americans in this country. There are beliefs that have led to changes in courthouses and statehouses around our nation through lawful means. The defendants are on trial for their actions that day, for their violations of federal law that involved their intentional blockading, their intentional interference with the provision and receipt of reproductive health services that lasted for over two hours.

Your Honor, I would like to take any time Your Honor would like to address any questions that

Your Honor has. If there's anything that you would like me to address, I'd be happy to, but otherwise I'm happy to respect your time.

THE COURT: I don't have any questions.

MR. BOYNTON: All right. Thank you, Your Honor.

THE COURT: Thank you very much.

I'm going to take a recess. It's pretty late in the evening. But I think what I'd like to have happen is for the lawyers to stay around. Since it's after hours, people can stay, but you need to stay on this floor because I think we may have some security issues in terms of people being able to be all throughout the building. So I need any spectators who intend to stay to stay on this floor.

And I suppose if anyone needs to leave, the court security and the marshals will help make arrangements to get them down and out if you choose to leave, but you're welcome to stay. And then I will -- I'll get word back to you when I'm ready to make a decision in the matter or to adjourn for the evening.

So if you-all -- the lawyers would stay close by and make sure that Ms. Morrissey knows how to get in touch with you if we need to, I'll return as soon as I can. Thank you.

(Whereupon, a break was taken from 6:37 p.m. to 7:08 p.m.)

THE COURT: All right. We're back on the record. The Court's heard the proof in this matter, and I've considered the evidence that's been presented as well as the arguments of counsel in this case. I've also considered the evidence in light of the applicable case law with regard to the elements of the charges in this matter and other legal standards that the parties have previously provided the Court and are generally in agreement upon.

Based upon all the foregoing, with respect to Count Two of the indictment, which charges each of the defendants with violating 18 United States Code Sections 248(a)(1) and 2, the Freedom of Access to Clinic Entrances, FACE Act, and for violating the FACE Act either personally or as an aider and abettor under Title 18 United States Code Section 2, with respect to Count Two of the indictment, I find as follows:

With respect to defendant Paul Place, guilty; with respect to Eva Edl, guilty; with respect to defendant Eva Zastrow, guilty; and with respect to defendant James Zastrow, I find the defendant guilty.

The Court has considered all these matters. I want to thank the lawyers for your efforts. We had a

status conference previously in this matter where we discussed bifurcating any sentencing. Normally the Court would move directly to sentencing in petty offense matters, but based upon our previous conversations and in light of the fact that the codefendants who were previously convicted in the other trial before Judge Trauger are awaiting sentencing in July, I would propose that we set the sentencings in this matter for either July the 30th or August the 1st or 2nd subject to the parties' availability and agreement.

Does the government have a preference?

MS. KLOPF: I'm sorry, Your Honor.

THE COURT: That's fine. You-all can consult.

(Pause in proceedings.)

MS. KLOPF: I'm so sorry, Your Honor, both my co-counsel will be out of town that day. Could we do it the next week in August?

THE COURT: I think we're back on duty that week. What's the next week, the 12th? How about the week of the 12th of August?

MR. COOPER: Your Honor, Ms. Zastrow just reminded me that she starts the Michigan trial on August the 6th, which I think impacts some or -- some folks in here.

THE COURT: Okay, thank you, Mr. Cooper. What do you think about the week of the 12th in terms of availability for that? And I guess -- I could also ask --

MR. COOPER: I don't know if the trial in Michigan would be over. I don't know how long it's going to take. They've got several defendants, I think.

THE COURT: Right. Again, I'm going to -- I'll certainly hear from counsel at sentencing and allow for allocution. The main reason, as we discussed before, was to avoid any potential disparity at sentencing.

But, Ms. Klopf, is there any possibility that you may be able to proceed with sentencing without your co-counsel?

MS. KLOPF: Certainly. It sounds like Mr. Boynton would be available on July 30 if that works for everybody.

THE COURT: What about that date for the defense? Mr. McGowan, it looks like you're anxious to stand up.

MR. McGOWAN: I'll make it happen.

MR. COOPER: Yes, sir, that should be fine.

MR. LUCAS: On July 30, I'm pretty sure I'll be in Greensboro. My kids generally run in the Junior Olympics. I've got one that I'm pretty sure she's

going to be there.

THE COURT: Maybe what we could do is we could set them all on the 30th. And if we need to make other arrangements, you know, if -- Mr. Heroux, are you available the 30th?

MR. HEROUX: Your Honor, I would be, but the difficulty is for my client to travel to here and then to Michigan for the matter. That -- that would be very difficult for her to make that travel. I would ask that we somehow set this with more time between the Michigan trial and the need to be there with counsel there and our sentencing date if that's possible.

THE COURT: So you're asking to do something after the Michigan trial?

MR. HEROUX: Well, no.

THE COURT: Tell me what you're looking at.

MR. HEROUX: I'm sorry. The 30th is -- my client's concern is the 30th is too close to the Michigan trial. Could we do it earlier than the 30th if there's any availability? And if there's no availability --

THE COURT: We're not available earlier, between the 2nd and the 30th.

MR. HEROUX: Let me have a moment.

THE COURT: Sure, thank you.

MR. HEROUX: The 30th -- I apologize. My

client will make the 30th work.

THE COURT: Okay. Why don't we do this: We'll set everything for 9 o'clock on July the 30th. We will probably be in my courtroom, 5B, for sentencing.

And then if we need to deal with any conflict, Mr. Lucas, that you might have, we'll address that at a later date. And you can certainly let the Court know, let opposing counsel know as well, and we'll address those issues as we need to.

All right. Very well. That's what we'll do. Thank you all very much.

Is there anything further from the government's standpoint that we need to do today?

MS. KLOPF: No, Your Honor. Thank you.

THE COURT: All right. Mr. Lucas, for your client?

MR. LUCAS: No, Your Honor.

THE COURT: Mr. Heroux?

MR. HEROUX: No, Your Honor.

THE COURT: Mr. Cooper?

MR. COOPER: No, sir.

THE COURT: And Mr. McGowan?

MR. McGOWAN: No, sir.

THE COURT: Appreciate everybody's work today. Thank you.

(Whereupon, at 7:14 p.m. these were all of the proceedings had in the above-captioned cause on the above-captioned date.)

**REPORTER'S CERTIFICATE PAGE**

I, Roxann Harkins, Official Court Reporter for the United States District Court for the Middle District of Tennessee, in Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on April 2, 2024, in the matter of UNITED STATES OF AMERICA v. EVA EDL, ET AL, Case No. 3:22-cr-327; that said proceedings were reduced to typewritten form by me; and that the foregoing transcript is a true and accurate transcript of said proceedings.

This is the 14th day of October, 2024.

s/ Roxann Harkins____
ROXANN HARKINS, RPR, CRR
Official Court Reporter