IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. |
| v. | ) | 3:22-cr-00327 |
| EVA ZASTROW (9), JAMES ZASTROW (10), PAUL PLACE (11), | ) | JEFFERY S. FRENSLEY MAGISTRATE JUDGE |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE THE HONORABLE

JEFFERY S. FRENSLEY, MAGISTRATE JUDGE

TRANSCRIPT OF PROCEEDINGS

July 30, 2024

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

(APPEARANCES ON THE FOLLOWING PAGE)

PREPARED BY:

LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
lise_matthews@tnmd.uscourts.gov

APPEARANCES:

For the Plaintiff: Ms. Nani Gilkerson
U.S. Attorney's Office
719 Church Street, Suite 3300
Nashville, Tennessee 37203

For the Defendant JAMES ZASTROW (9): Mr. Rayburn McGowan, Jr.
Attorney at Law
8005 Church Street, Suite 219
Brentwood, Tennessee 37027

For the Defendant EVA ZASTROW (10): Mr. David L. Cooper
Law Office of David L. Cooper, P.C.
208 Third Avenue, N, Suite 300
Nashville, Tennessee 37201

For the Defendant PAUL PLACE (11): Leonard E. Lucas, III
The Law Firm of Leonard Earl Lucas
315 Deaderick St
Suite 1550
Nashville, Tennessee 37238

The above-styled cause came on to be heard on July 30, 2024, before the Honorable Jeffrey S. Frensley, Magistrate Judge, when the following proceedings were had, to-wit:

THE COURT: Thank you. You can be seated.

Good morning, everyone. Welcome.

We are here this morning in the matter of the United States of America versus James Zastrow, Eva Zastrow and Paul Place. It's Case Number 3:22-327. The defendants are all present here in court with their attorneys this morning. For Mr. Zastrow we have Mr. McGowan; for Ms. Zastrow, Mr. Cooper; and Mr. Lucas is here for Mr. Place. Ms. Gilkerson is here for the United States.

We had set the matter today for a sentencing hearing after the trial in this matter earlier this year. And the parties have filed a number of documents. Each of the parties and the government have filed sentencing memorandum. There also have been a number of letters of support that have been filed by the defendants individually, and some collective letters, as well.

The Court's reviewed the sentencing memorandum, as well as each of the letters that have been filed with the Court. The Court's also reviewed the victim impact statements that were read into evidence in sentencing hearings of certain of the co-defendants in this case. I've

also reviewed portions of the sentencing documents and sentencing transcripts of co-defendants in this case.

My intention this morning is to hear from the lawyers with regard to any matters that you all wish to address regarding the appropriate sentence in this case. I'll hear from the government first and then the defendants.

We'll take the defendants in order starting from -- with Mr. McGowan with Mr. Zastrow, Mr. Cooper with Ms. Zastrow and Mr. Lucas with Mr. Place.

The government can address each of the defendants collectively if you wish or if you want we can do those individually. I don't have a preference. I'll hear from you all in terms of what your preference is, if any.

I'll allow the defendants to allocute, to the extent that they wish to do so. And any statement that the defendants wish to state individually, I'll hear from them. My intention is to impose sentence at the same time with regard to each of the defendants, and I'll just identify that accordingly.

And so that's generally how I anticipate moving forward this morning. I'll hear from the parties. First of all, if there are any announcements or if you have any objection or any statements with regard to the manner in which I intend to proceed, or any preferences otherwise, as well.

Ms. Gilkerson, I'll hear from the government first.

MS. GILKERSON: Good morning, Your Honor.

THE COURT: Good morning.

MS. GILKERSON: I think for efficiency sake we're happy to address the defendants collectively. I think many of our arguments relate to all of them. And to the extent that we need to call out or -- or focus on a particular defendant we can do that. And I think that might be the most efficient way for us to proceed, Your Honor.

THE COURT: All right. Very good. Thank you.

Mr. McGowan, any preliminary matters or statements?

MR. MCGOWAN: Well, I do have one preliminary matter. I just wanted to note for the record and -- we -- I did fail to raise it in writing, but there -- the victim impact statements, we weren't there for that sentencing. I know that that was -- that was read into the record. So -- and I don't think that there was a written statement that could have been afforded us. But -- and I suspect I know probably what the statement says, but I haven't -- I don't know what that statement is. So I -- I just feel obligated to object to the Court's consideration of that when it comes to these defendants. And with that being said, I would -- I would just move forward with my argument at this -- for the

appropriate sentence.

THE COURT: Okay, Mr. McGowan. Thank you.

MR. MCGOWAN: All right.

THE COURT: All right. You can go ahead and have your seat unless there are any other matters you need to take up.

Mr. Cooper, anything for your client this morning preliminarily?

MR. COOPER: I'll join with Mr. McGowan, Your Honor. I haven't heard or read the victim impact statement either, so I don't know what it says. So I'll just join in that objection.

THE COURT: And, Mr. Lucas?

MR. LUCAS: Yes, Your Honor. I would join in the same objection. I don't know what it says and how to address it.

THE COURT: All right. Very good.

Ms. Gilkerson, I guess I'll ask, first of all, do you all have copies of those statements? They were referenced in your sentencing memorandum for each of the defendants. And I reviewed them by obtaining a copy of the transcript portion that involved that. So, first, do you have copies of those? Secondly, to the extent that the government wants me to rely upon it, it's been referenced in the sentencing memorandum, I have reviewed those statements,

and I have a copy. I could make a copy of those portions -- it's relatively short. Several pages of that transcript. I don't think it's an official transcript. But, you know, again, what we could do is we could take a recess, I could make copies and let them see them. But, you know, I don't -- I gather you don't have those -- those victims here. And if you want me to rely on them I think it's appropriate for them to at least see what I'm relying on.

MS. GILKERSON: I don't have any objection to you providing transcripts of those statements. One of the statements I think was based on a written statement. And I can't remember if they provided me a copy of that or not. I don't have it with me today if they did. It was just a courtesy copy of a statement that was read into the record. And for the other one, we don't -- there was no written statement. It was very brief, as I think Your Honor is aware.

THE COURT: Right.

MS. GILKERSON: Statement of one of the victims who came and sort of last minute decided to make a statement. And what we did, again for efficiency purposes, and I realize this is a different court and a different judge, but rather than repeat those statements on the record for each sentencing, we essentially asked the Court to sort of adopt those -- Judge Trauger to adopt those statements, given that

I think all the defense attorneys for the felony defendants were all present at each other's hearings in early July. But I have no objection to a short recess for them to review those statements. And I think, you know, they -- they could have requested those transcripts in advance, but I realize that, you know, we didn't raise that until we had filed our sentencing memos in this case, which may not have been adequate time for them to receive those copies anyway.

