IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA )
)
) Case No.
v. ) 3:22-cr-00327-1
)
CHESTER GALLAGHER )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TRANSCRIPT OF PROCEEDINGS
SENTENCING HEARING

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

BEFORE: THE HONORABLE ALETA A. TRAUGER, DISTRICT JUDGE

DATE: SEPTEMBER 26, 2024

TIME: 2:28 p.m.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:

FOR THE GOVERNMENT: NANI GILKERSON
U.S. Attorney's Office
Nashville, Tennessee

KYLE RANDOLPH BOYNTON
WILFRED T. BEAYE, JR.
U.S. Department of Justice
Washington, D.C.

FOR THE DEFENDANT: JODIE A. BELL
Law Office of Jodie Bell
Nashville, Tennessee

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEBORAH K. WATSON, RPR, CRR
Official Court Reporter
Fred D. Thompson U.S. Courthouse
713 Church Street, Suite 2300
Nashville, TN 37203
debbie_watson@tnmd.uscourts.gov

*  *  *

**The above-styled cause came on to be heard on September 26, 2024, before the Honorable Aleta A. Trauger, District Judge. The following is an excerpt of the proceedings that were had, to-wit:**

**THE COURT:** Good afternoon. We're here on sentencing in *United States v. Chester Gallagher*. We have, for the government, Nani Gilkerson and Kyle Boynton and Wilfred Beaye.

**MR. BEAYE:** Yes, Your Honor.

**MR. BOYNTON:** Good afternoon.

**THE COURT:** And we have, for Mr. Gallagher, Jodie Bell. Good afternoon.

**MS. BELL:** Hello, Your Honor. Good afternoon.

**THE COURT:** Mr. Gallagher, have you read the presentence report and feel you understand it?

**THE DEFENDANT:** Yes, ma'am.

**THE COURT:** Okay. Very good. It looks as though there are a few objections I need to rule on.

**MS. BELL:** There are, Your Honor, and I also have three exhibits that I think that the government does not object to that may be slightly relevant towards the objection --

**THE COURT:** Okay.

**MS. BELL:** -- if I may.

May I approach the podium and just introduce those and tell you what they are?

**THE COURT:** Sure. Perfect.

**MS. BELL:** They sort of go to all the proof, but it seems to make sense to just introduce them initially. One is simply a character letter from Senator Mark Pody, and that would be marked Defendant's Exhibit 1.

The second one is a photograph of the door of the clinic that was texted to Employee A and Employee A's comment back that she should not have gone back out there.

And then attached to that, the reason I'm introducing that photo is that there's a little note on the door, and then I have a copy of the note which says: "Anyone may exit peacefully. We are blocking the doors to rescue others. This is not a protest but a lifesaving rescue." And so that was put on the door.

That's Defense Exhibit 2, and I'll hand that up to Your Honor in just a second.

The third one is an FBI 302 dated 10/23/2023, and it is of Patient A. That would be Defense Exhibit 3, and we have agreed, subject to your approval, to file that under seal only to reference the last full paragraph on the second page where Patient A describes a little bit about her situation. And I'm not going to put that in the record out

loud, but I just wanted you to have that as we're talking about in your ruling on the vulnerable victim.

Just, all we would say about that in addition to what we filed, is that this was a very difficult and it is a very difficult situation for anyone going to a reproductive health center, and that this last paragraph just kind of underscores sort of that complication.

And I think once Your Honor reads it, you'll understand what I'm saying.

But I'm going to pass all three up, and again requesting that Exhibit 3 be placed under seal with the Court.

**THE COURT:** Okay. Any objection to Exhibits 1, 2, and 3?

**MR. BOYNTON:** No, Your Honor.

The government would just like to note that the note that was attached to the door, that was not something that came from the government's discovery. The government never had that. My understanding is Mr. Gallagher took that note with him when he was arrested and has provided it to Ms. Bell. And so the government doesn't know that that is, in fact, the note that was applied to the door.

I will say that door is the entrance into -- the patient entrance into the clinic, and there was a second door past that; that was the reception area. And so I don't

know that any employees were actually in that reception area at any time and would have seen the note.

**MS. BELL:** And that may well be true.

**THE COURT:** Okay. Very good.

**MS. BELL:** And may I just approach and hand this up?

**THE COURT:** Yeah.

**MS. BELL:** So those would be just our additional exhibits and information for Your Honor's --

**THE COURT:** All right. Let me just read these for a minute and then . . .

**MS. BELL:** Thank you.

(Respite.)

**THE COURT:** Okay. These will be received into evidence. I've read them.

(Defense Exhibits 1 through 3 were marked and admitted into evidence.)

**THE COURT:** Does anybody wish to say anything further about the vulnerable victim objection?

**MR. BOYNTON:** No, Your Honor.

**MS. BELL:** No, Your Honor.

**THE COURT:** All right. The defendant has objected to the two points assigned in paragraph 29 under Section 3A1.1(b)(1) of the -- of the sentencing guidelines for vulnerable victim. I have denied this four times, and

I'll deny it on the fifth occasion. My reasoning is that this particular guideline applies to a person who is a victim of the offense of conviction and any conduct for which the defendant is accountable as relevant conduct, and who is unusually vulnerable due to age, physical, or mental condition, or who was otherwise particularly susceptible to the criminal conduct.

A pregnant woman contemplating abortion approaching a clinic of this sort is in the midst of trying to make a serious grave decision about her life, and I find that she is vulnerable due to the mental condition at the time. And I will point out that the 302 does nothing but reinforce my ruling in terms of this particular person being a vulnerable victim who was at the clinic that day.

So that objection is denied.

Ms. Bell, I understand you have withdrawn your objection to various paragraphs of the factual recitation; is that correct?

**MS. BELL:** That is correct.

**THE COURT:** And you are asking for a departure based on Mr. Gallagher's age under 5H1.1 and a departure for his physical condition under 5H1.4 of the guidelines?

**MS. BELL:** That's correct, Your Honor. And I think -- I don't know if you want me to address that at any point, but --

**THE COURT:** Well, I'm going to ask for just a minute.

The defendant is requesting a timed-served sentence, and Mr. Gallagher has served about 30 days from when he was initially, I guess, surrendered in South Carolina. He was in custody for a few days, and then -- yeah, he was -- no, he was arrested in Mount Juliet and served a few days.

**MS. BELL:** Correct.

**THE COURT:** Then he surrendered in South Carolina on October 6th and was brought to Tennessee and was released here on November 2nd. So it was about 30 days that he served.

**MS. BELL:** Yes, ma'am. And --

**THE COURT:** So she's requesting a time-served sentence to be followed by supervised release or probation with home confinement. The government is requesting a sentence of 20 months to be followed by three years of supervised release.