THE COURT: Okay. You know, given the nature of this case and the issues involved, I think that, number one, it's appropriate for the Court to consider victim impact. And I think that the government, you know, requested it. It was identified in the sentencing memorandum. Like Ms. Gilkerson says -- I know that there are a lot of moving parts to every case. And maybe it was something that defense counsel just overlooked in terms of requesting from the government. But I do think that it's appropriate that counsel have an opportunity to review those statements. Again, we're in a little bit different territory than pretty much everyone in this room are used to dealing with. These are petty offense cases. They're slightly different than our typical sentencing hearings in federal criminal matters. But, nonetheless, I think to the extent the government wants me to rely upon it, that I have reviewed them, it is appropriate for defense counsel to have access to those. As

I said, I've got the portions of the transcript. And I'll ask the government to read them, as well. As I said, I'm not sure if it's official or if it was just a -- it was just a draft transcript that I've got. So I would like for the government to review them to make sure there's not some issue that needs to be addressed that everybody needs to know about. So we're going to take just a short recess. I'll make copies and have those distributed to defense counsel. You can review those. As I said, it's really short. And like Mr. McGowan said, I don't think you're going to find anything surprising in those statements, but I do think it's appropriate for you to have them. So we'll take a recess, let you see those, and then we'll come back and continue at that point.

Thank you.

(Recess.)

THE COURT: Thank you. You can be seated.

All right. We're back on the record after a short recess. The Court provided defense counsel and the government with copies of the draft transcript of the victim impact statements in this case.

Ms. Gilkerson, was the government able to review the transcripts and is there any significant or substantial modification required to what was provided to the parties?

MS. GILKERSON: Yes, we were able to review them.

I did not see any inaccuracies in those draft transcripts. I think they adequately and accurately reflect the statements that were provided in front of Judge Trauger.

THE COURT: All right. Very good. Thank you.

Mr. McGowan, you received a copy of the -- of the statements. Did you have a chance to review those with your client?

MR. MCGOWAN: Yes, sir, I have.

THE COURT: All right. Mr. Cooper?

MR. COOPER: Yes, Your Honor, I have.

THE COURT: And Mr. Lucas?

MR. LUCAS: Yes, Your Honor.

THE COURT: Okay. Very good. Any preliminary matters before we begin?

MR. COOPER: No, sir.

MR. MCGOWAN: No, sir.

THE COURT: All right. Very good.

Ms. Gilkerson, I'll hear from the government.

MS. GILKERSON: Good morning, Your Honor.

THE COURT: Good morning.

MS. GILKERSON: I will be brief today because I think we addressed all of the 3553(a) factors in our sentencing submissions. But I did want to address and focus today on a couple of those factors in response to some of the arguments that were made in defendants' sentencing

submissions in front of Your Honor.

I wanted to focus on in particular three of the 3553(a) factors that this Court is required to consider in imposing a sentence that is sufficient but not greater than necessary to promote the goals of sentencing. And those are the nature of the offense conduct, the need for deterrence, both general and specific, and the desire to avoid unwarranted sentencing disparities in this case and across these types of cases across the country.

Turning first to the nature of the offense. I think it is easy, particularly when reading the defendants' sentencing memorandum, to dismiss the seriousness of the offense conduct here and to sort of construe it as a nonviolent protest or other sort of expression of beliefs. But that is not what this was. This was a knowing, intentional violation of federal law. These defendants used their bodies to physically block access to this particular clinic in Mt. Juliet. They trapped employees inside, as chronicled in the victim impact statement by carafem, and they prohibited patients from entering the clinic and receiving necessary care.

This is not a victimless crime. We have one patient who testified at trial, and she also provided a statement at Calvin Zastrow's sentencing where she talked to the judge about how she felt about how scared she was, about

how she felt belittled as a woman coming into that clinic to receive necessary care, and that she would not want her own daughters to have to go through that experience. And as Judge Trauger repeated during sentencing hearings, defendants' religious fervor allowed them to ignore the humanity of the people they were purportedly trying to help.

As to the need for deterrence in this case, I think the theme repeated throughout these sentencings thus far is the complete lack of remorse. There are lawful means to protest abortion, to express one's beliefs. This was not a lawful means of doing that. Defendants knew they were violating the law. They ignored repeated warnings to leave before ultimately being arrested hours later. Many of the defendants in this place, including one of the defendants here before Your Honor, Eva Zastrow, travels around the country engaging in illegal blockades of reproductive health clinics, and this is not her only pending charge. Some of the defendants in this case have been arrested multiple times. Others have been convicted of trespass and other misdemeanors for essentially the same conduct. This has not stopped them from continuing to break the law.

There must be consequences for breaking the law, not only to send a clear message to these defendants, but to send a message to others across the country there are lawful means of expressing one's beliefs, of making those views

known, of challenging laws they don't agree with; violating those laws is not one of them.

Now, the government is particular mindful here of not wanting to create unwarranted sentencings disparities in this case. Very mindful of the sentences that were imposed against some of the felony defendants in this case and the need to take into account the relative responsibility and culpability of all the defendants charged and convicted in this case. And that is our main reason for recommending noncustodial sentences for these defendants in this case. But we are also mindful of the sentence of probation received by Caroline Davis who testified at both of the trials, and that is why we are recommending a period of court supervision with conditions, including those similar to the ones imposed by Judge Trauger for the felony defendants, although for shorter periods of time, to reflect this is a misdemeanor conviction rather than a felony conviction. And that includes a home -- a period of home detention. And we would also request that as a condition of probation in this case a condition of supervision that there be a prohibition for not being near, entering any building or facility that provides reproductive health services. This was a condition of most of the defendants release -- pretrial release in this case, and it was also a condition imposed by Judge Trauger for all of the felony defendants who have thus far been sentenced,

to, again, provide an additional level of deterrence for a period of time on supervision, to ensure that defendants don't violate this law again and engage in similar behavior. And we think that is very important in this case, that there be some period of supervision that has those conditions, so that if there is a violation that we have the ability to come back in front of Your Honor to address that violation. And so with that said, we are -- we submit that time served as requested by the defendants is insufficient to accomplish the goals of sentencing in this case, and we would recommend three years of probation with conditions, with those first four months on home detention, to reflect the seriousness of the offense, to provide adequate deterrence, and to avoid unwarranted sentencing disparities.

Thank you, Your Honor.

THE COURT: Thank you, Ms. Gilkerson.

Mr. McGowan, I'll hear from you first.

MR. MCGOWAN: Good morning, Your Honor.

The -- I had prepared a little bit differently for this sentencing hearing. So I think what I want to say is maybe a little bit different. So I'll begin with this. The seriousness of the offense. What are we here for? It's a bench trial. It's a conviction for a Class B Misdemeanor. The most time that they could -- the most time that they are looking at is six months in jail. Of course, the government

argues that this is a serious offense. They offer a victim statement from someone who did not testify at our trial, and I don't think they testified at the other trial, from a clinical worker that was inside the clinic. The -- the content of the letter -- and I'll just summarize it in general. The content of the statement argues that they were so terrorized that they were making threats -- that they were so terrorized that they were considering possibly breaking windows and jumping out from the second floor; that they were locked in.