So let me hear from you first, and then I'll let the government respond.

**MS. BELL:** Sure. Is this as to the variance departure argument?

**THE COURT:** Everything.

**MS. BELL:** Everything? Okay, sure. May I

approach the podium, Your Honor?

**THE COURT:** Yes.

**MS. BELL:** Thank you.

Thank you, Your Honor. Mr. Gallagher comes before this Court -- and I know that the Court is very familiar with the facts of this case -- but having been convicted, following a jury trial, where he and fellow pro-life advocates rescuers went to carafem clinic in Mount Juliet, as the Court knows, to interpose themselves between the clinic and women or couples who they thought may have had an unplanned pregnancy with the intent to offer help, offer assistance, offer an alternative to potentially terminating that pregnancy.

And as Your Honor knows from the trial, these are people who have pretty strong religious beliefs and believe that they were there pursuant to those beliefs, pursuant to their faith, their spiritual -- strongly-held spiritual beliefs. And back on March 5th in 2021 when they were at the carafem clinic, they were there in a group. They were prepared to be arrested.

But what I would underscore for the Court is that at that point on March 5th, 2021, they were prepared to be arrested for criminal trespass. They were aware of the FACE Act, that is true, but at that point in time, there had been very few FACE prosecutions of a criminal nature. There

may have been civil ones. There also had not been any felony conspiracy FACE prosecutions that they were aware of.

So I just kind of want to bring that full circle, that that's sort of what these people anticipated, and that did come up throughout the trial, that we were arguing that they were anticipating a criminal trespass arrest.

When you look at the nature and circumstances of the offense -- and I don't want to belabor what is already in the sentencing memorandum -- but Mr. Gallagher, what I would say on behalf of him, is he underscores that his goal in any rescue, any pro-life advocacy, is to be peaceful and nonviolent. You lose the message -- according to Mr. Gallagher, the message loses any impact that it might have if it is violent, if it is not peaceful.

And so that is always his goal in every single one of these criminal trespass protests/rescues that he has been involved in. And Your Honor knows he has been involved in quite a few. And I would submit here in this case, he was peaceful and nonviolent. And in coming into this court and in coming to sentencing today, he has accepted responsibility for his leadership, for the fact that this happened where he lives.

But I know he would want me to tell the Court this, and he'll probably say it when he gets up to allocute, that he believes he is defending an unborn child and that he

is willing to break, at that time, that criminal trespass law, because in his mind, it's worth the balance. There's a balance there, and that he believes that defending that life, even though he didn't get a defensive life instruction at trial, outweighs sort of the fact that this child would die.

And those are deeply-held, deeply-grounded spiritual beliefs that he has.

**THE COURT:** It sounds like he gave up his career because of that belief.

**MS. BELL:** Well, I was getting there.

But still, in talking about sort of the offense and what happened, when he learned of the indictment, he was in South Carolina caring for, I believe it was, his wife's sister, and he went right to the federal building and he turned himself in. And I wanted to talk about that just a little bit because it ties into also his medical issues.

He went into custody in South Carolina. The Judge there would not let him out. So he traveled from facility to facility to facility before he got to Nashville nearly 30 days later. What is not in the record that I learned from him the other day, so you can give it whatever weight you want, is that he was on and off his medications during that time. So sometimes he would have them, sometimes he would not because he was transferring from

facility to facility.

I think that is important in considering the variance or the departure that is requested, because his medical issues, which I'm not going to say in detail in public, are very real. And when he, a year ago, was serving a sentence in another jurisdiction, he was taken to the emergency room because of a medical situation that could not get under control, and he ended up getting a suspended sentence and that sentence terminating early as a result of his health problems, which are ongoing.

As Your Honor knows, he needs a surgical procedure which is scheduled for November. The reason for that delay ties back to what happened back in Florida because he couldn't get the right kind of stress test due to that medical issue.

**THE COURT:** Now, he's had the stress test this week, as I understand it?

**MS. BELL:** Yes, ma'am. And he is scheduled.

Turning to the history and characteristics of Mr. Gallagher: He was in law enforcement, and he sacrificed that career over his beliefs. He was in the military. And so all of that sort of law-and-order person that Mr. Gallagher was, he was willing to give up because he holds these religious and spiritual beliefs so close to the heart, and he truly believes that he was -- he is doing the

right thing.

And he will emphasize and he will tell you and I'll emphasize for him: Doing the right thing means you keep it peaceful, means that you do everything you can not to elevate the situation.

Now, given the complexity of this issue -- and people have very strong beliefs and they're allowed to have those beliefs on both sides. People get heated, and Mr. Gallagher, in his experience, knows that. And part of why he's there on a lot of these things and his role on this particular day was to make sure everybody was calm.

And I think I referred, in the sentencing memo, to when people got kind of excited, that somebody left the hallway -- I think it was the patient that was walking down the hall with maybe Officer -- Corporal Schneider, and people got excited that were with Mr. Gallagher. And he's like, no, no, this is a serious situation. We're not going to cheer about that. And he calmed them down.

So I would just underscore that for the Court.

Mr. Gallagher is married. His wife, Joann, is here in the courtroom, if she could stand up, please.

They've been married for quite some time. He lives in Wilson County, Tennessee. He is retired. He takes care of animals. He continues to preach, and he is steadfast in his beliefs. He has been on pretrial release

since his release in Nashville after that 30 days of diesel therapy. He's not had any violations, Your Honor.

I think that when we turn to the issue of just punishment, deterrence, respect for the law, that Mr. Gallagher kind of learned a lot by that time in diesel therapy, that 30 days on --

**THE COURT:** I've never heard that term. It's very appropriate and descriptive.

**MS. BELL:** Yes, it is. And we'll talk about it a little more today when we get also to his surrender and things like that, should you impose a sentence.

But that is a hardship. And I think you'll probably hear more about it to Heather Idoni. It's terrible, I would think, as many times as she has moved around. But we're here on Mr. Gallagher, and he did it just that one time. And I think he feels for his codefendant, Ms. Idoni, because he knows what she has gone through over and over again.

But that has taught him that is hard, because, again, he wasn't always getting his medications.

You've had no issues, again, with him while he's been on release, and I think that that shows that the requested sentence would be just punishment, has deterred him from additional conduct of this type. He does have respect for the law.

He also noted, in our conversations today, that, you know, some of the collateral consequences are a big deal to him. He's not going to be able to vote. This is an important issue. We can tell this is a very political issue, so Mr. Gallagher not being able to vote for the people he wants to put in office, some of whom I would assume he would vote for the ones that would promote this issue in the way that he likes it, losing that is a very big deal.

He's not a firearms person, but he's familiar with them from having been in law enforcement and been in the military, having served his country.