This -- the evidence this Court heard at trial from Ms. Ashby, nonetheless, said that she was never threatened. The Court saw videotape for the most part of the exact actions of all four of these defendants -- or all three of them that are here today, the four that went to trial.

Mr. Zastrow was located in various parts. He didn't ambush anyone. He didn't -- he didn't -- it's clearly not his intent to lock these people in and keep these people from leaving. And, in fact, one of the -- one of the workers at the clinic entered, then exited. She was allowed to leave. That -- that wasn't what they were doing. They weren't threatening anyone. They weren't -- they weren't -- well, Mr. Zastrow, he never even spoke to anyone. He didn't -- he didn't speak to anyone, a clinical worker or a patient at the clinic. The only thing that he did, the only

thing you're going to see in that video, was him singing hymns and sitting on the floor.

And so I think -- I'll go back to how I was going to prepare and what I wanted to say. And I think we're here -- one of the things the Court will consider at sentencing is -- is the impact -- the need to promote respect for the law and -- and protect the public. Well, I can tell you that this -- we're on exact opposite ends when it comes to Mr. Zastrow of a need to protect the public.

I'm not sure that I have -- I'm sure I've never had someone stand beside me today, a defendant in this situation, who has -- is of the moral character. So what I -- my intent today, my object today, is to get you to see this young man's heart. Because the government hasn't seen his heart. The government thinks he was there for malicious purposes, that he was there to humiliate somebody, that he was there to scare somebody, terrorize somebody. That word terrorize is used five or six times in what I consider a very self-serving victim impact statement. He wasn't there for any of that. He was -- he was there in a belief that he can effect change, that -- that it is -- that it is wrong to kill -- kill a person. And he considers the unborn innocent, and it's his obligation to protect the innocent. And he did that because that's -- that's what he believes. He did not do that out of disrespect for the law. He did not do that

for monetary gain. He did not do that -- he did not even do that for the praises of men. He did that because that is what he believes. And he did it in a way completely opposite of what's being argued today. He -- they haven't even shown that he even knew that there was anyone else in the clinic other than the lady that walked in the door the first time. They can't even tell us when he arrived. There was no evidence that -- from Caroline Davis, that -- that he was there at any of those earlier meetings. He's obviously not someone who has a high level of any kind of culpability or leadership role in trying to orchestrate this. And to the contrary, he's not charged in any other jurisdiction for -- for this type of activity. His -- his family was there, yes, in different -- different regards, different aspects. But the reason why he was there was -- was out of love for his fellow man. And I think it would be improper to think that for -- for -- for the Court to reach the conclusion that he doesn't help -- help his neighbor, he doesn't -- he's -- he was there trying to help his neighbor that -- he does so many things from the letters -- from the letters that you see. He's not there to terrorize anyone or -- or -- his whole belief system is charitable works, to be a Christian. You know, the fruit -- the fruit that he wants people -- the fruits and laborers that he does is out of Christian love, and -- and it is not for his own benefit or glory whatsoever.

It's to glorify God. And he -- he would like to say something. I don't know -- and -- and -- and in his -- just so that you'll know, in his belief system -- that's a very private thing. I haven't even discussed with him what he's about to say. But I know after working with him for the last several years he is true to his word. He's an honorable person. There's nothing that he's going to say that's going to be different from what his actions said that day. And that's what's so important I think for the Court to understand. That he can be trusted. He can be relied upon to always do the right thing. And it's unfortunate that -- that for whatever reason people can't see that. But it wouldn't be the first -- wouldn't be the first time that they can't see Christian love in action.

THE COURT: I'm going to hear from the -- from the defendants at the end before sentencing.

MR. MCGOWAN: Okay.

THE COURT: At this time I just want to hear from the lawyers first.

MR. MCGOWAN: Thank you.

THE COURT: Thank you, Mr. McGowan.

MR. COOPER: Good morning, Your Honor.

THE COURT: Good morning, Mr. Cooper.

MR. COOPER: Your Honor, it's hard to sum up such a complex issue in a lawsuit. I was just sitting over there

thinking about this. I mean, we have in this courtroom a group of people who have a deeply held religious and moral belief. Ms. Zastrow does, the other defendants. All the people in this courtroom, they have this deeply held religious and moral belief that just happens to differ with a federal law. And that's what brings us here. I mean, these people are all sincere in this belief. And it's unfortunate, but that's -- that's what brings us here today. And so, you know, Ms. Zastrow, after a very fair trial before Your Honor several months ago, she was found guilty. And I want to talk about some of the reasons why the Court should implement the sentence that I suggested. Maybe the Court when it thought I was suggesting time served with really no supervision, thinking, well, that's really not punishment. But I want to point out some stuff. Ms. Zastrow was arraigned in this Court back on October the 14th of 2022. So my calculation, she's been on supervision, pretrial release, but it's supervision, for about 21 months. And I don't think that there has been any misbehavior by Ms. Zastrow during that 21-month period. I don't think so. I hope -- I mean, that -- I'm sure if there has been the government will point that out when they want to come back up here.

She's been convicted of this Class B Misdemeanor and so that, you know, the sentence -- and, of course, the government's not asking for a term of incarceration. And I

think rightfully so. But I asked Ms. Zastrow a couple weeks ago -- I said, you know, I know that you have engaged in a lot of mission trips in your very young life. How about just writing them out for me. Because we talked about some of them. I mean, when she was first arrested in this case, I tried to get her passport back so she could go to Ukraine, a war torn country -- she wanted to go back there to help children and families in Ukraine after Russia had invaded that country. And, of course, Judge Holmes after considering it denied that. But I asked her, I said, well, point out some of the things that -- you know, some of these trips. And I've done that -- this is in Docket Entry 697-1. And I think the Court has read it, the email that she wrote to me outlining some of these places. And it just blows my mind that this young lady in her young age has done this, not to help herself, but to help others, and to glorify the God that she worships. Okay? That's why she has done this. And that's why she continues to want to do this. She wants the Court to give her her passport back so she can go out and provide help to others. I mean, what a wonderful idea, to go out and help others. In this country that we're so divisive in these days, she wants to go help others.