When turning to the issue of sentencing disparities, I would submit that the requested sentence would not result in a disparity. And I know that Mr. Zastrow received a sentence of six-months' incarceration. Six-months' incarceration, I would submit to you, where you're allowed to self-report is a whole lot different than 30 days in custody when you're going all over the place.

So I would ask Your Honor to take into consideration that diesel therapy period of confinement when deciding what sentence is appropriate for Mr. Gallagher.

Mr. Zastrow will be able to self-report. Mr. Zastrow, I don't think, has the health problems that

Mr. Gallagher has, so when Mr. Zastrow does report, he will go to Michigan, I think, for sentencing as well.

**THE COURT:** When is that sentencing?

**MS. BELL:** I looked at the docket today, and the most recent order from the Judge reads that the Judge has ordered that the trial transcripts get prepared. He would like the parties to do some post-conviction, presentence briefing. That briefing will not be due until 60 days after the trial transcript is prepared.

So that was the closest I could get, and that was an order, I think, from maybe mid August.

**THE COURT:** Are there post-trial motions pending?

**MS. BELL:** I did not see any that had been filed yet, but apparently there must be some issues. And Mr. Crampton is here if you want to ask him. He'll know what issues are being raised.

But the Judge made it clear in the order that he's going to give everyone time to raise those issues, but that would -- the order read that it would make sense to have the trial transcripts first. So there's that.

But turning back to comparing Mr. Gallagher and Mr. Zastrow. Mr. Zastrow traveled from out of state. Mr. Zastrow was also a leader, but again, Mr. Zastrow blocked the door in a way that Mr. Gallagher didn't. You could probably balance them out.

I think the big difference between the two, though, is Mr. Gallagher's age and his health issues, which are genuine. And they also seem to fall right within the guidelines. When you read the guidelines for age and the guideline for physical condition, it really seems to contemplate that if someone is of an advanced age and has physical ailments to such a degree that it may make more sense to put someone on a period of home confinement as opposed to placing them in the Bureau of Prisons, so I think that Mr. Gallagher falls well within that guideline.

So I would submit, just kind of on top of all of that, that considering all of the 3553(a) factors, the nonviolent nature of his conduct, the acceptance of responsibility to the extent that he can, in this case, by not disputing his leadership, by almost embracing it and taking responsibility for that, given the -- his past military service, his past law enforcement service, given the genuine nature of his spiritual beliefs that led him to do something where he was acting in a way that I do not think was malicious -- it was definitely annoying; inappropriate, by many accounts, to people who do not share those beliefs; kind of putting yourself in a situation where somebody doesn't want to think about this issue, but I think what Mr. Gallagher would say -- and he's going to speak here in a minute -- is that's kind of the point. He knows this

is a difficult issue and wants people to think about it if they're contemplating something.

But I would submit, in light of all of the factors in front of Your Honor, that the variance or a departure is appropriate in this case. This is a truly unique case, so there aren't many cases other than the ones in front of Your Honor to compare Mr. Gallagher to.

But I would submit that a time-served sentence followed by three years' supervised release with a sufficient period of home confinement is sufficient, but no greater than necessary to further the sentencing objectives of this court.

Now, should Your Honor consider, I think, that a period of imprisonment is appropriate, we would ask for a recommendation to FCI Forrest City, which is a low-security facility in Arkansas. It's relatively -- it's one that's closest to where he lives. But we would also ask that Your Honor consider letting him get his surgery and letting him report sort of after that rehabilitative period, and maybe even considering delaying any report date until that Michigan sentencing happens. Because I think that if --

**THE COURT:** Why?

**MS. BELL:** If he's at FCI Low or any other Bureau of Prisons facility, the same diesel therapy is going to happen again. And so he's going to be on the bus or the

van to the local prison before he gets on the plane that flies to Michigan and then he goes to another jail. And what happens is, again, the medication and any mobility issues that he has. We just don't know, from the surgery he's going to have, how he'll respond.

And I know he had had another joint surgery about a year ago, and by being incarcerated, I think he had explained to me that he didn't get all of his PT, his physical therapy, and so that has just been a hard one to come back from. And that surgery should be referenced in the presentence report.

Thank you.

**THE COURT:** Okay. Thank you. Does he wish to allocute?

**MS. BELL:** Yes, he does.

**THE COURT:** I'll listen to that now.

**DEFENDANT ALLOCUTION**

**THE DEFENDANT:** Good afternoon, Your Honor.

**THE COURT:** Good afternoon.

**THE DEFENDANT:** I'm very grateful for all that's transpired, and I want to say that in preference to some of the several things I would hope to share with Your Honor today.

Without saying -- sounding in any way patronizing

to the Court, the orders of the Court and the ability that the Court has given me to travel with my wife to take care of her sister in South Carolina is greatly appreciated, and I want to thank you for that.

I'm also indebted to the government for assigning me Ms. Bell as my attorney. You may recall, Your Honor, that -- I hope this doesn't come across as any kind of a sexist statement, but among the nine attorneys, all of them being male except for her, she sat here at the end and led that team, and led that team quite successfully. I'm very, very grateful to the government for having in place, because I couldn't afford an attorney, someone like Ms. Bell who has the credibility with this Court and have that caliber of an attorney. So for that, I'm also very grateful.

Allocution that I'd like to begin with now is -- also could be defined by a phrase that's being used again and again, both throughout the trial and even as recently as what Ms. Bell just presented, this "fervently-held religious beliefs." And it's not that I object to that, Your Honor. I just -- what I hope to be able to share with the Court today is really who I am, and that's important to me in the light of this one aspect of who I am.

There is a creator, God, the father that I serve. And his Holy Spirit is the one that has permitted me to be in this place, permitted me to be in a place to serve him

and to use him to ensure that he receives all the glory. When I say that I take responsibility for the leadership and all of the points that the government has indicated, specifically the things that I did and inviting people and organizing people to come to Tennessee where I live and to initiate all those things, I did all of those things, and have done that previously over the years. It's been something that has in a way not only defined my ministry as an ordained minister, but also my lifestyle.

Some of those things, if the Court would allow, I'd like to detail. But I'm about to say something --

**THE COURT:** Just don't preach to me, Mr. Gallagher.

**THE DEFENDANT:** Pardon me?

**THE COURT:** Just don't preach to me, Mr. Gallagher.

**THE DEFENDANT:** Yeah, Your Honor, I'm here to reveal who I am, and I don't want to act presumptuously. I want to be as honest as I can with the Court.

I have my Bible here. I don't plan on opening it. I'm not talking about the -- my Bible being opened and laying it here bare. I do preach; I can do that. My desire right now is to be sure that everything that I say is in the context of not appearing to be more than I am.