And so I asked her before court started today, I said how many times has your passport been stamped. Because I don't even own a passport. One of these days I'm going to

get one, but I don't even own a passport. She said, it's been stamped, Mr. Cooper, 50-plus times. I had to get some sort of extension for that. And so her -- her whole being is about helping others. She violated the law. She's been found guilty of that. And, oh, by the way, she's going to stand for trial next week or in a couple weeks in Michigan. The Court knows about that. And that will be taken care of in Michigan. What we're here about today is in Nashville, Tennessee, because of what she did, or did not do, in that hallway in Mt. Juliet. And honestly, Judge, she just stood there and held the wall up. She didn't say anything. She didn't make smirks. She didn't -- she just sang and held the wall up, is what she did. And it just seems to me that when you look at the behavior and the fact that she hasn't violated any terms of release in the last almost two years -- it will be two years in October. She spent a night in jail. And that's never fun. That -- just suspend her sentence on that -- on that 24 hours that she served; give her her passport back. I provided the Court with a copy of the order for Michigan where the Court in Michigan is okay with her -- and I think the other defendants having their passport back. And let her go and do some of this good work that she is wanting to do. And if something happens in the Michigan case and she's convicted and the judge there wants to revert back and take the passport away and put her on probation or put

her in the jail, that's another case. But for here, for what she has done in this case, and an appropriate amount of punishment for the Court to consider under 3553(a) and these factors, I'm just going to stand on what I have suggested to the Court and ask that the Court let that be a fair and appropriate sentence in this case.

Thank you.

THE COURT: Thank you, Mr. Cooper.

Mr. Lucas.

MR. LUCAS: Yes, Your Honor. Your Honor, I want to address the statement from carafem first because I think -- I think it's appropriate. And it goes along with the nature and circumstances of this particular case. Carafem is not just -- it would be easy if carafem was just a supplier of -- of reproductive services. They're not. They're also an advocate. They have -- if you go to carafem's website, they have an advocacy tool. And in that advocacy tool they say, Become a carafem bodily freedom fighter. And they say, The Supreme Court just ruled against what the majority of Americans believe in and decimated our longstanding federally protected right to abortion care. If you're as infuriated as we are, you know that now more than ever before is a time to talk about your support for abortion access. Join carafem in fighting for bodily freedom by doing any and all of the actions below. I'm not going read through

those. "Don't forget the carafem BFF # tag", and then it has a little button where you can donate now.

I bring that up because you have to look at that statement in context. First of all, we had testimony in this case. One of the things I did hear the government attorney say is -- they -- they quoted Judge Trauger, one of Judge Trauger's comments in the case, because it supported their theory of this case. But Judge Trauger also was very, very upset about the fact that some of what this carafem statement said after she had sat and listened to the defendants -- or listened to the witnesses and sit in the case, she thought this was overblown, and I do, too.

Terrorizing, wanting to jump out windows. We talked about this during our trial, that basically the manual -- the carafem manual said that they were supposed to stay in place. So why were they trying to jump -- why would they even be trying to jump out windows? They stated in this -- in this statement that the police arrived abruptly. So why were they so terrified? Nobody testified that they were harassed. Nobody testified that there was any physical violence. It's just -- that statement just seems overblown. And it goes along with how the nature and circumstances of this case are -- it's -- it's being fashioned and molded to suggest that these people were -- were on some sort of violent path. In fact, even carafem states in here again --

you have to take it into consideration what carafem is. They talk about that they were in a long line of extremists who have used intimidation, terror and violence against healthcare providers. That's not what happened here. This is a case where the defendants in this -- in this case were charged with what we call petty offenses, where the most that they could have been incarcerated were for six months. The government's not arguing for any type of custodial punishment. And they're not -- they haven't done anything to rise to the level of -- of sentencing them to custodial punishment.

What I would state to the Court is is that the nature and circumstances that we understand, they did violate a federal law. They understand it, too. I think that the nature and circumstances of this reflect, in some way -- what we want in some ways in this country, was if you're going to protest, if you're going to use civil disobedience, it should be in a way that doesn't call physical harm to people, doesn't harass people. You're still going to face some consequences. But what we don't want in this country, given the political climate that we have -- and make no mistake about it, reading carafem's website, the fact that this case was brought after the *Dobbs* decision, the case that -- a year after the actual incident took place, that we're talking about divisiveness in this country, and we need to tap it

down. And as Your Honor knows, I included it in our -- our memorandum that basically punishment -- punishment should be sufficient, but it also shouldn't be more than necessary. Because punishment that's more than necessary is counter-productive. In this particular case -- and my -- and my -- counsel for the co-defendants in this case have laid it out beautifully, that these are really good people. I've -- my client had 18 letters submitted on his behalf. Not from people that don't know him. People that live in Hickman County. People that he lives with, goes to church with, people that he services as -- as an electrician. Since this case has started my client's had -- he's gotten married and he's had a young child, as well. In fact, his -- his son's birthday is today.

What I will tell you is that -- my client is going to have a misdemeanor federal conviction on his record. That's -- that's not something that anybody should take lightly. He has basically been under some form of release for more than three years. I understand that about a year and-a-half of that was with the state -- was with the state, but that case was -- that case was dropped. Why was it dropped? Because they brought a federal case a year later. That case was ultimately dismissed. And that case was just trespass. So I -- our argument is for time served, not because -- not so that my client will not face any

consequences. He already has faced consequences. Our argument is time served without the home detention so he can continue to service his community.

And I do want to make one point about Ms. Caroline Davis. Ms. Caroline Davis was charged with a felony. She pled down to two misdemeanors. One would assume that that was the deal that she cut with the government in that she -- and primarily because she was charged with a felony and looking at more than a year in custody. Whereas my client, again, was charged with a petty offense. He has no prior criminal history other than what this case -- other than this particular case and the trespass that she was charged with, which is relevant conduct, which was dismissed. I think time served would be appropriate in this case.

Again, just really good person sitting there. The things he does for his community -- and I'll make -- I spoke to him yesterday, just in preparation for today. And one of the things he said to me was that -- and they do this every Monday. They go out on the square or out in the circle in Hickman County or in Centerville. And they basically do a sing along and minister to the public. And he said, Mr. Lucas, I'm going to pray for you. My father-in-law passed away last week. His funeral was on Sunday. He said, Mr. Lucas, I'm going to pray for you for that. He wasn't thinking about himself at that moment. He was -- he just

said I'm going to pray for you. These are good people. The fact that we're even looking at trying to give them any sort of custodial, whether it's home or away, seems -- seems to be overbearing in this particular case.

I would ask Your Honor to sentence him to time served so he can go out and do things which people -- to be quite honest, most people don't do who never see a courtroom. He's out there doing those things. And that's what we want.

That's all I have, Your Honor.

THE COURT: Thank you, Mr. Lucas.

Ms. Gilkerson, does the government have anything they want to add in rebuttal?

MS. GILKERSON: Just briefly, Your Honor. I would be remiss if I didn't address the attempts here today to diminish and invalidate the experience of the carafem workers who were impacted here. The point of being able to come in as a victim and make a statement on -- and in this case, it was the organization, but making a statement on behalf of the employees and their experience of what happened and from their perspective. They did not know what was inside these particular defendants' head, what their intentions were. All they knew was that they were trapped inside the clinic and that their patients were unable to get in. And they were not allowed back in once they left. They were left without any knowledge about what was going on, to speculate. And there

is a long history of using much more violent tactics, not just in the past, but more recently in other cases that have been charged in other districts. They did not know that. And so I just wanted to raise that for the Court, to protect the rights of the victims here to make statements on their behalf to bring their perspective to the experience that was a direct result of defendants' actions.