I'm a man who is married to a wife that I dearly

love, have been for 40 years. But I am a servant of the most high God, and He is the one that has, I hope, received the glory for all the things that we're about to do.

And clearly, if the Holy Spirit of God did not lead me in this direction, then I have no reason to do it. Because it's got to be not about me, about Him. Right now, in terms of the allocution that I want to make now, is much about me. I'm going to say something that probably the Court would find unusual: I'm not giving an allocution, specifying specific things about my history and who I am and asking the Court to consider some of those things, for the sake of mitigating my sentence. I appreciate that I have an attorney here who has done a good job of articulating health situations that are real. My age is pretty evident, so that's not a surprise. But I really -- and I appreciate Ms. Bell in doing that. That's her job to do that. But I'm not seeking mitigation, Your Honor, in the things that I have to share with you.

So having said all of that in preference -- in preface, rather, let me just say a few things. It's not enough for me to have sincerely-held religious beliefs and use my sincerely-held religious beliefs alone to justify breaking the law.

I first heard about Operation Rescue 35 years ago. I was invited to come and participate with hundreds of

others at the birth of Operation Rescue, in a sense, in Atlanta in 1988. I had been a police officer up until that time for not quite 20 years; beginning my law enforcement career in the military, served in both the Air Force and the National Guard. Was promoted eventually to E-7. And I had a very solid understanding of what the law was and my responsibility as a police officer.

I have a degree from the University of Nevada in criminal justice. I'm not an attorney, don't pretend to be an attorney, but I did the most that I could to understand my responsibility as a lesser magistrate to enforce the law; not to adjudicate the law, not as a legislator to write the law, but to enforce the law. I took it very seriously, Your Honor.

But I became convinced, back in 1988, that real children were dying. I thought, in fact, that what these Christians were doing in coming to Atlanta was to commit acts of civil disobedience to further their deeply-held religious beliefs, which I'm opposed to. I was opposed to them now for that reason, I was opposed to them then.

So I went to Atlanta to try to find out why all these Christians were trying to justify their behavior. As a police officer at that time, I clearly saw that this was indeed something that if it were to come to Las Vegas, that I would certainly be able to arrest the rescuers because

they were breaking the law.

What I learned however, Your Honor, is that by going to Atlanta, I found out that it was more than just deeply-held Christian beliefs, that their belief in the personhood of this child was real.

And so over a period of time in Atlanta, Georgia, I spoke to many women who had had abortions. I spoke to former clinic workers, former abortionists. Held a dead, aborted baby in my hands. I did as much of an investigation as I could, because I saw, soon coming on the horizon, that I would have a responsibility, something actually that was required in the police manual in the Las Vegas Metropolitan Police Department that I had served for the last 10 years of my almost 20-year career, and I determined that I would be responsible, as the manual demanded that I do, if there's any suspect that was about to be incarcerated, taken in to be arrested, whether or not there was probable cause -- that was our determination, of course, as law enforcement officers -- but I had a responsibility, the manual said, if I knew of any circumstances or any things that should be considered, that I had the responsibility to report those to the officers about to make the arrest.

That was only part and parcel of what I'm going to tell you about had happened eventually.

But also, one of the things that I was privileged

to do in the police department was to teach not only on the discretion of police officers and the use of discretion, but I also led the department in arresting and teaching officers how to do successful drunk driving arrests.

I was privileged to participate, during the last year of my role as a police officer/motorcycle officer in Las Vegas, in the arrest of 250 drunk drivers myself, and I was able to train many officers, not only in our department, but across the board.

I was able to do that and do it successfully, and many times, I had many of the people I had arrested, male and female alike, afterwards thank me for taking them into custody. I thought that treating people like people was very, very important.

My last year in the department, at most, I might have had to engage someone physically three or four times because I had the ability to try to convince them. I mean, I'm not a stout guy, so the idea of putting everybody in handcuffs was a challenge sometimes, so I had to rely on my ability to convince them in a way they could understand.

So I have some abilities hopefully even in the scenario of this -- of these rescues to convince people there's only certain things that we can do that would be successful if they were done in a peaceful and nonviolent way. My responsibility, in every rescue I've participated

in, was to communicate with the police. It was a logical assignment for me because of my prior background.

But my dilemma, Your Honor, was that this was going to come to a point of real decision where the rubber meets the road. And this is to my point of deeply-held religious beliefs standing alone, and then acting upon your deeply-held religious beliefs, that also have a basis beyond just religion.

The personhood of individuals, as Your Honor is well aware -- I'm not trying to educate the Court in this; I'm just trying to tell you who I am and what I learned and how it affected my life. Understanding that in the realm of the abolitionist movement, there were laws in this country, as you know, that made it very easy for the owners of slaves to, in fact, do whatever they wanted to do to their slaves. And there was the abolitionist movement that rose to rescue those slaves until the federal Fugitive Slave Act was enacted making it a felony to rescue slaves. It's not far from where we are here in this situation.

What was even worse, however, is when, in the second World War, Jews and Poles and gypsies and others were declared nonpersons by Hitler's regime, and not only was it lawful to kill a Jew, that was the final solution. And so there were people, not just Christians, not just because of their deeply-held religious beliefs -- the story of

*Schindler's List* goes to that point. He wasn't a religious man at all, yet he was declared a righteous person by the Jews when he laid down his life and his business and took upon himself the risk of rescuing these persons.

When we submitted our defense-of-others request for when we requested for a mistrial -- not a mistrial -- a dismissal in this case, it was to that very point, Your Honor. It boils down to the personhood of these children. Are they persons? If they're not, then we have no business trying to interfere with anybody's reproductive rights to health care. We don't protest against Pap smears, vasectomies, birth control, none of those things. We're here to save innocent human life created in the image of God. That's our role.

But it's not just based in religious beliefs, though it would be enough for me. I don't expect it would be enough for this court, but I will tell you that in regimes in the past that stood on laws that were unjust and ungodly and threatened the lives of innocent people, that those laws had to be challenged. They've been challenged successfully in our country, and even in Hitler's regime.

I don't mean to cause any consternation, Your Honor.

**THE COURT:** You're not causing consternation.

**THE DEFENDANT:** I'm trying to, in my attempts,

it's not to educate the Court as to history. The Court is well-aware of that. I'm amazed at some of the briefs that I was able to read and the responses, both to us and to the government, over the last couple of years that we've been working through this.

And thankfully, Your Honor is very highly-esteemed among your peers. Judge Matthew Leitman said many, many positive things about you, and so I deeply respect your intellect and your judgment, and, I think, also your predicament, Your Honor.