I don't think that anybody here is arguing that there was some malicious intent behind these actions or that there was anything other than sort of the sincerity of these beliefs driving these defendants' actions. But again, those beliefs had impact on real people, and those real people came and gave statements and testimony in front of the Court as to their experience. And I think that if Your Honor were to look at the transcript of the sentencing hearings in front of Judge Trauger, while she initially made some comments about the carafem statement to the effect that maybe it was exaggerated in terms of how some of the employees felt, later on during later sentencings, she actually went back and addressed the carafem statement again and said, well, actually we don't really know what their training was, we don't know what information they had about what was going on inside; I think I can understand why it is that they might have been thinking worst-case scenario.

So I would just draw Your Honor's attention to the

rest of the transcript where Judge Trauger I think went back and appropriately sort of reconsidered her position with respect to that statement. Again, in the context of all of the other factors. But I would be remiss if I didn't address these attempts to sort of invalidate the victims in this case who came forward and -- and explained to the Court how these actions impacted them.

Again, this is a country of laws. Everyone equal under those laws. It is -- nobody is arguing here that you cannot have strong beliefs and express those beliefs. But again, there have to be consequences for violating those laws.

Thank you.

THE COURT: Thank you, Ms. Gilkerson.

At this time I'll hear from the defendants, if they wish to make any statement to the Court.

Mr. McGowan, does your client wish to make a statement?

THE DEFENDANT J. ZASTROW: Good morning, Your Honor.

THE COURT: Good morning.

THE DEFENDANT J. ZASTROW: I would like to make a statement that it's not that I have a disregard for federal law, but more so a regard for a higher law, the law of God. When God commands to love your neighbor as yourself, I do

believe that preborn children are people that have just as many rights as their mothers, and, therefore, in loving my neighbor, as obeying a higher law than the law of this land even, the law of God, that's what led me to do my actions.

That's all I have. Thank you.

THE COURT: Thank you, Mr. Zastrow.

Mr. Cooper, would your client like to make a statement?

MR. COOPER: Yes, Your Honor, she would like to.

THE COURT: All right. Then step up.

THE DEFENDANT E. ZASTROW: Good morning --

THE COURT: Good morning.

THE DEFENDANT E. ZASTROW: -- Judge Frensley.

Thank you for the opportunity to speak. I really appreciate it. And I respect the position of authority that God has given you. I intend to not take more than just a few minutes.

As a Christian woman, the ambition of my life is to follow the two greatest commandments: To love the Lord your God with all your heart, mind, soul and strength, and to love your neighbor as yourself.

God personally identifies with the weak, the needy and the vulnerable, going so far to say in Matthew 25 what you do or don't do for them, he takes that personally and says that's what you do or you don't fail -- or you fail to

do for me.

My neighbors were in danger. Both children and their mothers. There was no intent of harm. There was no intent to terrorize anyone. My intentions were to be a channel of peace that day so that no one would be harmed and no one would be murdered.

In preparation for this sentencing, I wrote a poem. And as a brief means of introduction, as you're aware, my co-defendant's name is also Eva. I'm actually named after her. She survived a death camp shortly after World War II in Yugoslavia.

As the government was making their closing arguments at the trial, they pointed to our intentions and said Eva Edl made their intentions clear when she pointed behind her to the abortion clinic door and said, Officer, this is a death camp. And they also pointed to my culpability when they said and Eva Zastrow pushed the wheelchair.

> I pushed the wheelchair. I parked it in front of door. In that chair sat a woman whose earliest memories are the horrors of war. Hunted, captured, brutalized. She was shipped off to die, crammed into a cattle car at the whim of those who believed the lie, the lie that reigned in that day, a Danube Swabian is

worthless anyway. Denying and distorting the image of God, murder and bloodshed justified innocent lives ruined, destroyed. The devil's thirst for blood never satisfied.

I pushed that wheelchair, and I parked it in front of the door. And with Eva I wept, and with Eva I prayed that God would have mercy once more. Would he spare the lives scheduled for slaughter? Would he bless and save the sons and the daughters of a generation believing the lie of our day? You can do what you want. The unborn child is worthless anyway.

I pushed the wheelchair. I park parked it in front of the door. Lord have mercy. May this murder cease and your spirit bring peace to our nation once more. Tried and convicted before you I stand. Today -- the day to be sentenced is now at hand. Whatever you choose or finally decide, those children are valuable and precious in God's eyes. How could I regret or come and repent for simply loving my neighbors who are weak and innocent? I pray that no suffering or difficulty deter me from loving the very least of these.

That's all I have. Thank you.

THE COURT: Thank you, Ms. Zastrow.

Mr. Lucas?

THE DEFENDANT P. PLACE: Your Honor, thank you for the chance to speak today.

Your Honor, I stand before you today as a Christian, as a man, and as a citizen of the United States of America, one who loves this country and is proud to be an American, one who respects this country and its laws. This is a country that was founded on Christian values and on the word of God.

Your Honor, the Bible tells us that when righteousness rules, the people rejoice. It calls us to care for the downtrodden, the widows and the orphans. It tells us that children are a blessing from the Lord and are to be cherished.

Your Honor, I would like to share with the Court today a quotation regarding the beginning of our great country and what set it apart from the rest of the world when it was founded.

This is a quotation from Alexis de Tocqueville. He says, sought for greatness -- for the greatness and genius of America in her commodious harbors and her ample rivers, and it was not there; in her fertile fields and her forests, and it was not there; in her rich minds and vast world commerce, and it was not there; in her Democratic Congress and her matchless Constitution, and it was not there. Not

until I went into the churches of America and heard her pulpit flame with righteousness did I understand the secret of her genius and power. America is great because she is good, and if America ever ceases to be good, she will cease to be great.

Your Honor, I would like to close with a reading from Romans Chapter 13. Versus 1 through 3 reads, Let every soul be subject to the governing authorities, for there is no authority except from God, and the authorities that exist are appointed by God. Therefore, whoever resists the authority resists the ordinance of God, and those who resist will bring judgment on themselves. For rulers are not a terror to good works but to evil.

Your Honor, I would like to echo the words of my co-defendant, Jim Zastrow, when he said that everything that we did that day was out of love for our neighbor, out of love for the children that are -- that were being brought to that clinic. And, Your Honor, we submit to your authority today. Thank you.

THE COURT: Thank you, Mr. Place.

At the beginning I mentioned the materials that the Court had reviewed prior to the sentencing hearing. I realized I neglected to reference one material. And that is the -- again, while this is a petty offense case and typically does not require a presentence report being

prepared, I did ask probation to prepare an abbreviated presentence report. I believe the parties all received copies of those reports. And I've reviewed those reports and considered those, as well, in the materials that I've reviewed in preparation for the sentencing hearing today.