Because there came a time when I had already communicated, after my arrest in Atlanta, to my sheriff that I was going there for that purpose, understood that if I were arrested -- that was not my intention -- I would report to the civil -- the internal affairs division as was required, and I did that. I wrote a memo to the sheriff and told him, Sheriff, don't worry because if the rescues ever came to Las Vegas, I would certainly be able to arrest the rescuers. Now, that's would I told him.

And then I went to Atlanta and learned something quite the contrary, some of which I've detailed.

So when the rescues came four or five months later to Las Vegas, I tried to get the day off. I was working, but I had already taken my vacation that I used that October to go to Atlanta. Pretty cowardly thing to do.

But, see, I was three months from being vested for my retirement, my early tenure, and a lot of fellow believers that were counseling me that I needed to be a good steward of what God's given me: Save your retirement. Wait until three months have passed and secure your retirement.

Well, that seemed to be a pretty good suggestion. I thought, well, surely that's God speaking to me.

Then I had this conversation, I believe, with the Holy Spirit, very quickly, went like this: Imagine, Chet, that some months down the road, you run into a girl who come up to you and say, Chet, on the day that I had my baby killed, you weren't there. How come? Maybe if you had been there, I wouldn't have.

And I would say: Well, I had to get my retirement.

She would say: But I have a dead baby.

All I could say was: I have my retirement.

It just didn't wash.

My sergeant, the morning of the rescue -- because they knew that I had been arrested in Atlanta, Georgia, because of what I had learned about abortion. And I had been with 764 other people and spent 18 days in jail, released on my own recognizance, went back a year later for trial, was convicted.

I had been so convinced that acting on these

deeply-held religious beliefs became something more than just a religious exercise. It defined who I was. I'm a servant of the most high God. He has expectations. One of the expectations that He has -- Jesus is speaking; I'm not preaching. I'm just telling you what He said.

He said in the last days, the gospel will be preached to all nations. The next verse follows, though, and it says: And when they arrest you -- not if they arrest you, Your Honor -- and when they arrest you and drag you before the magistrates -- I'm here today -- do not fear on that day what it is you're about to say, neither even premeditate or prepare beforehand, because in that hour, those words will be given to you by the spirit of God.

If I'm standing here speaking my own words to you, Your Honor, in part, I am -- hopefully not a large part -- but if I'm not communicating what I believe the spirit of God has commanded me and others to do, I'd be doing not only myself and this courtroom and Your Honor a disservice.

But I'm convinced that the spirit of God is real. I'm amazed that although the Court was concerned with jury nullification and had originally written orders to restrict certain conduct by the defendants, that even things that we could say that I certainly am saying today and could not say in the trial had I testified, it does not eliminate the

genuineness or the desire to testify. It wasn't something that could be done for a variety of reasons.

And I was very thankful that, as one attorney told me, that in the case of Caroline Davis, she was a gift. Certainly she turned out to be just that because the government had to deal with her over-and-over insistence that decisions were made by her and others because of the leading of the Holy Spirit.

So although I had a leadership role, Your Honor, I say again, the leader of this rescue was the Holy Spirit of God.

Not asking if Your Honor believes that or whether she gives any credibility to it or not. I'm just saying that we are beyond convinced.

So this is how my career ended in Las Vegas. My sergeant came in that day and said, Chet, the rescue has come to Las Vegas -- he didn't call it a rescue. He said, there's a demonstration going on, we know how you feel about abortion, so I'm going to assign you to a completely different area so that you don't have to deal with this conflict.

I was amazed. That was my out. Surely, God, you would not want me to disobey my superior.

Your Honor, I believe it was the voice of the Holy Spirit that came in that nanosecond and asked the

question, Chet, who is your superior?

Some people say that Chet was fired because he refused to arrest the rescuer. That's not entirely true. I went, against orders of my sergeant, and went directly to that abortion mill; got off my motorcycle and walked across through this line of police officers who were sitting there, because I was going to plead with them not to arrest the rescuers who were doing their job.

And needed a bullhorn -- the guy leading the bullhorn was off to the left. It's an important part of the story. He was a bivocational pastor. The reason that's important is because not only was he pastor, but his bivocational position was, until he retired the day before so that he could lead the rescue, he retired as the administrative police lieutenant of the North Las Vegas Police Department in nearby -- officer in that jurisdiction.

So I went forward and looked behind me, 62 people -- excuse me -- 92 people about to be arrested. There were a line of police officers preparing to arrest them. I read a statement, basically made a plea, asked them to use their discretion. It's a peaceful event. All we have to do is stand by here, keep the doors closed, no babies would die.

I waxed eloquent for about two minutes. Your Honor may or may not appreciate the fact that my

supervisors were not at all impressed with what I had to say. But my sergeant stepped up to me, said, Chet, you're suspended. Leave this area immediately.

And in that moment, that was the defining moment. It all led up to that moment, because I could have turned and walk away when he told me, "Go back to the station, you're suspended." But I couldn't.

The reason that I couldn't was because what I had just explained to Your Honor. I tried to explain to those police officers in a nutshell, and I couldn't walk away from those rescuers.

And so I told him, I said, Sergeant, I know that you may think I'm some kind of a protester. I'm not. I'm not even doing this so much as a Christian, my deeply-held religious belief, but as a police officer, knowing what I know. Though I know you're not convinced you're killing children in this killing center behind me, as a police officer, I cannot walk away from what I know to be a murder in progress.

So I was the first one arrested that day, in uniform, and that's how my career in law enforcement ended.

And now I'm going to wrap this up. I'm going to finish this in the next two or three minutes.

Eventually, the Civil Service Board gave me my job back. The sheriff filed a motion in district court,

overturned his decision. That process took nine months. The media had been following this; wanted to know if I had anything to say about what I and these 92 people had done. So we had a press conference in front of that same abortion clinic where I'd been arrested nine months earlier.

The way that I answered the question, Your Honor -- it was the only question all these reporters asked: if I had any regrets. I turned to Brenda; she was standing next to me. She was 18 years old, but she was 17 nine months earlier, seeking an abortion she had no desire to get but was being forced to have by her boyfriend and her mother.

And I asked her for her 6-month-old baby boy -- excuse me -- 6-week-old baby boy, Joshua. And I took that 6-week-old baby boy, and I held him out just like this in my hands, and he kicked his arms and drooled all over me, and I said had it not been for these people sitting in front of the door of this abortion clinic, yes, and one police officer, this baby, this one right here, because of the time that we bought, was able to be ministered to by a sidewalk counselor, was able to talk to her one-on-one and invite her into her own home, rescue her, bring her into church, rescue her family with the gospel, and see that baby's pregnancy bills taken care of, this baby right here, Your Honor.