The Court's obligation is to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of the sentencing statues, taking into account the nature and circumstances of the offense, the history and characteristics of the defendant, and the other matters set forth in Section 3553(a) of Title 18 United States Code.

With regard to those issues, it is the Court's finding, as made at the trial, and I believe consistent with the findings that were made in the trials of the co-defendants and at sentencing by Judge Trauger, that the actions of the defendants in this case were in clear violation of the law.

The defendants have acknowledged and understand, and the Court believes understood at the time of these offenses that they were, in fact, violating federal law. The actions that they undertook on that occasion in terms of the live streaming of the event over the internet with the intended effect to train and encourage others to engage in similar type conduct is significant and also goes to the

issue of the nature and circumstances of the offense and the defendants knowledge of the law and the knowledge that they were violating the law on those occasions.

The Court's heard the testimony and arguments of counsel with regard to the nature of the Defendants' beliefs. And the Court has absolutely no doubt whatsoever that each of these defendants have sincere religious beliefs that informed and were motivating factors in their conduct on that occasion. But as Judge Trauger also noted, these individuals were, in fact, imposing their own beliefs on others who were engaging in conduct that was, in fact, protected by the law.

It's striking to me that the statements of the defendants and arguments of counsel and the proof at trial in this case show the genuine love, and I say that sincerely, genuine love that these individuals have in their hearts. But in some ways I can't help but wonder where that love was for the individuals who were coming to that facility that day whose purposes and intentions were actually unknown to any of us.

Facilities that provide reproductive healthcare are not only abortion providers. They are, in fact, reproductive healthcare services. There are many people in this country who don't have access to healthcare of any type, many individuals who find themselves with child who need to make sure that they're doing everything they can for the

benefit of that child and for their families, and they seek out the services of these facilities. And they do it not only for the purposes of obtaining services to terminate pregnancies, but also to facilitate the birthing process, as well. And there's no evidence in this record about the purposes of any of the potential clients of the facility, about any of the services that were intended to be provided to individuals on that occasion. But one thing that there is in this case is there is evidence -- and there are submissions through the victim statements about the impact of these Defendants' conduct on individuals. It is certainly true that on that occasion there was no violence. And that's reflected both in terms of the charge that was brought against these individuals, the charges that they were facing as a result of this and was evident through -- the ultimate conviction is relevant to the sentencing determination. But as the government points out, the harm to individuals who were exercising their rights to receive healthcare services seemed to be unknown or not considered at all by these defendants. And those concerns and fears are, indeed, real fears. They're not to be discounted, as Ms. Gilkerson points out.

These Defendants' intentions, their motivations, their ultimate actions were unknown to anybody who was coming to that facility for care services or any of the individuals

who were working at those facilities. And certainly while these individuals, in the Court's opinion had no intention to engage in any type of violent conduct or anything that would cause physical injury to any of the individuals who were either seeking care or providing care at those facilities, that was unknown to those individuals. And it's concerning to the Court that there's no acknowledgment of that, that these individuals with so much love for so many -- so many people, who express their love to other individuals through the many good acts that they engage in, seemed to have a blind spot for the real harm and real damage that was brought upon the clients and the providers on that particular day.

While these folks knew that they didn't have any intention to harm anybody, certainly the people who worked at the facility didn't know that. The people who were prospective clients didn't know that. It was known, and there is evidence in this record, that the conduct on that day was very different than conduct that had previously been engaged in at that facility. In fact, that's the whole reason, according to the testimony, about why these events came to happen, that the regular protests outside the facility weren't believed to be effective enough and that things needed to be escalated. And escalated they were, by actually entering the facility.

And if you put yourself in the shoes of an

individual who is a client or provider at the facility and you see whereas normally you have protestors outside the facility and now they're right in the hallway, it's just inconceivable that those people wouldn't have a great deal of fear associated with that. And that fear was caused only by the actions of these and other defendants. They didn't have that fear from any other source. When the protests were occurring outside the facility, there might have been some concern, but their personal space wasn't being invaded in that situation. And it's clear that there would be a greater level of concern, anxiety and fear among those individuals because of the nature of the protest that was occurring in the situation.

The Court also accepts and acknowledge that this was, in fact, a form of protest. These individuals, based upon their prior lack of a criminal history, are not career criminals. They're not people who want to go out and violate the law and have no regard whatsoever for the law. But, again, it troubles me that they have this blind spot about where their beliefs lead them to the conclusion that it's okay to violate the law without any concern for how that's going to affect other individuals. And it would just seem that there could be some room for grace, some room for acknowledgment that when you engaged in this conduct that that caused a great deal of fear and anxiety on the part of

those clients and care providers at the facility.

The Court doesn't expect these Defendants to show remorse for violating the law. It's the clear they don't believe that this is a law that should exist. And that's the manner in which they have chosen to protest that law. As the government points out, there are certainly other ways to protest the law that would be legitimate and legal. They could advocate for changing the law. They could write letters to newspapers. There are all kinds of things that they could do beyond what they did. But it's clear to the Court that they are firmly convinced that their actions, with respect to the law at least, were appropriate. And, again, what concerns me is that I can understand that, but what I can't understand is why it is that they can't have remorse or concern for the effect that their actions had on these individual citizens who were only trying to exercise their rights under the law. And I think that's an important consideration in the sentencing in this case. Because the lack of recognition of the impact that a defendant's conduct has on other individuals goes to the issue of deterrence. It suggests to the Court that nothing's going to change about these beliefs unless something changes about the law that these individuals and others may be intent on continuing to engage in conduct that they know and understand would have negative impact and consequences for other citizens, but

those don't seem to matter because they've placed their concern and their needs about these unborn over the needs of the individuals who are trying to receive care and who are providing care in those circumstances without even having any knowledge about what care was being sought in those particular circumstances and situations.

The Court agrees that there was, in fact, a risk of violence to the individuals who were prospective clients and caregivers at the facility. I'm thankful that it didn't happen, obviously. And I don't believe that it was, in fact, the intention of these defendants that there would be any violent conduct, and certainly their conduct wasn't violent in this case. But that doesn't change the analysis with regard to the risk and the impact that risk had on the victims in this case. There are, of course, significant mitigating circumstances present in the case of these particular defendants.

Counsel have referred to, and the Court acknowledges having reviewed each of the letters that were provided regarding these defendants. Again, I had a similar reaction to what Mr. Lucas described, and Mr. McGowan and Mr. Cooper as well to varying degrees, about the good works of these individuals and how impressive those are. The self-sacrifice that's been made by these defendants is really, really amazing and astounding. The conviction that

these individuals have is impressive to the Court.