Last thing I did as a police officer. Couldn't

look back on almost 20 years. Couldn't ever say that I ran into a burning building and rescued somebody or pulled somebody out of a car, gave somebody CPR, until that last moment standing with those rescuers in 1989 in Las Vegas, Nevada, as a police officer changed my life, changed Joshua's life, Your Honor. He's 30 years old today and has two sons. His mother was brought in, administered to, to Christ, all to the glory of God.

I'm not seeking mitigation, Your Honor. Could be that federal prison may be the fruitful ministry field that I have to look forward to. If that's the plan, I thank God that you have a role in making that decision.

My wife needs me at home. That's a big deal, too. I got some physical issues. I'm old. But I can walk and I can talk. And I submit to the decision of this Court. And I'm very, very thankful that you allowed my allocution to go down this route with this time.

Thank you, Your Honor.

**THE COURT:** Thank you, Mr. Gallagher.

**MS. BELL:** Thank you.

**THE COURT:** Mr. Boynton?

**MR. BOYNTON:** Judge, I want to just begin kind of recognizing the difficulty of sentencing. It's the -- my least favorite part of my job as a prosecutor, and I can only imagine how you feel about it in your role as a judge.

**THE COURT:** It's the hardest thing we do.

**MR. BOYNTON:** Unlike other civil rights offenses, like those involving willful excessive force, hate-motivated mass shootings, or the arson of a house of worship, there was no viciousness here. But Judge Frensley noted just hours ago, in the sentencing of Mr. Gallagher's codefendant, Ms. Edl, that there was a risk of violence. And there was a lack of empathy in how this offense affected patients, clinic workers, and other visitors to the Providence Pavilion that day.

I want to recognize Ms. Bell's persuasive memo. She's a talented writer, and I appreciated her efforts with it.

Her memo highlighted, and Mr. Gallagher just spoke at length about his law enforcement background, and I want to grapple with that for a second because our memo addresses that as well.

His law enforcement background is an important one to me. I started my career as a police officer as well. And that memo quotes from the police officer's code of ethics. But I want to flag that that very same oath that officers swear to is to never let their personal feelings, prejudices, political beliefs, aspirations, animosities, or friendships to influence their decisions. And they swear to be exemplary in obeying the law and regulations of their

department.

Now, when Mr. Gallagher could not abide by that oath, he left the department. He made the decision. There were consequences for that decision, and he left the department. But that personal history contrasts sharply with his decisions in this case, not to focus on lawful means to address his conscience, but on unlawful means.

And the social contract requires us all to follow the law. Mr. Gallagher knew the law, and he knew he was violating the law. But instead of focusing those efforts on changing the law, he led a group of blockaders to violate the law. And it wasn't just about presenting an alternative. It wasn't just about creating space for coconspirators to minister to women who were contemplating whether to have an abortion or engage in other protective reproductive health activity.

It was about precluding them from entering that facility. Just because there may be counseling going on doesn't mean that if that counseling fails and the patient says, you know what? I hear you. I would like to go in now.

She was not getting in. That was very clear. There was no way anybody was going to enter there. So it was not just about creating space or creating opportunity. It was about precluding somebody from making a lawful

reproductive health care decision.

As I said in closing argument in this case, this prosecution is not about beliefs. It's not about beliefs. It's always been about how those beliefs have been placed into action. If you can't follow the law, you work to change it. And breaking the law must be met with the same resolve that Mr. Gallagher no doubt exhibited when he was a police officer. There must be consequences to deter future violations, consequences that make it clear that criminal acts are not a way to effect change.

Here, the core of those consequences should be 20 months of incarceration. The government doesn't make that recommendation lightly. We appreciate that 20 months is a significant amount of time, particularly in light of the other sentences that have been handed out. This is the one time in this case where the government has fully endorsed probation's recommended sentence.

But there are reasons for that recommendation. First, Mr. Gallagher concedes that he was a leader, and the Court has already and very appropriately applied the vulnerable victim enhancement. Second, the 20-month recommended sentence is a downward variance from the guideline sentences in this case. So the government is embracing probation's recommendation that a downward variance be applied because of Mr. Gallagher's age and

because of his health conditions.

But even in light of accepting those -- the application of those downward variances, 20 months is still the appropriate sentence.

I will note that this sentence fully takes into account that -- that downward variance for age and medical issues, and the Bureau of Prisons is capable of handling those issues. If he's allowed to self-report, which the government would not object to, there shouldn't be any issues with moving facilities that would create those same special hardships that Ms. Bell was talking about before. I recognize that it is the case that when inmates are transferred, their medications trail them. I don't know why BOP has that policy, but it does, and I recognize the hardship that creates for somebody who is on daily medication.

The 20 months is appropriate because but for Mr. Gallagher, but for Mr. Gallagher, this blockade would not have occurred. He was the architect of this blockade before it. You'll recall the trial testimony about his search history on the Internet, his communications in the weeks prior, looking at the Mount Juliet jail, and discussing who would be risking arrest. It was his e-mail address on the flyer Your Honor saw in pretrial hearings. "We are rescuers" was the handle.

And but for Mr. Gallagher, this blockade would not have lasted for nearly three hours. He directed it in real time. Time and time again in the video, exhibits at trial, he told other blockaders what to do, and he discussed stalling tactics he was using with the police.

And that last one is what concerns me about the law enforcement background. He leveraged his knowledge as a former law enforcement office and he wielded it against the officers of the Mount Juliet Police Department that day.

Your Honor saw firsthand Mr. Vaughn's witness at trial, Detective Watkins, the police negotiator. Detective Watkins was on that witness stand talking about the negotiations that he engaged in that day, and on cross-examination, he was learning for the first time that he had been played during those negotiations. He was unaware of the fact that Mr. Gallagher was intentionally engaged in stalling tactics along with Mr. Vaughn.

So in that sense, Mr. Gallagher's prior service as a police officer is a mitigator, but in the way he used it here in this blockade, is an aggravator.

And for Mr. Gallagher, this blockade was not just about blocking carafem for as long as possible. It was about reaching and motivating, soliciting really as many people as possible, via the Internet, to undertake blockades themselves.

Your Honor saw the video exhibits of the live streams of the blockade. And Mr. Gallagher's live stream in particular was basically a live how-to with instruction and advice for how to engage in a blockade effectively and safely. The government will concede that the purpose here was to be nonviolent.

Now, clearly, there is a need here to specifically deter Mr. Gallagher, but his efforts to encourage others to violate the FACE Act implicates general deterrence concerns as well. And those concerns weren't present for the other defendants in this case.

20 months is sufficient, but it's not more than necessary to address Mr. Gallagher's uniquely concerning role.

Now, Your Honor imposed a six-month term of incarceration on Mr. Zastrow, and in some ways, Mr. Zastrow was the most clearly culpable for the FACE violation since he verbalized his refusal to allow an employee access to the clinic, and was physically pushed out of the way by a police officer, if you'll recall the footage of Corporal Schneider coming down the hallway with a patient behind him.