You can believe a lot of things until it gets difficult and then sometimes those beliefs take a side step. And that's never been the case for these defendants. They have really shown up in terms of their good works for their community, their good works for the world community at large, and the Court acknowledges that. The fact that so many people have expressed their support in letters and their presence at the proceedings before the Court is also an important consideration. Because, again, it's evidence that these are good people who are engaged in lots of good works and do lots of good things for their communities and for others. But that, again, doesn't change the fact that the conduct in this particular case was knowingly and intentionally in violation of the law. And it is important that the law be respected. It's important that there be consequences for intentional violations of the law. And it's important not only in terms of accountability at an individual level, but it's also important from a larger situation in terms of the effect on other individuals and deterring future violations of the law.

It is true that the political landscape and the legal landscape is different now than it was at the time of this offense. And that will certainly have an impact on some things in this jurisdiction, given the state of the law. The

Court's not greatly concerned that the sentence needs to provide a deterrent effect on individuals here that -- regarding similar behavior in the future. But there are still places where the law is different, and as the defendants in this case established, folks are able and willing to travel to other jurisdictions and engage in conduct that is in violation of the law, and would still be a violation of the law. And so, therefore, the issue of general deterrence is a consideration that the Court must take into account with respect to sentencing in this case.

A final determination that the Court has to take into account relates to the issue of sentence disparity. And in this case the parties have identified those issues. And what is significant to the Court is considering the sentence that's appropriate for each of these defendants in relation to the sentencing of co-defendants who have already been sentenced by Judge Trauger. It's true that those individuals, with the exception of Ms. Davis, have been sentenced for felony offenses, and that's an important factor with regard to determining an appropriate sentence in this case. But it's also important to consider the sentence of Ms. Davis, who was sentenced to a term of probation for three years. And so it seems that considering the sentences that have been handed out to date that there are certain factors and consideration that the Court should take into account

with regard to framing an appropriate sentence.

The Defendants have each suggested a sentence of time served as being appropriate and without further sanction to be imposed. In support of that position they each acknowledge or argue to some extent part of the basis for that is the fact that these individuals have been under supervision for a significant period of time in a pretrial capacity. The government's asked for a sentence of three years probation, which would track the sentence received by Ms. Davis, and they've asked for a term of four months of home detention as a condition of that probation, which is two months less than home detention sentences given to the co-defendants sentenced at this point by Judge Trauger in the felony offenses.

The Court's considered the arguments of counsel. I've considered all of the materials that I've previously identified and discussed. And for these reasons I will sentence each of the defendants to a term of time served, followed by a term of three years of probation with a condition of that probation being that they will serve 90 days on a term of home detention. While on home detention, they'll be required to remain at the residence at all times except for approved absences for gainful employment, community service, religious services, medical care or other such times as may be specifically authorized by the probation

office. And they will participate in a location monitoring program for the 90-day period utilizing a GPS location monitoring technician -- technology, rather, as soon as practicable or within ten business days from the Court's order.

In addition, I will impose the following special conditions of probation. They will be prohibited from entering any building that contains a facility that provides reproductive health service or from occupying the curtilage of the building or being within 100 feet of the building without prior approval of the probation office. Additionally, I will order that as a condition of their probation they not participate in person or online in any planning or training related activities made illegal by 18 United States Code Section 241 and Section 248(a).

I will additionally order the following conditions of their probation. They must not commit another federal, state or local crime. They must not unlawfully possess a controlled substance. They must report to probation in the federal judicial district where they are authorized to reside within 72 hours unless the probation officer instructs them to report to a different office or within a different timeframe. After initially reporting to probation, they'll receive instructions from the Court or the probation officer about how and when to report to the probation office and must

report to the officer as instructed. They must not knowingly leave the federal judicial district where they're authorized to reside without first obtaining permission from the Court or the probation officer. They must answer truthfully the questions asked by the probation officer. They must live in a place approved by the probation officer. If they plan to change where they live or anything about the living arrangements, such as the people they live with, they're to notify the officer at least ten days before the change. If notifying the officer in advance is not possible due to an unanticipated circumstance, they must notify the officer within 72 hours of becoming aware of a change or expected change. They must allow the probation officer to visit them at any time at home or elsewhere and permit the officer to confiscate any items prohibited by the conditions of probation observed in plain view.

They're to maintain full-time employment, at least 30 hours a week at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment, you must try to find full-time employment, unless excused by the probation officer from doing so. If they plan to change anything about where you work, such as your position or job responsibilities, you're to notify the officer at least ten days before the change. If that's not possible due to an unanticipated circumstance,

you're to notify the officer within 72 hours of becoming aware of a change or expected change. And you're not to communicate or interact with anyone or with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with the person without first obtaining permission from the probation officer.

If you're arrested or questioned by a law enforcement officer you're to notify the probation officer within 72 hours. And you're to follow the instructions of the probation officer related to any of the conditions of supervision.

The Court believes that this sentence will comport with the purposes of the federal sentencing. And the Court's considered the arguments of counsel, the materials that I've referenced, and the 3153(a) factors that the Court is to consider.

I believe this sentence will reflect the seriousness of the offense, promote respect for the law, be a just punishment, protect the public from further crimes of this nature by the individual defendants. And, of course, I don't anticipate there would be any additional crimes by these individuals. And, importantly, given the sentences that have been handed down in this case already, it will not the create an unwarranted sentence disparity. I believe that

this sentence is appropriate and in line with the other sentences that have been handed down. And the Court does acknowledge, as Mr. Lucas pointed out, these individuals are now convicted of federal misdemeanor offenses, and those convictions are significant punishments. They would have impact and consequence for future behavior and potentially future sentencing in the event there is any type of concern or further illegal conduct.

The Court will not impose a fine in this case. The Court will, however, impose a special assessment of $10 for each defendant, as well as the $30 processing fee associated with the petty offenses.

Are there any further matters from the government's standpoint at this time?

MS. GILKERSON: Your Honor, there is a pending violation petition related to Defendant James Zastrow that I believe was continued to this morning --

THE COURT: Oh, okay.

MS. GILKERSON: -- to address, Your Honor.

THE COURT: Thank you. Yeah. I recall that now.

MS. GILKERSON: I've spoken with Officer Franklin yesterday about the pending petition. I think that Pretrial Services's position is that, given that it looks like there is a trial date in that matter set for the spring of 2025, it does appear that that case has been bound over to the circuit

court and is still pending. But given the posture of this case, Pretrial Services's position is that the petition should be dismissed given that there's sort of no likelihood that this matter appears to be resolved any time soon and that there haven't been any other issues. We don't know what the outcome of that case will be.

THE COURT: I understand.

Mr. McGowan, I did notice -- and I apologize. I meant to address that earlier. I noticed you had referenced that in your sentencing petition.

Is there any additional information you need to put on the record? And I guess do you have any objection to dismissing the petition, more importantly?

MR. MCGOWAN: First of all, I have no objection. I do know that it was bound over on a waiver. There was no hearing.

THE COURT: Okay.