But Mr. Gallagher was there standing near the patient entrance as Employee A was trying to reenter and part of the blockade that Patient A faced when she was attempting to go down that hallway. If you'll recall the

still photo from the exhibit where a blockader is crossing the hallway, Mr. Gallagher is there behind them.

Mr. Gallagher was also a key presence when Corporal Schneider attempted to escort the presumed patient down the hall. He said in that video, in response to Corporal Schneider's lawful order to move, "We can't do that."

After Schneider pushed past Mr. Gallagher once, Mr. Gallagher followed him and appeared to be prepared to move in front of him again but for things diffusing as a result of the patient deciding she was overwhelmed, intimidated, and returned back.

Now, again, Mr. Zastrow was also a leader, but Mr. Gallagher was the leader. But for him, this blockade would not have happened.

In addition to the requested term of incarceration, the government urges the Court to impose three years of supervised release consistent with the other defendants and consistent with the three years of probation that Judge Frensley has now imposed on all four misdemeanor defendants. To our knowledge, Mr. Gallagher has complied with his conditions of release and not committed new offenses, and three years of supervised release will help ensure that he continues that for the longest period possible.

As I said, this case has never been about Mr. Gallagher's views. It's about how he chose, on March 9th, 2021, and conspired with others to act on those views, not through lawful means at the ballot box or utilizing a judicial process, but through a criminal act that Mr. Gallagher knew violated distinct state and federal laws.

It's for all these reasons, the government submits, a sentence of 20 months' incarceration and three years of supervised release is appropriate.

Now, with respect to self-report, if Your Honor does allow for that, the government would request that the supervised release conditions that I expect Your Honor will impose also be applied as modifications to his conditions of release pending that self-report, such that the conditions of supervised release don't go into effect only after his release from custody, but go into effect as of today prior to his reporting.

Those would include specifically Your Honor's condition that you've imposed on the other defendants, that they stay 100 feet away from reproductive health care facilities. It did come up earlier today before Judge Frensley, the concern that a -- Mr. Gallagher or Ms. Edl might need to go to a health care facility for their own health care. We recommended -- and this was off the cuff,

so Your Honor may have better ideas than we came up with -- but a condition that Mr. Gallagher not willfully go to a reproductive health care facility for purposes other than his own personal medical care, such that he's not going to a hospital for his own medical condition and be a violation of that condition of probation, since a hospital emergency room, I think, would, by definition of reproductive health care, be a reproductive health care facility.

If Your Honor has any other questions, I'm happy to address those; otherwise, that's the government's position.

**THE COURT:** Thank you.

**MR. BOYNTON:** Thank you.

**MS. BELL:** I think Your Honor has heard everything. I mean, I would just emphasize again that Mr. Gallagher, he was law enforcement, and he was there and did have that experience and knowledge to ensure, to the best of his ability, that everything remain peaceful, nonviolent, so that the message could get across to people.

**THE COURT:** Okay.

**MS. BELL:** Thank you.

**THE COURT:** All right. The Court's obligation is to impose a sentence that is sufficient but not greater than necessary to comply with the purposes of the sentencing statute, taking into account the nature and circumstances of

the events and the history and characteristics of the defendant.

Mr. Gallagher was convicted, after a jury trial held in January of this year, of conspiring to obstruct access to a clinic providing reproductive health services over the course of February 10 through March 5 of '21 and a violation of the FACE Act on the day of the blockade.

Mr. Gallagher basically was the organizer of this event. He brought these people to his home county of Wilson County by promoting this blockade on social media. He coordinated travel. He functioned as the leader, questioning them about who is willing to stay and get arrested and so forth, and live-streamed a video of the blockade, basically teaching people how to do this. It was very much a teaching video.

So that's what the offense is, and this is a serious offense.

He has basically no criminal record. He has been engaging in this kind of protest at clinics since about 1988.

In terms of his personal background, he is 75. He has a bachelor's degree in criminal justice. He lives in Lebanon with his wife. He's retired. His entire career, until he gave it up for his beliefs, was law enforcement. He served in the Air Force for eight years.

And a law enforcement specialist sounds like an MP to me. Is that right?

**MS. BELL:** Yeah, he was an MP in the military, yes.

**THE COURT:** And then he was an MP in the Army National Guard from '82 to '86, and then worked as a -- he worked as a deputy sheriff in San Bernadino, California, and he was a motorcycle cop in Las Vegas for about ten years, and gave up that career when he found he was not willing to arrest people protesting at abortion clinics.

He apparently became an ordained minister in I don't know what church or what faith, but at any rate, in 1995.

He was born in Iowa. He has three surviving siblings, all of whom live in Iowa. He was raised middle class, raised a Catholic; claims that he became an agnostic as a teen and then became a Christian.

He has two children from a former marriage, both grown, and he's been married to his wife who is here today, Joann, for many years. And there are four grown children that she had.

He has lived mostly, before he came to Tennessee, in California and Las Vegas, and then engaged in a traveling ministry for a number of years, taking him many different places.

He has several health conditions, some of them rather serious. He's on medication for some of them. He's scheduled for a hip replacement in November and will need physical therapy after that for a number of months.

The government has agreed with the defendant that some variance downward for his age is appropriate. Indeed, he is 75. He is the oldest person charged in this offense, although I don't remember the ages of the misdemeanants before Judge Frensley.

Were any of them older than Mr. Gallagher?

**MR. BOYNTON:** Yes, Your Honor. Ms. Edl was 89. She was sentenced earlier today.

**THE COURT:** Oh, okay. Well, he's the oldest one before me.

And under 5H1.1 -- so I'm going to also -- I'm going to grant a variance under that. I'm also going to grant a variance under 5H1.4 for his physical condition.

The aggravating parts of this offense -- and I do want to say I am taking into account the victim statement made by Melissa Ashby, Patient A, during the Zastrow sentencing, and the victim statement read by Ms. Karnell representing carafem in the Vaughn sentencing. The government is asking me to take account of those, and I am taking account of those victim statements.

This -- the aggravating parts of this offense as

participated in by Mr. Gallagher are, I agree with the government: He has accepted his responsibility for a leadership role here, and he certainly had it. I agree that probably this would not have taken place in Mount Juliet without the leadership of Mr. Gallagher. He was the primary organizer.

He did utilize his law enforcement experience in the execution of the blockade and in the teaching about the blockade, about jollying along the police for as long as you possibly can, making them believe that you're cooperating and you're going to try to see that people leave that don't want to be arrested and so forth. The whole point is to prolong it as long as possible so you prevent as many people as possible from getting into the facility. And I view that as an aggravating factor.