MR. MCGOWAN: (Indiscernible) the Grand Jury has met so --

THE COURT: Hang on just a second. Would you make sure -- why don't you step up to the podium. I want to make sure the court reporter is able to hear you.

MR. MCGOWAN: Well, I guess -- again, there's no objection, Your Honor.

THE COURT: Okay.

MR. MCGOWAN: I know that the matter that's in Missouri was bound over on waivers. There was no preliminary hearing conducted. And I guess that will work its- -- work its way out.

THE COURT: Okay. Thank you, Mr. McGowan. I'll -- I'll dismiss the petition then.

Anything further from any of the defendants?

MR. COOPER: Your Honor, I have three questions, if I could.

THE COURT: Sure. Mr. Cooper.

MR. COOPER: Just so I'm clear, Your Honor, GPS monitoring -- that's for the 90 days of house arrest; is that correct?

THE COURT: That's correct.

MR. COOPER: Okay. Will the Court return Ms. Zastrow's passport to her?

THE COURT: Let me hear from the government on that issue.

MS. GILKERSON: I think, Your Honor, given the remaining conditions of release, which would require permission from the Court or the probation officer to engage in any travel, at this point in time I think there are -- aren't particularly compelling reasons to continue to withhold passports, especially given that -- you know, the history of good works by these defendants in their travel.

THE COURT: Okay. So I think I understand you're saying release the passports?

MS. GILKERSON: Yes, Your Honor.

THE COURT: All right. Very good.

MR. COOPER: Oh, okay.

THE COURT: Then we'll release the passports.

Mr. Cooper, I will note that, you know, obviously this 90-day period with the home detention and electronic monitoring, I mean if there are matters that you need to bring to the Court's attention or approach probation about --

MR. COOPER: No, sir.

THE COURT: -- out of country travel will be a little bit complicated. But once we get passed the 90 days I don't think there would be an issue.

MR. COOPER: Right. I was not really thinking about traveling to Ukraine during this 90-day period, Your Honor. But just going forward passed that.

THE COURT: Sure.

MR. COOPER: And then the other thing, as far as the probation, since Ms. Zastrow lives in Michigan -- will the probation be monitored in Michigan? I just want to be clear about that.

THE COURT: Yeah, I suspect it will be. And that's why I gave the condition that gave the additional time for the location monitoring to be taken care of.

MR. COOPER: Okay.

THE COURT: And I suppose, you know, if -- if the probation office in Michigan prefers to utilize a different form of location monitoring, I don't have any objection to that. I just thought that the GPS monitoring would be sort of a uniform, easy kind of method of location monitoring that would -- would be okay. But again, I don't -- I want to minimize the burden on probation in terms of supervision.

MR. COOPER: Right.

THE COURT: And so whatever system -- if she gets up there and they say, gee, we really rather do it this way, I don't have a problem with that. And if I need to do something further with regard to the order, I'll be happy to do that.

MR. COOPER: That's fine. That clarifies that. Thank you.

THE COURT: All right. Thank you, Mr. Cooper.

Mr. Lucas, any matters for your client?

MR. LUCAS: No, Your Honor.

MR. MCGOWAN: Judge, I have one question.

THE COURT: Yes, Mr. McGowan.

MR. MCGOWAN: Could I get Your Honor to go over the special condition that prohibited the -- or that addressed his -- his access to a medical facility? Was that any building that had women's --

THE COURT: Yeah. Let me --

MR. MCGOWAN: I just wanted to make sure I --

THE COURT: Yeah. He's prohibited from entering any building that contains a facility that provides reproductive health services or from occupying the curtilage of the building or being within 100 feet of the building without prior approval of probation -- of the probation office.

So, for example, Mr. McGowan, if your client has a medical appointment at some facility that also has, like the place in Lebanon did, you know, a reproductive health service provider, he can obtain permission from probation and to go see his provider. So it's not going to keep him in accessing medical care. But it's to keep him from engaging in the same type of conduct that was at issue in this case.

MR. MCGOWAN: And I meant -- I mentioned that. And because he is from -- he resides in a very small town and county in Missouri.

THE COURT: Yeah.

MR. MCGOWAN: So I don't know if they even have a healthcare other than maybe a walk-in clinic.

THE COURT: Right.

MR. MCGOWAN: So I'll -- I understand. Thank you.

THE COURT: Okay. Very good, Mr. McGowan. Thank you.

MR. COOPER: Your Honor, one other thing. Ms. Zastrow brought this to my attention. Your order does not preclude her from talking to her brother and her father who have both been convicted in this case? I assume that's not the case. She can communicate with them?

THE COURT: Right. And I recognize that there are individuals that these defendants may -- the co-defendants who have been convicted of felonies, for example. They just need to talk to probation about that, explain that situation.

MR. COOPER: All right.

THE COURT: And, of course, Mr. Cooper, I'm not -- my intention is not for her not to be able to communicate with her family or friends.

MR. COOPER: I just wanted to be clear on that, Judge.

THE COURT: Right. It's sort of -- as you are well aware, it's sort of one of those standard conditions of probation. So if there is an issue that comes up or some problem with regard to that condition, you can bring it to my attention. But I think my intentions are clear about that.

MR. COOPER: All right. Thank you.

THE COURT: All right. Very good.

I think the final matter in this case, this, as a petty offense, is governed by Rule 58 of the Federal Rules of Criminal Procedure. Under Rule 58(g)(2)(B) I need to advise

each of the defendants that you have a right to appeal. Any appeal must be filed within 14 days. And you may apply to appeal under a pauper's oath. And the Clerk will file your Notice of Appeal if you request the Clerk to do so. Your counsel can review the rule with you. Any appeal in this case would go to the District Judge and would not be a trial de novo before the District Judge, but I need to advise you of your appellate rights.

Ms. Gilkerson, is there anything further from the government's standpoint we need to address at this point?

MS. GILKERSON: No, Your Honor. Thank you.

THE COURT: Thank you.

Mr. McGowan, anything else for your client?

MR. MCGOWAN: No, Your Honor.

THE COURT: All right. Mr. Cooper?

MR. COOPER: No, sir.

THE COURT: Mr. Lucas?

MR. LUCAS: No, Your Honor.

THE COURT: All right. Very good. Thank you all very much.

We'll be in recess. Good luck to you all. Hope everything works out for you.

(Court adjourned.)

REPORTER'S CERTIFICATE

I, Lise S. Matthews, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on July 30, 2024, in the matter of UNITED STATES OF AMERICA v. EVA ZASTROW, JAMES ZASTROW, PAUL PLACE, Case No. 3:22-cr-00327-9, 3:22-cr-00327-10 and 3:22-cr-00372-11;that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 55) is a true and accurate record of said proceedings.

This the 14th day of October, 2024.

/s/ Lise S. Matthews
LISE S. MATTHEWS, RMR, CRR, CRC
Official Court Reporter