The people here, including Mr. Gallagher, their religious fervor gives them permission to ignore the pain they are causing other people with their actions that violate the law. Fervently-held beliefs of this sort can be exercised and advanced in ways that do not violate the law, but these folks, including Mr. Gallagher, chose to advance their beliefs by violating the law.

They caused terror and pain to the people that were present: the people in the clinic, the employees, and people approaching the clinic.

Many patients, including Patient A, had traveled a good distance for an appointment. Even though this was nonviolent as opposed to, I believe it was, D.C. where there really was violence -- someone was injured and so forth -- this was nonviolent, and that may be thanks to Mr. Gallagher. But there was the risk of violence: the policeman that had to shove his way through in an effort to get the patient into the clinic and so forth. There was always the risk of violence with this kind of a blockade; the invasion of privacy by filming the people that were showing up for legitimate appointments at this clinic; the obstruction of business for the other medical offices that were in this building -- there were other medical offices that were not able to carry on business during the time of this -- during the time of this blockade.

The mitigating factors are that it was nonviolent as opposed to some of these other blockades. And the Court does not doubt the sincerity of the religious, Mr. Gallagher would perhaps say, scientific beliefs that they have that having an abortion at whatever stage is killing a baby.

But for all these reasons, the Court is going to sentence Mr. Gallagher to 16 months in the custody of the Bureau of Prisons to be followed by three years of supervised release.

I don't levy a fine because I find he's

financially unable to pay a fine. He must pay the $200 special assessment -- actually, it's not $200, is it? Is it 125?

**MS. GILKERSON:** 110, Your Honor.

**THE COURT:** Excuse me?

**MS. GILKERSON:** 110.

**THE COURT:** 110. The sentence is 16 months on Count 1 and six months with just the statutory maximum on Count 2 to run concurrently, and three years of supervised release on Count 1, and one year on Count 2, Ms. Testa?

**PROBATION OFFICER:** It's not applicable.

**THE COURT:** It's not applicable at all? Okay. Three years on Count 1.

**PROBATION OFFICER:** I'm sorry, Your Honor. You could do one year on Count 2.

**THE COURT:** I thought you could do one year. All right. One year on Count 2 to run concurrently.

I believe that this sentence will comport with all the purposes of federal sentencing. It will reflect the seriousness of the offense, promote respect for the law, be a just punishment. I don't think we need -- yes, we do need to protect the public from further crimes of this sort by this defendant. And given the legitimate variances, I do not believe it will result in unwarranted sentencing disparities.

The -- I will allow Mr. Gallagher to self-report, and I think I will put that date in February, but I would be amenable to postponing it if he has not been sentenced in Michigan. I would like to avoid him being transported all over the countryside.

**THE DEFENDANT:** Thank you, Your Honor.

**THE COURT:** Does the government object to that?

**MR. BOYNTON:** No, Your Honor.

**THE COURT:** All right. So the surgery --

**MS. BELL:** It's November 18th, Your Honor, and it's a --

I think you have your last appointment three months after; is that correct?

**THE DEFENDANT:** That's correct.

**THE COURT:** So it looks like late February.

**MS. BELL:** Yes, ma'am.

**THE COURT:** All right. I'll schedule this for Monday, February 24th, by 2:00; February 24th of '25 by 2:00. You are to report wherever the Bureau of Prisons has designated you to report, and your failure to report would be a criminal offense.

I will recommend FCI Forrest City Low.

Are there any other recommendations you want me to make?

**MS. BELL:** Not at this time, Your Honor.

**THE COURT:** All right.

And I will add: To the conditions of his release pending his report, I will add the condition that is recommended as a special condition of his supervised release, and it will also be a condition of his supervised release that he has, except for his own health care needs, he is not to -- he is prohibited from entering any building that contains a facility that provides reproductive health services occupying the curtilage of such building or being within 100 feet of such building without prior approval of the U.S. Probation Office.

Again, that is with the exception of his own health care needs.

**MS. BELL:** And, Your Honor, I think that that should be fine, but I -- I think that in Tennessee, I'm not sure that -- I think it's sort of a moot point now, isn't it? Or is it?

**THE COURT:** No, I don't think it is. I think an emergency room in Tennessee --

**MS. BELL:** I'm not sure.

**THE COURT:** -- provides reproductive health services. They may not do abortions except for the health of the mother, but --

**MS. BELL:** The point being that -- that Mr. Gallagher doesn't object to any other kind of

reproductive health services. So I don't -- I mean, he's happy to stay away, but he will be in and out of hospitals in Tennessee and in and out of doctors' appointments, so I just want to --

**THE COURT:** Well, he can do that under the way I've worded the condition.

**MS. BELL:** Okay.

**THE COURT:** So have you gone over the --

**MS. BELL:** Yes, we've gone over everything in the presentence report including --

**THE COURT:** -- standard and mandatory conditions?

**MS. BELL:** Yes. And I explained to him, too, that some of those standard conditions don't apply to him at all.

**THE COURT:** We will waive the drug testing condition --

**MS. BELL:** Okay.

**THE COURT:** -- on recommendation of the probation office.

Mr. Gallagher, you have the right to appeal. Any appeal must be filed within 14 days. You may apply to appeal under the pauper's oath, and the clerk will file your Notice of Appeal if you request the clerk to do so.

Does the government object to my variance?

**MR. BOYNTON:** No, Your Honor.

But one point of clarification, Your Honor, and I think it is a highly detailed technicality, but when Your Honor was discussing the 5H1.1 and 5H1.4 departures, I think Your Honor referred to them as variances, and we just ask for the record to clarify that those were departures. But no objection.

**THE COURT:** My misspeaking. Yes, they are departures, not variances. Yes.

Any objections by the defense not previously raised?

**MS. BELL:** No further objections.

**THE COURT:** All right. Is there anything else on this case from the government?

**MR. BOYNTON:** No, Your Honor.

**THE COURT:** Anything else from you?

**MS. BELL:** No, Your Honor.

**THE COURT:** All right. We're in recess.

(WHEREUPON, the foregoing proceedings were concluded at 3:48 p.m.)

REPORTER'S CERTIFICATE

I, Deborah K. Watson, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the stenotype shorthand machine the proceedings held in open court on September 26, 2024, in the matter of ***UNITED STATES OF AMERICA vs. CHESTER GALLAGHER***, Case No. 3:22-cr-00327-1;

That a transcript of the proceedings in connection with the hearing was reduced to typewritten form by me;

That the foregoing transcript (pages 1 through 53) is a true and accurate record of the proceedings to the best of my skills and abilities;

This the 7th day of December, 2024.

/s/ Deborah K. Watson
DEBORAH K. WATSON, RPR, CRR
Official Court Reporter